# 25-115

## 𝕌𝕟𝕚𝕥𝕖𝕕 𝕊𝕥𝕒𝕥𝕖𝕤 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 for the Second Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

BRUTUS TRADING, LLC,

*Relator-Appellant,*

v.

STANDARD CHARTERED BANK, STANDARD CHARTERED PLC,
STANDARD CHARTERED TRADE SERVICES CORPORATION,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
Volume I of II (Pages JA-1 - JA-286)

DAVIS POLK & WARDELL LLP
*Attorneys for Defendants-Appellees*
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
antonio.perez@dpw.com

AIDALA, BERTUNA & KAIMINS, P.C.
*Attorneys for Relator-Appellant*
546 Fifth Avenue, Suite 6
New York, NY 10036
(212) 486-0011
judgeleventhal@aidalalaw.com

MATTHEW PODOLSKY
ACTING UNITED STATES ATTORNEY
*Attorneys for Plaintiff-Appellee*
86 Chambers Street
New York, New York 10007
(212) 637-2717
jean-david.barnea@ussdoj.gov

**3194**


ELECTRONIC
PARALEGAL

i

# TABLE OF CONTENTS

Docket Entries ...............................................................................JA-1

Second Supplemental Declaration of Alexander Manfull,
Dated December 22, 2020 (ECF No. 75)......................................JA-21

Relator Brutus Trading LLC's Notice of Motion to Vacate
Final Judgment, Dated May 31, 2024 (ECF No. 101) ................JA-35

Relator Brutus Trading LLC's Supporting Declaration of
Patrick M. McSweeney, Dated May 31, 2024 (ECF No. 103)....................JA-37

    Exhibit A to McSweeney Declaration -
    Declaration of Matthew F. Komar, Dated November 21, 2019
    (ECF No. 103-1) .................................................................JA-39

    Exhibit B to McSweeney Declaration -
    Supplemental Declaration of Matthew F. Komar,
    Dated February 28, 2020 (ECF No. 103-2).......................JA-53

    Exhibit C to McSweeney Declaration -
    Declaration of Alexander Manfull, Dated November 21, 2019
    (ECF No. 103-3) .................................................................JA-58

    Exhibit D to McSweeney Declaration -
    Supplemental Declaration of Alexander Manfull,
    Dated February 28, 2020 (ECF No. 103-4).......................JA-80

    Exhibit E to McSweeney Declaration -
    Declaration of Patrick M. Bryan, Dated November 21, 2019
    (ECF No. 103-5) .................................................................JA-95

    Exhibit F to McSweeney Declaration -
    Declaration of Elizabeth Nochlin, Dated February 28, 2020
    (ECF No. 103-6) .................................................................JA-99

    Exhibit G to McSweeney Declaration -
    Second Supplemental Declaration of Matthew F. Komar,
    Dated December 22, 2020 (ECF No. 103-7)....................JA-105

ii

Exhibit H to McSweeney Declaration -
Third Supplemental Declaration of Matthew F. Komar,
Dated March 8, 2021 (ECF No. 103-8)...............................................JA-109

Exhibit I to McSweeney Declaration -
Third Supplemental Declaration of Alexander Manfull,
Dated December 22, 2020 (ECF No. 103-9)....................................JA-118

Exhibit J to McSweeney Declaration -
Third Supplemental Declaration of Alexander Manfull,
Dated February 28, 2020 (ECF No. 103-10)....................................JA-127

Exhibit K to McSweeney Declaration -
Filed Under Seal ..............................................................................JA-141

Relator Brutus Trading LLC's Supporting Declaration of
David J. Scantling, Dated May 20, 2024 (ECF No. 104) ........................JA-142

Exhibit A to Scantling Declaration -
Company Status Report of TAJC0 Ltd. (ECF No. 104-1)...............JA-179

Exhibit B to Scantling Declaration -
Company Status Report of Euro African Group Ltd.
(ECF No. 104-2) ................................................................................JA-183

Exhibit C to Scantling Declaration -
FRBNY's TAF Loan Data for Standard Chartered PLC
(ECF No. 104-3) ................................................................................JA-187

Exhibit D to Scantling Declaration -
Addendum: Detailed Technical Analysis (ECF No. 104-4).............JA-197

Relator Brutus Trading, LLC's Supporting Declaration of
Julian M. Knight, Dated May 20, 2024 (ECF No. 105) ...........................JA-233

Letter from Patrick M. McSweeney to Hon. Paul A. Engelmayer,
Dated May 31, 2024 (ECF No. 106) .........................................................JA-239

Order of Hon. Paul A. Engelmayer, Dated June 4, 2024
(ECF No. 107)............................................................................................JA-241

Letter from Patrick M. McSweeney to Hon. Paul A. Engelmayer,
Dated June 5, 2024 (ECF No. 108) ................................................JA-242

Letter from Patrick M. McSweeney to Hon. Paul A. Engelmayer,
Dated June 5, 2024 (ECF No. 109) ................................................JA-244

Letter from Jean-David Barnea to Hon. Paul A. Engelmayer,
Dated June 20, 2024 (ECF No. 110) ..............................................JA-246

Letter from Jean-David Barnea to Hon. Paul A. Engelmayer,
Dated June 20, 2024 (ECF No. 111) ..............................................JA-248

Letter from Patrick M. McSweeney to Hon. Paul A. Engelmayer,
Dated June 24, 2024 (ECF No. 112) ..............................................JA-249

Letter from Jean-David Barnea to Hon. Paul A. Engelmayer,
Dated June 24, 2024 (ECF No. 113) ..............................................JA-250

Letter from Patrick M. McSweeney to Hon. Paul A. Engelmayer,
Dated June 25, 2024 (ECF No. 114) ..............................................JA-251

Realtor Brutus Trading LLC's Notice of Motion to Disqualify,
Dated July 1, 2024 (ECF No. 115) ................................................JA-253

Realtor Brutus Trading LLC's Supporting Declaration of
Jullian M. Knight, Dated July 1, 2024 (ECF No. 115-2) ........................JA-255

Realtor Brutus Trading LLC's Supporting Declaration of
Robert Marcellus, Dated July 1, 2024 (ECF No. 115-3) ..........................JA-257

Realtor Brutus Trading LLC's Supporting Declaration of
Patrick M. McSweeney, Dated July 1, 2024 (ECF No. 115-4) ..................JA-259

    Exhibit A to McSweeney Declaration -
    E-Mail from David Koenigsberg to Bob Marcellus and
    Lynton Knight, Dated December 13, 2012 (ECF No. 115-4) ..........JA-261

    Exhibit B to McSweeney Declaration -
    E-Mail from David Koenigsberg to Bob Marcellus
    and Lynton Knight, Dated December 14, 2012 (ECF No. 115-4) ...JA-262

iv

Exhibit C to McSweeney Declaration -
E-Mail from Jean David Barnea to David Koenigsberg,
Dated December 1, 2012 (ECF No. 115-4) ......................................JA-263

Exhibit D to McSweeney Declaration -
Letter from Daniel S. Alter to H. Rodgin Cohen,
Dated December 20, 2012 (ECF No. 115-4) ....................................JA-264

Exhibit E to McSweeney Declaration -
E-Mail from Jean David Barnea to David Koenigsberg,
Dated December 2, 2012 (ECF No. 115-4) ......................................JA-267

Exhibit F to McSweeney Declaration -
E-Mail from David Koenigsberg to Lynton Knight and
Bob Marcellus, Dated January 3, 2013 (ECF No. 115-4) ...............JA-269

Exhibit G to McSweeney Declaration -
E-Mail from David Koenigsberg to Lynton Knight and
Bob Marcellus, Dated January 3, 2013 (ECF No. 115-4) ...............JA-271

Exhibit H to McSweeney Declaration -
Declaration of Matthew F. Komar, Dated November 21, 2019
(ECF No. 115-4) ..............................................................................JA-273

Exhibit I to McSweeney Declaration -
Letter from Jean-David Barnea to Hon. Paul A. Engelmayer,
Dated December 11, 2019 (ECF No. 115-4) ....................................JA-287

Exhibit J to McSweeney Declaration -
Declaration of Elizabeth Nochlin, Dated February 28, 2020
(ECF No. 115-4) ..............................................................................JA-291

Realtor Brutus Trading LLC's Notice of Motion to Appoint,
Dated July, 2024 (ECF No. 116) ................................................JA-297

Realtor Brutus Trading LLC's Supporting Declaration of
Jullian M. Knight, Dated July 1, 2024 (ECF No. 116-2) ..........................JA-299

Realtor Brutus Trading LLC's Supporting Declaration of
Robert Marcellus, Dated July 1, 2024 (ECF No. 116-3) ...........................JA-301

v

Realtor Brutus Trading LLC's Notice of Motion to
Disqualify, Dated July 1, 2024 (ECF No. 117) .........................................JA-303

Realtor Brutus Trading LLC's Supporting Declaration of
Patrick M. McSweeney, Dated July 1, 2024, with Exhibits
(Reproduced herein at pgs. JA-259-JA-296) ...............................................JA-305

Realtor Brutus Trading LLC's Supporting Declaration of
Patrick M. McSweeney, Dated July 1, 2024, with Exhibits
(Reproduced herein at pgs. JA-259-JA-296) ...............................................JA-305

Letter from Jean-David Barnea to Hon. Paul A. Engelmayer,
Dated July 5, 2024 (ECF No. 118) .............................................................JA-306

Realtor Brutus Trading LLC's Notice of Motion to Disqualify,
Dated July 1, 2024 (ECF No. 119) .............................................................JA-308

Realtor Brutus Trading LLC's Supporting Declaration of
Patrick M. McSweeney, Dated July 1, 2024, with Exhibits
(ECF No. 119)
(Reproduced herein at pgs. JA-259-JA-296) ...............................................JA-310

Order of Hon. Paul A. Engelmayer, Dated July 8, 2024 (ECF No. 120)..JA-311

Letter from Patrick M. McSweeney to Hon. Paul A. Engelmayer,
Dated June 24, 2024 (ECF No. 121) ...........................................................JA-313

Realtor Brutus Trading LLC's Notice of Motion to Appoint,
Dated July, 2024 (ECF No. 122) ................................................................JA-315

Declaration of Robert Marcellus, Dated July 1, 2024 (ECF No. 124)......JA-317

Declaration of Robert Marcellus, Dated July 1, 2024 (ECF No. 125)......JA-319

Declaration of Jullian M. Knight, Dated July 1, 2024 (ECF No. 126).....JA-321

Realtor Brutus Trading LLC's Notice of Motion to Disqualify,
Dated July 1, 2024 (ECF No. 127) .............................................................JA-323

Realtor Brutus Trading LLC's Supporting Declaration of
Patrick M. McSweeney, Dated July 1, 2024, with Exhibits (ECF No. 129)
(Reproduced herein at pgs. JA-259-JA-296) ...............................................JA-325

Letter from Jean-David Barnea to Hon. Paul A. Engelmayer,
Dated August 15, 2024 (ECF No. 135).......................................................JA-326

Letter from Jean-David Barnea to Hon. Paul A. Engelmayer,
Dated August 15, 2024 (ECF No. 136).......................................................JA-327

Letter from Patrick M. Sweeney to Hon. Paul A. Engelmayer,
Dated September 9, 2024 (ECF No. 138).....................................................JA-328

Letter from Patrick M. Sweeney to Hon. Paul A. Engelmayer,
Dated September 9, 2024 (ECF No. 139).....................................................JA-329

Letter from Patrick M. Sweeney to Hon. Paul A. Engelmayer,
Dated September 23, 2024 (ECF No. 140)...................................................JA-330

Letter from Patrick M. Sweeney to Hon. Paul A. Engelmayer,
Dated September 23, 2024 (ECF No. 141)...................................................JA-331

Notice of Appearance, Dated October 7, 2024 (ECF No. 143).................JA-332

Letter from Matthew A. Leish to Hon. Paul A. Engelmayer,
Dated October 7, 2024 (ECF No. 144).........................................................JA-333

Rule 7.1 Disclosure Statement, Dated October 7, 2024 (ECF No. 145)...JA-334

Letter from Matthew A. Leish to Hon. Paul A. Engelmayer,
Dated October 7, 2024 (ECF No. 146).........................................................JA-337

Letter from Antonio J. Perez-Marques to Hon. Paul A. Engelmayer,
Dated October 9, 2024 (ECF No. 147).........................................................JA-340

Letter from Antonio J. Perez-Marques to Hon. Paul A. Engelmayer,
Dated October 9, 2024 (ECF No. 148).........................................................JA-341

Letter from Jean-David Barnea to Hon. Paul A. Engelmayer,
Dated October 25, 2024 (ECF No. 149)......................................................JA-342

Letter from Patrick M. McSweeney to Hon. Paul A. Engelmayer,
Dated October 25, 2024 (ECF No. 150)......................................................JA-343

Letter from Antonio J. Perez-Marques to Hon. Paul A. Engelmayer,
Dated October 25, 2024 (ECF No. 151)......................................................JA-346

Letter from Patrick M. McSweeney to Hon. Paul A. Engelmayer,
Dated October 28, 2024 (ECF No. 152).......................................JA-350

Order of Hon. Paul A. Engelmayer, Dated October 28, 2024
(ECF No. 153).................................................................................JA-351

Letter from Patrick M. McSweeney to Hon. Paul A. Engelmayer,
Dated October 28, 2024 (ECF No. 154).......................................JA-352

Letter from Matthew Kassel to Hon. Paul A. Engelmayer,
Dated October 25, 2024 (ECF No. 155).......................................JA-353

Letter from Sarah Chakales to Hon. Paul A. Engelmayer,
Dated October 25, 2024 (ECF No. 156).......................................JA-354

Second Amended Complaint, Dated September 20, 2019
(ECF No. 22-1) ...............................................................................JA-355

     Exhibit A to Second Amended Complaint -
     Deferred Prosecution Agreement, Dated December 7, 2012
     (ECF No. 22-2) ...............................................................JA-379

     Exhibit B to Second Amended Complaint -
     Amended Deferred Prosecution Agreement, Dated April 8, 2019
     (ECF No. 22-3) ...............................................................JA-437

     Exhibit C to Second Amended Complaint -
     Indictment, Dated
     (ECF No. 22-4) ...............................................................JA-529

Opinion and Order of Hon. Paul A. Engelmayer,
Dated August 12, 2024 (ECF No. 134).......................................JA-540

Opinion and Order of Hon. Paul A. Engelmayer,
Dated November 13, 2024, Appealed From (ECF No. 157).....................JA-552

Realtor Brutus Trading LLC's Notice of Appeal,
Dated January 13, 2025 (ECF No. 159).......................................JA-563

**Query**   **Reports**   **Utilities**   **Help**   **Log Out**

CLOSED,APPEAL,ECF

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CIVIL DOCKET FOR CASE #: 1:18-cv-11117-PAE**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al. | Date Filed: 11/29/2018 |
| Assigned to: Judge Paul A. Engelmayer | Date Terminated: 07/02/2020 |
| Related Case: 1:19-cv-11739-PAE | Jury Demand: Plaintiff |
| Case in other court: U.S. Court of Appeals, 2nd Circ., 20-02578 | Nature of Suit: 376 Qui Tam (31 U.S.C. § 3729(a)) |
| Cause: 31:3729 False Claims Act | Jurisdiction: Federal Question |

**Plaintiff**

**ABC**
*TERMINATED: 07/10/2019*

**Plaintiff**

**United States of America**                represented by   **Jean-David Barnea**
U.S. Attorney's Office, SDNY (Chambers Street)
86 Chambers Street
New York, NY 10007
(212) 637-2679
Fax: (212) 637-2717
Email: jean-david.barnea@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick M McSweeney**
Patrick M. McSweeney, Attorney at Law
3358 John Tree Hill Road
Powhatan, VA 23139
804-937-0895
Email: patrick@mck-lawyers.com
*ATTORNEY TO BE NOTICED*

**Robert J. Cynkar**
McSweeney Cynkar & Kachouroff PLLC
10506 Milkweed Drive
Great Falls, VA 22066
703-621-3300
Email: rcynkar@mck-lawyers.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brutus Trading, LLC**                represented by   **David A. Koenigsberg**
Menz Bonner Komar & Koenigsberg L.L.P.
One N. Lexington Ave, Suite 1550

White Plains, NY 10601
(914)-949-0222
Fax: (914)-997-4117
Email: dkoenigsberg@mbklawyers.com
*TERMINATED: 08/07/2019*

**Patrick M McSweeney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert J. Cynkar**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DEF**
*TERMINATED: 07/10/2019*

**Defendant**

**Standard Chartered Bank**            represented by  **Antonio Jorge Perez-Marques**
                                                        Davis Polk & Wardwell LLP (NYC)
                                                        450 Lexington Avenue
                                                        New York, NY 10017
                                                        (212)-450-4559
                                                        Fax: (2122)-450-3559
                                                        Email: antonio.perez@dpw.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Standard Chartered PLC**            represented by  **Antonio Jorge Perez-Marques**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Standard Chartered Trade Services**  represented by  **Antonio Jorge Perez-Marques**
**Corporation**                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Interested Party**

**NYS Department of Financial Services**

**Interested Party**

**Times Media Limited**            represented by  **Matthew Aaron Leish**
                                                    Miller Korzenik Sommers Rayman LLP
                                                    The Paramount Building
                                                    1501 Broadway
                                                    Suite 2015
                                                    New York, NY 10036

**[JA-3]**

212-752-9200
Email: matthew.leish@klarislaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/29/2018 | | Magistrate Judge James L. Cott is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: http://nysd.uscourts.gov/forms.php. (mhe) (Entered: 11/29/2018) |
| 11/29/2018 | 1 | SEALED DOCUMENT placed in vault.(mhe) (Entered: 11/29/2018) |
| 01/02/2019 | 2 | SEALED DOCUMENT placed in vault.(mhe) (Entered: 01/02/2019) |
| 07/10/2019 | 3 | ORDER IT IS HEREBY ORDERED THAT: The complaint shall be unsealed 30 days after entry of this Order.All documents previously filed in this action shall remain under seal and not be made public, except for, 30 days after the date of entry of this Order, plaintiff-relator's qui tam complaint, this Order, and the United States' Notice of Election to Decline Intervention.SO ORDERED (Signed by Judge Paul A. Engelmayer on 3/20/19) (rz) (Entered: 07/11/2019) |
| 07/10/2019 | 4 | COMPLAINT against STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED TRADE SERVICES CORPORATION. Document filed by BRUTUS TRADING, LLC. This document was previously filed under in envelope document no. 1. (rjm) (Entered: 07/11/2019) |
| 07/10/2019 | 5 | CIVIL COVER SHEET. This document was previously filed under in envelope document no. 1. (rjm) (Entered: 07/11/2019) |
| 07/10/2019 | 6 | RULE 7.1 STATEMENT. No Corporate Parent. Document filed by BRUTUS TRADING, LLC. This document was previously filed under in envelope document no. 1. (rjm) (Entered: 07/11/2019) |
| 07/12/2019 | 7 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Robert J. Cynkar to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17238181. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by BRUTUS TRADING, LLC. (Attachments: # 1 Affidavit, # 2 Exhibit, # 3 Text of Proposed Order)(Cynkar, Robert) Modified on 7/15/2019 (wb). (Entered: 07/12/2019) |
| 07/15/2019 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 7 MOTION for Robert J. Cynkar to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17238181. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of Virginia;. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (wb)** (Entered: 07/15/2019) |
| 07/15/2019 | 8 | **FILING ERROR - DEFICIENT DOCKET ENTRY -** MOTION for Robert J. Cynkar to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by BRUTUS TRADING, LLC. (Attachments: # 1 Declaration in support, # 2 Certificate of Good Standing, # 3 Proposed Order)(Cynkar, Robert) Modified on 7/15/2019 (wb). (Entered: 07/15/2019) |

| 07/15/2019 | | >>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE-FILE Document No. 8 MOTION for Robert J. Cynkar to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff… The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of Virginia, NOT THE STATE BAR OF VIRGINIA. Re-file the motion as a Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (wb) (Entered: 07/15/2019) |
|---|---|---|
| 07/16/2019 | 9 | MOTION for Robert J. Cynkar to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by BRUTUS TRADING, LLC. (Attachments: # 1 Declaration in Support of Motion, # 2 Cert. of Good Standing from Va. Supreme Court, # 3 Proposed Order)(Cynkar, Robert) (Entered: 07/16/2019) |
| 07/16/2019 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 9 MOTION for Robert J. Cynkar to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (jc) (Entered: 07/16/2019) |
| 07/17/2019 | 10 | ORDER FOR ADMISSION PRO HAC VICE: granting 9 Motion for Robert J. Cynkar to Appear Pro Hac Vice. (Signed by Judge Paul A. Engelmayer on 7/17/2019) (ama) (Entered: 07/17/2019) |
| 07/17/2019 | 11 | MOTION for Patrick Michael McSweeney to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17261667. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by BRUTUS TRADING, LLC. (Attachments: # 1 Letter to clerk, # 2 Declaration of counsel, # 3 Va. Sup. Ct. certificate, # 4 Order of Admission pro hac vice)(McSweeney, Patrick) (Entered: 07/17/2019) |
| 07/17/2019 | 12 | PROPOSED ORDER FOR SUBSTITUTION OF ATTORNEY. Document filed by BRUTUS TRADING, LLC. (Koenigsberg, David) (Entered: 07/17/2019) |
| 07/18/2019 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 11 MOTION for Patrick Michael McSweeney to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-17261667. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb) (Entered: 07/18/2019) |
| 07/18/2019 | 13 | FILING ERROR - DEFICIENT PLEADING - FILER ERROR - FIRST AMENDED COMPLAINT amending 4 Complaint against STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED TRADE SERVICES CORPORATION with JURY DEMAND.Document filed by BRUTUS TRADING, LLC. Related document: 4 Complaint. (Attachments: # 1 Exhibit 2012 Deferred Prosecution Agreement, # 2 Exhibit 2019 Deferred Prosecution Agreement)(Cynkar, Robert) Modified on 7/19/2019 (jgo). (Entered: 07/18/2019) |
| 07/18/2019 | 14 | ORDER FOR ADMISSION PRO HAC VICE granting 11 Motion for Patrick M. McSweeney to Appear Pro Hac Vice. (Signed by Judge Paul A. Engelmayer on 7/18/2019) (anc) (Entered: 07/18/2019) |
| 07/19/2019 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Robert J. Cynkar to RE-FILE Document No. 13 Amended Complaint,. The filing is deficient for the following reason(s): all of the filers were not selected for the pleading. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the |

| | | |
|---|---|---|
| | | correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. (jgo) (Entered: 07/19/2019) |
| 07/19/2019 | 15 | FIRST AMENDED COMPLAINT amending 4 Complaint, 13 Amended Complaint, against STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED TRADE SERVICES CORPORATION with JURY DEMAND.Document filed by BRUTUS TRADING, LLC, UNITED STATES OF AMERICA. Related document: 4 Complaint, 13 Amended Complaint,. (Attachments: # 1 Exhibit 2012 Deferred Prosecution Agreement, # 2 Exhibit 2019 Deferred Prosecution Agreement)(Cynkar, Robert) (Entered: 07/19/2019) |
| 07/20/2019 | 16 | PROPOSED STIPULATION AND ORDER. Document filed by BRUTUS TRADING, LLC. (Cynkar, Robert) (Entered: 07/20/2019) |
| 07/22/2019 | 17 | STIPULATION AND ORDER EXTENDING TIME TO ANSWER, MOVE OR OTHERWISE RESPOND TO THE COMPLAINT AND TO STAY DISCOVERY: THE PARTIES HEREBY STIPULATE AND AGREE, through their respective counsel, subject to the approval of the Court, as follows: 1. Defendants' counsel agrees to accept service of the Amended Complaint on Defendants' behalf, but each Defendant expressly reserves all rights, defenses, or other objections (other than insufficient process or insufficient service of process); 2. Defendants shall file their motion to dismiss or otherwise respond to the Amended Complaint by September 27, 2019; 3. Plaintiff shall file its opposition to Defendants' motion to dismiss by November 15, 2019; 4. Defendants shall file their reply to Plaintiffs opposition by December 17, 2019; 5. Plaintiff and Defendants agree to stay all disclosures and discovery in this action until the Court rules on the motion to dismiss to be filed by Defendants. IT IS SO ORDERED. (STANDARD CHARTERED BANK answer due 9/27/2019; STANDARD CHARTERED PLC answer due 9/27/2019; STANDARD CHARTERED TRADE SERVICES CORPORATION answer due 9/27/2019. Motions due by 9/27/2019. Responses due by 11/15/2019. Replies due by 12/17/2019.) (Signed by Judge Paul A. Engelmayer on 7/22/2019) (anc) (Entered: 07/22/2019) |
| 07/22/2019 | | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Robert J. Cynkar. The party information for the following party/parties has been modified: Standard Chartered Bank; Standard Chartered PLC; Standard Chartered Trade Services Corporation; Brutus Trading, LLC. The information for the party/parties has been modified for the following reason/reasons: party name was entered in all caps. (sj) (Entered: 07/22/2019) |
| 07/29/2019 | 18 | FILING ERROR - DEFICIENT PLEADING - FILED AGAINST PARTY ERROR - SECOND AMENDED COMPLAINT amending 15 Amended Complaint, against Brutus Trading, LLC, United States of America with JURY DEMAND.Document filed by Brutus Trading, LLC, United States of America. Related document: 15 Amended Complaint,. (Attachments: # 1 Exhibit 2012 Deferred Prosecution Agreement, # 2 Exhibit 2019 Deferred Prosecution Agreement, # 3 Exhibit Elyassi Indictment)(McSweeney, Patrick) Modified on 7/30/2019 (pc). (Entered: 07/29/2019) |
| 07/30/2019 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Patrick M McSweeney to RE-FILE re: Document No. 18 Amended Complaint,,. The filing is deficient for the following reason(s): the wrong party/parties the pleading is against were selected; Court's leave has not been granted. Re-file the pleading using the event type Amended Complaint found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. File the Exhibit to Pleading event found under |

| | | |
|---|---|---|
| | | the event list Other Documents and attach either opposing party's written consent or Court's leave. (pc) (Entered: 07/30/2019) |
| 08/07/2019 | 19 | CONSENT ORDER GRANTING SUBSTITUTION OF ATTORNEY: Notice is hereby given that, subject to approval by the court, BRUTUS TRADING, LLC substitutes ROBERT J. CYNKAR, Pro Hac Vice, as counsel of record in place of DAVID A. KOENIGSBERG. Attorney Robert J. Cynkar for Brutus Trading, LLC added. Attorney David A. Koenigsberg terminated. (Signed by Judge Paul A. Engelmayer on 8/7/2019) (mro) (Entered: 08/07/2019) |
| 08/28/2019 | 20 | LETTER addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 8/28/19 re: Government Motion to Dismiss. Document filed by United States of America. (Barnea, Jean-David) (Entered: 08/28/2019) |
| 08/29/2019 | 21 | MEMO ENDORSEMENT on re: 20 Letter filed by United States of America. ENDORSEMENT: Granted. The Court hereby adjourns the briefing schedule for defendants' motion to dismiss and sets the following schedule for the Government's motion to dismiss: Government's motion to dismiss is due October 31, 2019; realtor's opposition is due December 13, 2019; and Government's reply is due January 13, 2020. SO ORDERED. (Motions due by 10/31/2019, Responses due by 12/13/2019, Replies due by 1/13/2020.) (Signed by Judge Paul A. Engelmayer on 8/29/2019) (jca) (Entered: 08/29/2019) |
| 09/20/2019 | 22 | **FILING ERROR - DEFICIENT DOCKET ENTRY** - MOTION to Amend/Correct *Complaint*. Document filed by Brutus Trading, LLC. (Attachments: # 1 Amended complaint, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Memorandum in support, # 6 Affidavit Declaration)(McSweeney, Patrick) Modified on 12/5/2019 (db). (Entered: 09/20/2019) |
| 09/23/2019 | 23 | MEMO ENDORSEMENT granting 22 Motion to Amend/Correct. ENDORSEMENT: Granted. The Court accepts filing of the Second Amended Complaint. The briefing schedule set out at Dkt. 21 remains in effect: Government's motion to dismiss is due October 31, 2019; realtor's opposition is due December 13, 2019; and Government's reply is due January 13, 2020. (Signed by Judge Paul A. Engelmayer on 9/20/2019) (rro) (Entered: 09/23/2019) |
| 09/23/2019 | | Set/Reset Deadlines: Motions due by 10/31/2019. Responses due by 12/13/2019 Replies due by 1/13/2020. (rro) (Entered: 09/23/2019) |
| 10/24/2019 | 24 | LETTER MOTION for Extension of Time to File *Motion to Dismiss and to Unseal Original Qui Tam Complaint* addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 10/24/19. Document filed by United States of America.(Barnea, Jean-David) (Entered: 10/24/2019) |
| 10/25/2019 | 25 | ORDER granting 24 Letter Motion for Extension of Time to File. The Court grants the motion for additional time and adopts the jointly proposed briefing schedule. The Government shall file its motion to dismiss on November 21, 2019, the relator will file its opposition on January 10, 2020, and the Government will file its reply on February 7, 2020. As to the parties' request to unseal the relator's original complaint in 12-cv-9160, the Court is amenable to doing so but requests that the parties provide the specific ECF document number to be unsealed and the date that it was filed. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 10/25/2019) (kv) (Entered: 10/25/2019) |
| 10/25/2019 | | Set/Reset Deadlines: Motions due by 11/21/2019. Responses due by 1/10/2020 Replies due by 2/7/2020. (kv) (Entered: 10/25/2019) |
| 10/28/2019 | 26 | LETTER addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 10/28/19 re: Unsealing Qui Tam Complaint. Document filed by United States of America. |

| | | (Barnea, Jean-David) (Entered: 10/28/2019) |
|---|---|---|
| 10/28/2019 | 27 | MEMO ENDORSEMENT on re: 26 Letter filed by United States of America. ENDORSEMENT: The Clerk of Court is respectfully directed to unseal the original complaint, filed on December 17, 2012, in the related (and now closed) matter: 12-cv-9160 (KBF). (Signed by Judge Paul A. Engelmayer on 10/28/2019) (jwh) Transmission to Sealed Records Clerk for processing. (Entered: 10/28/2019) |
| 11/18/2019 | 28 | LETTER MOTION for Leave to File Excess Pages *in Motion to Dismiss* addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 11/18/19. Document filed by United States of America.(Barnea, Jean-David) (Entered: 11/18/2019) |
| 11/19/2019 | 29 | ORDER granting 28 Letter Motion for Leave to File Excess Pages: Granted. (Signed by Judge Paul A. Engelmayer on 11/19/2019) (jwh) (Entered: 11/19/2019) |
| 11/21/2019 | 30 | MOTION to Dismiss *Relator's Second Amended Complaint*. Document filed by United States of America.(Barnea, Jean-David) (Entered: 11/21/2019) |
| 11/21/2019 | 31 | MEMORANDUM OF LAW in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint*. . Document filed by United States of America. (Barnea, Jean-David) (Entered: 11/21/2019) |
| 11/21/2019 | 32 | DECLARATION of FBI Special Agent Matthew F. Komar in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint*.. Document filed by United States of America. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Barnea, Jean-David) (Entered: 11/21/2019) |
| 11/21/2019 | 33 | DECLARATION of FBI Special Agent Wayne C. Boddy in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint*.. Document filed by United States of America. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Barnea, Jean-David) (Entered: 11/21/2019) |
| 11/21/2019 | 34 | DECLARATION of Alexandre Manfull (OFAC) in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint*.. Document filed by United States of America. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Barnea, Jean-David) (Entered: 11/21/2019) |
| 11/21/2019 | 35 | DECLARATION of Patrick M. Bryan, Board of Governors of Federal Reserve System in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint*.. Document filed by United States of America. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Barnea, Jean-David) (Entered: 11/21/2019) |
| 12/03/2019 | 36 | LETTER MOTION for Discovery addressed to Judge Paul A. Engelmayer from Patrick M.McSweeney dated December 3, 2019. Document filed by Brutus Trading, LLC. (McSweeney, Patrick) (Entered: 12/03/2019) |
| 12/06/2019 | 37 | LETTER addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 12/6/19 re: Timing of Response to Relator's Request to Take a Deposition. Document filed by United States of America.(Barnea, Jean-David) (Entered: 12/06/2019) |
| 12/09/2019 | 38 | MEMO ENDORSEMENT on re: 37 Letter. ENDORSEMENT: After reviewing Relator's submission, Dkt. 36, the Court concludes that it would benefit from the views of the Government and DFS before ruling on Relator's request. The Court therefore construes the Government's letter as a motion for an extension of time to respond, which it grants nunc pro tunc. The Government is reminded that the procedure for discovery disputes is outlined in the Court's individual rules, which require a response within 3 business days absent a request for more time. The letters in opposition are due by December 11, 2019. (Set Deadlines/Hearing as to 36 LETTER MOTION for Discovery: Responses due by |

| | | |
|---|---|---|
| | | 12/11/2019) (Signed by Judge Paul A. Engelmayer on 12/9/2019) (jwh) (Entered: 12/09/2019) |
| 12/11/2019 | 39 | LETTER addressed to Judge Paul A. Engelmayer from Kevin J. Bishop dated December 11, 2019 re: Opposition to Discovery Request. Document filed by NYS Department of Financial Services.(Bishop, Kevin) (Entered: 12/11/2019) |
| 12/11/2019 | 40 | LETTER addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 12/11/19 re: Request for Deposition. Document filed by United States of America. (Attachments: # 1 Exhibit, # 2 Exhibit)(Barnea, Jean-David) (Entered: 12/11/2019) |
| 12/11/2019 | 41 | NOTICE OF APPEARANCE by Antonio Jorge Perez-Marques on behalf of Standard Chartered Bank, Standard Chartered PLC, Standard Chartered Trade Services Corporation. (Perez-Marques, Antonio) (Entered: 12/11/2019) |
| 12/11/2019 | 42 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate Standard Chartered PLC, Other Affiliate Standard Chartered Holdings Limited for Standard Chartered Bank; Other Affiliate Standard Chartered Bank, Other Affiliate Standard Chartered Holdings, Inc. for Standard Chartered Trade Services Corporation. Document filed by Standard Chartered Bank, Standard Chartered PLC, Standard Chartered Trade Services Corporation.(Perez-Marques, Antonio) (Entered: 12/11/2019) |
| 12/11/2019 | 43 | LETTER addressed to Judge Paul A. Engelmayer from Antonio J. Perez-Marques dated December 11, 2019 re: Request for Deposition. Document filed by Standard Chartered Bank, Standard Chartered PLC, Standard Chartered Trade Services Corporation.(Perez-Marques, Antonio) (Entered: 12/11/2019) |
| 12/12/2019 | 44 | FIRST LETTER MOTION for Leave to File Letter motion addressed to Judge Paul A. Engelmayer from Patrick M.McSweeney dated December 12, 2019. Document filed by Brutus Trading, LLC.(McSweeney, Patrick) (Entered: 12/12/2019) |
| 12/12/2019 | 45 | ORDER granting 44 Letter Motion for Leave to File Document: The relator's request to file a consolidated reply by December 16, 2019, is granted. (Signed by Judge Paul A. Engelmayer on 12/12/2019) (jwh) (Entered: 12/12/2019) |
| 12/12/2019 | | Set/Reset Deadlines as to 36 LETTER MOTION for Discovery: Replies due by 12/16/2019. (jwh) (Entered: 12/12/2019) |
| 12/16/2019 | 46 | SECOND LETTER MOTION for Discovery addressed to Judge Paul A. Engelmayer from Patrick M.McSweeney dated December 16, 2019. Document filed by Brutus Trading, LLC. (Attachments: # 1 Exhibit, # 2 Exhibit)(McSweeney, Patrick) (Entered: 12/16/2019) |
| 12/23/2019 | 47 | ORDER denying without prejudice 36 Letter Motion for Discovery. The Court need notand, to be clear, does not in this Order resolving Relator's motion to depose Mr. Alterdecide the applicable standard of review for the United States' motion to dismiss Relators complaint. That is because Relator has not shown how the testimony of Mr. Alter, to the extent it concerns non-privileged material, is warranted or appropriate on a motion to dismiss. Even under the more demanding standard, the Court can resolve, without Mr. Alter's testimony, whether there is a basis to contend that the governments proffered rationale for dismissing the complaint is "fraudulent, arbitrary and capricious, or illegal." Sequoia Orange Co., 151 F.3d at 1145. A deposition of Mr. Alter is simply not necessary at this stage of the litigation. Relator's motion to depose Mr. Alter is therefore denied, without prejudice to Relator renewing its application if the complaint survives the United States' motion to dismiss. The Clerk of Court is respectfully directed to terminate the motion pending at docket 36. (And as further set forth herein.) SO ORDERED.. (Signed by Judge Paul A. Engelmayer on 12/23/2019) (jca) (Entered: 12/23/2019) |

| 01/10/2020 | 48 | **FILING ERROR - DEFICIENT DOCKET ENTRY (SEE DOCUMENT #49) -** MEMORANDUM OF LAW in Opposition re: 30 MOTION to Dismiss *Relator's Second Amended Complaint.* . Document filed by Brutus Trading, LLC. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit) (McSweeney, Patrick) Modified on 1/23/2020 (ldi). (Entered: 01/10/2020) |
| 01/22/2020 | 49 | RESPONSE in Opposition to Motion re: 30 MOTION to Dismiss *Relator's Second Amended Complaint. [corrected].* Document filed by Brutus Trading, LLC. (McSweeney, Patrick) (Entered: 01/22/2020) |
| 01/30/2020 | 50 | LETTER MOTION for Extension of Time to File Response/Reply as to 30 MOTION to Dismiss *Relator's Second Amended Complaint.*, 49 Response in Opposition to Motion addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 1/30/20. Document filed by United States of America.(Barnea, Jean-David) (Entered: 01/30/2020) |
| 01/31/2020 | 51 | ORDER granting 50 Letter Motion for Extension of Time to File Response/Reply re 30 MOTION to Dismiss: Granted. (Replies due by 2/28/2020.) (Signed by Judge Paul A. Engelmayer on 1/31/2020) (jwh) (Entered: 01/31/2020) |
| 02/25/2020 | 52 | LETTER MOTION for Leave to File Excess Pages *for Reply Brief* addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 2/25/20. Document filed by United States of America..(Barnea, Jean-David) (Entered: 02/25/2020) |
| 02/25/2020 | 53 | ORDER granting 52 Letter Motion for Leave to File Excess Pages. The request to file a reply brief not to exceed 15 pages is granted. Counsel is urged not to use more pages than is necessary. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 2/25/2020) (rj) (Entered: 02/26/2020) |
| 02/28/2020 | 54 | REPLY MEMORANDUM OF LAW in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint.* . Document filed by United States of America..(Barnea, Jean-David) (Entered: 02/28/2020) |
| 02/28/2020 | 55 | REPLY AFFIRMATION of FBI Special Agent Matthew F. Komar in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint..* Document filed by United States of America..(Barnea, Jean-David) (Entered: 02/28/2020) |
| 02/28/2020 | 56 | REPLY AFFIRMATION of FBI Special Agent Wayne C. Boddy in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint..* Document filed by United States of America. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Barnea, Jean-David) (Entered: 02/28/2020) |
| 02/28/2020 | 57 | REPLY AFFIRMATION of Alexandre Manfull (OFAC) in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint..* Document filed by United States of America..(Barnea, Jean-David) (Entered: 02/28/2020) |
| 02/28/2020 | 58 | REPLY AFFIRMATION of Elizabeth Nochlin (DFS) in Support re: 30 MOTION to Dismiss *Relator's Second Amended Complaint..* Document filed by United States of America. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4). (Barnea, Jean-David) (Entered: 02/28/2020) |
| 03/02/2020 | 59 | LETTER MOTION for Leave to File Sur-reply addressed to Judge Paul A. Engelmayer from Patrick M. McSweeney dated 03/02/2020. Document filed by Brutus Trading, LLC.. (McSweeney, Patrick) (Entered: 03/02/2020) |
| 03/05/2020 | 60 | ORDER: granting 59 Letter Motion for Leave to File Document. Granted. Relator may file a brief sur-reply by March 13, 2020. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 3/05/2020) (ama) (Entered: 03/05/2020) |

| 03/05/2020 | | Set/Reset Deadlines: Surreplies due by 3/13/2020. (ama) (Entered: 03/05/2020) |
|---|---|---|
| 03/13/2020 | 61 | REPLY MEMORANDUM OF LAW in Opposition re: 30 MOTION to Dismiss *Relator's Second Amended Complaint*. . Document filed by Brutus Trading, LLC. (Attachments: # 1 Exhibit SCB bulletin 10-23-08, # 2 Exhibit Relator's disclosure statement, # 3 Exhibit Letter to AUSA, # 4 Exhibit Master List, # 5 Exhibit Koenigsberg Declaration, # 6 Exhibit Marcellus Supp. Declaration).(McSweeney, Patrick) (Entered: 03/13/2020) |
| 07/02/2020 | 62 | OPINION & ORDER re: 30 MOTION to Dismiss *Relator's Second Amended Complaint*: For the reasons stated above, the Court finds that at least two of the reasons proffered by the Government in support of dismissal qualify as "valid government purpose[s]" and that the Government has articulated "a rational relation between dismissal and accomplishment of th[ose] purpose[s]." Sequoia Orange, 151 F.3d at 1145. The Court further finds that relator has not carried its burden of showing that either, let alone both, of these reasons "is fraudulent, arbitrary and capricious, or illegal." Id. The Court therefore grants the Government's motion to dismiss the Second Amended Complaint. The Clerk of Court is respectfully directed to terminate the motion pending at docket 30 and close this case. (Signed by Judge Paul A. Engelmayer on 7/2/2020) (jwh) Transmission to Orders and Judgments Clerk for processing. (Entered: 07/02/2020) |
| 07/02/2020 | 63 | CLERK'S JUDGMENT re: 62 Memorandum & Opinion in favor of United States of America against Standard Chartered Bank, Standard Chartered PLC, Standard Chartered Trade Services Corporation. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion & Order dated July 2, 2020, the Court finds that at least two of the reasons proffered by the Government in support of dismissal qualify as "valid government purpose[s]" and that the Government has articulated "a rational relation between dismissal and accomplishment of th[ose] purpose[s]." Sequoia Orange, 151 F.3d at 1145. The Court further finds that relator has not carried its burden of showing that either, let alone both, of these reasons "is fraudulent, arbitrary and capricious, or illegal." Id. The Government's motion to dismiss the Second Amended Complaint is granted; accordingly, this case is closed. (Signed by Clerk of Court Ruby Krajick on 7/2/2020) (Attachments: # 1 Right to Appeal) (km) (Entered: 07/02/2020) |
| 07/31/2020 | 64 | **FILING ERROR - NO ORDER SELECTED FOR APPEAL - NOTICE OF APPEAL.** Document filed by Brutus Trading, LLC. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (McSweeney, Patrick) Modified on 7/31/2020 (tp). (Entered: 07/31/2020) |
| 07/31/2020 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney McSweeney, Patrick to RE-FILE Document No. 64 Notice of Appeal. The filing is deficient for the following reason(s): the order/judgment being appealed was not selected. Re-file the appeal using the event type *Corrected Notice of Appeal* found under the event list Appeal Documents - attach the correct signed PDF - select the correct named filer/filers - select the correct order/judgment being appealed. (tp) (Entered: 07/31/2020) |
| 08/03/2020 | 65 | **FILING ERROR - NO ORDER SELECTED FOR APPEAL - CORRECTED** NOTICE OF APPEAL re: 64 Notice of Appeal,. Document filed by Brutus Trading, LLC. (McSweeney, Patrick) Modified on 8/3/2020 (tp). (Entered: 08/03/2020) |
| 08/03/2020 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney McSweeney, Patrick to RE-FILE Document No. 65 Corrected Notice of Appeal. The filing is deficient for the following reason(s): the order/judgment being appealed was not selected. Re-file the appeal using the event type *Corrected Notice of Appeal* found under the event list Appeal Documents - attach the correct signed PDF |

| | | - select the correct named filer/filers - select the correct order/judgment being appealed. (tp) (Entered: 08/03/2020) |
|---|---|---|
| 08/03/2020 | 66 | CORRECTED NOTICE OF APPEAL re: 64 Notice of Appeal, 62 Memorandum & Opinion,,,. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 08/03/2020) |
| 08/03/2020 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 66 Corrected Notice of Appeal. (tp) (Entered: 08/03/2020) |
| 08/03/2020 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 66 Corrected Notice of Appeal filed by Brutus Trading, LLC were transmitted to the U.S. Court of Appeals. (tp) (Entered: 08/03/2020) |
| 08/03/2020 | | Appeal Fee Due: for 66 Corrected Notice of Appeal. $505.00 Appeal fee due by 8/17/2020..(nd) (Entered: 08/04/2020) |
| 08/31/2020 | | Appeal Fee Payment: for 66 Corrected Notice of Appeal. Filing fee $ 505.00, receipt number ANYSDC-21412038..(McSweeney, Patrick) (Entered: 08/31/2020) |
| 09/03/2020 | | USCA Case Number 20-2578 from the U.S. Court of Appeals, 2nd Circ. assigned to 66 Corrected Notice of Appeal filed by Brutus Trading, LLC..(nd) (Entered: 09/03/2020) |
| 10/27/2020 | 67 | MOTION to Reopen Case . Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 10/27/2020) |
| 10/27/2020 | 68 | BRIEF in support of Motion for indicative Ruling. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 10/27/2020) |
| 10/28/2020 | 69 | MEMO ENDORSEMENT on re: 68 Brief. ENDORSEMENT: The Court directs the Government to respond by November 13, 2020. (Set Deadlines/Hearing as to 67 MOTION to Reopen Case: Responses due by 11/13/2020) (Signed by Judge Paul A. Engelmayer on 10/28/2020) (jwh) (Entered: 10/28/2020) |
| 11/10/2020 | 70 | LETTER MOTION for Extension of Time to File Response/Reply as to 67 MOTION to Reopen Case . addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 11/10/20. Document filed by United States of America..(Barnea, Jean-David) (Entered: 11/10/2020) |
| 11/12/2020 | 71 | ORDER of USCA (Certified Copy) as to 66 Corrected Notice of Appeal filed by Brutus Trading, LLC. USCA Case Number 20-2578. Appellant moves the Court to hold this appeal in abeyance pending resolution in the district court of a motion for an indicative ruling. IT IS HEREBY ORDERED that the motion is GRANTED. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 11/12/2020..(nd) (Entered: 11/12/2020) |
| 11/12/2020 | 72 | ORDER granting 70 LETTER MOTION for Extension of Time to File Response/Reply as to 67 MOTION to Reopen Case. Granted. SO ORDERED. Responses due by 12/22/2020, Replies due by 1/11/2021. (Signed by Judge Paul A. Engelmayer on 11/12/2020) (jca) (Entered: 11/12/2020) |
| 12/22/2020 | 73 | MEMORANDUM OF LAW in Opposition re: 67 MOTION to Reopen Case . . Document filed by United States of America..(Barnea, Jean-David) (Entered: 12/22/2020) |
| 12/22/2020 | 74 | DECLARATION of FBI Special Agent Matthew F. Komar in Opposition re: 67 MOTION to Reopen Case .. Document filed by United States of America..(Barnea, Jean-David) (Entered: 12/22/2020) |
| 12/22/2020 | 75 | DECLARATION of Alexandre Manfull (OFAC) in Opposition re: 67 MOTION to Reopen Case .. Document filed by United States of America..(Barnea, Jean-David) |

| | | (Entered: 12/22/2020) |
|---|---|---|
| 01/11/2021 | 76 | REPLY MEMORANDUM OF LAW in Support re: 67 MOTION to Reopen Case . . Document filed by Brutus Trading, LLC. (Attachments: # 1 Exhibit Declaration of Marcellus, # 2 Exhibit Declaration of Knight, # 3 Exhibit Declaration of Chandra, # 4 Exhibit Koenigsberg memorandum).(McSweeney, Patrick) (Entered: 01/11/2021) |
| 01/12/2021 | 77 | DECLARATION of Robert G. Marcellus in Opposition re: 67 MOTION to Reopen Case .. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 01/12/2021) |
| 01/12/2021 | 78 | DECLARATION of Anshuman Chandra in Support re: 67 MOTION to Reopen Case .. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 01/12/2021) |
| 01/12/2021 | 79 | REPLY MEMORANDUM OF LAW in Support re: 67 MOTION to Reopen Case . . Document filed by Brutus Trading, LLC. (Attachments: # 1 Exhibit Declaration of Marcellus, # 2 Exhibit Declaration of Knight, # 3 Exhibit Declaration of Chandra, # 4 Exhibit Koenigsberg memorandum).(McSweeney, Patrick) (Entered: 01/12/2021) |
| 01/29/2021 | 80 | LETTER MOTION for Leave to File Sur-Reply *or to Strike Portions of Reply Brief* addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 1/29/21. Document filed by United States of America..(Barnea, Jean-David) (Entered: 01/29/2021) |
| 02/01/2021 | 81 | ORDER granting 80 Letter Motion for Leave to File Document: The Government is granted leave to file a sur-reply brief, not to exceed 5 pages, due February 22, 2021. No further replies from either side will be invited. (Signed by Judge Paul A. Engelmayer on 2/1/2021) (jwh) (Entered: 02/01/2021) |
| 02/01/2021 | | Set/Reset Deadlines: Surreplies due by 2/22/2021. (jwh) (Entered: 02/01/2021) |
| 02/01/2021 | 82 | LETTER RESPONSE in Opposition to Motion addressed to Judge Paul A. Engelmayer from Patrick M. McSweeney dated Feb. 1, 2021 re: 80 LETTER MOTION for Leave to File Sur-Reply *or to Strike Portions of Reply Brief* addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 1/29/21. . Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 02/01/2021) |
| 02/02/2021 | 83 | MEMO ENDORSEMENT on re: 82 Response in Opposition to Motion, filed by Brutus Trading, LLC. ENDORSEMENT: Plaintiff's request is denied. As ordered at docket 81, the Government is granted leave to file a sur-reply brief, due February 22, 2021. No further replies from either side are invited. The Court will, however, consider this letter (Dkt. 82) from plaintiffs. SO ORDERED. (Surreplies due by 2/22/2021.) (Signed by Judge Paul A. Engelmayer on 2/2/2021) (jca) (Entered: 02/02/2021) |
| 02/19/2021 | 84 | LETTER MOTION for Extension of Time to File *Sur-Reply* addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 2/19/21. Document filed by United States of America..(Barnea, Jean-David) (Entered: 02/19/2021) |
| 02/22/2021 | 85 | ORDER granting 84 LETTER MOTION for Extension of Time to File Sur-Reply. Granted. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 2/22/2021) (jca) (Entered: 02/22/2021) |
| 02/22/2021 | | Set/Reset Deadlines: Surreplies due by 3/8/2021. (jca) (Entered: 02/22/2021) |
| 03/08/2021 | 86 | RESPONSE in Opposition to Motion re: 67 MOTION to Reopen Case . *(Sur-Reply Brief)*. Document filed by United States of America. (Attachments: # 1 Exhibit).(Barnea, Jean-David) (Entered: 03/08/2021) |
| 03/08/2021 | 87 | REPLY AFFIRMATION of FBI Special Agent Matthew Komar in Opposition re: 67 MOTION to Reopen Case .. Document filed by United States of America. (Attachments: |

| | | |
|---|---|---|
| | | # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit). (Barnea, Jean-David) (Entered: 03/08/2021) |
| 03/08/2021 | 88 | REPLY AFFIRMATION of Alexandre Manfull (OFAC) [REDACTED] in Opposition re: 67 MOTION to Reopen Case .. Document filed by United States of America. (Attachments: # 1 Exhibit).(Barnea, Jean-David) (Entered: 03/08/2021) |
| 03/08/2021 | 89 | LETTER MOTION to Seal *Portions of 3d Supp Manfull and 2d Supp Marcellus Declarations* addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 3/8/21. Document filed by United States of America..(Barnea, Jean-David) (Entered: 03/08/2021) |
| 03/12/2021 | 90 | ORDER granting 89 LETTER MOTION to Seal Portions of 3d Supp Manfull and 2d Supp Marcellus Declaration. On March 8, 2021, the Government moved to place under seal portions of Dockets 76, 77, and 79, and for leave to file a redacted version of the Third Supplemental Declaration of Alexandre Manfull on the public docket, as well as an unredacted version under seal. Dkt. 89. That motion is granted. The Clerk of Court is respectfully requested to place dockets 76, 77, and 79 under seal, and the parties are directed to file redacted copies of the documents as proposed in the Government's letter, Dkt. 89. The Government is also directed to file the Third Supplemental Declaration of Alexandre Manfull, Dkt. 88, without redactions and under seal. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 3/11/2021) (jca) (Entered: 03/12/2021) |
| 03/12/2021 | 91 | LETTER addressed to Judge Paul A. Engelmayer from Patrick McSweeney dated March 12, 2021 re: Offer of Proof. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 03/12/2021) |
| 03/16/2021 | 92 | REPLY MEMORANDUM OF LAW in Support re: 67 MOTION to Reopen Case .. Document filed by Brutus Trading, LLC. (Attachments: # 1 Affidavit Declaration of Marcellus).(McSweeney, Patrick) (Entered: 03/16/2021) |
| 03/16/2021 | 93 | REPLY MEMORANDUM OF LAW in Support re: 67 MOTION to Reopen Case .. Document filed by Brutus Trading, LLC. (Attachments: # 1 Affidavit Declaration of Knight).(McSweeney, Patrick) (Entered: 03/16/2021) |
| 03/16/2021 | 94 | REPLY MEMORANDUM OF LAW in Support re: 67 MOTION to Reopen Case .. Document filed by Brutus Trading, LLC. (Attachments: # 1 Affidavit Declaration of Chandra).(McSweeney, Patrick) (Entered: 03/16/2021) |
| 03/16/2021 | 95 | REPLY MEMORANDUM OF LAW in Support re: 67 MOTION to Reopen Case .. Document filed by Brutus Trading, LLC. (Attachments: # 1 Exhibit Koenigsberg memorandum).(McSweeney, Patrick) (Entered: 03/16/2021) |
| 03/17/2021 | 96 | ***SELECTED PARTIES***REPLY AFFIRMATION of Alexandre Manfull (OFAC) [UNREDACTED] in Opposition re: 67 MOTION to Reopen Case .. Document filed by United States of America, Brutus Trading, LLC, Standard Chartered Bank, Standard Chartered PLC, Standard Chartered Trade Services Corporation. (Attachments: # 1 Exhibit)Motion or Order to File Under Seal: 89 .(Barnea, Jean-David) (Entered: 03/17/2021) |
| 10/13/2021 | 97 | OPINION & ORDER re: 67 MOTION to Reopen Case, filed by Brutus Trading, LLC. For the foregoing reasons, the Court denies relator's motion for an indicative ruling that, if it had jurisdiction to do so, it would grant relator relief under Rule 60. Quite to the contrary, were the Court of Appeals to remand this case, the Court would deny relator's motion for relief under Rule 60. The Clerk of Court is respectfully directed to terminate the motion pending at docket number 67. This case remains within the jurisdiction of the Court of Appeals. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 10/13/2021) (va) (Entered: 10/13/2021) |

| | | |
|---|---|---|
| 10/25/2021 | 98 | ORDER of USCA (Certified Copy) as to 66 Corrected Notice of Appeal filed by Brutus Trading, LLC. USCA Case Number 20-2578. IT IS HEREBY ORDERED that the motion is GRANTED. The stay of the appeal is lifted, and Appellant may file a replacement opening brief. Appellants opening brief and any supplemental appendix are due December 20, 2021. Appellees' briefs are due March 21, 2022. A reply brief, if any, is due April 11, 2022. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 10/25/2021..(nd) (Entered: 10/26/2021) |
| 01/24/2023 | 99 | ORDER of USCA (Certified Copy) as to 66 Corrected Notice of Appeal filed by Brutus Trading, LLC. USCA Case Number 20-2578. The parties are hereby advised that consideration of this appeal will be held in abeyance pending the Supreme Court's issuance of its decision in United States, ex rel. Polansky v. Executive Health Resources (U.S. No. 21-1052). It is ORDERED that, no later than fourteen days after issuance of that decision, each party shall submit to this court a letter brief, not to exceed fifteen pages double-spaced, addressing the effect, if any, that the Polanksy decision has on this appeal. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 1/24/2023..(nd) (Entered: 01/24/2023) |
| 11/03/2023 | 100 | MANDATE of USCA (Certified Copy) as to 64 Notice of Appeal, filed by Brutus Trading, LLC USCA Case Number 20-2578. UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court is AFFIRMED. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Issued As Mandate: 11/3/2023. (tp) (Entered: 11/03/2023) |
| 11/03/2023 | | Transmission of USCA Mandate/Order to the District Judge re: 100 USCA Mandate. (tp) (Entered: 11/03/2023) |
| 05/31/2024 | 101 | MOTION to Vacate . Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 05/31/2024) |
| 05/31/2024 | 102 | MEMORANDUM OF LAW in Support re: 101 MOTION to Vacate . . Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 05/31/2024) |
| 05/31/2024 | 103 | DECLARATION of Patrick McSweeney in Support re: 101 MOTION to Vacate .. Document filed by Brutus Trading, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J).(McSweeney, Patrick) (Entered: 05/31/2024) |
| 05/31/2024 | 104 | DECLARATION of David Scantling in Support re: 101 MOTION to Vacate .. Document filed by Brutus Trading, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Supplement Addendum).(McSweeney, Patrick) (Entered: 05/31/2024) |
| 05/31/2024 | 105 | DECLARATION of Julian Knight in Support re: 101 MOTION to Vacate .. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 05/31/2024) |
| 05/31/2024 | 106 | LETTER MOTION to Seal addressed to Judge Paul A. Engelmayer from Patrick McSweeney dated 05/31/2024. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 05/31/2024) |
| 06/04/2024 | 107 | ORDER: On May 31, 2024, relator Brutus Trading, LLC ("Brutus") filed a motion to set aside judgment under Federal Rule of Civil Procedure 60(d)(3). Dkt. 106. The Court directs the Government to file a response by June 25, 2024; and Brutus to file a reply by July 9, 2024. SO ORDERED. Responses due by 6/25/2024, Replies due by 7/9/2024. (Signed by Judge Paul A. Engelmayer on 6/4/2024) (mml) (Entered: 06/05/2024) |
| 06/05/2024 | 108 | SECOND LETTER MOTION to Seal *Exhibit K* addressed to Judge Paul A. Engelmayer from Patrick M.McSweeney dated June 5, 2024. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 06/05/2024) |

| 06/06/2024 | 109 | ORDER granting 108 Letter Motion to Seal. Granted. Counsel can file Exhibit K under seal. Additionally, counsel is permitted to submit Exhibit K via an electronic storage device by either mailing or delivering it to the Thurgood Marshall Courthouse, 40 Centre Street, New York, New York 10007. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 6/6/2024) (tg) (Entered: 06/06/2024) |
|---|---|---|
| 06/20/2024 | 110 | LETTER MOTION for Extension of Time to File Response/Reply as to 101 MOTION to Vacate . addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 6-20-24. Document filed by United States of America..(Barnea, Jean-David) (Entered: 06/20/2024) |
| 06/20/2024 | 111 | ORDER granting 110 Letter Motion for Extension of Time to File Response/Reply re 110 LETTER MOTION for Extension of Time to File Response/Reply as to 101 MOTION to Vacate . addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 6-20-24., 101 MOTION to Vacate . Granted. SO ORDERED. Responses due by 7/9/2024 Replies due by 7/23/2024.. (Signed by Judge Paul A. Engelmayer on 6/20/2024) (tro) (Entered: 06/20/2024) |
| 06/24/2024 | 112 | LETTER MOTION for Conference re: 101 MOTION to Vacate . addressed to Judge Paul A. Engelmayer from Patrick M.McSweeney dated 101. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 06/24/2024) |
| 06/24/2024 | 113 | LETTER RESPONSE in Opposition to Motion addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 6-24-24 re: 112 LETTER MOTION for Conference re: 101 MOTION to Vacate . addressed to Judge Paul A. Engelmayer from Patrick M.McSweeney dated 101. . Document filed by United States of America..(Barnea, Jean-David) (Entered: 06/24/2024) |
| 06/25/2024 | 114 | LETTER REPLY to Response to Motion addressed to Judge Paul A. Engelmayer from Patrick M.McSweeney dated 6/25/2024 re: 112 LETTER MOTION for Conference re: 101 MOTION to Vacate . addressed to Judge Paul A. Engelmayer from Patrick M.McSweeney dated 101. . Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 06/25/2024) |
| 07/01/2024 | 115 | **FILING ERROR - DEFICIENT DOCKET ENTRY - (SUPPORTING DOCUMENTS TO BE FILED SEPARATELY)** - FIRST MOTION to Disqualify Counsel *Jean-David Barnea.* Document filed by Brutus Trading, LLC. (Attachments: # 1 Supplement Memorandum of Law, # 2 Affidavit Declaration of Julian Knight, # 3 Affidavit Declaration of Marcellus, # 4 Affidavit Decl of McSweeney with exhibits). (McSweeney, Patrick) Modified on 7/3/2024 (lb). (Entered: 07/01/2024) |
| 07/01/2024 | 116 | **FILING ERROR - DEFICIENT DOCKET ENTRY - (SUPPORTING DOCUMENTS TO BE FILED SEPARATELY)** - FIRST MOTION to Appoint Expert . Document filed by Brutus Trading, LLC. (Attachments: # 1 Supplement Memorandum of Law, # 2 Affidavit Declaration of Julian Knight, # 3 Affidavit Declaration of Marcellus). (McSweeney, Patrick) Modified on 7/3/2024 (lb). (Entered: 07/01/2024) |
| 07/02/2024 | 117 | **FILING ERROR - DEFICIENT DOCKET ENTRY - (SUPPORTING DOCUMENTS TO BE FILED SEPARATELY)** - SECOND MOTION to Disqualify Counsel . Document filed by Brutus Trading, LLC. (Attachments: # 1 Supplement Memorandum of Law, # 2 Affidavit Declaration of Patrick M. McSweeney).(McSweeney, Patrick) Modified on 7/3/2024 (lb). (Entered: 07/02/2024) |
| 07/03/2024 | | ***NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR.** Notice to Attorney Patrick M McSweeney to RE-FILE Document 115 FIRST MOTION to Disqualify Counsel *Jean-David Barnea.* and 116 FIRST MOTION to Appoint Expert .. ERROR(S): Supporting Documents are filed |

| | | |
|---|---|---|
| | | separately, each receiving their own document #. (Supporting Documents are found under the Event Type - Replies, Opposition and Supporting Documents). (lb) (Entered: 07/03/2024) |
| 07/05/2024 | 118 | LETTER MOTION for Extension of Time *Proposed Sequence and Briefing Schedule for Relator's Recent Motions* addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 7-5-24. Document filed by United States of America..(Barnea, Jean-David) (Entered: 07/05/2024) |
| 07/05/2024 | 119 | FIRST MOTION to Disqualify Counsel *Jean-David Barnea*. Document filed by Brutus Trading, LLC. (Attachments: # 1 Supplement memorandum of law, # 2 Affidavit Declaration of McSweeney, # 3 Exhibit Exh. A to mot. to disqualify, # 4 Exhibit Exh. B to mot. to disqualify, # 5 Exhibit Exh. C to mot. to disqualify, # 6 Exhibit Exh. D to mot. to disqualify, # 7 Exhibit Exh. E to mot. to disqualify, # 8 Exhibit Exh. F to mot. to disqualify, # 9 Exhibit Exh. G to mot. to disqualify, # 10 Exhibit Exh. H to mot. to disqualify, # 11 Exhibit Exh. I to mot. to disqualify, # 12 Exhibit Exh. j to mot. to disqualify).(McSweeney, Patrick) (Entered: 07/05/2024) |
| 07/08/2024 | 120 | ORDER terminating 112 Letter Motion for Conference re: 112 LETTER MOTION for Conference re: 101 MOTION to Vacate . addressed to Judge Paul A. Engelmayer from Patrick M.McSweeney dated 101., 119 FIRST MOTION to Disqualify Counsel *Jean-David Barnea.* ; with respect to 119 Motion to Disqualify Counsel. The motion for a pre-motion conference, and the proposed motion itself, appears to be transparent bids to delay this litigation by unnecessarily hampering the Government's response to the pending motion to vacate. Although the Court doubts that Brutus Trading can meet the high "standard of proof" required for motions to disqualify, which are "disfavored" and recognized as "often interposed for tactical reasons" and as "inevitably caus[ing] delay" even when made in good faith, Pagan v. CI Lobster Corp., 549 F. Supp. 3d 356,359 (S.D.N.Y. 2021), the Court will permit such a motion to be made, and adopts the joint briefing schedule proposed. The Government's response to the disqualification motion is due July 15. Brutus Trading's reply, if any, is due July 22. The Government's response to the motion to appoint an independent expert will be due 14 days after the Court decides the disqualification motion. Brutus Trading's reply, if any, will be due 7 days after that. The Government's response to the motion to vacate will be due 14 days after the Court decides the motion to appoint an independent expert. Brutus Trading's reply, if any, will be due 7 days after that. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 7/8/2024) (tg) (Entered: 07/08/2024) |
| 07/08/2024 | | Set/Reset Deadlines: Responses due by 7/15/2024 Replies due by 7/22/2024. (tg) (Entered: 07/08/2024) |
| 07/09/2024 | 121 | LETTER addressed to Judge Paul A. Engelmayer from Patrick McSweeney dated 07/09/2024 re: 07/08/2024 Order 120 . Document filed by Brutus Trading, LLC.. (McSweeney, Patrick) (Entered: 07/09/2024) |
| 07/09/2024 | 122 | MOTION to Appoint Expert . Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 07/09/2024) |
| 07/09/2024 | 123 | MEMORANDUM OF LAW in Support re: 122 MOTION to Appoint Expert . . Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 07/09/2024) |
| 07/09/2024 | 124 | DECLARATION of Marcellus in Support re: 122 MOTION to Appoint Expert .. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 07/09/2024) |
| 07/09/2024 | 125 | DECLARATION of Marcellus in Support re: 122 MOTION to Appoint Expert .. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 07/09/2024) |

| 07/09/2024 | 126 | DECLARATION of Knight in Support re: 122 MOTION to Appoint Expert .. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 07/09/2024) |
|---|---|---|
| 07/09/2024 | 127 | MOTION to Disqualify Counsel *Jean-David Barnea*. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 07/09/2024) |
| 07/09/2024 | 128 | MEMORANDUM OF LAW in Support re: 127 MOTION to Disqualify Counsel *Jean-David Barnea*. . Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 07/09/2024) |
| 07/09/2024 | 129 | **FILING ERROR - DEFICIENT DOCKET ENTRY - FILER ERROR -(SEE #131)** DECLARATION of Patrick McSweeney in Support re: 127 MOTION to Disqualify Counsel *Jean-David Barnea*.. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) Modified on 7/11/2024 (kj). (Entered: 07/09/2024) |
| 07/10/2024 | 130 | SEALED DOCUMENT placed in vault..(jus) (Entered: 07/10/2024) |
| 07/11/2024 | 131 | DECLARATION of Patrick M. McSweeney in Support re: 127 MOTION to Disqualify Counsel *Jean-David Barnea*.. Document filed by Brutus Trading, LLC. (Attachments: # 1 Exhibit Email, # 2 Exhibit Email, # 3 Exhibit Email, # 4 Exhibit Letter, # 5 Exhibit Email, # 6 Exhibit Email, # 7 Exhibit Email, # 8 Exhibit Declaration, # 9 Exhibit Letter, # 10 Exhibit Declaration).(McSweeney, Patrick) (Entered: 07/11/2024) |
| 07/15/2024 | 132 | MEMORANDUM OF LAW in Opposition re: 127 MOTION to Disqualify Counsel *Jean-David Barnea*. . Document filed by United States of America..(Folch, Monica) (Entered: 07/15/2024) |
| 07/16/2024 | 133 | REPLY MEMORANDUM OF LAW in Support re: 127 MOTION to Disqualify Counsel *Jean-David Barnea*. . Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 07/16/2024) |
| 08/12/2024 | 134 | OPINION & ORDER re: 127 MOTION to Disqualify Counsel *Jean-David Barnea*. filed by Brutus Trading, LLC., The Court denies Brutus Trading's motion to disqualify. The Clerk of the Court is respectfully directed to terminate the motion pending at Docket 127. The Court hereby directs the Government to respond to Brutus Trading's motions to vacate and to appoint an independent expert by August 23, 2024. Brutus Trading's reply is due August 30, 2024. This amended briefing schedule will pe1mit the Court to resolve both motions simultaneously. (And as further set forth herein.) SO ORDERED. (Replies due by 8/30/2024., Responses due by 8/23/2024) (Signed by Judge Paul A. Engelmayer on 8/12/2024) (jca) (Entered: 08/12/2024) |
| 08/15/2024 | 135 | LETTER MOTION for Extension of Time to File Response/Reply as to 122 MOTION to Appoint Expert ., 101 MOTION to Vacate . addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 8-15-24. Document filed by United States of America.. (Barnea, Jean-David) (Entered: 08/15/2024) |
| 08/16/2024 | 136 | ORDER granting 135 Letter Motion for Extension of Time to File Response/Reply. Granted. SO ORDERED. Responses due by 9/6/2024 Replies due by 9/13/2024. (Signed by Judge Paul A. Engelmayer on 8/16/2024) (tg) (Entered: 08/16/2024) |
| 09/06/2024 | 137 | MEMORANDUM OF LAW in Opposition re: 122 MOTION to Appoint Expert ., 101 MOTION to Vacate . . Document filed by United States of America..(Barnea, Jean-David) (Entered: 09/06/2024) |
| 09/09/2024 | 138 | LETTER MOTION for Extension of Time to File Response/Reply addressed to Judge Paul A. Engelmayer from Patrick M.McSweeney dated 9/09/2024. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 09/09/2024) |

| 09/09/2024 | 139 | ORDER granting 138 Letter Motion for Extension of Time to File Response/Reply. Granted. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 9/9/2024) Responses due by 9/27/2024 (ks) (Entered: 09/09/2024) |
|---|---|---|
| 09/23/2024 | 140 | LETTER MOTION for Leave to File addressed to Judge Paul A. Engelmayer from Patrick McSweeney dated September 23, 2024. Document filed by Brutus Trading, LLC.. (McSweeney, Patrick) (Entered: 09/23/2024) |
| 09/23/2024 | 141 | ORDER granting 140 Letter Motion for Leave to File Document. Granted. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 9/23/2024) (tg) (Entered: 09/23/2024) |
| 09/27/2024 | 142 | REPLY MEMORANDUM OF LAW in Support re: 122 MOTION to Appoint Expert ., 101 MOTION to Vacate . . Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 09/27/2024) |
| 10/07/2024 | 143 | NOTICE OF APPEARANCE by Matthew Aaron Leish on behalf of Times Media Limited..(Leish, Matthew) (Entered: 10/07/2024) |
| 10/07/2024 | 144 | LETTER addressed to Judge Paul A. Engelmayer from Matthew Leish dated October 7, 2024 re: Request to Unseal Exhibit. Document filed by Times Media Limited..(Leish, Matthew) (Entered: 10/07/2024) |
| 10/07/2024 | 145 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Corporate Parent News Corporation for Times Media Limited. Document filed by Times Media Limited.. (Leish, Matthew) (Entered: 10/07/2024) |
| 10/08/2024 | 146 | MEMO ENDORSEMENT on re: 144 Letter filed by Times Media Limited. ENDORSEMENT: The Court directs the Government and Brutus to file letter responses by Friday, October 11, 2024. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 10/8/2024) (tg) (Entered: 10/08/2024) |
| 10/09/2024 | 147 | LETTER MOTION for Extension of Time to File Response/Reply as to 146 Memo Endorsement, addressed to Judge Paul A. Engelmayer from Antonio J. Perez-Marques dated October 9, 2024. Document filed by Standard Chartered Bank, Standard Chartered PLC, Standard Chartered Trade Services Corporation..(Perez-Marques, Antonio) (Entered: 10/09/2024) |
| 10/10/2024 | 148 | ORDER granting 147 Letter Motion for Extension of Time to File Response/Reply. Granted. The Court directs the Government, SO ORDERED. Brutus, and Standard Chartered to file letter responses by October 25, 2024. The Court does not authorize replies. (Signed by Judge Paul A. Engelmayer on 10/10/2024) (tg) (Entered: 10/10/2024) |
| 10/25/2024 | 149 | LETTER addressed to Judge Paul A. Engelmayer from AUSA Jean-David Barnea dated 10-25-24 re: Times Media Request to Unseal Exhibit. Document filed by United States of America..(Barnea, Jean-David) (Entered: 10/25/2024) |
| 10/25/2024 | 150 | LETTER RESPONSE in Support of Motion addressed to Judge Paul A. Engelmayer from Patrick M. McSweeney dated 10/25/2024 re: 147 LETTER MOTION for Extension of Time to File Response/Reply as to 146 Memo Endorsement, addressed to Judge Paul A. Engelmayer from Antonio J. Perez-Marques dated October 9, 2024. *Response to Motion to Unseal [ECF No.144]*. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 10/25/2024) |
| 10/25/2024 | 151 | LETTER addressed to Judge Paul A. Engelmayer from Antonio J. Perez-Marques dated October 25, 2024 re: Times Media Request to Unseal Exhibit. Document filed by Standard Chartered Bank, Standard Chartered PLC, Standard Chartered Trade Services Corporation..(Perez-Marques, Antonio) (Entered: 10/25/2024) |

| 10/28/2024 | 152 | LETTER MOTION for Leave to File Response to Standard Chartered Bank's 10/25/2024 letter addressed to Judge Paul A. Engelmayer from Patrick M. McSweeney dated 10/28/2024. Document filed by Brutus Trading, LLC..(McSweeney, Patrick) (Entered: 10/28/2024) |
|---|---|---|
| 10/28/2024 | 153 | ORDER. On October 25, 2024, the Court received letters from Jewish Insider and WWBT 12 On Your Side in support of and requesting to join The Times's motion to unseal Exhibit K. See Dkt. 144. The Court respectfully directs the Clerk of the Court to publicly file these letters on the docket of this case. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 10/28/24) (yv) (Entered: 10/28/2024) |
| 10/29/2024 | 154 | ORDER denying 152 Letter Motion for Leave to File Document. Denied. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 10/28/2024) (tg) (Entered: 10/29/2024) |
| 10/29/2024 | 155 | LETTER addressed to Judge Paul A. Engelmayer from Matthew Kassel dated 10/25/2024 re: I write on behalf of Jewish Insider, a U.S.-based news outlet, to request access to an exhibit of immense public interest that was filed under seal by Relator Brutus Trading, LLC (Brutus) in support of its pending Motion to Set Aside Judgment in this proceeding. (nb) (Entered: 10/29/2024) |
| 10/29/2024 | 156 | LETTER addressed to Judge Paul A. Engelmayer from Sarah Chakales dated 10/25/2024 re: I write on behalf of WWBT 12 On Your Side, an NBC-affiliated local news station in Richmond, VA, to request access to an exhibit of immense public interest that was filed under seal by Relator Brutus Trading, LLC ("Brutus"} in support of its pending Motion to Set Aside Judgment in this proceeding...(nb) (Entered: 10/29/2024) |
| 11/13/2024 | 157 | OPINION AND ORDER re: 122 MOTION to Appoint Expert . filed by Brutus Trading, LLC, 101 MOTION to Vacate . filed by Brutus Trading, LLC. For the foregoing reasons, the Court denies Brutus's motion to vacate and motion to appoint an independent expert. The Court also denies the motion by non-party Times Media Limited ("Times Media") to unseal Brutus's Exhibit K. The Clerk of Court is respectfully directed to terminate the motions pending at Dockets 101, 122, and 144. SO ORDERED. (Signed by Judge Paul A. Engelmayer on 11/13/2024) (tg) (Entered: 11/13/2024) |
| 01/13/2025 | 158 | **FILING ERROR - DEFICIENT DOCKET ENTRY** - NOTICE OF APPEAL from 157 Memorandum & Opinion,,. Document filed by Brutus Trading, LLC. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(McSweeney, Patrick) Modified on 1/13/2025 (nd). (Entered: 01/13/2025) |
| 01/13/2025 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney Patrick McSweeney to RE-FILE Document No. 158 Notice of Appeal,.. The filing is deficient for the following reason(s): the Opinions and Orders being appealed were not selected. Re-file the appeal using the event type Notice of Appeal found under the event list Appeal Documents - attach the correct signed PDF - select the correct named filer/filers - select the correct order/judgment being appealed. (nd)** (Entered: 01/13/2025) |
| 01/13/2025 | 159 | NOTICE OF APPEAL from 134 Memorandum & Opinion, Set Deadlines,,,, 157 Memorandum & Opinion,,. Document filed by Brutus Trading, LLC. Filing fee $ 605.00, receipt number ANYSDC-30449945. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(McSweeney, Patrick) (Entered: 01/13/2025) |
| 01/13/2025 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 159 Notice of Appeal,..(nd) (Entered: 01/13/2025) |
| 01/13/2025 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 159 Notice of Appeal, filed by Brutus Trading, LLC were transmitted |

to the U.S. Court of Appeals..(nd) (Entered: 01/13/2025)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 02/24/2025 11:51:25 | | | |
| **PACER Login:** | BLandy33 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:18-cv-11117-PAE |
| **Billable Pages:** | 18 | **Cost:** | 1.80 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                Plaintiff,

      v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVICES
CORPORATION,

                Defendants.

No. 18 Civ. 11117 (PAE)

**SECOND SUPPLEMENTAL DECLARATION OF ALEXANDRE MANFULL**

I, Alexandre Manfull, hereby declare the following pursuant to 28 U.S.C. § 1746:

1.      I previously submitted two declarations in support of the United States' motion to

dismiss Relator's second amended complaint in the above-captioned case. I have reviewed

Relator's motion for an indicative ruling and supporting memorandum, *see* Relator's Motion for

Indicative Ruling ("Mot.") and the accompanying Memorandum in Support of Motion for

Indicative Ruling ("Mem."), and hereby make the following second supplemental declaration to

respond to certain fundamental misunderstandings and other points made in Relator's filings

with regard to the U.S. government investigations and financial filings at issue.

2.      I make this declaration, like the previous two, based on my own personal

knowledge, a review of Relator's allegations and documents relating to these investigations, as

well as my general familiarity with the procedures and authorities of other Treasury components,

including the Financial Crimes Enforcement Network ("FinCEN").[1, 2] I have also reviewed the

*BuzzFeed News* article (the "BuzzFeed Article") referenced by Relator, *see* Richard Holmes et

al., *The Government and the Whistleblowers*, BuzzFeed News (Sept. 25, 2020),

https://www.buzzfeednews.com/article/richholmes/standard-chartered-bank-money-iran-fbi.

This declaration does not set forth all of my knowledge of the matters discussed herein. All

dates and amounts set forth are approximate and to the best of my recollection, unless otherwise

noted.

## OFAC'S MISSION AND AUTHORITY

3.     As explained in my initial declaration, OFAC is the agency within Treasury that is

principally responsible for administering U.S. economic sanctions programs on behalf of the

U.S. government. Most of OFAC's economic sanctions programs are administered under the

authority of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, and

various Executive Orders issued pursuant to that statute.

## RELATOR'S LATEST ARGUMENT

4.     In its latest papers, Relator claims that there are at least 31 entities subject to U.S.

sanctions in documents that it and Anshuman Chandra provided to the U.S. government in 2012-

13 that were also the subject of alleged Suspicious Activity Reports ("SARs") filed by Standard

Chartered Bank ("SCB" or the "Bank") with FinCEN, as described in the BuzzFeed Article.

Mot. ¶¶ 9, 13; Mem. at 2. In particular, the article cited by Relator claims that "the bank filed at

least 35 SARs on 31 customers that appeared in the documents Chandra and [Julian] Knight [of

---

[1] This declaration uses abbreviations and capitalized terms defined in my earlier declarations.
[2] FinCEN is a Treasury bureau whose mission is to safeguard the financial system from illicit use, money laundering, and related crimes, including terrorism, and to promote national security through the strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence. *See generally* 31 U.S.C. § 310; https://www.fincen.gov/about/mission.

the Relator entity] sent to the FBI in 2013." Elsewhere, Relator alleges without citation to evidence that the alleged relevant SARs disclosed "hundreds" of SCB transactions that violated Iran sanctions (Mot. ¶¶ 7, 9) and misrepresents the article by suggesting that the alleged SARs all described prohibited transactions with sanctioned Iranian parties (*id.* ¶¶ 9, 11), rather than several types of reportable activities, *cf.* BuzzFeed Article ("*[s]ome* of the 35 SARs mentioning customers in the whistleblowers' documents discussed possible links to Iran" (emphasis added)). Relator admits that it has not reviewed the alleged SARs. Mot. ¶ 14.

## PRIOR INVESTIGATIONS OF STANDARD CHARTERED BANK

5.      As explained in my prior declarations and the accompanying motion papers, Relator never specifically identified to the U.S. government any of the entities that were subsequently determined to be Iranian front companies in the investigation that led to the 2019 settlement agreements with SCB. While some of the entities (or associated individuals) that were ultimately found to be involved in apparent sanctions violations may have appeared within the large number of SCB Dubai customer lists and transaction lists that Relator produced to the U.S. government, Relator never identified any of them as meriting further investigation among the thousands of non-Iranian entities based in Dubai or elsewhere in the United Arab Emirates ("U.A.E."), which have not been accused of illegal associations or transactions with Iranian entities. As Relator admits, it produced "tens of thousands of pages of spreadsheets and other financial records" (Mot. ¶ 4) to the U.S. government, but identified only a small number of those customers or transactions as involving Iran or Iranian parties for the Government to investigate. Specifically, Relator pointed to a small number of known Iran-related entities on these lists (major Iranian banks, government agencies, and companies) as evidence that SCB had continued to engage in business with Iran after 2007. *See* BuzzFeed Article ("[p]oring over Standard

3

Chartered's accounts, [Knight] found a number of customers in Iran, a country under US sanctions"). Relator did not suggest that the U.S. government should investigate the thousands of seemingly legitimate non-Iranian, U.A.E.-based customers of SCB's Dubai branch that were also listed in the documents it produced to see if they had any undisclosed Iranian connections, nor would it have been within the reasonable scope of the investigation into Relator's claims for the U.S. government to do so.

6.      As I explained in my prior declarations, OFAC and other agencies investigated Relator's allegations that SCB had continued to process transactions in U.S. dollars with its known Iranian clients after 2007, when the bank had promised it would terminate such business. However, that investigation concluded that the post-2007 transactions were largely permissible wind-down transactions or otherwise did not constitute violations for reasons discussed in the prior declarations, for example because they were conducted in currencies other than U.S. dollars by non-U.S. financial institutions or otherwise not conducted through U.S. financial institutions. Again, the investigation of Relator's claims was limited to an analysis of the post-2007 transactions by the known and overt Iranian clients identified on the documents provided.

7.      As I also explained previously, the separate investigation that led to the 2019 settlements concerning several clients of SCB's Dubai branch—including several entities owned by an Iranian individual, Mahmoud Reza Elyassi—was based on information obtained from another matter. That information identified a U.A.E.-based petrochemical company client (which does not appear in Relator's documents) with improper Iranian connections that the Bank should have identified. This in turn led the U.S. government to investigate several other clients of SCB's Dubai branch, including those associated with Mr. Elyassi, whose interactions with the Bank (by fax and online) suggested Iranian links. Relator did not identify the Iranian

4

connections of those U.A.E. entities to the U.S. government, nor did it suggest that the government should investigate whether such links existed. Thus, as I explained previously, the presence or absence in Relator's voluminous client lists and transaction registers of any of the U.A.E.-based SCB clients that the U.S. government ultimately identified as having improper Iranian links does not indicate any role by Relator in helping to identify these entities.

## SUSPICIOUS ACTIVITY REPORTS

8.      SARs are among a number of non-public reports that are filed by banks and other financial institutions with FinCEN pursuant to a collection of anti-money laundering laws commonly referred to as the Bank Secrecy Act ("BSA").[3] *See generally* 31 U.S.C. § 5318(g); *see also, e.g., id.* § 5313 (statutory authority for the filing of currency transaction reports). Banks file SARs to report a broad spectrum of suspicious activity, including potential money laundering, tax evasion, and other illegal activity. Generally speaking, a transaction at or above a certain dollar threshold must be reported if a bank "knows, suspects, or has reason to suspect" that the transaction: involves funds derived from illegal activity; is designed to evade a BSA requirement; or has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the bank knows of no reasonable explanation for the transaction. *See* 31 C.F.R. § 1020.320(a)(2) (outlining the categories for which a bank must file a SAR). This last category of mandatory SAR filings is intentionally broad and covers potentially any suspected unlawful activity. SARs themselves do not constitute evidence of wrongdoing, but rather suspicions of potential illegal activity that can provide leads to U.S. government agencies. *See SAR Confidentiality Final Rule*, 75 Fed. Reg. 75,593, 75,594

---

[3] The BSA includes the Currency and Financial Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act of 2001 and other legislation codified at 12 U.S.C. §§ 1829b, 1951-1959, and 31 U.S.C. §§ 5311-5314 and 5316-5332.

(Dec. 3, 2010) ("SARs generally are unproven reports of possible violations of law or regulation, or of suspicious activities, that are used for law enforcement or regulatory purposes."). Moreover, as further described below, SARs may be filed for a broad spectrum of potential illegal activities, of which sanctions violations are just one.

9.     For example, there are over twenty different specified kinds of suspicious activity that a financial institution can identify through the SAR form (though these categories are not exhaustive of reportable types of suspicious activities). Some examples of specified reportable activity include: structuring (*i.e.*, breaking up a transaction into several transactions to evade a reporting or record-keeping requirement); terrorist financing; financial fraud (*e.g.*, check fraud, consumer loan fraud, credit card fraud, health care fraud, and securities fraud); illegal gaming activities; and money laundering (*i.e.*, disguising the proceeds of illicit activity). In addition, specifiable suspicious activity includes suspected criminal activity involving: a customer's identification; insurance products; securities products; mortgage products; account takeover; bribery; counterfeit instruments; elder financial exploitation; embezzlement; forgeries; human smuggling and trafficking; identify theft; little or no concern for product performance or fees; misuse of position; corruption; use of informal transfer value systems; use of multiple transaction locations; transactions with no business or apparent lawful purpose; transactions involving high-risk jurisdictions; two or more individuals working together; unlicensed or unregistered money services businesses; and a cyber event. *See FinCEN Suspicious Activity Report (FinCEN SAR) Electronic Filing Requirements XML Schema User Guide*, Attachment C, at 153-59 (July 2020), https://bsaefiling.fincen.treas.gov/docs/XMLUserGuide_FinCENSAR.pdf.

10.     Reports filed with regard to activities that banks believe may relate to potential sanctions violations (which usually fall under "transactions involving high-risk jurisdictions") constitute a small fraction of total SAR filings.[4]

11.     SARs are subject to strict confidentiality requirements.  *See generally* 31 U.S.C. § 5318(g)(2); 31 C.F.R. § 1020.320(e); 12 C.F.R. § 21.11(k).  SARs, and any information that would reveal the existence of a SAR, are confidential and cannot be disclosed except as specifically authorized by law.  *Id.*  These confidentiality requirements prohibit financial institutions, government entities, and their respective officers and agents from disclosing SARs and any information that would disclose the existence of a SAR, including in response to discovery requests and subpoenas in private litigation.  *Id.*  Violations of the confidentiality provisions expose violators to criminal liability.  31 U.S.C. § 5322(a).  The unauthorized disclosure of Suspicious Activity Reports can compromise the national security of the United States as well as threaten the safety and security of those institutions and individuals who file such reports. *See* Statement by FinCEN Regarding Unlawfully Disclosed Suspicious Activity Reports (Sept. 1, 2020), https://www.fincen.gov/news/news-releases/statement-fincen-regarding-unlawfully-disclosed-suspicious-activity-reports ("[T]he unauthorized disclosure of SARs is a crime that can impact the national security of the United States, compromise law enforcement investigations, and threaten the safety and security of the institutions and individuals who file such reports.").

---

[4] *See* FinCEN, *SAR Filings by Industry*, https://www.fincen.gov/reports/sar-stats/sar-filings-industry (showing transactions with high-risk jurisdictions, such as sanctioned countries, account for less than 1% of banks' total SAR filings by type of suspicious activity category from January 1, 2014 to December 31, 2019).

## SARs AND POTENTIAL SANCTIONS VIOLATIONS

12.     As a preliminary matter, the references to the alleged SARs in Relator's motion are nothing more than unsupported allegations recited in a news article.  Based on the text of the article itself, many of the alleged SARs concern issues unrelated to potential sanctions violations generally or specific violations of Iran sanctions that were not otherwise reported to OFAC.  Due to the strict confidentiality requirements identified above, *see* ¶ 10 *supra*, Treasury cannot confirm or deny herein the veracity of any descriptions in the BuzzFeed Article of alleged SARs or otherwise discuss the contents of any alleged SAR.  As discussed in this declaration and in the U.S. government's accompanying response to Relator's motion, any discussion or review of any alleged or actual SARs is not necessary as it is not relevant to the determinative legal issue currently before the Court.

13.     Relator's allegations that SCB may have filed such alleged SARs would not change the U.S. government's conclusion from its investigation of Relator's allegations: that the Bank's post-2007 transactions with its known Iranian clients did not give rise to additional Iran sanctions violations charges.  The presence in Relator's documents of known Iranian SCB clients was evident—and the investigation was able to relatively easily identify those entities and look more closely at their post-2007 transactions.  Whether SCB filed any alleged SARs related to these known Iranian clients is irrelevant because the principal question under investigation was whether the Bank's own post-2007 transactions with those Iranian entities violated any sanctions rules.

14.     It was also irrelevant to the investigation into Relator's claims whether SCB had filed alleged SARs relating to its non-Iranian Dubai-based clients as these entities were not part of that investigation, which again focused on Relator's claims regarding identifiable Iranian

8

entities.  Certainly nothing in Relator's disclosures suggested that such entities in general, or any specific ones, required a further review.

15.     Moreover, as the BuzzFeed Article makes clear, at least many of the alleged SARs it describes were purportedly filed after Relator provided its disclosures to the U.S. government and thus would not have even been in existence at the time the government investigated Relator's claims.  The only alleged SARs discussed in the BuzzFeed Article for which dates are provided were filed between 2014 and 2017, well after the investigation into Relator's allegations was completed in 2013.

16.     As for the separate investigation that led to the 2019 settlements with SCB, I understand that the FBI has filed a supplemental declaration in this case, which describes searches that government investigators conducted in certain circumstances when the investigative agencies uncovered evidence during that investigation relating to possible Iranian connections of particular clients of SCB's Dubai branch, without any consideration of whether such entities may have coincidentally also appeared on lengthy client lists or transaction registers provided by Relator years earlier.

## THE ALLEGATIONS IN THE BUZZFEED ARTICLE

17.     The BuzzFeed Article makes vague and unsupported allegations that SCB continued to process transactions for Iranian customers after 2007 in violation of U.S. sanctions, without any evidence from the alleged SARs or otherwise.  Furthermore, it does not appear that the alleged SARs discussed in the BuzzFeed Article describe any Iranian companies or Iranian front companies based in the U.A.E.—which were the focus of the investigation into SCB Dubai's clients that led to the 2019 settlements.  The article provides details regarding only four

9

of the alleged 35 SARs that supposedly relate to entities appearing on Relator's documents, none

of which seem to be Iranian entities.

18.     First, the article discusses alleged SARs relating to SCB transactions with Al

Zarooni Exchange, a U.A.E. (not Iranian) company that has never been subject to Iran-related

sanctions.  Treasury sanctioned Al Zarooni Exchange in 2015 for providing support to a Dubai

money-laundering organization, the Khanani Money Laundering Organization, which had

laundered funds for Chinese, Columbian, and Mexican crime groups, and whose head was

involved in moving funds for the Taliban along with the Al Zarooni Exchange.  *See* U.S. Dep't

of Treasury, Press Release, *Treasury Sanctions the Khanani Money Laundering Organization*

(Nov. 12, 2015), https://www.treasury.gov/press-center/press-releases/Pages/jl0265.aspx.  The

sanctions imposed on this organization were thus based on illegal activity entirely unrelated to

the Iranian sanctions at issue in this case.  Moreover, according to the article, the transactions

that SCB reported in the alleged SARs had been processed in 2009 and 2010, more than five

years before sanctions were imposed on Al Zarooni Exchange.

19.     Next, the BuzzFeed Article describes an alleged SAR filing from 2017 relating to

transactions with a diamond trading company that had been accused "by prosecutors" of "black

market diamond sales, tax evasion, and bribery."  There is no indication that this company was

an Iranian entity or was ever subject to Iran sanctions.

20.     Finally, the BuzzFeed Article states that "some" (it does not specify how many)

"of the 35 SARs mentioning customers in the whistleblowers' documents discussed possible

links to Iran."  Of course, not any "possible link[] to Iran" would subject a company to Iran

sanctions.  A non-Iranian company might have been linked to Iran or engaged in a transaction

with an Iranian entity without being an Iranian front company or otherwise subjecting itself to

10

sanctions.  From the article's description, it is clear that the two examples provided are of non-Iranian entities: one "used 'fraudulent documents' to hide trade with Iran until at least 2014" and the other "'may have sought to obfuscate' payments to Iran for the leasing of containers at Iranian airports, according to a 2017 [alleged] SAR."  As discussed above, Relator does not appear to have highlighted the Iran-related links of these two non-Iranian companies—or any non-Iranian entities—to the U.S. government during its investigation.

21.    As explained in my prior declarations, the relevant Iran sanctions regulations prohibit the exportation to Iran of financial services from the United States or by "U.S. persons" (such as U.S. financial institutions), including exports of financial services from the United States to third countries with knowledge or reason to know the services are intended specifically for Iran.  *See* 31 C.F.R. § 560.204.  The fact that non-Iranian companies previously engaged in transactions that were subsequently linked to Iran does not mean that the specific transactions processed by SCB related to Iran, or if they did, that they violated sanctions rules.  Moreover, even if a company had engaged in some improper Iran-related transactions, it does not mean that all of its other transactions with non-Iranian parties violate the sanctions rules.  For example, in recent years OFAC has taken enforcement actions for Iran sanctions violations against major American and international companies and financial institutions including Apple, Amazon, Berkshire Hathaway, HSBC, and Société Générale (a French bank)—but that does not mean that the Iran sanctions rules prohibit any transactions with those companies by U.S. persons or involving the United States.

22.    Further, in terms of whether *SCB* could be potentially viewed as having violated sanctions regulations by facilitating the transactions described in the supposed SARs, Relator fails to demonstrate that the Bank was aware of any Iranian components of these transactions at

11

the time it processed these transactions for its non-Iranian customers, or that the transactions were ever confirmed to violate Iran sanctions regulations. At the very least, if SCB reported these transactions to FinCEN in alleged SARs, the Bank does not appear to have attempted to conceal from the U.S. government its role in these transactions.

23.     In any event, the mere presence in Relator's documents of a handful of non-Iranian companies that SCB allegedly reported to FinCEN, sometimes years later, for having engaged in suspicious transactions with Iranian entities does not bolster Relator's claim. It still remains the case that Relator never identified these (or any other non-Iranian) entities to the U.S. government.

## THE MAXIMUM PRESSURE CAMPAIGN AGAINST IRAN

24.     Finally, Relator's new motion repeats an inaccurate accusation it made in its previous briefing: that the agencies investigating SCB in this case failed to implement the "maximum pressure" sanctions campaign against Iran announced after the United States withdrew in 2018 from the Joint Comprehensive Plan of Action ("JCPOA") nuclear deal. As noted in the State Department fact sheet about the maximum pressure campaign cited by Relator, OFAC and State have sanctioned a large number of individuals and entities on OFAC's List of Specially Designated Nationals and Blocked Persons ("SDN List") and re-imposed a range of secondary sanctions since the JCPOA withdrawal. *See* U.S. Dep't of State, *Fact Sheet: Maximum Pressure on the Regime in Iran* (Apr. 4, 2019), https://www.state.gov/maximum-pressure-campaign-on-the-regime-in-iran.

25.     However, OFAC primary sanctions—such as those relevant to the SCB investigations—have broadly prohibited the processing of transactions with Iran through U.S. financial institutions since November 2008 under separate prohibitions that have been in effect

before, during, and after the United States' participation in the JCPOA. *See* 31 C.F.R. § 560.204.[5] The "maximum pressure" campaign does not allow OFAC to apply penalties for transactions that were not U.S. sanctions violations at the time they occurred. The Iran sanctions program, and all sanctions programs, are subject to the agency's general enforcement framework of undertaking a case-by-case evaluation of specific facts and circumstances when determining the appropriate enforcement response. Indeed, OFAC's Economic Sanctions Enforcement Guidelines require the consideration of a range of factors when assessing an apparent violation of its sanctions programs. *See* 31 C.F.R. §§ 560.703(c)-(d), 560.704; OFAC Economic Sanctions Enforcement Guidelines, 31 C.F.R. Part 501, App. A.

26.    As noted in prior declarations in this case, OFAC and other federal agencies have aggressively and consistently enforced the relevant primary sanctions against both U.S. and non-U.S. financial institutions alleged to have processed transactions through the United States for as long as those sanctions have been in effect. For example, OFAC concluded 26 sanctions enforcement actions in 2019 resulting in over $1.28 billion in penalties and settlement amounts for alleged violations of its sanctions programs, including the $639 million 2019 Settlement Agreement with SCB, which was part of a combined $1.1 billion settlement with OFAC's federal, state, local, and United Kingdom government partners.[6] From 2009 to 2019, OFAC

---

[5] Primary sanctions are those that prohibit virtually all transactions with Iran by U.S. persons or through the United States and were not lifted under the JCPOA (with limited exceptions not relevant here). *See* Iranian Transactions and Sanctions Regulations, 31 C.F.R. Part 560. By contrast, secondary sanctions are generally those that allow the U.S. government to impose sanctions on non-U.S. persons for engaging in targeted activity with designated Iran-related persons or specific sectors in Iran, which was the focus of the re-imposition of sanctions following the U.S. withdrawal from the JCPOA.

[6] U.S. Dep't of Treasury, Press Release, *U.S. Treasury Department Announces Settlement with Standard Chartered Bank* (Apr. 9, 2019), https://home.treasury.gov/news/press-releases/sm647.

collected over $5.64 billion in penalties and settlements for alleged violations of OFAC's

sanctions regulations, including $5.27 billion from U.S. and foreign banks.

* * *

27.     Ultimately, Relator has not provided any evidence that the vague and unsupported

allegations in the BuzzFeed Article relate to transactions with Iranian entities identified by

Relator, much less transactions that represent violations of U.S. sanctions against Iran that were

not investigated by OFAC.  The alleged SARs described in the BuzzFeed Article do not show

that OFAC failed to investigate Relator's allegations against SCB of Iran sanctions violations.

Relator has not provided any new information in its motion to change OFAC's view that

dismissal of its case is appropriate.

Dated: Washington, D.C.
          December 22, 2020

ALEXANDRE MANFULL
Assistant Director
Sanctions Compliance and Evaluation
Office of Compliance and Enforcement
Office of Foreign Assets Control

14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                                 Plaintiff,                      Case No. 18 Civ. 11117 (PAE)

           v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVIICES
CORPORATION,

                                 Defendants.

------------------------------------------------------------x

## NOTICE OF MOTION

        PLEASE TAKE NOTICE, that upon the Memorandum of Law, dated May 31, 2024, and upon the declarations of David J. Scantling, dated May 20, 2024, and the exhibits annexed thereto, Julian Knight, dated May 20, 2024, and the exhibits annexed thereto, and of Patrick M. McSweeney, dated May 31, 2024, and the exhibits annexed thereto, and upon all the prior papers and proceedings had herein, relator Brutus Trading, LLC ("Brutus") will move this Court, before the Hon. Paul A. Engelmayer, at the United States District Courthouse located at 40 Foley Square, New York, New York 10007, on a date and at a time to be designated by the Court, for an Order pursuant to Federal Rule of Civil Procedure 60(d)(3) and this Court's inherent power vacating the final judgment entered in this action on the grounds that plaintiff United States of America (the "Government") committed fraud upon this Court.

PLEASE TAKE FURTHER NOTICE, that pursuant to Federal Rule of Civil Procedure 6, the Government's opposing papers, if any, must be filed by June 17, 2024, and Brutus' reply must be filed by June 27, 2024.

Dated: May 31, 2024

*Patrick M. McSweeney*

_____

Patrick M. McSweeney
Robert J. Cynkar
McSweeney Cynkar & Kachouroff PLLC
3358 John Tree Hill Road
Powhatan, VA 23139
(804) 937-0895
*Attorneys for Relator Brutus Trading LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

|  |  |  |
|---|---|---|
| | Plaintiff, | Case No. 18 Civ. 11117 (PAE) |

      v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVIICES
CORPORATION,

                         Defendants.

-------------------------------------------------------------x

## DECLARATION OF PATRICK M. McSWEENEY

PATRICK M. McSWEENEY, pursuant to 28 U.S.C. § 1746 and subject to the penalties of perjury, declares as follows:

1.      I am counsel to Relator Brutus Trading LLC ("Brutus") in the above-captioned action, and I submit this declaration in support of Brutus's present motion to vacate the judgment.

2.      Annexed hereto as Exhibit A is a true and correct copy of the Declaration of Special Agent Matthew F. Komar, dated November 21, 2019, without exhibits.

3.      Annexed hereto as Exhibit B. is a true and correct copy of the Supplemental Declaration of Special Agent Matthew F. Komar, dated February 28, 2020, without exhibits.

4.      Annexed hereto as Exhibit C is a true and correct copy of the Declaration of Alexander Manfull, dated November 21, 2019, without exhibits.

5.      Annexed hereto as Exhibit D is a true and correct copy of the Supplemental Declaration of Alexander Manfull, dated February 28, 2020, without exhibits.

6.      Annexed hereto as Exhibit E is a true and correct copy of the Declaration of Patrick M. Bryan, dated November 21, 2019, without exhibits.

7.      Annexed hereto as Exhibit F is a true and correct copy of the Declaration of Elizabeth Nochlin, dated February 28, 2020, without exhibits.

8.      Annexed hereto as Exhibit G is a true and correct copy of the Second Supplemental Declaration of Special Agent Matthew F. Komar, dated December 22, 2020, without exhibits.

9.      Annexed hereto as Exhibit H is a true and correct copy of the Third Supplemental Declaration of Special Agent Matthew F. Komar, dated March 8, 2021, without exhibits.

10.      Annexed hereto as Exhibit I is a true and correct copy of the Second Supplemental Declaration of Alexander Manfull, dated December 22, 2020, without exhibits.

11.      Annexed hereto as Exhibit J is a true and correct copy of the Supplemental Declaration of Alexander Manfull, dated February 28, 2020, without exhibits.

12.      Submitted herewith as Exhibit K are true and correct electronic copies of the cloaked and decloaked data files that Brutus gave to the Government in 2012 and 2013.


Dated: May 31, 2024
       Powhatan, VA


*Patrick M. McSweeney*

_____
Patrick M. McSweeney

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                    Plaintiff,

          v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVICES
CORPORATION,

                    Defendants.

No. 18 Civ. 11117 (PAE)

### DECLARATION OF SPECIAL AGENT MATTHEW F. KOMAR

I, Special Agent Matthew F. Komar of the Federal Bureau of Investigation, hereby declare the following pursuant to 28 U.S.C. § 1746:

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 2008.  From December 2010 to November 2014, I was assigned to a squad designated to investigate securities fraud, money laundering and other financial crimes in New York, New York.  Since December of 2014, I have been assigned to the FBI's office in Cleveland, Ohio.

2.      In December 2012, I was assigned as the lead agent in assisting the Civil Division of the U.S. Attorney's Office for the Southern District of New York ("SDNY") in investigating the allegations in a *qui tam* complaint filed by relator Brutus Trading, LLC (the "Relator"), against Standard Chartered Bank, Standard Chartered plc, and Standard Chartered Trade Services Corporation (together, "SCB" or the "Bank") in a case captioned *United States ex rel. Brutus Trading LLC v. Standard Chartered Bank et al.*, No. 12 Civ. 9160 (KBF) (S.D.N.Y.).

3.     Starting in June 2011, I also served as the case agent for an investigation of SCB by the Criminal Division of the U.S. Attorney's Office for the District of Columbia and what is now known as the Money Laundering and Asset Recovery Section of the U.S. Department of Justice's Criminal Division (together, "DOJ").  This investigation initially resulted in a Deferred Prosecution Agreement between the Bank and DOJ dated December 10, 2012 (the "2012 DPA").  *See* Exhibit 1.  After the *qui tam* complaint was filed, I assisted DOJ in its investigation of the Relator's allegations to determine whether SCB had violated the DPA and/or committed additional crimes.  And, as further explained below, beginning in August 2013 until I left New York in 2014, I participated in a separate aspect of the investigation of SCB's conduct that ultimately—several years after my departure—resulted in an Amended Deferred Prosecution Agreement with the Bank on April 9, 2019 (the "2019 DPA").

4.     I make this declaration based on my own personal knowledge as well as a review of documents relating to these investigations, in support of the motion by the United States of America (the "United States") to dismiss the Relator's second amended complaint in the above-captioned case.  This declaration does not set forth all of my knowledge of the matters discussed herein.  All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

**A. The 2012 DPA with SCB and the Associated Investigation**

5.     In January 2010, SCB approached federal and state authorities to self-report that it had facilitated transactions in violation of U.S. sanctions laws.  As a result, FBI and DOJ began an investigation of the Bank relating to this disclosure, to which I was assigned beginning in June 2011.  Other federal and state agencies also began parallel investigations.  The investigations uncovered, among other things, that, from 2001 to 2007, SCB had conspired to violate U.S. economic sanctions laws and processed a large number of illegal payments through

2

the U.S. financial system on behalf of entities subject to U.S. economic sanctions. As relevant here, SCB processed U.S. dollar transactions on behalf of several Iranian banks and companies, but altered the associated wire-transaction records to remove references to sanctioned countries or entities or processed the payments in a non-transparent manner so as to minimize the chances that the transactions would be caught by other banks' sanctions filters and blocked, rejected, or stopped for further investigation. The Bank informed DOJ that it had formally ended its relationships with customers based in Iran in 2006 (in U.S. dollars) and at the end of 2007 (in all other currencies).

6. On December 10, 2012, SCB entered into the 2012 DPA with DOJ, which was filed in the U.S. District Court for the District of Columbia, *see United States v. Standard Chartered Bank*, No. 12 Cr. 262 (JEB) (D.D.C.). As part of the 2012 DPA, the Bank acknowledged that it had facilitated at least $227 million worth of illegal transactions, and agreed to forfeit $227 million to the United States. Among other things, the Bank also agreed to implement improved monitoring for sanctions violations. Around the same time as the 2012 DPA, several of the other agencies that were investigating similar misconduct at SCB also announced resolutions of their investigations, including the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the Board of Governors of the Federal Reserve System (the "Federal Reserve"), and the New York County District Attorney's Office ("DANY"), as well as what is now known as the New York State Department of Financial Services ("DFS"), which had publicly announced its findings a few months earlier.

**B. The Relator's First *Qui Tam* Complaint and Disclosure Statement**

7. On December 17, 2012, approximately one week after the 2012 DPA and certain other agreements were finalized, the Relator—an entity created for the purpose of the lawsuit,

whose members are Julian Knight, a former SCB employee, and Robert Marcellus, a friend of Mr. Knight's who had banking experience—filed its original *qui tam* complaint under seal. *See* Exhibit 2.

8.　　The Relator's complaint alleged that the Bank had misled DOJ and OFAC leading up to the 2012 DPA and 2012 OFAC settlement agreement by failing to disclose certain sanctions-violative transactions in which it had engaged with Iranian entities after 2007.[1]  The complaint alleged that, despite its commitment to have ended its relationships with Iranian banks and companies located in Iran in 2006-07, the Bank continued to knowingly facilitate U.S. dollar transactions for its preexisting Iranian clients for several years after that date.

9.　　Specifically, the Relator claimed that after 2007, SCB had knowingly facilitated specific trade-finance and foreign-exchange transactions on behalf of Iranian government agencies (such as Bank Markazi, which is Iran's central bank, and entities affiliated with the "Ministry of Energy of Iran Group"), and state-owned and private Iranian banks (such as Bank Saderat) and energy groups (such as the National Iranian Tanker Company and the Iranian Offshore Engineering Company)—including several that OFAC had listed as Specially Designated Nationals, *i.e.*, persons or entities with whom financial transactions in U.S. dollars are specifically prohibited.  According to the Relator, these illegal transactions were part of an SCB program known as Project Green, which was run by high-level Bank officials and was designed to hide evidence of these transactions, including by booking the revenue the Bank earned from them in a special "sundry" account and by failing to include the clients' internal

---

[1] Relator amended its complaint on November 14, 2014, solely to add a claim that SCB had also misled the Federal Reserve in the same respect with regard to that agency's 2012 resolution with the Bank.  *See* Exhibit 3.

customer identification numbers in the associated records. The Relator claimed that Project Green was wound down in 2012, in the lead-up to the 2012 DPA.

10.     Along with the *qui tam* complaint, the Relator provided SDNY with a disclosure statement that attached several internal SCB documents that Mr. Knight asserted were in his possession when he left the Bank. These documents included customer lists of SCB's Dubai branch that, as the Relator pointed out, included the Iranian entities described above. These documents also showed, according to the Relator, that the Bank had facilitated certain trade-finance and foreign-exchange transactions for these clients after 2007. Finally, the disclosure statement listed several current and former SCB employees who, according to the Relator, could corroborate the allegations in the *qui tam* complaint.

### C. The Investigation of the Relator's Allegations

11.     Shortly after the Relator's complaint was filed, SDNY notified several other agencies, including DOJ, OFAC, the Federal Reserve, DANY, and DFS, of the Relator's allegations and SDNY's investigation into them, and these other agencies began their own parallel investigations. As mentioned above, I was assigned as the lead agent both to the SDNY investigation of the *qui tam* complaint and to DOJ's parallel criminal investigation of the Bank.

12.     Our investigation began with a joint interview of Mr. Knight and Mr. Marcellus on January 16, 2013, which representatives from each of the above agencies attended. Mr. Knight told us that he had worked at SCB's Dubai branch from January 2009 to November 2011. He reported that, during that time, he had spoken with Bank employees about Project Green and was told it was related to sanctions evasion. He also described contacts between Bank employees and Iranian entities. He stated that he was not aware of any SCB accounts opened for

5

Iranian clients while he was at the Bank, but had heard that some SCB employees may have used their own names to open accounts for Iranian entities.

13.    Mr. Knight described some of the documents attached to the disclosure statement and described in the *qui tam* complaint.  According to these documents, he believed Iranian banks had active login capabilities for SCB's online foreign-exchange system at least as of 2009.  These and other Iranian banks appeared on customer lists of SCB's Dubai branch that Relator provided.  Other documents he discussed appeared to reflect trade-finance and foreign-exchange transactions in U.S. dollars in 2008 and 2009 between SCB and Iranian banks, government agencies, and companies, such as the National Iranian Tanker Company and corporate entities associated with the "Iranian Ministry of Energy Group."  All of the entities referenced by these documents that Mr. Knight brought to our attention were clearly identifiable as Iranian or based in Iran.

14.    Mr. Marcellus told us that he had never worked at SCB, but was knowledgeable about the mechanics of foreign-exchange transactions.  He told us that when a bank such as SCB converted one non-U.S. dollar currency to another, especially currencies that were not commonly traded such as the United Arab Emirates dirham, it likely converted first into U.S. dollars and then into the other currency.  Relatedly, Mr. Knight explained that any transactions at SCB involving U.S. dollars would have necessarily had to involve the Bank's New York branch.

15.    Mr. Knight further stated that when he learned of the government investigation that led to the 2012 DPA, after he left the Bank, he reviewed Bank documents still in his possession, and decided to file a *qui tam* complaint.  Mr. Knight also provided the names of several SCB employees who he said could corroborate his allegations.

6

16. After the interview, the Relator provided SDNY with additional SCB documents of the same type as those attached to the disclosure statement. These documents, which were shared with DOJ, FBI, and other agencies, showed similar information regarding possible transactions involving Iranian clients of SCB.

17. DOJ, SDNY, and other agencies made several requests for information and documents to the Bank relating to the Relator's allegations, including a Civil Investigative Demand ("CID") issued by SDNY on February 4, 2013. In addition, after coordinating with the Relator's then-counsel, SDNY sent the Bank copies of most of the documents the Relator had provided with the disclosure statement, to request the Bank's explanation of them. I understand that these documents were first cleaned of metadata connecting them to Mr. Knight by the Relator's counsel.

18. Over the next several months, SCB produced hundreds of thousands of pages of documents in response to these requests, which I and other members of the investigative team reviewed. We also obtained certain documents directly from former SCB employees whom we contacted, which we also reviewed.

19. Furthermore, counsel for SCB gave two presentations, on February 8 and April 24, 2013, that addressed the transactions alleged by the Relator to be sanctions violations that the Bank failed to disclose before the 2012 DPA. At these presentations, the Bank's counsel reiterated that SCB had committed not to enter into any *new* U.S. dollar transactions with Iranian clients after 2006 and in other currencies after 2007, but that its existing commitments with those clients could not always be immediately broken off. Thus, most of the documents the Relator had provided related to the "wind down" of SCB's pre-2007 business with Iranian clients.

20.    In some instances, SCB had open transactions and commitments with its Iranian clients that were outstanding when the Bank suspended its business with them, such as outstanding loans, trade transactions (letters of credit), and bank accounts.  It therefore sought to wind down those transactions in a manner compliant with U.S. sanctions rules by, for example, permitting its Iranian clients to repay their outstanding loans from the Bank in currencies other than U.S. dollars, or to withdraw their existing balances from bank accounts that were otherwise blocked.[2]  These clients, who had ongoing wind-down transactions with the Bank, continued to be included in client lists and the like until the underlying transactions were completely unwound.  The Bank further reiterated that it had disclosed many of these clients and their associated wind-down activity to DOJ and OFAC in 2011 as part of the investigation that led to the 2012 DPA.

21.    SCB also disclosed that it had facilitated certain other U.S. dollar transactions for these clients as an intermediary between two foreign banks, which was permitted under OFAC rules until mid-2008.  As for the access that Iranian banks and other entities may have had to conduct transactions using SCB's online foreign-transaction system, the Bank explained that these entities had not engaged in any such transactions since early 2007, and indeed were not given access to a new online banking system set up in late 2007 to which other SCB clients were transitioned.

---

[2] Furthermore, the Bank explained that its internal reporting currency was the U.S. dollar, so that any transaction in any currency would be reflected in the Bank's records in its U.S. dollar value, even when the transaction actually took place in another currency.  Moreover, in some of the documents, the category or heading of "Iran" confusingly referred to customers from certain third-party countries, such as Kuwait and others in addition to Iran, that were managed from the Bank's Dubai office, and thus some of the entities under this heading were neither Iranian nor subject to sanctions.

8

22.     The documents produced by the Bank included several "wind down" reports, which detailed how its pre-2007 business with Iranian clients was wound down over the following years, including several such reports that the Bank had previously provided to DOJ and OFAC, as discussed above. DOJ, SDNY, and the other agencies selected a sample of these transactions and asked SCB to provide more detailed information about them. In response, the Bank produced records regarding these transactions as well as an independent report analyzing them, which confirmed the Bank's account of the transactions as wind-down activity.

23.     Furthermore, we interviewed many current and former employees of SCB, including most of the employees the Relator suggested that we contact. Among other things, we learned that Project Green was the internal name that SCB had given to the matter that ultimately led to the 2012 DPA and related settlements.

24.     Our investigation into the Relator's allegations largely wrapped up in August 2013. That investigation did not lead us to uncover any evidence of sanctions violations or violations of the 2012 DPA of the types alleged by the Relator. Instead, we found that the information provided by the Relator related almost entirely to the Bank's winding down of its preexisting transactions with Iranian clients in a manner that did not appear to violate the U.S. sanctions laws, or to the presence of Iranian entities on client lists and similar types of records without any evidence that these clients had engaged in any illegal transactions. We also verified that the Bank had previously disclosed most of the specific customer relationships at issue to DOJ and OFAC.

25.     Based on these findings, SDNY and DOJ concluded that they were not able to corroborate or validate the Relator's allegations. SDNY informed Relator's counsel that it had not been able to substantiate the Relator's allegations, and intended to decline to intervene in the

*qui tam.* Furthermore, DOJ informed the Bank's counsel that it did not need to finish producing privilege logs for documents it had withheld from its productions in response to the CID and other requests.

**D. New Evidence Separately Emerges of Potential Sanctions Violations by SCB**

26.     In 2013, I was also the case agent assigned to a separate, ongoing criminal investigation of another financial institution for providing financial services in violation of U.S. economic sanctions laws.

27.     On or about August 15, 2013, this other financial institution disclosed to DOJ and FBI information relating to certain U.S. dollar transactions it had processed involving a Dubai-based petrochemical company with Iranian links, which had a prior banking relationship with SCB, and its Iranian owner.

28.     This information was promptly disclosed to the team responsible for the 2012 DPA with SCB, as well as to SDNY.

29.     None of the information provided by the Relator prompted this disclosure by this other financial institution or led, even indirectly, to the DOJ's identification of the petrochemical company as an entity whose financial transactions would be subject to U.S. economic sanctions.

**E. The Investigation of SCB's Connection with the Petrochemical Company**

30.     Shortly after learning, from the investigation of the other financial institution, about SCB's connection with the petrochemical company, DOJ and FBI asked SCB in August 2013 for information about its dealings with the company and its knowledge about the company's Iranian connections. The petrochemical company was registered as a Dubai corporate entity, and ultimately owned by an Iranian national who had a Dubai residence permit.

31.     SDNY informed the Relator's counsel that the Government was investigating new information from another source, and had decided to keep the *qui tam* complaint under seal so as not to interfere with this investigation, and in recognition of the possibility that this new investigation might corroborate some of the Relator's allegations.

32.     Over the following months, the Bank produced documents in response to the investigating agencies' requests regarding its client relationship with the petrochemical company, as well as its "know your customer" ("KYC") processes at the Bank's Dubai branch, which I and the other members of the investigative team reviewed.  Furthermore, we interviewed current and former SCB employees regarding, among other things, the Bank's relationship with the petrochemical company and KYC procedures in Dubai.

33.     As a result of this investigation, we identified Bank records indicating that the petrochemical company was a front for an Iranian energy company.  This evidence included, among other things, a fax transmission from the petrochemical company's president to SCB's Dubai branch requesting that the Bank execute a U.S. dollar transaction from the company's account.  The fax header indicated that it was sent from an Iranian number and suggested to the Bank's employees that the company was connected to Iran.

**F.  The SCB Investigation Expands**

34.     Based on the discovery of the fax transmission from the president of the petrochemical company, in the spring of 2014, DOJ requested information from the Bank regarding faxes received by SCB's Dubai branch that requested the execution of U.S. dollar transactions and had headers indicating they were received from Iranian numbers.  A review of those fax transmissions showed that a substantial number of them came from a small number of customers, who became the focus of the next phase of our investigation.

11

35.     Those customers included two Dubai-incorporated companies controlled by an Iranian national who ordinarily resided in Iran named Mahmoud Reza Elyassi, who had a Dubai residence permit.  This was the first time the investigating agencies learned of potential wrongdoing by Mr. Elyassi in connection with this investigation.

36.     I understand that over the following several years, DOJ and FBI investigated the Bank's relationships with Mr. Elyassi's companies and others like it, but I was not part of that investigation.  I understand that this investigation ultimately led to the 2019 DPA.  Other FBI colleagues, including Special Agent Wayne C. Boddy, were the lead agents on the investigation in its later stages.

**G. The Relator's Second *Qui Tam* Complaint**

37.     I am aware that on September 19, 2017, the Relator voluntarily withdrew its *qui tam* case after it had been unsealed.  The following year, the Relator filed a second *qui tam* action against SCB, which it amended twice, most recently on September 23, 2019.  In the latest second amended *qui tam* complaint, which I have reviewed, the Relator alleges that its original complaint and disclosures were the source of the information that led to the agency investigations of SCB that culminated in the 2019 DPA and other related settlement agreements. This is not correct.

38.     First, the investigation of SCB that ultimately led to the 2019 DPA began after SDNY, DOJ, and FBI had initially determined that they could not corroborate the allegations in the original *qui tam* complaint, and the subsequent investigation prompted by the disclosure of the Bank's relationship with the petrochemical company did not change that determination.

39.     Furthermore, as explained above, the investigation that led to the 2019 DPA began as a result of the information DOJ and FBI learned from the separate, ongoing

investigation of a different financial institution, which revealed that SCB had a client relationship with the petrochemical company with Iranian connections discussed above. This led to the broader investigation of faxed instructions for U.S. dollar payments from Iran and other sanctioned countries, which I understand was one of the principal bases for the 2019 DPA.

40.     Moreover, the Relator's allegations are different in kind from what was uncovered in the later investigation of SCB. While the Relator claimed that the Bank continued after 2007 to process illegal transactions in U.S. dollars for its known, preexisting Iranian clients, our recent investigation found that the Bank, among other things, knowingly and willfully violated U.S. economic sanctions laws by processing U.S. dollar transactions through the United States on behalf of customers of SCB's Dubai branch with known Iranian connections. Most of these violations were the result of deficiencies in SCB's compliance program that allowed customers to order U.S. dollar transactions via fax and online payment instructions from Iran and other sanctioned countries. The criminal conspiracy that serves as the basis for the 2019 DPA primarily involved two former employees of SCB's Dubai branch who conspired to help the Bank's Iran-connected customers process U.S. dollar transactions through the United States in violation of U.S. law.

41.     With regard to Mr. Elyassi in particular, although the Relator notes that his name appears on certain client lists of SCB's Dubai branch that the Relator provided to SDNY in connection with its original *qui tam* complaint, that was not the reason why Mr. Elyassi and his activities became subject to investigation. It is true that Mr. Elyassi's name and companies appear on these client lists, among more than 1,400 other Bank clients. But at the time these lists were provided to SDNY, the Relator indicated that they were significant because they included the known Iranian entities identified in the Relator's disclosure statement and discussed during

13

our interview with Mr. Knight and Mr. Marcellus.  During our investigation of the Relator's *qui tam* allegations, the Relator never identified or pointed to Mr. Elyassi's name on those lists, or suggested that we should look into any of the hundreds of other listed Dubai-based SCB clients, including Mr. Elyassi's companies, and never suggested that Mr. Elyassi or his companies had engaged in any wrongdoing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:        November 21, 2019
                  Cleveland, Ohio

                                     Matthew F. Komar
                                       Special Agent
                                       Federal Bureau of Investigation

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BRUTUS TRADING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, and STANDARD CHARTERED TRADE SERVICES CORPORATION,<br><br>Defendants. | No. 18 Civ. 11117 (PAE) |

**SUPPLEMENTAL DECLARATION OF SPECIAL AGENT MATTHEW F. KOMAR**

I, Special Agent Matthew F. Komar of the Federal Bureau of Investigation, hereby declare the following pursuant to 28 U.S.C. § 1746:

1.     I previously submitted a declaration in support of the United States' motion to dismiss Relator's second amended complaint in the above-captioned case.[1]  I have reviewed the Relator's opposition to this motion, and hereby make the following supplemental declaration to respond to certain factual inaccuracies and other points made in Relator's opposition papers with regard to the government investigations at issue.

2.     I make this declaration, like the previous one, based on my own personal knowledge as well as a review of documents relating to these investigations.  This declaration does not set forth all of my knowledge of the matters discussed herein.  All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

---

[1] This declaration uses abbreviations and capitalized terms defined in my original declaration.

### A. The Investigation of Relator's Allegations

1.      As discussed in my first declaration, I participated in the January 16, 2013, interview of the two members of the Relator entity, Julian Knight and Robert Marcellus, at which the investigating agencies asked about the documents that Relator had provided.

2.      At that interview, Mr. Knight directed us to certain entries in those documents reflecting particular known Iranian clients of SCB who he said had continued to transact with the Bank after 2007. These clients included Iranian banks, government agencies, and large companies, such as Bank Markazi (Iran's central bank), Bank Saderat, and the National Iranian Tanker Company. As explained in my prior declaration and in the declaration provided by Alexandre Manfull of OFAC, our investigation concluded that SCB's post-2007 transactions with these entities which were referenced in these documents were either legitimate wind-down transactions that the Bank had previously (*i.e.*, before the Relator filed its complaint) disclosed to DOJ and OFAC or otherwise did not appear to violate any sanctions rules.

3.      We likewise did not find evidence that the Bank had facilitated improper foreign-exchange transactions with known Iranian entities or that it had hidden such transactions by booking the associated revenue in "sundry" accounts.

4.      Our investigation included requesting and reviewing large numbers of documents from the Bank, attending presentations given by Bank counsel about these transactions, and interviewing Bank employees regarding these transactions.[2] After completing these steps, during

---

[2] As mentioned in my prior declaration, as part of our investigation, we provided counsel for SCB with some of the documents we received from Relator, after obtaining the consent of Relator's then-counsel to do so and having Relator's counsel remove any metadata from them that might associate them with Mr. Knight. Mr. Marcellus is thus incorrect that we failed to adequately remove the metadata from these documents, as we were not involved in that process. Mr. Marcellus is also incorrect that anyone from the investigating agencies disclosed Mr. Knight's name to SCB or its counsel.

which we did not uncover evidence corroborating Relator's allegations, we asked the Bank to provide more detailed information about certain representative transactions. The Bank provided this information in a report prepared by an independent consultant. The report confirmed what we had learned from other sources—that the transactions at issue were either legitimate wind-down transactions or were otherwise compliant with sanctions rules.

5.     At no point in the Relator interview did Mr. Knight or Mr. Marcellus indicate that the agencies should investigate entities listed on the documents Relator had provided that were not clearly identified in Bank records as Iranian, such as Dubai-based corporate entities. Instead, Relator identified and urged us to investigate only transactions with a handful of specific known Iranian entities on these documents, such as many of those listed in paragraphs 40-44 of Mr. Knight's declaration.[3]

6.     As I explained in my previous declaration, some of the client lists and other documents provided by Relator included, among well over a thousand other SCB clients, a corporate entity for which Mahmoud Reza Elyassi was listed as a contact. Relator never indicated during the course of the investigation that we should look into this entity, and Mr. Elyassi's contact information in the documents Relator provided does not associate him with Iran. The fact that Mr. Elyassi's Dubai-based company was listed as a client of SCB's Dubai branch was not notable or suspicious in any way.

_____

[3] Nor did Messrs. Knight or Marcellus indicate to us that any of the SCB spreadsheets they provided contained "hidden" columns or data. However, as part of preparing this declaration, I have re-reviewed these documents, including all "hidden" information I could locate, and did not see any additional material information that would have been relevant to our investigation, such as information suggesting that any entities other than those Relator brought to our attention at the time were Iranian.

3

7.      Relatedly, Mr. Knight is incorrect that the SCB employees he identifies in his declaration, Salar Khan and Harish Hernandes, supervised or otherwise worked closely with the two Bank employees (identified in the Elyassi indictment as Persons A and B) who conspired with Mr. Elyassi to cover up his companies' Iranian connections.

8.      Relator also incorrectly suggests that the documents it provided to the investigating agencies included the petrochemical company whose association with SCB was actually disclosed to DOJ and FBI through an unrelated criminal investigation (as discussed in paragraphs 26-27 of my previous declaration). I have confirmed that there are no references to the petrochemical company in the documents Relator provided, and that the entries which Relator suggests may be associated with this company are, in fact, unrelated to it.

9.      Finally, Mr. Marcellus's declaration references an entity called Tanootas Taban Engineering. This entity was not discussed or highlighted in Relator's interview or any of Relator's submissions during the course of the investigation. The documents provided by Relator at the time do not reference an entity by this name, but do list a similarly named entity whose contact information does not associate it with Iran.

**B. Contacts with Anshuman Chandra**

10.     After an introduction mediated by then-counsel for Relator, I corresponded and then spoke with an SCB employee named Anshuman Chandra in September 2013. We first spoke on September 26, 2013.[4] Mr. Chandra had previously made contact with Mr. Knight, directly and through intermediaries. Mr. Chandra also said that he had several CDs containing SCB files, which I asked him to provide to a colleague in the U.S. Consulate in Dubai, who

---

[4] On that call, I informed Mr. Chandra that we had inadvertently disclosed his name to counsel for SCB in an email exchange, but received appropriate reassurance that the attorney in question, a former federal prosecutor, would not share this information with anyone at the Bank.

4

forwarded them to me for review. I then spoke with Mr. Chandra by phone about these files on October 29, 2013, and January 23, 2014, and corresponded with him by email during the same timeframe.

11.     During my discussions with Mr. Chandra, we reviewed the documents he provided. I also reviewed them closely on my own. These files and the information that Mr. Chandra provided were similar to that provided by the Relator. Some of it concerned the same entities and transactions the agencies had previously investigated, including Bank Saderat, but did not call into question any of our conclusions regarding SCB's transactions with those entities. Other documents provided by Mr. Chandra discussed SCB's dealings with Al Rajhi Bank, a Saudi bank that I understand was not subject to U.S. sanctions at the time.

12.     After discussing this information with other investigating agencies, we decided that the information provided by Mr. Chandra did not provide a basis to expand the ongoing investigation. Just like the information provided by Relator, this information did not figure in our investigation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:          February 23, 2020
                Cleveland, Ohio

                                        _____
                                        Matthew F. Komar
                                        Special Agent
                                        Federal Bureau of Investigation

5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

               Plaintiff,

      v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVICES
CORPORATION,

               Defendants.

No. 18 Civ. 11117 (PAE)

### DECLARATION OF ALEXANDRE MANFULL

    I, Alexandre Manfull, hereby declare the following pursuant to 28 U.S.C. § 1746:

    1.    I have held multiple positions with the U.S. Department of the Treasury's Office
of Foreign Assets Control ("OFAC") since 1997. I started as a Compliance Officer in 1997,
primarily providing guidance to financial institutions on the applicability of OFAC-administered
sanctions programs to various transactions. In 2000, I became a Senior Compliance Officer and
performed largely the same functions. In 2005, I became a Chief responsible for managing the
blocked assets reported to OFAC by U.S. persons or persons subject to U.S. jurisdiction. I
briefly left OFAC in 2013 to join Citibank as a Senior Vice President, Global Sanctions
Compliance. I returned to OFAC in 2014 to assume the position of Assistant Director, Sanctions
Compliance and Evaluation ("SC&E") within OFAC's Office of Compliance and Enforcement,
which remains my position today.

    2.    As the Assistant Director for SC&E, I manage all aspects of the division,
including providing guidance on the applicability of OFAC-administered sanctions to financial

institutions and the international trade community, engaging in outreach to the domestic and international financial services community, and managing OFAC's financial sector enforcement process. I have overseen the investigation and resolution of more than 600 financial sector enforcement cases in this position.

3.  I was peripherally involved in OFAC's 2012 settlement with Standard Chartered Bank ("SCB"), which is discussed herein. As stated above, my primary function within SC&E at the time, prior to when I became Assistant Director of the division, related to the administration of blocked assets, and typically did not involve in-depth involvement with the financial sector investigations conducted by others in the division. I attended some meetings at which SCB presented information. Based on my experience with banking products, I also provided advice to colleagues about types of transactions that could be considered likely apparent violations of OFAC's regulations.

4.  In relation to the investigation of the allegations of relator Brutus Trading, LLC ("Relator") in this case, I participated in OFAC's call with Robert Marcellus, as further discussed below, and attended the January 2013 multi-agency meeting with Mr. Marcellus and Julian Knight, as further discussed below. I left OFAC in March 2013, and participated in no further meetings pertaining to SCB or the Relator prior to that departure.

5.  Upon my return to OFAC in August 2014, as the Assistant Director of SC&E, I was directly involved in the investigation of SCB that led to its 2019 settlement with OFAC, which is also discussed herein. I reviewed and edited memos, participated in internal, inter-agency, and external meetings related to the investigation, and participated in the settlement negotiations.

2

6.     I make this declaration based on my own personal knowledge as well as a review of OFAC's files relating to these investigations, in support of the Government's motion to dismiss the Relator's second amended complaint in the above-captioned case.

### OFAC's Mission and Authority

7.     OFAC is principally responsible for administering U.S. economic sanctions programs on behalf of the U.S. government.  These programs are primarily directed against foreign states and nationals to implement U.S. foreign policy and national security goals. Pursuant to authority delegated by the President to the Secretary of the Treasury, OFAC acts under Presidential wartime and peacetime national emergency powers, as well as authority granted by specific legislation, to impose controls on transactions and to freeze, or "block," certain property and interests in property within the United States or in the possession or control of U.S. persons.  OFAC currently administers approximately thirty economic sanctions programs against foreign governments, entities, and individuals.  As part of its sanctions implementation efforts, OFAC publishes a list of individuals and companies whose property and interests in property are blocked (although this list is not exclusive, as there are persons not included on the list whose property and interests in property are blocked).  Listed individuals and companies are often referred to as "Specially Designated Nationals" or "SDNs."

### Sanctions Pursuant to IEEPA

8.     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, grants the President a broad spectrum of powers to deal "with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." *Id.* § 1701(a); *see also id.* § 1702(a)

3

(enumerating Presidential powers permitted to be used in the case of a national emergency).  The President has exercised these powers through Executive orders by declaring national emergencies and imposing economic sanctions to address those emergencies.  Most of OFAC's economic sanctions programs are administered under the authority of IEEPA and various Executive orders issued pursuant to that statute.

9.      The President may, for instance, issue Executive orders that identify specific countries as subject to sanctions authorized by IEEPA, and prohibit any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which such a country has any interest, by any person, or with respect to any property, subject to the jurisdiction of the United States.

**OFAC-Administered Export Sanctions Against Iran**

10.      In November 1979, after Iran seized the U.S. Embassy in Tehran and captured and held hostage U.S. diplomatic personnel working there, the President declared a national emergency with respect to Iran.  In 1995, the President declared another national emergency with respect to Iran, which is the basis for a variety of sanctions.  Most IEEPA-based sanctions on Iran are in place pursuant to the national emergency declared in 1995.  *See, e.g.*, Executive Order (E.O.) 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995) (declaring national emergency); E.O. 12,959, 60 Fed. Reg. 24,757 (May 6, 1995) (imposing comprehensive trade and financial sanctions on Iran); E.O. 13,059, 62 Fed. Reg. 44,531 (Aug. 19, 1997) (among other things, clarifying export and import prohibitions from previous Executive orders).

11.      Section 2(a) of E.O. 13,059 broadly prohibits, with limited exceptions:

[T]he exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or

4

services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that:

> (i) such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran; or

> (ii) such goods, technology, or services are intended specifically for use in the production of, for commingling with, or for incorporation into goods, technology, or services to be directly or indirectly supplied, transshipped, or reexported exclusively or predominantly to Iran or the Government of Iran.

This prohibition has remained in place since 1997.

12.    IEEPA also authorizes the President to issue regulations necessary for the exercise of the authorities granted by that statute. *See* 50 U.S.C. § 1704. This regulatory authority is generally delegated to the Secretary of the Treasury by Executive order when the President issues Executive orders imposing sanctions. *See, e.g.*, E.O. 13,059, § 5. The Treasury Department promulgates regulations to implement economic sanctions which are generally codified in Chapter V of Title 31 of the Code of Federal Regulations. The Iranian Transactions and Sanctions Regulations, 31 C.F.R. part 560, are the regulations that implement E.O. 13,059 and related orders.[1] The regulatory authority delegated to the Secretary Treasury generally is further delegated to the Director of OFAC. *See, e.g.*, 31 C.F.R. § 560.802.

13.    The export prohibition of E.O. 13,059 is implemented at 31 C.F.R. § 560.204, which prohibits "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran[.]"

---

[1] On October 22, 2012, OFAC revised and renamed 31 C.F.R. part 560, and reissued the regulations in their entirety. *See* 77 Fed. Reg. 64,664 (Oct, 22, 2012). This declaration discusses and cites the regulations that were in place at the relevant times.

14.     In an interpretive provision, 31 C.F.R. § 560.410(a), OFAC has made clear that:

The prohibition on the exportation, reexportation, sale or supply of services contained in § 560.204 applies to services performed on behalf of a person in Iran or the Government of Iran or where the benefit of such services is otherwise received in Iran, if such services are performed:

    (1)     In the United States, or

    (2)     Outside the United States by a United States person, including by an overseas branch of an entity located in the United States.

Section 560.410(b) further notes that "[t]he benefit of services performed anywhere in the world on behalf of the Government of Iran is presumed to be received in Iran." This provision has been in place in its current form since April 1999. *See* 64 Fed. Reg. 20,168 (Apr. 26, 1999).

15.     The prohibitions on exportation of services therefore apply (and applied during the times relevant to this matter) to the export of financial services to, *inter alia*, (i) the Government of Iran, including its agencies, and (ii) individuals and entities in Iran, including banks in Iran. However, these prohibitions do not necessarily apply to Iranian citizens who are ordinarily resident outside of Iran, or to corporate entities that such Iranian citizens ordinarily resident outside of Iran own and operate outside of Iran.

## OFAC'S INVESTIGATIONS OF STANDARD CHARTERED BANK

### A. Standard Chartered Bank

16.     SCB is a global financial institution registered and organized under the laws of England and Wales, and headquartered in London. It provides retail, wholesale, and corporate banking services to its customers through operations located predominantly in Asia, Africa, and the Middle East. SCB operates in approximately seventy-one markets and has approximately 90,000 employees, including U.S. offices in New York, California, Florida, and Texas.

6

**B. The 2012 OFAC Settlement with SCB and the Associated Investigation**

17.    As later established by OFAC in the course of an enforcement investigation undertaken by SC&E, in or around March 2005, SCB learned that another financial institution was facing regulatory scrutiny by U.S. authorities for Iranian payment practices that obscured the true identities of beneficiaries in funds transfers.  SCB launched an internal sanctions review to ascertain whether its Iranian business complied with OFAC regulations.  The results of this review led to an additional sanctions compliance review, which began in August of 2005.

18.    The findings and recommendations stemming from this review led to the implementation of additional controls and restrictions on SCB's Iranian business in late 2005 and 2006.  In March 2006, SCB took the following actions: (i) it no longer processed U.S. dollar payments that its Iranian bank clients made on the instructions of, or for the account of, their customers; (ii) SCB asked its Iranian bank customers to include a reference in their payment instructions indicating the type of transaction underlying each payment and to provide documentary evidence to enable SCB to undertake due diligence on a sample basis; and (iii) SCB stopped its prior procedure of altering the information it received in payment instructions from Iranian banks.

19.    SCB then decided to end its Iranian U.S. dollar business altogether as of November 2006.  Thereafter, its business with Iran in other currencies became increasingly restricted and eventually ceased altogether—save for certain pre-existing commitments—by the end of 2007.  Those outstanding commitments to Iranian customers fell into three categories: (i) outstanding loans (including syndicated and bilateral facilities); (ii) trade transactions

(including letters of credit and performance guarantees); and (iii) consumer and wholesale bank accounts.

20.     SCB, as a foreign financial institution, had multiple options for winding down its pre-existing obligations with its Iranian clients.  For transactions related to U.S. dollar-denominated obligations that did not involve an individual or entity blocked by OFAC, SCB could make or accept payments via the so-called U-turn general license, which was in place until November 10, 2008.[2]  For transactions related to pre-existing U.S. dollar-denominated obligations involving an individual or entity blocked by OFAC, or occurring after November 10, 2008, SCB could make or accept payments in currencies other than U.S. dollars, so long as they did not involve the U.S. financial system or any other element subjecting the transactions to the jurisdiction of the United States.

21.     As part of SCB's review and subsequent winding down of its relationships with Iranian clients, the bank identified certain conduct and transactions it had facilitated between 2001 and 2007 in apparent violation of multiple sanctions programs, including sanctions related to Iran.  SCB disclosed the conduct and transactions constituting apparent violations to OFAC in 2010.

22.     Based on SCB's disclosure, OFAC launched an investigation into the bank's payment practices from 2001 to 2007 that impaired compliance with U.S. economic sanctions by financial institutions located in the United States.[3]  This investigation was conducted jointly with the U.S. Department of Justice ("DOJ"), the Office of the District Attorney of New York County

---

[2] Under OFAC rules that were in place until November 2008, U.S. banks could serve as intermediaries in U.S. dollar transactions involving Iranian parties that both originated and terminated outside the United States.  This was often referred to as the "U-turn" general license.

[3] *See* Exhibit 1, Settlement Agreement between U.S. Department of Treasury's Office of Foreign Assets Control and Standard Chartered Bank, December 10, 2012 ("2012 Settlement Agreement"), paragraphs 19-23.

("DANY"), the Federal Reserve Bank of New York and the Board of Governors of the Federal Reserve System ("Federal Reserve"), and the New York State Department of Financial Services (which was then known as the New York State Banking Department) ("DFS").

23.     The investigation revealed that SCB's London branches had omitted or removed material references to the locations of entities (including Iranian entities) in SWIFT messages;[4] replaced the names of SCB customers (including Iranian customers) on SWIFT messages with special characters; and forwarded payment messages to U.S. financial institutions that had been originated by Iranian banks who were SCB customers, which falsely referenced SCB as the ordering financial institution.  SCB memorialized its procedures to process payments sent through the United States from Iranian banks in a document that included detailed instructions on how to omit the Iranian banks' identifiers.[5]

24.     Moreover, SCB's branches in the United Arab Emirates ("U.A.E."), including its Dubai branch, sent payment messages to or through the United States without references to locations or entities implicating U.S. sanctions (such as Iran), which prevented U.S. financial institutions from identifying prohibited payments.  There was typically no indication of the originating customers' Iranian nexus in payment messages to the U.S. intermediary beneficiary banks, and no indication that SCB had attempted to ascertain the permissibility under U.S. sanctions of the payments it was sending.  Thus, the U.S. banks would generally not have been in a position to identify the involvement of an Iranian entity and, as a result, processed hundreds of transactions in apparent violation of OFAC's regulations that were sent by SCB's Dubai branch involving Iranian entities.[6]

---

[4] The SWIFT network, named for the Society for Worldwide Interbank Financial Telecommunication, is the primary mechanism by which financial institutions in different countries transmit payment instructions to one another.
[5] *See* Exhibit 1, 2012 Settlement Agreement, paragraph 5.
[6] *See* Exhibit 1, 2012 Settlement Agreement, paragraph 13.

25. Meanwhile, while the agencies' investigation was ongoing in 2011, SCB sent OFAC a number of wind-down reports regarding its attempts to close out its pre-August 2007 existing obligations related to its Iranian customers. These reports explained how SCB was going about winding down these customer and trade relationships in a manner compliant with OFAC rules. Specifically, SCB explained that for its outstanding lending and trade transactions with Iranian parties denominated in U.S. dollars, the bank was seeking payment in other currencies. With regard to guarantees and counter-guarantees it had given to Iranian clients, SCB was seeking releases from the beneficiaries where possible, but where there had been payment demands under the guarantees that involved an SDN Iranian bank, SCB was attempting to place the funds it owed in the SDN bank's European accounts. Finally, SCB had suspended all consumer and wholesale accounts for Iranian parties, and permitted account holders only to consummate transactions relating to pre-existing obligations or close their accounts. SCB explained that any payments it made or facilitated to Iranian banks did not involve U.S. dollars and were made to frozen accounts where required, and that, per SCB policy, all payments and transactions were being approved by SCB's Group Sanctions Advisor. OFAC had no objection to the manner in which SCB wound down these client relationships.

26. Upon concluding its investigation, OFAC reached a settlement with SCB on December 10, 2012 resolving SCB's potential civil liability for its apparent violations of OFAC sanctions regulations.[7] The bank agreed to settle with OFAC for $132 million,[8] with the obligation deemed satisfied by payment of a greater amount in satisfaction of penalties assessed by U.S. federal or state authorities arising out of the same pattern of conduct. As a part of the

---

[7] OFAC generally refers to transactions with respect to which potential civil liability has been settled as "apparent violations" when no penalty notice has been issued. *See* 31 C.F.R. Part 501 Appendix A. Therefore this Declaration refers to the transactions it has settled with SCB as apparent violations.

[8] *See* Exhibit 1, 2012 Settlement Agreement, paragraph 32.

settlement with OFAC,[9] SCB stated that it had terminated its business and prohibited all new business since 2007, in any currency, with Iranian and other OFAC-sanctioned persons or entities; and had strengthened its sanctions compliance controls by implementing enhanced policies and procedures, customer due diligence, automated transaction and customer screening, training, and assurance.[10]

27.    DFS announced its regulatory action against SCB in relation to the same apparent violations and conduct on August 6, 2012, a few months before the other investigating agencies.

**C. Robert Marcellus Contacts OFAC Before the Relator's *Qui Tam* Complaint Is Filed**

28.    On September 13, 2012, an individual named Scott Anderegg told an OFAC staff member that a friend of his had information relating to some sanctions-related issues involving a bank in the U.A.E. Mr. Anderegg then put OFAC in touch with Mr. Marcellus, who later became part of the Relator entity that filed the federal *qui tam* lawsuit.

29.    OFAC's Compliance Division first spoke by telephone with Mr. Marcellus on September 14, 2012. On that phone call and in subsequent email exchanges in the fall of 2012, Mr. Marcellus told OFAC that he knew a source within SCB's Dubai branch who had information related to ongoing sanctions violations. He also shared what he stated were internal SCB documents and excerpts thereof relating to SCB's dealings after 2006 in U.S. dollars with its Iranian clients, including Iranian banks such as Bank Markazi (which is Iran's central bank) and Bank Saderat, and Iranian companies such as the Iranian Offshore Oil Company. According

---

[9] *See* Exhibit 1, 2012 Settlement Agreement, paragraph 26.
[10] Although SCB indicated to OFAC that it had ended its relationships with its Iranian clients in currencies other than the U.S. dollar, transactions in such other currencies are not subject to U.S. sanctions rules as long as those non-U.S. dollar transactions do not involve the U.S. financial system or otherwise involve transactions subject to the jurisdiction of the United States.

11

to the documents provided by Mr. Marcellus, these transactions included foreign-exchange transactions and letters of credit.[11]

30.     Mr. Marcellus told OFAC that because certain SCB letters of credit with Iranian clients referenced in his documents were denominated in U.S. dollars, the settlement of those letters of credit was necessarily in dollars and would have cleared through SCB's New York branch.  As for foreign-exchange transactions, the information Mr. Marcellus provided indicated that some Iranian financial institutions had access to an SCB foreign-exchange trading facility.  According to Mr. Marcellus, if Iranian banks used this facility for any currency exchanges involving U.A.E. dirhams (which are pegged to the U.S. dollar), it would necessarily entail U.S. dollar clearing transactions involving SCB's New York branch.  That is because, according to Mr. Marcellus, whenever a client converted dirhams to another currency, such transactions required an intermediate step of converting the dirhams to U.S. dollars, which would necessarily be routed through the U.S. financial system.

31.     OFAC thanked Mr. Marcellus for this information and advised him that the agency would contact him with additional questions or issues.

**D.  The Relator's *Qui Tam* Complaint and Associated Investigation**

32.     On December 17, 2012, shortly after the 2012 OFAC settlement was finalized, the Relator filed its original complaint under seal, along with a disclosure statement explaining the allegations and enclosing certain documents.  OFAC was notified of the filing of this complaint by the U.S. Attorney's Office for the Southern District of New York ("SDNY") shortly thereafter, on December 28, 2012.

---

[11] A letter of credit is a commitment by a bank on behalf of an importer (buyer) that payment will be made to the beneficiary (exporter), provided the terms and conditions stated in the letter of credit have been met, as evidenced by the presentation of specified documents.  To expedite the receipt of funds, banks involved in letter of credit transactions typically use wire transfers to settle obligations.

33.     In brief, the Relator claimed that SCB had misled DOJ and OFAC leading up to the 2012 settlement agreements by failing to disclose certain sanctions-violative transactions in which it had engaged with its Iranian clients after 2007.  These Iranian clients included Iranian banks, government agencies, and companies.  The documents attached to the disclosure statement included client lists and prospective client lists for SCB's Dubai branch, access lists for the bank's online foreign-exchange trading platform, and statements indicating the bank's profits and losses from certain customers.  Several of the documents appeared to be spreadsheets from which the information Mr. Marcellus provided to OFAC in September 2012 was excerpted.

34.     OFAC attended a multi-agency interview of the Relator's two members, Mr. Marcellus and Julian Knight, a former employee of SCB's Dubai branch, in January 2013.  In this interview, Mr. Knight and Mr. Marcellus explained their belief that the documents they provided contained evidence that SCB likely engaged in U.S. dollar transactions with Iranian financial institutions and other clients after November 2006 (when SCB decided not to enter into any new U.S. dollar business with Iran) and after December 31, 2007 (at which point SCB had already decided not to enter into any new business with Iran in any currency).  Many of the companies that the Relator mentioned had clear or otherwise obvious ties to Iran, including in their names.  For example, many of the companies were large Iranian banks or commercial entities that were listed in SCB records as being part of the "Ministry of Energy of Iran Group," or otherwise readily associated with Iran, such as the National Iranian Tanker Company.

35.     OFAC also attended presentations by SCB's counsel to several agencies in February and April 2013, which were given in response to inquiries from SDNY, DOJ, and DFS, based on the information and documents provided by the Relator.  In these presentations, SCB identified several Iranian entities (banks and commercial entities related to government agencies)

13

on whose behalf it had processed numerous U.S. dollar transactions from November 14, 2006, to

December 31, 2007. These transactions all related to SCB's winding down of its pre-existing

obligations to these clients, and, due to the "U-turn" general license in place at the time of the

transactions,[12] did not appear to violate OFAC regulations. The Relator's documents further

showed that seven Iranian entities held U.S. dollar accounts at SCB after January 1, 2008. Of

these, five accounts had no activity after 2007, and the remaining two (Bank Saderat and

National Iranian Tanker Company) reflected activity that was limited to wind-down obligations,

for which the Iranian customers' payments to SCB were made in non-U.S. dollar currencies.

36.     As for SCB's online foreign-exchange system, only one Iranian customer (Bank

Saderat) had access to this system after January 1, 2008, but SCB access logs showed that this

customer did not access the system in that timeframe.

37.     OFAC reviewed the information Mr. Marcellus provided to OFAC in September

of 2012, the information subsequently provided by the Relator in connection with the *qui tam*

complaint and disclosure statement, and the information provided by SCB in connection with its

presentations. OFAC was furthermore aware that SCB had previously disclosed to OFAC that it

was continuing to wind-down certain business with Iran that existed prior to the 2007

determination by SCB to end new Iranian business in a manner that did not appear to violate

OFAC regulations. OFAC concluded that the information the Relator had provided likely

reflected neither any new business with a U.S. nexus that SCB had entered into with Iran after

2007, nor transactions with any SDN, but rather the bank's wind-down of its pre-2007

relationships with its Iranian clients. Moreover, to the extent any of the transactions between

---

[12] As noted above, under OFAC rules that were in place until November 2008, U.S. banks could serve as
intermediaries in U.S. dollar transactions involving Iranian parties that both originated and terminated outside the
United States.

14

Iranian clients and SCB reflected in the Relator's documents were processed through the U.S. financial system, OFAC concluded that those transactions were likely consistent with the "U-turn" general license, and did not constitute apparent violations of OFAC's regulations.

38.     OFAC is aware that SDNY, DOJ, and other agencies continued their investigations of the Relator's allegations for several more months after SCB's presentations, including by interviewing bank employees and reviewing documents provided by the bank. While OFAC was generally aware of these investigative steps, and received updates regarding them from the other agencies, it did not participate actively in the remaining investigation of Relator's allegations, as OFAC had already concluded that the conduct was likely related to SCB's winding down of its pre-existing obligations and that the transactions were likely processed in a manner consistent with OFAC regulations. OFAC understands that this investigation had largely ended by August 2013.

**E. New Evidence Separately Emerges of SCB's Sanctions Violations**

39.     A separate investigation of SCB began in August 2013, based on information obtained from an unrelated investigation by OFAC, DOJ, the Federal Reserve, DANY, and DFS into another financial institution (the "Other Financial Institution"). In the course of that investigation, OFAC and the other agencies learned about a Dubai-based petrochemical company (the "Dubai Petrochemical Company") that held an account at SCB's Dubai branch.[13]

40.     The agencies further learned that the Dubai Petrochemical Company was owned and controlled by an Iranian national ordinarily resident in Iran and was affiliated with several corporate entities in Iran, and that its U.S. dollar transactions processed to or through the United States pertained to Iranian commercial activity not authorized by OFAC's regulations or

---

[13] The agencies' investigation of the Other Financial Institution was entirely unrelated to their previous investigations of SCB or to any information that Mr. Marcellus or the Relator provided to OFAC or other agencies.

15

exempted by statute.  Beginning no later than June 27, 2009, and continuing through June 24, 2012, SCB processed 190 transactions totaling over $151 million to or through the United States on behalf of the Dubai Petrochemical Company.[14]

**F.  A New Investigation of SCB Begins**

41.     The new investigation of SCB began with its relationship with the Dubai Petrochemical Company, but the inquiry later expanded to other areas.  First, the investigating agencies discovered that the Dubai Petrochemical Company's president had sent a fax transmission to SCB's Dubai branch authorizing a U.S. dollar transaction, and that the fax transmission included a header indicating it had been sent from an Iranian number.  As a result, the agencies inquired more broadly about faxes SCB had received from Iranian numbers.  Later, the agencies also requested information about customers who had logged in to SCB's online systems from Iranian IP addresses.

42.     Through this new investigation, OFAC and the other agencies learned the following facts, which are detailed in OFAC's 2019 Settlement Agreement, discussed below.  From 2009 to 2012, SCB processed numerous transactions for or on behalf of the Dubai Petrochemical Company, the benefit of which were received in Iran.[15]  These services included several U.S. dollar transactions that the Dubai Petrochemical Company had originated by faxing payment instructions to SCB's Dubai branch from Iran.  As relevant here, the Dubai Petrochemical Company was a Dubai-incorporated entity owned by an Iranian national who presented to SCB a Dubai residence permit.[16]  It was nevertheless improper for SCB to process transactions on behalf of the Dubai Petrochemical Company through the U.S. financial system

---

[14] *See* Exhibit 2, Settlement Agreement between U.S. Department of Treasury's Office of Foreign Assets Control and Standard Chartered Bank, April 9, 2019 ("2019 Settlement Agreement"), paragraph 7.
[15] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 7.
[16] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 10.

16

under U.S. sanctions regulations. SCB had in its possession documents and information, including the faxes from Iran, suggesting that the Dubai Petrochemical Company was actually a front for, and closely affiliated with, an Iranian business controlled by the same individual.[17] Thus, SCB engaged in apparent violations of OFAC's regulations which prohibit the direct or indirect exportation of services to Iran from the United States or by a U.S. person.

43.   SCB's Dubai branch also received faxes whose headers showed Iranian numbers that authorized payment instructions in U.S. dollars from other customers.[18] These payment instructions were used by SCB to originate a number of outgoing U.S. dollar transactions for these customers that the bank processed to or through the United States. A review of these faxes, which SCB produced as part of the investigation, showed that two of the bank's Dubai corporate customers—both of which were part-owned by the same Iranian individual, Mahmoud Reza Elyassi—generated the majority of the payment transaction volume based on faxes from Iran.[19] Like the Dubai Petrochemical Company, these entities were incorporated in Dubai, and their owner, Mr. Elyassi, had a Dubai residence permit. But a close examination of SCB's records and communications with these clients showed that the Bank should have been, and indeed was, aware of the improper Iranian connections of these clients and others like them. The investigation further uncovered that two SCB employees actively assisted Mr. Elyassi in disguising his Iranian connections in order to facilitate SCB's processing of U.S. dollar transactions on behalf of his companies.[20]

44.   SCB appears to have had actual knowledge that some of the Bank's customers were misusing or misrepresenting their U.A.E. residency and, instead, were ordinarily resident in

---

[17] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 15.
[18] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 30.
[19] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 31.
[20] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 31.

17

or conducting business with or from Iran. Although the bank had information connecting several of its customers to Iran or Iranian-related payments, the bank failed to implement proper controls or conduct a reasonable level of due diligence to identify problematic customers and prohibited transactions.[21]

45.    Based on the volume and scope of potentially violative transactions that SCB processed to or through the United States as a result of faxes and other communications it received directly from Iran, OFAC and its interagency partners later requested that SCB investigate whether it had engaged in similar conduct with sanctioned countries or parties through SCB's online and mobile banking platforms.[22]  SCB subsequently reviewed U.S. dollar-denominated online and mobile banking transactions it processed to or through the United States that were for or on behalf of customers of certain branches (including Dubai) to determine whether (i) the account holders were physically located in Iran or other countries subject to comprehensive U.S. economic sanctions when they initiated the payments, or (ii) the payment instructions originated from Iran or other countries subject to comprehensive U.S. economic sanctions.

46.    The investigation determined that SCB did not block access to its online banking platforms from sanctioned jurisdictions until 2014, which meant that entities and individuals with SCB accounts could conduct transactions while they were physically located in Iran or other countries subject to comprehensive sanctions.  Allowing entities and individuals to access the U.S. financial system by conducting U.S. dollar transactions from sanctioned countries is an improper exportation of services to that country.  SCB's failure to prevent such access led to

---

[21] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 30.
[22] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 44.

apparent violations of sanctions regulations relating to its online and mobile banking platform.[23] These apparent violations, like the others, showed that some of SCB's clients had improper connections with Iran and other sanctioned countries, which should have led SCB to restrict these clients' ability to transact in U.S. dollars.

47.    None of the online transactions that were eventually determined to constitute apparent violations, and none of the fax transactions that were eventually determined to constitute apparent violations, were made on behalf of any of the Iranian entities brought to OFAC's attention by Mr. Marcellus or the Relator.

**G. Resolution of OFAC's Investigation of SCB**

48.    In total, OFAC determined through its latest investigation that from June 2009 until June 2014, SCB processed almost 10,000 transactions totaling more than $437 million to or through the United States involving persons or countries subject to comprehensive sanctions programs administered by OFAC. The majority of the conduct concerned Iran-related accounts maintained by SCB's Dubai branch. This branch processed U.S. dollar transactions to or through SCB's New York branch and other U.S. financial institutions on behalf of customers that sent payment instructions to SCB Dubai while physically located and/or ordinarily resident in Iran.[24]

49.    SCB agreed to settle with OFAC its civil liability related to these transactions for approximately $639 million. SCB's obligation to pay OFAC this settlement amount was deemed satisfied up to an equal amount by payments in satisfaction of penalties assessed by other U.S. federal agencies (DOJ and the Federal Reserve) arising out of the same patterns of conduct

---

[23] *See* Exhibit 2, 2019 Settlement Agreement, paragraphs 54-55.
[24] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 6.

19

during the same time periods.[25]  SCB's settlement with OFAC was part of a global settlement of the bank's conduct that also involved DOJ, the Federal Reserve, DANY, DFS, and the United Kingdom Financial Conduct Authority, SCB's home regulator.  All together, the bank paid in excess of $1.1 billion to resolve the potential claims and charges of these agencies relating to the conduct described herein.

### H. The Relator's Second *Qui Tam* Complaint

50.    While the interagency investigation of SCB continued, the Relator withdrew its original *qui tam* complaint against SCB in September 2017 after the Court unsealed it.  About one year later, on November 28, 2018, while the agencies were negotiating their latest settlements with the Bank, the Relator filed a new complaint, which essentially restated the allegations in the earlier withdrawn complaint.  In April 2019 (and again in September 2019), the Relator amended this second complaint somewhat.  The new complaint included allegations suggesting that the then-recent interagency settlements (including OFAC's) were a result of, at least in part, the agencies' investigations into the Relator's allegations in his original, withdrawn complaint.  Furthermore, Relator's second amended complaint claims that it was the Relator who brought Mr. Elyassi to OFAC's (and the other agencies') attention.  This contention is not correct.

51.    As explained above, OFAC and the other agencies had largely ended their investigation of the Relator's allegations *before* they received the information about the Dubai Petrochemical Company via the investigation of the Other Financial Institution.  It was as part of the investigation of the Dubai Petrochemical Company that the agencies learned that SCB's Dubai branch received faxes that included payment instructions in U.S. dollars, which led to a

---

[25] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 64.

production of similar faxes from SCB that included many from Mr. Elyassi's companies. This inquiry was how OFAC and the other agencies first learned of Mr. Elyassi.

52. Upon receipt of the Relator's latest complaint, OFAC re-reviewed the documents and communications that Mr. Marcellus and the Relator provided in 2012 and early 2013. While some of the lengthy customer lists of SCB's Dubai branch include Mr. Elyassi's name among approximately 1,400 others, nothing in the Relator's disclosure statement or communications at the time identified or pointed specifically to Mr. Elyassi's connection to Iran. Instead, at the time, the Relator pointed OFAC and the other agencies to completely unrelated customers on these lists, which were known Iranian banks and entities that were indisputably based in or connected to Iran. Even the contact information for Mr. Elyassi on these lists did not suggest an Iranian connection. It was thus not the Relator that led OFAC or its agency partners to Mr. Elyassi.

53. Moreover, the types of allegedly violative transactions that the Relator disclosed are different in kind from the transactions OFAC and the other agencies uncovered in their recent investigations. While the Relator alleged that SCB intentionally, and improperly, continued to permit its known Iranian pre-2007 clients to transact in U.S. dollars after it had announced that it would no longer permit such transactions, the investigation that led to the recent round of settlements with SCB was based on independent discoveries that SCB's Dubai branch exercised insufficient due diligence with regard to, and in some instances knowingly overlooked, the Iranian connections and ownership of some of its Dubai-based corporate clients.

54. With respect to SCB's online and mobile banking platforms, OFAC's investigation centered on the fact that SCB did not take appropriate measures to ensure that those transactions on its platforms that were initiated from countries subject to comprehensive OFAC-

21

administered sanctions were compliant with applicable prohibitions.[26] OFAC's focus was on clients of SCB's Dubai branch who logged into their online accounts to request transactions in U.S. dollars while using an Iranian IP address (*i.e.*, while geographically located in Iran). Because OFAC's regulations prohibit the exportation of services to Iran, these transactions were likely violations of OFAC's regulations simply by virtue of the client having been located in Iran at the time it requested the transaction.

55.     In contrast, the Relator's allegations were that preexisting Iranian clients maintained and utilized their online access to SCB systems to effect foreign exchange transactions that, because of the U.A.E. dirham peg to the U.S. dollar, would require an intermediate U.S. dollar foreign-exchange leg that would clear through SCB's New York branch. OFAC did not have to determine whether this allegation was correct because, as explained above, the agencies found no evidence that any of the Iran-based clients identified as a result of the Relator's information engaged in online foreign-exchange transactions with SCB after 2008.

56.     Relator is thus incorrect that its disclosures, or any of the information provided by Mr. Marcellus to OFAC, prompted or contributed to the investigations that led to the 2019 settlements by OFAC and other agencies with SCB.

Dated: Washington, D.C.
       November 21, 2019

_Alexandre Manful_
ALEXANDRE MANFULL
Assistant Director
Sanctions Compliance and Evaluation
Office of Compliance and Enforcement
Office of Foreign Assets Control

---

[26] *See* Exhibit 2, 2019 Settlement Agreement, paragraph 44.

22

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BRUTUS TRADING, LLC, | |
| Plaintiff, | No. 18 Civ. 11117 (PAE) |
| v. | |
| STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, and STANDARD CHARTERED TRADE SERVICES CORPORATION, | |
| Defendants. | |

### SUPPLEMENTAL DECLARATION OF ALEXANDRE MANFULL

I, Alexandre Manfull, hereby declare the following pursuant to 28 U.S.C. § 1746:

1.     I previously submitted a declaration in support of the United States' motion to dismiss Relator's second amended complaint in the above-captioned case.  I have reviewed the Relator's opposition to this motion, *see* Relator's Opposition to the Government's Motion to Dismiss Relator's Second Amended Complaint ("Opp."), and the accompanying declarations, and hereby make the following supplemental declaration to respond to certain inaccuracies and other points made in Relator's opposition papers with regard to the government investigations at issue.

2.     I make this declaration, like the previous one, based on my own personal knowledge as well as a review of documents relating to these investigations.  This declaration does not set forth all of my knowledge of the matters discussed herein.  All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

### OFAC'S MISSION AND AUTHORITY

3.      As explained in my initial declaration, OFAC is the agency principally responsible for administering U.S. economic sanctions programs on behalf of the U.S. government.[1]  Most of OFAC's economic sanctions programs are administered under the authority of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, and various Executive Orders issued pursuant to that statute.  OFAC may impose sanctions by, *inter alia*, (i) prohibiting transactions by U.S. persons with sanctioned foreign countries or (ii) freezing (or "blocking") the property and interests in property within U.S. jurisdiction of certain sanctioned individuals, entities, and governments.  As part of its sanctions implementation efforts, OFAC publishes a List of Specially Designated Nationals and Blocked Persons ("SDN List"), which is a list of individuals and entities known colloquially as "SDNs," whose property and interests in property are blocked if they are or come within the United States or the possession or control of a U.S. person.

4.      Contrary to the Relator's allegations, Opp. at 2, 27-28, OFAC and other federal agencies aggressively enforce these sanctions against both U.S. and non-U.S. banks.  OFAC concluded 26 sanctions enforcement actions in 2019 resulting in over $1.28 billion in penalties and settlement amounts for alleged violations of its sanctions programs.  Among these settlements were OFAC's $639 million 2019 Settlement Agreement with SCB, which was part of a combined $1.1 billion settlement with federal, state, local, and United Kingdom government partners.[2]  From 2009 to 2019, OFAC collected over $5.64 billion in penalties and settlement

---

[1] This declaration uses abbreviations and capitalized terms defined in my first declaration.
[2] U.S. Treasury Department, Press Release, "U.S. Treasury Department Announces Settlement with Standard Chartered Bank" (Apr. 9, 2019), *available at* https://home.treasury.gov/news/press-releases/sm647.

amounts for alleged violations of OFAC sanctions, including $5.27 billion from U.S. and non-U.S. banks.

5.　　In addition, OFAC is an integral part of the U.S. Government's current "maximum pressure" campaign against Iran, which is applying unprecedented financial pressure on the Iranian regime.  Since the United States' withdrawal from the Joint Comprehensive Plan of Action with Iran relating to its nuclear program, OFAC has re-imposed all the sanctions that were lifted or waived in connection with that deal and has sanctioned over 800 targets in connection with Iran.[3]

**OFAC-ADMINISTERED SANCTIONS**

**A. OFAC-Administered Export Sanctions Against Iran**

6.　　As explained in my initial declaration, OFAC administers U.S. sanctions against Iran imposed under Executive Orders issued pursuant to IEEPA.  The IEEPA-based sanctions on Iran at issue in this case were issued pursuant to a national emergency declared in 1995. *See, e.g.*, Executive Order (E.O.) 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995) (declaring national emergency); E.O. 12,959, 60 Fed. Reg. 24,757 (May 6, 1995) (imposing comprehensive trade and financial sanctions on Iran); E.O. 13,059, 62 Fed. Reg. 44,531 (Aug. 19, 1997) (among other things, clarifying export and import prohibitions from previous Executive Orders).[4]

7.　　Treasury promulgates regulations to implement economic sanctions, including the Iranian Transactions and Sanctions Regulations, 31 C.F.R. part 560, which implement the

---

[3] U.S. Treasury Department, Press Release, "U.S. Government Fully Re-Imposes Sanctions on the Iranian Regime as Part of Unprecedented U.S. Economic Pressure Campaign" (Nov. 5, 2018), *available at* https://home.treasury.gov/news/press-releases/sm541.

[4] The Executive Order cited by the Relator, *see, e.g.*, Opp. at 12 (citing E.O. 12,170, 44 Fed. Reg. 65,729 (Nov. 14, 1979)), was revoked in 1981, and is not the basis for any of the sanctions at issue in this case.  *See* E.O. 12,282, 46 Fed. Reg. 7925 (Jan. 19, 1981) (revocation).

comprehensive sanctions on Iran imposed pursuant to E.O. 13,059 and related orders.[5]  The

export prohibition in Section 2(a) of E.O. 13,059 is implemented at 31 C.F.R. § 560.204, and is

further explained in 31 C.F.R. § 560.410(b).  These regulations prohibit the export of services,

including financial services, by a U.S. person or from the United States to, *inter alia*, (i) the

Government of Iran, including its agencies, and (ii) individuals and entities in Iran, including

banks in Iran.

8.      These prohibitions do not presumptively apply to exports of services to Iranian

citizens ordinarily resident outside of Iran, or to corporate entities outside Iran that are owned

and operated by Iranian individuals ordinarily resident outside of Iran.  In addition, the

prohibitions described above also do not apply to financial transactions conducted outside the

United States that do not involve U.S. financial institutions or other U.S. persons, even if the

transactions are denominated in U.S. dollars.  Such transactions are not prohibited by 31 C.F.R.

part 560 because they are outside of U.S. jurisdiction for purposes of these sanctions.

**B.  OFAC-Administered "Blocking" Sanctions Against Iran**

9.      Separate and distinct from the export prohibitions described above, OFAC also

administers "blocking" sanctions against a more limited set of Iranian "blocked persons."  Rather

than prohibiting exports of financial services (and other exports) to Iran by U.S. persons or from

the United States, these blocking sanctions require any property and interests in property of

particular blocked persons to be frozen (or "blocked") if the property or interests in property are

or come within the United States or the possession or control of a U.S. person.

---

[5] On October 22, 2012, OFAC revised and renamed 31 C.F.R. part 560, and reissued the
regulations in their entirety.  *See* 77 Fed. Reg. 64,664 (Oct. 22, 2012).  This declaration discusses
and cites the regulations that were in place at the relevant times.

4

10.     On February 5, 2012, the President issued an Executive Order blocking the

property and interests in property of the Government of Iran and Iranian financial institutions.

*See* E.O. 13,599, 77 Fed. Reg., 6,659 (Feb. 5, 2012).[6]  Sections 1(a) and (b) of the Executive

Order state:

> All property and interests in property of the Government of Iran [and of any
> Iranian financial institution], including the Central Bank of Iran, that are in the
> United States, that hereafter come within the United States, or that are or hereafter
> come within the possession or control of any United States person, including any
> foreign branch, are blocked and may not be transferred, paid, exported,
> withdrawn, or otherwise dealt in.

These blocking sanctions became effective on February 5, 2012, and were codified into

regulation on October 22, 2012.  31 C.F.R. § 560.211(a), (b) (promulgated by 77 Fed. Reg.

64,666, 64,669 (Oct. 22, 2012)).  The regulations further define the terms "blocked account and

blocked property" to mean:

> [A]ny account or property subject to the prohibitions in § 560.211 held in the
> name of the Government of Iran, any Iranian financial institution, or any other
> person whose property and interests in property are blocked pursuant to
> § 560.211, or in which the Government of Iran, an Iranian financial institution, or
> such person has an interest, and with respect to which payments, transfers,
> exportations, withdrawals, or other dealings may not be made or effected except
> pursuant to an authorization or license from [OFAC] expressly authorizing such
> action.

31 C.F.R. § 560.322 (promulgated by 77 Fed. Reg. 64,666, 64,672-73 (Oct. 22, 2012)).  These

blocking sanctions apply only with respect to property and interests in property in the United

States or the possession or control of a U.S. person; thus, an account or property would only be a

"blocked account or blocked property" within the meaning of section 560.322 if it were "subject

to the prohibitions in § 560.211" because it was within the United States or the possession or

---

[6] Until February 5, 2012, the only applicable blocking sanctions relating to Iran applied with
respect to particular SDNs designated under other OFAC sanctions programs, such as those
targeting global terrorism and proliferation of weapons of mass destruction, which are not
primarily at issue here.  *See, e.g.*, 31 C.F.R. parts 544, 594.

control of a U.S. person. *See id.* §§ 560.211, 560.322. The blocking sanctions do not presumptively apply to transactions conducted outside the United States by a non-U.S. bank, even if denominated in U.S. dollars.

11. The Relator incorrectly states that "[t]ransactions that involve or benefit individuals or entities subject to U.S. sanctions when the transactions are based in [U.S. dollars] must be blocked during the dollar-clearing process." Opp. at 12; *accord id.* at 13, 25; Sweeney Decl. ¶¶ 13-14; Knight Decl. ¶¶ 48-49. This is not accurate, however, because, as explained above, OFAC blocking sanctions do not apply to all transactions involving Iran, but rather only to dealings in the property or interests in property of blocked persons, such as the Government of Iran or Iranian financial institutions, that are or come within the United States or the possession or control of a U.S. person. Moreover, these sanctions did not come into effect until February 5, 2012. As a result, U.S. financial institutions were not required to block all U.S. dollar transactions relating to Iran.

12. Because the Relator documents that OFAC reviewed did not indicate that SCB engaged in transactions with the property or interests in property of the Government of Iran or Iranian financial institutions that took place in the United States or within the possession or control of a U.S. person after February 5, 2012, it does not appear the blocking provisions are relevant to this matter. The applicable sanctions rules are the export prohibitions discussed above.

**C. The "U-turn" General License**

13. Relator's Opposition inaccurately describes the requirements of the general license in 31 C.F.R. § 560.516(a)(1) that authorized certain Iran-related funds transfers until November 10, 2008 (the so-called "U-turn" general license). *See* Opp. at 28. Until November 10, 2008, this license provided that:

> (a) U.S. depository institutions are authorized to process funds transfers to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, if the transfer is covered in full by any of the following conditions and does not involve debiting or crediting an Iranian account [*i.e.*, an account of persons located in Iran or of the Government of Iran maintained on the books of a U.S. depository institution or a U.S. registered broker or dealer in securities]: …
>
> > (1) The transfer is *by order of a foreign bank which is not an Iranian entity* from its own account in a domestic bank (directly or through a foreign branch or subsidiary of a domestic bank) to an account held by a domestic bank (directly or through a foreign branch or subsidiary of a domestic bank) *for a foreign bank which is not an Iranian entity.* For purposes of this section, 'foreign bank' includes a foreign subsidiary, but not a foreign branch of a domestic bank.

31 C.F.R. §§ 560.516(a) (emphasis added), 560.320 (2007) (bracketed definition of "Iranian account"); *see also* 73 Fed. Reg. 66,541 (Nov. 10, 2008) (revocation of U-turn general license). Put simply, this license authorized foreign banks, before November 10, 2008, to route U.S. dollar transactions for Iranian clients through U.S. banks so long as the transaction both originated and terminated outside the United States.

14.     Contrary to Relator's description, this general license did not require the involvement of two different foreign banks, but instead required only that transfers be initiated and received by foreign banks. As a result, this rule did not foreclose a foreign bank like SCB from conducting U-turn transfers through its own New York branch on behalf of two foreign clients, even if no other foreign banks were involved in the transactions. The *Federal Register* notice cited by Relator, 73 Fed. Reg. 66,541 (Nov. 10, 2008) (preamble to the rule revoking the U-turn general license), described the most common scenario for U-turn transactions (*i.e.*, funds transfers from one foreign bank to another), but did not impose a requirement for two different foreign banks be involved.

7

15.     The U-turn general license did not, however, authorize funds transfers involving SDNs.  In particular, it explicitly excluded transactions directly or indirectly involving Bank Saderat, an Iranian bank, effective September 8, 2006, 31 C.F.R. § 560.516(f) (2007).  Certain transactions involving that bank that were ordinarily incident and necessary to a licensed transaction entered into before that date could nonetheless be completed until December 7, 2006, *see id.* § 560.405(a) (2007).  OFAC subsequently designated Bank Saderat and a related U.K. entity, Bank Saderat PLC, on the SDN List on October 25, 2007, pursuant to E.O. 13,224, 72 Fed. Reg. 65,837, 65,838 (Nov. 23, 2007).[7]

**D. Transactions by Non-U.S. Persons Outside the United States**

16.     As explained above, the applicable OFAC sanctions prohibit exports of financial services from the United States or by U.S. persons.  In contrast, non-U.S. banks are generally *not* prohibited from conducting transactions involving Iran outside the United States, even if denominated in U.S. dollars and even if the non-U.S. bank has a separate U.S. branch.  The mere fact that a transaction was denominated in U.S. dollars does not necessarily mean it was conducted in U.S. dollars through a U.S. financial institution.  For example, transactions may be denominated in U.S. dollars but processed outside the United States using non-U.S. dollar currencies or U.S. dollar reserves.

17.     The Relator is thus incorrect that non-U.S. banks such as SCB were prohibited from engaging in wind-down (or any) transactions in non-U.S. dollar currencies or for which they used funds in their U.S. dollar accounts outside the United States.  *See* Opp. at 1, 29; Knight Decl. ¶¶ 48-49.  Nor, contrary to Mr. Knight's statement, does the mere fact that a foreign

---

[7] Note that Bank Saderat PLC was not excluded from the U-turn general license in September 2006.  Bank Saderat PLC was designated by OFAC on the SDN List on October 25, 2007, at which point it became ineligible for the U-turn general license.

financial institution accepts the repayment of a U.S. dollar-denominated obligation of an Iranian client in another currency (in order to ensure compliance with OFAC regulations), constitute a sanctions violation, even if it required a separate agreement between the bank and the client. *See* Knight Decl. ¶¶ 61, 63.

18.  Moreover, as explained in my initial declaration and discussed further below, many of the transactions in the Relator's documents related to SCB's winding down of its pre-existing relationships with Iranian clients, which the Bank disclosed to OFAC in several wind-down reports.

19.  Not objecting to wind-down transactions outside the United States was consistent with the U.S. government's sanctions policies, at the relevant times, of restricting financial benefits to Iran.  By terminating their business relationships with Iran in an orderly way, non-U.S. banks reduced their legal exposures to Iranian counterparties, who otherwise could have pursued legal claims against SCB for contract terminations and benefitted from a windfall from any awarded damages or liabilities.  In addition, many of the wind-down transactions processed by SCB involved collection of outstanding loan payments from Iranian parties, which otherwise similarly would have resulted in a windfall for Iran.

### OFAC'S INVESTIGATIONS OF STANDARD CHARTERED BANK

**A.  OFAC's Investigation of Relator's Claims**

20.  I detailed in my prior declaration how OFAC learned of, and investigated, the information provided by the Relator and by Robert Marcellus before the Relator filed its complaint.  As previously explained, OFAC reviewed this information and concluded it largely related to the Bank's wind-down of its pre-2007 relationships with its Iranian clients in non-U.S. dollar currencies outside of the United States or, to the extent the transactions were processed

through the U.S. financial system, to transactions that were consistent with the "U-turn" general license, and therefore did not constitute apparent violations of OFAC's regulations.[8]

21. Specifically, the Relator's documents reflected that SCB had processed U.S. dollar transactions for several Iranian entities (banks and commercial entities related to government agencies) between November 14, 2006, and December 31, 2007. These transactions did not appear to violate OFAC regulations, due to the U-turn general license in place at the time of the transactions. We also learned that a handful of Iranian entities held U.S. dollar accounts at SCB after January 1, 2008. Of these, most had no activity after 2007, and the remainder reflected only wind-down obligations, for which the Iranian customers' payments to SCB were made in non-U.S. dollar currencies, which thus did not constitute apparent sanctions violations either.

22. Other transactions reflected in the Relator's documents had not been conducted in U.S. dollars through the U.S. financial system at all, but instead were recorded in their U.S. dollar equivalent in SCB's internal systems for record-keeping purposes, as the U.S. dollar was the Bank's reporting currency. And yet other transactions related to countries other than Iran which were overseen by the Bank's group for "Significant Non-Presence Countries," which covered Iran as well as other Middle Eastern countries. These categories of transactions did not appear to violate any sanctions rules either as they did not involve Iran or sanctioned parties.

23. As I also noted previously, during the agencies' first investigation of SCB, which resulted in the 2012 settlement agreement, the Bank sent OFAC a number of wind-down reports in 2011 regarding its attempts to close out its pre-August 2007 existing obligations related to its

---

[8] As noted in my initial declaration, OFAC uses the term "apparent violation" whenever it has not made a formal finding whether a particular transaction violated the applicable sanctions rules.

Iranian customers. OFAC reviewed these reports and found that they did not reflect apparent sanctions violations.

24.     Many of the transactions in the Relator's disclosures were with clients listed in these wind-down reports. These include IFIC Holding AG, *see* Opp. at 4; Marcellus Decl. ¶ 95, and all but one of the entities discussed in paragraphs 40-44 of Julian Knight's declaration, including the National Iranian Tanker Company, Bank Markazi, and the Iranian Ministry of Economic Affairs and Finance. The reports indicated that SCB's transactions with these clients were processed in non-U.S. dollar currencies outside the United States or that the clients maintained accounts in which there was no transactional activity. In other words, SCB provided details to OFAC of most of the relevant entities before Mr. Marcellus contacted OFAC and the Relator filed its complaint, and OFAC concluded that the relevant transactions did not appear to violate sanctions rules.

25.     Relator is incorrect that OFAC's investigation of its allegations relied to any significant extent on the report prepared by a consultant to the Bank regarding a sample of transactions selected by the investigating agencies. Opp. at 5, 22-23. This sample was selected only after most of the investigation of Relator's allegations had concluded, and was simply intended to spot-check and confirm the agencies' findings, which it did.[9]

26.     The Relator's disclosures pertained specifically to the handful of clearly identified Iranian customers on the documents it provided, as opposed to the hundreds of other clients of

---

[9] Nor is there any relevance to the discussion of OFAC's sampling processes in an internal email attached to a Congressional report cited by Relator. *See* Opp. at 3 & Ex. 6; Repub. Staff of H. Comm. on Financial Services, 114th Cong., 2d Sess., *Too Big to Jail: Inside the Obama Justice Department's Decision Not to Hold Wall Street Accountable*, appendix 27 (July 11, 2016), *available at* https://financialservices.house.gov/uploadedfiles/07072016_oi_tbtj_sr.pdf. This email addresses the opposite concern than the one cited by the Relator: namely, that OFAC had treated transactions as sanctions violations (in another case) without reviewing the underlying documents to confirm they were in fact prohibited.

SCB's Dubai branch listed therein. Relator is thus incorrect that it was a source of information regarding any such clients that, through the subsequent and separate investigative efforts of OFAC and the other agencies, were determined to be fronts for Iranian companies. Thus, as explained in my previous declaration, Relator never identified Mahmoud Reza Elyassi or his companies to OFAC. And nothing in the documents provided indicated that Mr. Elyassi had any connection to Iran.

27.     In regard to Tanootas Taban Engineering, Relator never identified that entity in its written or oral disclosures, and that name does not appear on any of the Relator documents reviewed by OFAC. The Relator's documents include an entity with a similar, but not identical, name which is identified as a United Arab Emirates company without any indication of Iran-related ties.

28.     Relator is further incorrect that the documents it provided reference the petrochemical company whose transactions with the Bank, disclosed to OFAC through an unrelated criminal matter, launched the investigation that ultimately led to the 2019 settlement with SCB. A similar name appears on the Relator documents reviewed by OFAC, which lists it as a United Arab Emirates company without any indication of Iran-related ties, but it is not clear these are the same entities. In any event, Relator never identified either of those entities in its disclosures.

29.     With regard to the documents and information provided by Anshuman Chandra to the FBI after the agencies wound down their investigation of the Relator's allegations, OFAC received these documents and, as with the Relator's documents, did not allege any additional apparent sanctions violations based on those documents. One of the banks mentioned in these documents, which Mr. Chandra says he reported to his superior, is Al Rajhi (or Al Rhajhi) Bank

12

of Saudi Arabia. Chandra Decl. ¶ 5; Marcellus Decl. ¶¶ 88-89. This bank is not an Iranian bank and was never on the SDN List or otherwise subject to OFAC sanctions. SCB was thus not generally prohibited from dealing with it under U.S. sanctions rules during the relevant period.

**B. The 2019 SCB Settlements**

30.     As explained in my initial declaration, OFAC launched a separate investigation of SCB in August 2013, based on information obtained from an unrelated investigation into another financial institution. This investigation resulted in OFAC's 2019 settlement agreement with SCB, as well as resolutions with the other investigating agencies.

31.     The Relator argues that OFAC's 2019 settlement agreement is inconsistent with the contemporaneous resolutions of the New York State Department of Financial Services ("DFS") and the U.K. Financial Conduct Authority ("FCA") with the Bank. *See* Opp. at 1, 3, 4, 6, 8. This is incorrect. These other agencies participated in the same investigation as OFAC and received, as relevant here, the same information from SCB. Any differences between the various agencies' resolutions primarily reflect each agency's statutory or regulatory remit, rather than any differences in the factual findings of their investigations. Moreover, unlike OFAC, which is expressly charged with enforcing U.S. sanctions laws, neither DFS nor FCA enforce any sanctions rules, but rather apply laws relating broadly to internal bank controls, such as anti-money laundering rules.

32.     The FCA decision notice explains that it relies on that agency's findings of violations of U.K. anti-money laundering and anti-terrorism laws and regulations, and that it calculated the penalty imposed on SCB based on the profits that the relevant SCB departments earned during the time period in which its controls were deficient. Although the FCA notice mentions sanctions issues in passing—and its statements in that regard are fully consistent with

13

OFAC's findings—it makes no determinations that any particular transactions violated U.S. sanctions rules.

33.    Similarly, the DFS 2019 consent order concerns banking control deficiencies rather than sanctions violations.  It, too, mentions sanctions issues in concluding that SCB's controls were insufficient, but draws no specific conclusions that particular transactions actually violated U.S. sanctions laws.  Relator argues, *see* Opp. at 8, that a numerical difference between DFS's order and OFAC's settlement agreement suggests that OFAC missed certain sanctions-violative transactions.  *See* DFS Consent Order ¶ 38 ("[D]uring the period November 2008 through July 2014, the Bank processed nearly 15,000 illegal payments for the benefit of sanctioned Iranian parties, totaling more than $600 million."); OFAC Enforcement Information for April 9, 2019, "Standard Chartered Bank Settles Potential Civil Liability for Apparent Violations of Multiple Sanctions Programs," *available at* https://www.treasury.gov/resource-center/sanctions/CivPen/Documents/20190408_scb_webpost.pdf (summarizing OFAC findings in 2019 settlement; approximately 9,335 sanctions-violative transactions from June 2009 to May 2014, totaling approximately $457 million).  Relator is incorrect.  The difference between the two agencies' findings is due to two factors:  First, some of the transactions took place between November 2008 and May 2009, and thus were not included in the OFAC settlement agreement because they fell outside the relevant statute of limitations governing OFAC sanctions.  As for the remaining transactions, OFAC knew of these transactions, but exercised its discretion not to charge them, which is consistent with OFAC's regulatory discretion.  *See* Economic Sanctions Enforcement Guidelines, 31 C.F.R. part 501, appendix A, §§ V.B-C.  As noted in my initial declaration, none of the transactions eventually determined to constitute apparent violations in

the 2019 settlement agreement with OFAC were made on behalf of any of the Iranian entities

brought to OFAC's attention by Mr. Marcellus or the Relator.

34.    In any event, neither the information provided by Relator nor any findings by

OFAC or, to OFAC's knowledge, any other agency provides any basis for Relator's conclusion

that SCB engaged in sanctions-violative transactions with Iranian clients totaling $56.75 billion

or any similar amount.  Opp. at 1; Knight Decl. ¶¶ 46, 65.

    Dated: Washington, D.C.
           February 28, 2020

                                    ALEXANDRE MANFULL
                                    Assistant Director
                                    Sanctions Compliance and Evaluation
                                    Office of Compliance and Enforcement
                                    Office of Foreign Assets Control

15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, *ex rel.*
BRUTUS TRADING, LLC,

               Plaintiff,

      v.

STANDARD CHARTERED BANK,
STANDARD CHARTERED PLC, and
STANDARD CHARTERED TRADE
SERVICES CORPORATION,

               Defendants.

No. 18-cv-11117 (PAE)

---

## DECLARATION OF PATRICK M. BRYAN

I, Patrick M. Bryan, declare as follows, pursuant to 28 U.S.C. § 1746:

      1.    I am the Assistant General Counsel for Enforcement at the Board of Governors of

the Federal Reserve System (the "Board"). I have held this position since I joined the Board in

2015. As Assistant General Counsel, I have responsibility for, among other things, overseeing

the Board's formal enforcement activities, including the action taken by the Board with respect

to Standard Chartered Bank PLC and Standard Chartered Bank (collectively "Standard

Chartered" or the "Bank") in April 2019. This declaration is based upon my personal

knowledge, information provided to me by Federal Reserve staff, and my review of the Board's

files with regard to the Bank. I submit this declaration in support of the Government's Motion to

Dismiss the Relator's Second Amended Complaint in this case.

## The Board's Authority

      2.    The Federal Reserve System is the central bank of the United States. The Federal

Reserve System is composed of the Board, twelve Federal Reserve Banks, and the Federal Open

"Federal Reserve") participated in the investigations of Standard Chartered described herein.

5.      On December 10, 2012, the Board announced an enforcement action against Standard Chartered. The Board issued a consent cease-and-desist order and assessed a $100 million civil money penalty (together the "2012 Orders") against Standard Chartered for unsafe and unsound practices relating to the Bank's deletion of information from payment messages to avoid U.S. sanctions controls, deficiencies in the Bank's anti-money laundering controls under the Bank Secrecy Act, and the Bank's failure to provide complete and accurate information to Federal Reserve examiners. True and correct copies of the 2012 Orders are attached as Exhibit A and Exhibit B.

6.      As described above, the Board's penalty was assessed for unsafe and unsound practices by Standard Chartered under the FDI Act. The Board's penalty was not based on sanctions violations or any independent determinations of whether the Bank had violated U.S. sanctions rules. The Board deferred to the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") to determine whether certain transactions violated U.S. sanctions regimes.

7.      The Board's 2012 Orders followed parallel investigations conducted by multiple agencies, including the U.S. Department of Justice and OFAC. Several of these other agencies entered into related agreements and settlements with Standard Chartered at or around the same time as the Board.

**The Federal Reserve's Investigation of the Relator's _Qui Tam_ Allegations**

8.      In December 2012, the Federal Reserve was notified by the U.S. Attorney's Office for the Southern District of New York that Relator Brutus Trading, LLC ("Relator") had filed a sealed _qui tam_ complaint alleging that, in connection with the negotiation and execution

3

of the 2012 settlements and agreements described above, Standard Chartered had failed to disclose to federal agencies certain information related to its sanctions violations.

9.      The Federal Reserve participated in a multiagency investigation of the Relator's allegations, including interviews of the Relator's members and Standard Chartered employees, review of the materials provided by the Relator and Standard Chartered in connection with the investigation, and presentations by Standard Chartered.

10.      Based on these interviews, materials, and presentations, the Board determined that the information provided by the Relator and obtained in connection with the investigation of its allegations did not warrant further administrative action by the Board and did not undermine or otherwise affect the basis for the Board's 2012 Orders.

### The Board's 2019 Enforcement Action Against Standard Chartered

11.      In August 2013, the Federal Reserve received information from a separate, independent investigation that the Bank was facilitating transactions in violation of U.S. sanctions. This information led to a multi-agency investigation of Standard Chartered, in which the Federal Reserve participated, regarding the Bank's facilitation of transactions from sanctioned jurisdictions. This subsequent investigation was not prompted by, or based on, information provided by the Relator.

12.      Based on the findings of that long-term investigation, on April 9, 2019, the Board announced a second enforcement action against Standard Chartered. The Board issued a consent cease-and-desist order and imposed a civil money penalty on Standard Chartered of $163,687,500 for the Bank's unsafe and unsound practices relating to inadequate internal sanctions controls and failure to disclose sanctions risks to the Federal Reserve. The Board also required the Bank to improve its U.S. law compliance program and strengthen management

4

oversight for sanctions compliance.  A true and correct copy of the Board's 2019 order is attached as Exhibit C ("2019 Order").

13.    In assessing the 2019 penalty, the Board found deficiencies in compliance procedures at certain of Standard Chartered's foreign offices relating to funds transfers initiated through faxed payment instructions and online banking channels.

14.    Like the 2012 penalty, the Board's 2019 penalty was assessed for unsafe and unsound practices by Standard Chartered under the FDI Act, not violations of U.S. sanctions laws or regulations.  Instead, the Board again deferred to OFAC to determine whether Standard Chartered had facilitated certain payments in violation of U.S. sanctions rules.

15.    The Board further found that Standard Chartered, while subject to the 2012 Orders, failed to disclose to the Board the possibility of further sanctions violations arising from its online banking channels from December 2012 (when the 2012 Orders were entered) to December 2014 (when Standard Chartered disclosed to the Board certain new information regarding its online banking channels) which constituted a further unsafe and unsound practice under the FDI Act, and therefore an additional basis for the 2019 Order.

16.    None of the Board's findings underlying the 2019 Order were based on the Relator's allegations or any information provided by the Relator.  Instead, they were based on information obtained in connection with the separate, independent investigation described above.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: November 21, 2019, Washington, D.C.

Patrick M. Bryan
Assistant General Counsel for Enforcement
Board of Governors of the Federal Reserve System

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BRUTUS TRADING, LLC, <br><br> Plaintiff, <br><br> v. <br><br> STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, and STANDARD CHARTERED TRADE SERVICES CORPORATION, <br><br> Defendants. | No. 18 Civ. 11117 (PAE) |

### DECLARATION OF ELIZABETH NOCHLIN

I, Elizabeth Nochlin, hereby declare the following pursuant to 28 U.S.C. § 1746:

1.     I am an attorney duly admitted to practice law before the courts of New York State, currently employed by the New York State Department of Financial Services ("Department") as Director, Investigations and Intelligence Division, and I have worked for the Department in various positions since February 2008.  Throughout my tenure, part of my responsibilities has been to investigate suspected wrongdoing by entities regulated by the Department and help craft orders to compel institutions to remediate any violations of the laws and regulations that apply to their operation in New York.

2.     I have worked on the Department's sanctions-related investigation of Standard Chartered Bank and its New York Branch, which is licensed by the Department (collectively referred to as "SCB"), since 2012.  In that capacity, I was a principal drafter of the three sanctions-related consent orders issued by the Department to SCB, dated September 21, 2012, August 19, 2014, and April 9, 2019, and am fully familiar with the findings underlying each of

the three consent orders.  Copies of these consent orders are attached hereto as Exhibits 1, 2, and 3, respectively.

3. I submit this declaration based on my personal knowledge as well as a review of documents relating to the Department's investigation of SCB.

4. The Department is tasked with supervising a broad array of state licensed financial institutions, including all New York state-chartered banking organizations, such as banks, trust companies, savings banks, and credit unions and, as relevant here, branch offices of foreign banks.

5. In this role, the Department is responsible for assessing the continued safety and soundness of New York's banking industry and its compliance with applicable laws and regulations, including title 3, N.Y. Codes, Rules, and Regulations part 116, which requires that all licensed foreign banking institutions establish and maintain anti-money laundering ("AML") and sanctions compliance programs necessary to comply with all applicable New York and federal requirements.  Such compliance with applicable legal and regulatory requirements is tested through, *inter alia*, the bank examination process, enforcement investigations, and self-reporting by institutions.

6. Based on self-reporting by SCB, the Department opened an investigation into SCB's sanctions compliance program and its use of its New York branch to clear U.S. dollar trades in or around 2010.

7. The Department's investigation of SCB's sanctions compliance program was conducted simultaneously with the U.S. Department of Justice ("DOJ"), the Office of the District Attorney of New York County ("DANY"), the Federal Reserve Bank of New York and the

Board of Governors of the Federal Reserve System ("Federal Reserve"), and U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC").

8.      Throughout the investigations, the Department, DOJ, DANY, the Federal Reserve, and OFAC often received and reviewed the same document productions.  As far as I know, the Department did not obtain any documents that were not also obtained by DOJ, nor did the Department interview any witnesses other than together with DOJ.

9.      As a result, the Department's findings, as reflected in the parallel settlements entered into 2012 and 2019, are consistent with those of DOJ, DANY, the Federal Reserve, and OFAC, with any differences due to language choices or the different mandates of the agencies involved in the investigation.

10.      The September 2012 consent order issued by the Department, and the December 2012 agreements issued by DOJ and OFAC, similarly detailed how SCB cleared millions of dollars of transactions through SCB's New York branch using nontransparent means to mask that the transactions were for the benefit of parties from Iran and other countries that are the subject of the United States sanctions laws.  Accordingly, for example, the Department's 2012 consent order stated that between 2001 and 2007, SCB "removed Iranian information from U.S. dollar wire payment messages," Ex. 1, ¶ 2, while DOJ's 2012 deferred prosecution agreement states that, during the same 2001 to 2007 time frame, SCB processed "payments … on behalf of sanctioned customers without reference to the payments' origin," and eliminated "payment data that would have revealed the involvement of sanctioned countries," Declaration of Matthew Komar, Ex. 1, Factual Statement, ¶ 5.  As demonstrated in those documents, the Department's main jurisdictional focus was on the lack of transparency on the face of wire payment messages

passing through its licensee, the New York Branch, while the DOJ's was on the criminal violations of sanctions regulations that resulted.

11.     The basis for the August 2014 consent order issued by the Department to SCB, for which there is no parallel settlement by DOJ, the Federal Reserve, OFAC, or DANY, was gleaned entirely from the work of a monitor installed at SCB as a result of the 2012 consent order issued by the Department. Specifically, the 2012 consent order required SCB to retain an independent monitor to "conduct a comprehensive review … of the [Bank Secrecy Act]/AML and OFAC compliance programs, policies, and procedures now in place at SCB's New York Branch" that led to that order. Ex. 1, ¶ 9. The monitor identified significant flaws in SCB's transaction monitoring system, leading to a consent order that sought to compel SCB to remediate the deficiencies in its transaction monitoring system.

12.     The investigation underlying the most recent parallel settlements began in late 2013, when a joint investigation of a different bank, in which the Department, DOJ, OFAC, DANY, and the Federal Reserve were participating, revealed that a Dubai-based petrochemical company, which was owned by an Iranian national, held an account at SCB's Dubai branch. This investigation was coordinated between the Department, DOJ, DANY, the Federal Reserve, and OFAC, with the agencies generally receiving the same document productions and participating in joint witness interviews.

13.     This new investigation revealed that SCB's Dubai branch processed transactions for this client despite indicia, including faxed correspondence indicating that the transmission originated in Iran, that the beneficial owner of the account was Iranian. Based on these findings, the investigation expanded to include other clients of the Dubai branch, the receipt of facsimile

transmissions originating in Iran, and the ability of SCB clients to access its online banking platforms from Iran to conduct prohibited transactions.

14. As in the 2012 settlements, the Department's April 2019 consent order addressed the same conduct addressed in the parallel orders issued by DOJ, OFAC, DANY, and the Federal Reserve.

15. For example, addressing the abuse of SCB's online banking system, the Department's consent order stated that between "November 2008 and 2012, the Bank's failure to block online banking access permitted more than 100 customers to conduct USD transactions from Iran and other sanctioned countries." Ex. 3, ¶ 19. The consent order also noted that SCB operated a facsimile system that "could facilitate USD payments initiated by requests originating in Iran." *Id.* ¶ 24.

16. The order issued by the Federal Reserve stated that, "between 2009 and 2014, [SCB] processed hundreds of millions of dollars in additional transactions in violation of the U.S. sanctions regimes … which primarily resulted from deficiencies in compliance procedures at certain of [SCB's] foreign offices related to international funds transfers initiated through faxed payment instructions and online banking channels." Declaration of Patrick M. Bryan, Ex. C, at 2.

17. Similarly, the settlement agreement executed by OFAC and SCB noted the same issues with SCB's online and facsimile systems, noting, among other things, that during the relevant period SCB processed "689 fax payments with a value of $35,348,468, and 705 USD-denominated online payments to or through the United States with a total value of $46,911,754 in apparent violation of § 560.204" of the Iranian Transactions and Sanctions Regulations. Declaration of Alexandre Manfull, Ex. 2, ¶ 55.

18.     While the Department and OFAC cited SCB for a different total number of violations, with OFAC citing SCB, between June 2009 until June 2014, for processing $437,553,380 in illicit transactions, and the Department citing SCB for processing approximately $600 million in illicit transactions between 2008 and 2014, the difference does not represent a distinction in the investigation undertaken by the two agencies. Rather, the distinction is based on the different statutes of limitations that apply to the different agencies and their different conclusions regarding which transactions should be included in a settlement given the agencies' respective enforcement priorities.

19.     The front companies referenced by the Department, OFAC and DOJ are the same companies. *See* Ex. 3, ¶¶ 30-37; Declaration of Alexandre Manfull, Ex. 2, ¶¶ 7-28; Declaration of Wayne Boddy, Ex. 1, Supplemental Factual Statement.

20.     Although I was not personally involved in the review of relator's claims, I understand that Department staff undertook a thorough review of the information provided by relator at the time it was produced. I understand, however, that the Department was unable to verify the allegations made by relator and took no enforcement action against SCB arising out of the information provided by relator.

21.     A copy of the letter from Kevin Bishop, the Department's Acting General Counsel, dated December 11, 2019, discussing, among other things, the Department's investigation of Promontory Financial Group, LLC, is attached hereto as Exhibit 4.

Dated:          February 28, 2020
                New York, New York


Elizabeth Nochlin
New York State Department of Financial Services

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

             Plaintiff,

      v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVICES
CORPORATION,

             Defendants.

No. 18 Civ. 11117 (PAE)

**SECOND SUPPLEMENTAL DECLARATION OF
SPECIAL AGENT MATTHEW F. KOMAR**

I, Special Agent Matthew F. Komar of the Federal Bureau of Investigation, hereby

declare the following pursuant to 28 U.S.C. § 1746:

    1.    I previously submitted two declarations in support of the United States' motion to

dismiss Relator's second amended complaint in the above-captioned case.[1]  I have reviewed

Relator's motion for an indicative ruling, and hereby make the following second supplemental

declaration to respond to certain factual inaccuracies and other points made in Relator's papers

with regard to the government investigations at issue.

    2.    I make this declaration, like the previous ones, based on my own personal

knowledge as well as a review of documents relating to these investigations.  This declaration

does not set forth all of my knowledge of the matters discussed herein.  All dates and amounts

set forth are approximate and to the best of my recollection, unless otherwise noted.

---

[1] This declaration uses abbreviations and capitalized terms defined in my earlier
declarations.

3.      As discussed in my earlier declarations, Relator provided the government with certain SCB documents that included lengthy client lists and transaction registers for SCB's Dubai branch.  Relator never suggested or alleged that any or all of the thousands of non-Iranian clients of SCB's Dubai branch were involved in sanctions violations through illicit and undisclosed Iranian connections.  Instead, and as explained in my prior declarations, Relator and its principals directed us to certain entries in those customer lists (among the thousands of entries in those documents) that were particular known Iranian clients of SCB.  These known Iranian customers included major Iranian banks, Iranian government agencies, and large Iranian companies.  Relator claimed that these Iranian entities had continued to transact with the Bank after 2007—despite the Bank's representation to the U.S. government that it had suspended new Iranian business after 2007.  As discussed in my earlier declarations, we reviewed the Bank's transactions with the Bank's known Iranian clients for the relevant time period and concluded that they were either legitimate wind-down transactions that the Bank had previously disclosed to DOJ and OFAC or otherwise did not appear to violate any sanctions rules.

4.      Relator never suggested that non-Iranian corporate clients of SCB may have illegally used their relationships with the Bank to violate the Iran sanctions rules.  Thus there was no reason for the investigating agencies to search for Suspicious Activity Reports ("SARs") associated with such clients.  Relator's allegations were limited to Iranian customers of the bank, which we were able to identify from the client lists and other materials.  Database searches for SARs relating to thousands of non-Iranian customers of the Bank would not have been an appropriate investigative step where Relator raised no allegations about any of those customers.

5.      After the conclusion of our investigation into Relator's allegations, as described previously, the agencies separately looked into certain non-Iranian clients of SCB's Dubai

2

branch—primarily business organizations incorporated in the United Arab Emirates—that may have operated as fronts for Iranian companies or were controlled by Iranian nationals ordinarily resident in Iran. This phase of the investigation focused not just on whether these non-Iranian SCB clients had actually participated in transactions that violated U.S. sanctions on Iran, but also on whether SCB and its employees knew of these violations.

6.    As part of this separate investigation, I and my colleagues at FBI and other investigating agencies queried government databases that included SARs for information regarding certain entities that we suspected may have participated in sanctions-violative transactions. We conducted limited searches with respect to a relatively small number of entities for which we had uncovered other evidence suggesting an Iranian connection. The mere fact that SCB (or another financial institution) could have filed a SAR with regard to a particular entity would not have proven that there was criminal activity associated with that entity. Instead, the existence of a SAR and its contents would simply be additional information that sometimes but not always sheds light on whether particular entities were connected to Iran and whether SCB was aware of such Iranian connections.

7.    I do not recall that we conducted (or considered conducting) broad searches for SARs relating to all of the thousands of clients of SCB's Dubai branch, nor would such searches have been consistent with a reasonable investigative strategy. And, as explained previously, we did not consult or consider any of the materials provided by Relator (or Mr. Chandra) in this separate investigation pertaining to certain of the Bank's non-Iranian clients, which ultimately led to the 2019 DPA and related agreements with other agencies.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:         December 21, 2020
                    Cleveland, Ohio

Matthew F. Komar
Special Agent
Federal Bureau of Investigation

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

               Plaintiff,

      v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVICES
CORPORATION,

               Defendants.

No. 18 Civ. 11117 (PAE)

**THIRD SUPPLEMENTAL DECLARATION OF**
**SPECIAL AGENT MATTHEW F. KOMAR**

    I, Special Agent Matthew F. Komar of the Federal Bureau of Investigation, hereby

declare the following pursuant to 28 U.S.C. § 1746:

    1.    I previously submitted three declarations in support of the United States' motion

to dismiss Relator's second amended complaint in the above-captioned case.[1]  I have reviewed

Relator's reply brief in support of its motion for an indicative ruling, and hereby make the

following third supplemental declaration to respond to certain factual inaccuracies and other

points made in Relator's papers with regard to the government investigations at issue.

    2.    I make this declaration, like the previous ones, based on my own personal

knowledge, my training and experience, as well as a review of documents relating to these

investigations and discussions with members of the investigatory team.  This declaration does

---

[1] This declaration uses abbreviations and capitalized terms defined in my earlier
declarations.

not set forth all of my knowledge of the matters discussed herein. All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

***Information Provided by Messrs. Knight and Marcellus***

3.     As discussed in my earlier declarations, Relator's allegations pertained to known Iranian clients of SCB that supposedly continued to transact with the Bank in U.S. dollars after 2007. Relator never claimed that SCB had Dubai-based clients that were fronts for Iranian businesses, which was what the Government uncovered in its separate investigation that led to the 2019 settlements.

4.     I was the case agent assigned to the Government's investigation into Relator's allegations as well as to the first part of the subsequent SCB investigation. As part of this assignment, I was responsible for taking detailed notes during the agencies' joint interview of Relator's members, Julian Knight and Robert Marcellus, which took place on January 16, 2013, at the U.S. Attorney's Office for the Southern District of New York. I then converted these notes into detailed interview reports, on FBI Forms FD-302, which became part of the official record of the investigation. True and correct copies of my interview reports for Messrs. Knight and Marcellus are attached hereto as Exhibits 1 and 2.[2]

5.     As a special agent of the FBI, I have been trained to carefully summarize pertinent information witnesses provide during interviews and memorialize that information in formal interview reports. Interview reports such as these are used to record information that may become evidence in criminal and civil proceedings.

---

[2] Pursuant to FBI protocols, I have redacted the agency case numbers and identifiers as well as all telephone numbers from these reports.

6.     This interview was the only time, of which I am aware, that the Government formally interviewed Messrs. Knight and Marcellus in this matter, although I am told that Mr. Marcellus communicated with representatives of DFS and OFAC (separately) to provide a preview of the allegations in Relator's *qui tam* complaint before it was filed.  Besides this interview and the complaint itself, Relator provided a disclosure statement (which was attached to Relator's sur-reply in opposition to the Government's motion to dismiss, ECF No. 61-2) and certain documents relating to SCB, and Relator's counsel provided certain information to the investigative team through the U.S. Attorney's Office.

7.     As relevant here, and as I previously summarized, Mr. Knight discussed several main points during the interview, including his work tenure at SCB, his knowledge about its historical efforts to engage with Iranian clients, and his understanding of scope and purpose of the Bank's Project Green.  Furthermore, Mr. Knight explained that he had been assigned to work on SCB's foreign-exchange "sundry" account, which had been used to book the Bank's revenues from certain foreign-exchange transactions that had not been linked with the relevant clients, by retroactively associating them with the correct clients—though none of the clients he identified with regard to this account were Iranian.

8.     Mr. Knight and Mr. Marcellus provided their general understanding that SCB executed foreign-exchange transactions between two non-U.S. dollar currencies by interposing an intermediate conversion to U.S. dollars—especially if one of the currencies was pegged to the dollar, such as the United Arab Emirates dirham.  They further noted their belief that such transactions would necessarily involve the Bank's New York branch.

9.     Mr. Knight also described the pertinent portions of the documents that had been provided with Relator's disclosure statement.  First, he explained his understanding of the

operation of an online system by which Bank clients could initiate foreign-exchange transactions, and pointed to documents listing many clients that had access to this system in 2007, 2008, and 2009. He noted that these clients included Bank Saderat, an Iranian bank, but explained that he did not know if Bank Saderat had actually logged in to this system or executed any transactions through it. He also discussed a document that listed a large number of clients that had access to this system in 2006 and 2007, and noted that the list included several Iranian banks though, as he recalled, these banks did not appear in a similar document from 2008.

10.     Mr. Knight also reviewed a few documents that described transactions or SCB revenues associated with a large number of transactions. In these documents, he pointed our attention to what appeared to be the Bank's trade-finance and foreign-exchange revenues in 2009 and 2010 from transactions with the National Iranian Tanker Company, Bank Markazi Jomhouri Islami Iran (Iran's central bank), the Iranian Ministry of Economic Affairs and Finance, and a group of entities referred to as the Ministry of Energy Iran Group, which comprised several Iranian energy companies including Mapna Co. LLC. The documents listed all SCB revenues in U.S. dollars.

11.     Another set of documents described by Mr. Knight listed various Iranian banks on long lists of potential SCB clients, and a final document was a presentation he had given his SCB colleagues about the sundry account.

12.     Additional, similar documents provided by Relator's counsel after the interview also listed many of the same Iranian banks, companies, and government agencies among long lists of non-Iranian clients and transactions.

13.     As explained in my previous declarations, we reviewed the documents, focusing specifically on SCB's relationships and transactions with its Iranian clients, and ultimately

4

concluded that the post-2007 transactions with these clients appeared legitimate as most of them represented winding-down of pre-2007 transactions in currencies other than the U.S. dollar (even where Bank documents listed them in dollars for internal accounting purposes), and the rest appeared to comply with applicable rules such as the U-turn license. We further did not find evidence of wrongdoing in connection with SCB's foreign-exchange sundry account, nor did it appear that any Iranian client had engaged in foreign-exchange transactions through the Bank's online system after 2007.

*Information Provided by Mr. Chandra*

14.     I spoke by telephone four times with Anshuman Chandra, a Bank employee then living in Dubai who had contacted Mr. Knight and indicated that he wished to speak with us regarding the investigation: on September 26, 2013; October 29, 2013; January 23, 2014; and October 28, 2014.[3] Each of these conversations was memorialized in a formal interview report, like the ones I prepared for the interviews with Messrs. Knight and Marcellus. These reports are attached hereto as Exhibits 3, 4, 5, 6, and 7.[4]

15.     Mr. Chandra told me that he had several SCB documents relating to the Bank's transactions with Iranian clients, the sundry account, and other topics. He transmitted these

_____

[3] About two years later, in 2016 when I was no longer working on the case, Mr. Chandra sent me an email about STB General Trading Company, a client of SCB's Dubai's branch that he suspected may have been involved in money laundering (unrelated to Iran or sanctions) due to suspicious foreign-exchange transactions. I forwarded this email to the prosecutors and agents who were working on the SCB investigation at that time, and I understand that they requested information about this entity from the Bank, but ultimately did not conclude the Bank was involved in any criminal wrongdoing with respect to STB.

[4] For the first of these interviews, I was joined by Special Agent Michael Fleischmann of the Internal Revenue Service's Criminal Investigation division, who prepared the formal report of the interview, while I prepared a brief memorandum noting my participation. Both memoranda are attached.

5

documents to me on three CDs, via the FBI attaché at the U.S consulate in Dubai. The CDs contained a total of 79 electronic documents, regarding which I interviewed Mr. Chandra.[5]

16.    Forty-nine of the files were Microsoft Excel spreadsheets containing monthly reports from 2010 to 2012 entitled "Performance Summary – Iran (SNPC)." Ex. 5, at 2-3; Ex. 6, at 2. These reports summarized foreign-exchange transactions for SCB's clients handled by the Bank's Dubai-based group that covered Iran and other "Significant Non-Presence Countries," *i.e.*, countries where the Bank did not have offices. The reports were in the form of pivot tables that display the information in summary form, which can be expanded to show the underlying full data; this appears to be what Relator repeatedly refers to as "hidden cells" in the documents. The clients identified as Iranian in these reports consisted largely of the same Iranian entities that had been included in Relator's documents and whose relationships with the Bank had been previously reviewed as part of the investigation into Relator's allegations. Mr. Chandra told me that he thought these documents would be relevant to the investigation as the name of the relevant Bank unit contained "Iran."

17.    Mr. Chandra also provided several documents he said had been prepared by the SCB team assisting in the Bank's response to the Government's investigation of Relator's allegations. Ex. 5, at 3, 4, 5; Ex. 6 at 3, 5.[6] These documents included lists of the Bank's Iranian clients, records of their foreign-exchange activity, and information about when the accounts were

---

[5] Relator mistakenly states that Mr. Chandra's CDs contained 20,000 files rather than 79, *see* Relator Reply at 2, 10, perhaps misunderstanding the statement in a memorandum by Relator's former counsel summarizing the documents which indicated that the one of the documents is a "spreadsheet [that] lists over 20,000 foreign exchange [transaction] records," ECF No. 79-4, ¶ 2. The information in counsel's memorandum largely duplicates what Mr. Chandra told me directly about the documents.

[6] In his memorandum discussing Mr. Chandra's documents, Relator's former counsel opined that the documents relating to the Bank's investigation "appear to be possibly attorney work product," and thus did not discuss them further. ECF No. 79-4, at 1.

blocked or closed. Mr. Chandra told me that one of these documents (with a long title beginning with "Juniper 35")—a copy of which he attached to his latest declaration—had been transmitted to SCB's attorneys, who in turn provided the information in it to the Government. The document appears to be dated several days before SCB's attorneys presented their review of the transaction activity by the Bank's Iranian clients to the Government. The document contains a list of certain SCB clients that had access to an SCB foreign-exchange system and information about whether they were Iranian and when, if ever, the Bank closed, blocked or flagged their accounts (as indicated by the codes "BLI" and "IRA" in the last column of the document).[7] SCB's presentation to the Government included information consistent with this report about the Bank's Iranian and Iran-associated clients.

18. Mr. Chandra provided several other documents regarding SCB's relationships or potential relationships with known Iranian clients Bank Saderat, Mapna International, IFIC Holding AG (Iran Foreign Investment Company), and Air Iran, but none of these documents indicated or suggested that the Bank had engaged in improper U.S. dollar transactions with such clients after 2007. Further, Mr. Chandra provided documents relating to the sundry account and to SCB's relationship with Al Rajhi Bank, a Saudi bank that he had been told had unspecified "legal and compliance" issues.

19. A review of all of these documents, which Mr. Chandra provided on the three CDs, did not change our conclusion regarding the viability of Relator's allegations.

---

[7] Like Messrs. Knight and Marcellus, Mr. Chandra never suggested that any of SCB's clients, including any of the clients listed on the documents he provided, were non-Iranian entities operating as fronts for Iranian companies.

7

***The Petrochemical Company***

20.    As I explained in my prior declarations, the investigation that ultimately led to the 2019 settlements began when the Government learned, as part of an investigation of a different financial institution, of information suggesting that a Dubai-incorporated petrochemical company that was a client of SCB's Dubai branch was actually a front for an Iranian business. I also previously noted that this petrochemical company was never mentioned by Relator or Mr. Chandra, nor is it included in any of the documents they provided. Mr. Marcellus now claims that Caspian Chemical FZCO, an entity listed in one of Relator's documents—though never mentioned by Messrs. Knight, Marcellus, or Chandra—is a corporate affiliate of the petrochemical company at issue. As part of our investigations, we reviewed documents relating to the ownership and corporate family structure of the petrochemical company and (although its name is somewhat similar), Caspian Chemical does not appear to have any relationship with the petrochemical company.[8]

***The Alleged Leaked Suspicious Activity Reports***

21.    Mr. Marcellus attaches to his latest declaration a list of entities regarding which—he claims—SCB allegedly filed SARs that were leaked to Buzzfeed and formed the basis of the BuzzFeed article that is the subject of the instant motion. 2d Supp. Marcellus Decl., Attachment D (ECF No. 79-1, at 21). I reviewed this list and compared it to our case files for the relevant investigations. None of the listed entities were ever mentioned by Messrs. Knight, Marcellus, or

---

[8] Mr. Marcellus is also incorrect that the revelation by the other financial institution about the petrochemical company was prompted by the SCB investigation. As I and others (including DFS's declarant) have previously pointed out, it was the other way around—the other bank provided information that led the agencies that had been investigating Relator's claims to open a new investigation into SCB. *E.g.*, Komar Decl. (ECF No. 32), ¶¶ 26-29; Nochlin Decl. (ECF No. 58), ¶ 12.

8

Chandra during our investigation of Relator's allegations. The listed entities also were never part of the separate investigation of SCB that led to the 2019 DPA. Thus, regardless of whether Mr. Marcellus's list is accurate or whether any such SARs actually exist, the entities listed on it are not relevant to the SCB investigations in which I participated.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:      March 8, 2021
               Cleveland, Ohio

Matthew F. Komar
Special Agent
Federal Bureau of Investigation

9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                          Plaintiff,

          v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVICES
CORPORATION,

                          Defendants.

No. 18 Civ. 11117 (PAE)

**THIRD SUPPLEMENTAL DECLARATION OF**
**SPECIAL AGENT MATTHEW F. KOMAR**

I, Special Agent Matthew F. Komar of the Federal Bureau of Investigation, hereby

declare the following pursuant to 28 U.S.C. § 1746:

1.       I previously submitted three declarations in support of the United States' motion

to dismiss Relator's second amended complaint in the above-captioned case.[1]  I have reviewed

Relator's reply brief in support of its motion for an indicative ruling, and hereby make the

following third supplemental declaration to respond to certain factual inaccuracies and other

points made in Relator's papers with regard to the government investigations at issue.

2.       I make this declaration, like the previous ones, based on my own personal

knowledge, my training and experience, as well as a review of documents relating to these

investigations and discussions with members of the investigatory team.  This declaration does

---

[1] This declaration uses abbreviations and capitalized terms defined in my earlier
declarations.

not set forth all of my knowledge of the matters discussed herein. All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

***Information Provided by Messrs. Knight and Marcellus***

3.      As discussed in my earlier declarations, Relator's allegations pertained to known Iranian clients of SCB that supposedly continued to transact with the Bank in U.S. dollars after 2007. Relator never claimed that SCB had Dubai-based clients that were fronts for Iranian businesses, which was what the Government uncovered in its separate investigation that led to the 2019 settlements.

4.      I was the case agent assigned to the Government's investigation into Relator's allegations as well as to the first part of the subsequent SCB investigation. As part of this assignment, I was responsible for taking detailed notes during the agencies' joint interview of Relator's members, Julian Knight and Robert Marcellus, which took place on January 16, 2013, at the U.S. Attorney's Office for the Southern District of New York. I then converted these notes into detailed interview reports, on FBI Forms FD-302, which became part of the official record of the investigation. True and correct copies of my interview reports for Messrs. Knight and Marcellus are attached hereto as Exhibits 1 and 2.[2]

5.      As a special agent of the FBI, I have been trained to carefully summarize pertinent information witnesses provide during interviews and memorialize that information in formal interview reports. Interview reports such as these are used to record information that may become evidence in criminal and civil proceedings.

---

[2] Pursuant to FBI protocols, I have redacted the agency case numbers and identifiers as well as all telephone numbers from these reports.

2

6.     This interview was the only time, of which I am aware, that the Government formally interviewed Messrs. Knight and Marcellus in this matter, although I am told that Mr. Marcellus communicated with representatives of DFS and OFAC (separately) to provide a preview of the allegations in Relator's *qui tam* complaint before it was filed.  Besides this interview and the complaint itself, Relator provided a disclosure statement (which was attached to Relator's sur-reply in opposition to the Government's motion to dismiss, ECF No. 61-2) and certain documents relating to SCB, and Relator's counsel provided certain information to the investigative team through the U.S. Attorney's Office.

7.     As relevant here, and as I previously summarized, Mr. Knight discussed several main points during the interview, including his work tenure at SCB, his knowledge about its historical efforts to engage with Iranian clients, and his understanding of scope and purpose of the Bank's Project Green.  Furthermore, Mr. Knight explained that he had been assigned to work on SCB's foreign-exchange "sundry" account, which had been used to book the Bank's revenues from certain foreign-exchange transactions that had not been linked with the relevant clients, by retroactively associating them with the correct clients—though none of the clients he identified with regard to this account were Iranian.

8.     Mr. Knight and Mr. Marcellus provided their general understanding that SCB executed foreign-exchange transactions between two non-U.S. dollar currencies by interposing an intermediate conversion to U.S. dollars—especially if one of the currencies was pegged to the dollar, such as the United Arab Emirates dirham.  They further noted their belief that such transactions would necessarily involve the Bank's New York branch.

9.     Mr. Knight also described the pertinent portions of the documents that had been provided with Relator's disclosure statement.  First, he explained his understanding of the

3

operation of an online system by which Bank clients could initiate foreign-exchange transactions, and pointed to documents listing many clients that had access to this system in 2007, 2008, and 2009.  He noted that these clients included Bank Saderat, an Iranian bank, but explained that he did not know if Bank Saderat had actually logged in to this system or executed any transactions through it.  He also discussed a document that listed a large number of clients that had access to this system in 2006 and 2007, and noted that the list included several Iranian banks though, as he recalled, these banks did not appear in a similar document from 2008.

10.     Mr. Knight also reviewed a few documents that described transactions or SCB revenues associated with a large number of transactions.  In these documents, he pointed our attention to what appeared to be the Bank's trade-finance and foreign-exchange revenues in 2009 and 2010 from transactions with the National Iranian Tanker Company, Bank Markazi Jomhouri Islami Iran (Iran's central bank), the Iranian Ministry of Economic Affairs and Finance, and a group of entities referred to as the Ministry of Energy Iran Group, which comprised several Iranian energy companies including Mapna Co. LLC.  The documents listed all SCB revenues in U.S. dollars.

11.     Another set of documents described by Mr. Knight listed various Iranian banks on long lists of potential SCB clients, and a final document was a presentation he had given his SCB colleagues about the sundry account.

12.     Additional, similar documents provided by Relator's counsel after the interview also listed many of the same Iranian banks, companies, and government agencies among long lists of non-Iranian clients and transactions.

13.     As explained in my previous declarations, we reviewed the documents, focusing specifically on SCB's relationships and transactions with its Iranian clients, and ultimately

concluded that the post-2007 transactions with these clients appeared legitimate as most of them represented winding-down of pre-2007 transactions in currencies other than the U.S. dollar (even where Bank documents listed them in dollars for internal accounting purposes), and the rest appeared to comply with applicable rules such as the U-turn license. We further did not find evidence of wrongdoing in connection with SCB's foreign-exchange sundry account, nor did it appear that any Iranian client had engaged in foreign-exchange transactions through the Bank's online system after 2007.

***Information Provided by Mr. Chandra***

14. I spoke by telephone four times with Anshuman Chandra, a Bank employee then living in Dubai who had contacted Mr. Knight and indicated that he wished to speak with us regarding the investigation: on September 26, 2013; October 29, 2013; January 23, 2014; and October 28, 2014.[3] Each of these conversations was memorialized in a formal interview report, like the ones I prepared for the interviews with Messrs. Knight and Marcellus. These reports are attached hereto as Exhibits 3, 4, 5, 6, and 7.[4]

15. Mr. Chandra told me that he had several SCB documents relating to the Bank's transactions with Iranian clients, the sundry account, and other topics. He transmitted these

---

[3] About two years later, in 2016 when I was no longer working on the case, Mr. Chandra sent me an email about STB General Trading Company, a client of SCB's Dubai's branch that he suspected may have been involved in money laundering (unrelated to Iran or sanctions) due to suspicious foreign-exchange transactions. I forwarded this email to the prosecutors and agents who were working on the SCB investigation at that time, and I understand that they requested information about this entity from the Bank, but ultimately did not conclude the Bank was involved in any criminal wrongdoing with respect to STB.

[4] For the first of these interviews, I was joined by Special Agent Michael Fleischmann of the Internal Revenue Service's Criminal Investigation division, who prepared the formal report of the interview, while I prepared a brief memorandum noting my participation. Both memoranda are attached.

5

documents to me on three CDs, via the FBI attaché at the U.S consulate in Dubai. The CDs

contained a total of 79 electronic documents, regarding which I interviewed Mr. Chandra.[5]

16.     Forty-nine of the files were Microsoft Excel spreadsheets containing monthly

reports from 2010 to 2012 entitled "Performance Summary – Iran (SNPC)." Ex. 5, at 2-3; Ex. 6,

at 2. These reports summarized foreign-exchange transactions for SCB's clients handled by the

Bank's Dubai-based group that covered Iran and other "Significant Non-Presence Countries,"

*i.e.*, countries where the Bank did not have offices. The reports were in the form of pivot tables

that display the information in summary form, which can be expanded to show the underlying

full data; this appears to be what Relator repeatedly refers to as "hidden cells" in the documents.

The clients identified as Iranian in these reports consisted largely of the same Iranian entities that

had been included in Relator's documents and whose relationships with the Bank had been

previously reviewed as part of the investigation into Relator's allegations. Mr. Chandra told me

that he thought these documents would be relevant to the investigation as the name of the

relevant Bank unit contained "Iran."

17.     Mr. Chandra also provided several documents he said had been prepared by the

SCB team assisting in the Bank's response to the Government's investigation of Relator's

allegations. Ex. 5, at 3, 4, 5; Ex. 6 at 3, 5.[6] These documents included lists of the Bank's Iranian

clients, records of their foreign-exchange activity, and information about when the accounts were

_____

[5] Relator mistakenly states that Mr. Chandra's CDs contained 20,000 files rather than 79, *see* Relator Reply at 2, 10, perhaps misunderstanding the statement in a memorandum by Relator's former counsel summarizing the documents which indicated that the one of the documents is a "spreadsheet [that] lists over 20,000 foreign exchange [transaction] records," ECF No. 79-4, ¶ 2. The information in counsel's memorandum largely duplicates what Mr. Chandra told me directly about the documents.

[6] In his memorandum discussing Mr. Chandra's documents, Relator's former counsel opined that the documents relating to the Bank's investigation "appear to be possibly attorney work product," and thus did not discuss them further. ECF No. 79-4, at 1.

blocked or closed.  Mr. Chandra told me that one of these documents (with a long title beginning with "Juniper 35")—a copy of which he attached to his latest declaration—had been transmitted to SCB's attorneys, who in turn provided the information in it to the Government.  The document appears to be dated several days before SCB's attorneys presented their review of the transaction activity by the Bank's Iranian clients to the Government.  The document contains a list of certain SCB clients that had access to an SCB foreign-exchange system and information about whether they were Iranian and when, if ever, the Bank closed, blocked or flagged their accounts (as indicated by the codes "BLI" and "IRA" in the last column of the document).[7]  SCB's presentation to the Government included information consistent with this report about the Bank's Iranian and Iran-associated clients.

18.    Mr. Chandra provided several other documents regarding SCB's relationships or potential relationships with known Iranian clients Bank Saderat, Mapna International, IFIC Holding AG (Iran Foreign Investment Company), and Air Iran, but none of these documents indicated or suggested that the Bank had engaged in improper U.S. dollar transactions with such clients after 2007.  Further, Mr. Chandra provided documents relating to the sundry account and to SCB's relationship with Al Rajhi Bank, a Saudi bank that he had been told had unspecified "legal and compliance" issues.

19.    A review of all of these documents, which Mr. Chandra provided on the three CDs, did not change our conclusion regarding the viability of Relator's allegations.

---

[7] Like Messrs. Knight and Marcellus, Mr. Chandra never suggested that any of SCB's clients, including any of the clients listed on the documents he provided, were non-Iranian entities operating as fronts for Iranian companies.

7

*The Petrochemical Company*

20.    As I explained in my prior declarations, the investigation that ultimately led to the 2019 settlements began when the Government learned, as part of an investigation of a different financial institution, of information suggesting that a Dubai-incorporated petrochemical company that was a client of SCB's Dubai branch was actually a front for an Iranian business.  I also previously noted that this petrochemical company was never mentioned by Relator or Mr. Chandra, nor is it included in any of the documents they provided.  Mr. Marcellus now claims that Caspian Chemical FZCO, an entity listed in one of Relator's documents—though never mentioned by Messrs. Knight, Marcellus, or Chandra—is a corporate affiliate of the petrochemical company at issue.  As part of our investigations, we reviewed documents relating to the ownership and corporate family structure of the petrochemical company and (although its name is somewhat similar), Caspian Chemical does not appear to have any relationship with the petrochemical company.[8]

*The Alleged Leaked Suspicious Activity Reports*

21.    Mr. Marcellus attaches to his latest declaration a list of entities regarding which—he claims—SCB allegedly filed SARs that were leaked to Buzzfeed and formed the basis of the BuzzFeed article that is the subject of the instant motion.  2d Supp. Marcellus Decl., Attachment D (ECF No. 79-1, at 21).  I reviewed this list and compared it to our case files for the relevant investigations.  None of the listed entities were ever mentioned by Messrs. Knight, Marcellus, or

---

[8] Mr. Marcellus is also incorrect that the revelation by the other financial institution about the petrochemical company was prompted by the SCB investigation.  As I and others (including DFS's declarant) have previously pointed out, it was the other way around—the other bank provided information that led the agencies that had been investigating Relator's claims to open a new investigation into SCB.  *E.g.*, Komar Decl. (ECF No. 32), ¶¶ 26-29; Nochlin Decl. (ECF No. 58), ¶ 12.

Chandra during our investigation of Relator's allegations. The listed entities also were never part of the separate investigation of SCB that led to the 2019 DPA. Thus, regardless of whether Mr. Marcellus's list is accurate or whether any such SARs actually exist, the entities listed on it are not relevant to the SCB investigations in which I participated.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:     March 8, 2021
           Cleveland, Ohio

                             Matthew F. Komar
                             Special Agent
                             Federal Bureau of Investigation

9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                Plaintiff,

    v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVICES
CORPORATION,

                Defendants.

No. 18 Civ. 11117 (PAE)

### THIRD SUPPLEMENTAL DECLARATION OF ALEXANDRE MANFULL

I, Alexandre Manfull, hereby declare the following pursuant to 28 U.S.C. § 1746:

1. I previously submitted three declarations in connection with the United States'
motion to dismiss Relator's second amended complaint in the above-captioned case and
Relator's application to reopen the Court's determination of that motion. I have reviewed
Relator's reply brief in support of its motion for an indicative ruling ("Relator Reply") and its
February 1, 2021, letter to the Court ("Relator Letter"), and hereby make the following third
supplemental declaration to respond to additional inaccuracies and other points made in Relator's
latest set of filings with regard to the Government investigations and financial filings at issue.

2. I make this declaration, like the previous three, based on my own personal
knowledge, a review of Relator's allegations and documents relating to these investigations, as
well as my general familiarity with the procedures and authorities of other Treasury components,

including FinCEN.[1]  As with my previous declarations, this declaration does not set forth all of my knowledge of the matters discussed herein.  All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

      3.     As explained in my prior declarations, I participated personally in part of OFAC's investigation into Relator's claims, including by taking part in a pre-complaint telephone call and email communications between OFAC and Robert Marcellus in September 2012 and in the (post-complaint) multiagency interview of Mr. Marcellus and Julian Knight in January 2013.  I also reviewed the documents provided by Relator in connection with the *qui tam* lawsuit as well as relevant documents provided by the Bank.  Although I did not work at OFAC from March 2013 to August 2014, upon my return I participated directly in the investigation of SCB that led to the 2019 settlement with OFAC.  Furthermore, as part of preparing my declarations in this matter, I have reviewed (and in many cases re-reviewed) numerous pertinent documents, including emails, memoranda summarizing interviews and meetings, Bank documents received in the course of the investigation, and documents provided by Relator and Anshuman Chandra.

### Relator's *Qui Tam* Allegations Were Limited to Iranian Entities and SDNs

      4.     As explained in my prior declarations, Relator's original allegations in this case were that SCB improperly conducted U.S. dollar transactions for Iranian entities and SDNs after 2007.  These were the types of clients that Messrs. Knight, Marcellus, and Chandra identified to the Government as suspect in various communications and interviews—including in a telephone call between Mr. Marcellus and OFAC in September 2012, a few months before the *qui tam* complaint was filed.  Like the other communications involving Relator's *qui tam* complaint, this

---

[1] This declaration uses abbreviations and capitalized terms defined in my earlier declarations.

conversation described Mr. Marcellus's allegations regarding Iranian and SDN clients of SCB. These allegations were investigated and were not corroborated.

5. Relator's recent filings claim that its allegations also included hundreds of companies based in the United Arab Emirates (U.A.E.) and elsewhere, which it now asserts conducted U.S. dollar transactions with Iran or had undefined Iranian affiliations. *See, e.g.*, Relator Reply at 9 (discussing "numerous customers with Iranian ties, some having a location in the UAE or other country"). While there were indeed thousands of non-Iranian entities listed in the documents Relator and Mr. Chandra provided, as detailed in my prior declarations, Relator and Mr. Chandra's allegations related to the known Iranian banks and entities identified on these documents that were indisputably based in or connected to Iran—including because they had "Iran" in their names (*e.g.*, Iran & Dubai Co. LLC) or were subsidiaries of known Iranian companies (*e.g.*, Mapna International FZE). Relator's allegations were not, as it now claims, that SCB conducted violative Iran-related U.S. dollar transactions through U.S. jurisdiction for hundreds of non-Iranian entities on Relator's lists with no apparent Iranian affiliations.

6. In any case, as part of preparing my declarations in this case, I have examined several lists produced by the Relator and Mr. Chandra in its latest filings, as further described below. In particular, these lists include several entities, such as Mapna International FZE and approximately 30 Iranian clients on the chart produced by Mr. Chandra, whose Iranian affiliations were apparent during the investigation, and whose post-2007 transactions with SCB were already investigated by the Government. The lists also include a large number of non-Iranian entities that do not appear to be Iranian or otherwise subject to sanctions—for example, because they were SDNs, owned by Iranian entities or individuals ordinarily resident in Iran, or owned or controlled by the Iranian government, as further described below, *see* 31 C.F.R.

§§ 560.204, 560.206, 560.211—and which Relator did not identify to OFAC as suspect among the thousands of companies listed in its original productions. In particular, Relator did not suggest that these non-Iranian companies in its original productions were Iranian front companies—*i.e.*, sham or shell companies that hold themselves out as non-Iranian companies but in actuality operate on behalf of Iranian entities or persons ordinarily resident in Iran—which were the subject of the investigation that led to the 2019 settlement.[2]

### The Alleged Leaked SARs Do Not Relate to Iranian Front Companies

7.      In its latest set of papers, Relator claims that the BuzzFeed Article describes alleged leaked Suspicious Activity Reports ("SARs") filed by SCB purportedly showing that the Bank "processed hundreds of millions of dollars in transactions suspected of violating the Iran sanctions until 2017, including transactions involving at least 31 companies identified in information the Relator had produced" to the Government in 2012 and 2013. Relator Reply at 1. As I explained previously, 2d Supp. Manfull Decl. (ECF No. 75) ¶ 4, Relator misinterprets the BuzzFeed Article by suggesting that the alleged SARs all described transactions with sanctioned Iranian parties in violation of OFAC sanctions, rather than reportable transactions across a broad range of suspicious activities, *see* BuzzFeed Article ("*[s]ome* of the 35 SARs mentioning customers in the whistleblowers' documents discussed *possible links* to Iran" (emphases

---

[2] As noted in my prior declarations, individuals of Iranian nationality or background who are ordinarily resident outside of Iran, such as in the U.A.E., are generally not considered Iranian for purposes of the OFAC sanctions. Manfull Decl. (ECF No. 34) ¶ 15; Supp. Manfull Decl. (ECF No. 57) ¶ 8.

added)).[3]  Mr. Marcellus admits that neither he nor Mr. Knight has seen the alleged leaked

SARs.  *See* 2d Supp. Marcellus Decl. ¶ 10 & Attachment D.[4]

8.      I have re-reviewed Relator's disclosure statement, notes from the January 2013

Relator interview, notes from OFAC's pre-complaint telephone conversation with Mr.

Marcellus, notes from the FBI's interviews with Mr. Chandra, and relevant contemporaneous

correspondence with Mr. Marcellus.  Relator and Mr. Chandra do not appear to have mentioned

any of the subjects of alleged leaked SARs in those communications.[5]

9.      In any event, I have reviewed the names of the entities on Mr. Marcellus's list,

which includes entities he claims are subjects of alleged leaked SARs, and none of them appear

to be Iranian entities or SDNs, Iranian front companies, or otherwise subject to the Iran

sanctions.  Relator did not allege or provide evidence in its communications to the Government

_____

[3] As I have noted, SARs may be filed to report a broad range of suspicious activity
unrelated to sanctions violations, such as suspicions of tax evasion, irregular business patterns, or
unusual flows of funds.  2d Supp. Manfull Decl. ¶¶ 8-9.  The BuzzFeed Article does not claim
that the alleged leaked SARs all describe transactions with Iranian companies or Iranian front
companies, and indeed, most of the identified examples of alleged SARs discussed in the body of
the article do not relate to Iran sanctions.

[4] Due to the applicable SAR confidentiality requirements, I address the alleged SAR
information herein only as it was provided in allegations made by Mr. Marcellus and the
BuzzFeed Article, and cannot discuss SAR information or otherwise comment on the existence
or accuracy of any such information.  Out of an abundance of caution, given the allegations of
specific SAR information and governing confidentiality requirements, and consistent with the
Government's request to seal Paragraph 10 and Attachment D to the Marcellus Declaration, I
submit portions of this information under seal to ensure confidentiality of any alleged SAR
information.

[5] As I noted previously, the mere fact that certain non-Iranian entities in Mr. Marcellus's
list also appear among thousands of others in the lengthy client lists or transaction registers
provided by Relator or Mr. Chandra, without evidence from Relator or Mr. Chandra of an
improper Iranian affiliation, would not have led OFAC to investigate all transactions involving
each such non-Iranian entity in the off-chance that an Iranian sanctions violation might be found.
Nor would such an investigation have been reasonable given the information actually provided
by Relator, which was far more specific—and was thoroughly investigated.

as part of the *qui tam* matter that SCB had facilitated violative Iran-related transactions through U.S. jurisdiction for the entities on Mr. Marcellus's list.

10.     Most of the entities on Mr. Marcellus's list are non-Iranian multinational or foreign companies based outside the U.A.E. that clearly are not fronts for Iranian companies or otherwise subject to U.S. sanctions. These companies include affiliates of large multinational companies ██████████████████████████████████████████████ ████████████████████████████████████████.

11.     At least two of the non-U.A.E. companies on this list have been subject to enforcement actions by OFAC for alleged violations of U.S. sanctions: ████████████████



However, as explained in my prior declarations, the fact that a non-Iranian company is known or suspected of having engaged in particular violative transactions does not mean that it is subject to sanctions[6] or that all transactions between a U.S. financial institution and the non-Iranian company would be prohibited.[7] The types of allegedly violative transactions that the Relator disclosed were different in kind, in that they related to transactions in U.S. dollars on behalf of the Bank's pre-2007 Iranian clients.

---

[6] As explained in my prior declarations, an entity is considered subject to sanctions when OFAC blocks (*i.e.*, "freezes") its interests in property and adds it to the SDN List. By contrast, an entity may be subject to an enforcement action by OFAC if it violates the prohibitions on transactions under U.S. jurisdiction that involve sanctioned countries or SDNs.

[7] Indeed, as I mentioned previously, many major American and European companies, including Apple and Amazon, have been penalized for engaging in transactions with Iran through U.S. jurisdiction, but U.S. financial institutions do not necessarily violate the Iran sanctions simply by processing transactions for such companies. 2d Supp. Manfull Decl. ¶ 21.

12.     The remaining entities on Mr. Marcellus's list are a group of Lebanese banks and companies ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████ The connection of these Lebanese entities to this matter is unclear, ███████████████████████████████ ████████████ Moreover, none of these entities appear to have been identified as subject to sanctions by Messrs. Knight, Marcellus, or Chandra in their communications with the Government in 2012 and 2013. █████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████ However, even if the allegations that they facilitated terrorist financing transactions were proven, it would not mean that the Lebanese entities were subject to OFAC sanctions, such that SCB would have violated sanctions regulations by dealing with them at the time of any relevant transactions.

**Relator and Mr. Chandra Did Not Identify SCB Sanctions Violations**

13.     Messrs. Knight, Marcellus, and Chandra's latest declarations also incorrectly claim that they had identified to the Government in the course of its investigation various SCB clients that were fronts for Iranian companies.  They do not allege any connection to alleged leaked SARs described in the BuzzFeed Article, and thus it is not clear why they are pertinent to this motion.  In any event, Relator did not specifically identify these entities as suspect to OFAC in the investigations.

---

████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

*Mr. Marcellus's Purported Pre-Complaint Email to OFAC*

14.     One of the documents attached to Mr. Marcellus's latest declaration is a purported copy of an email message dated September 19, 2012, that he claims to have sent to me and other OFAC personnel, which includes a list of SCB clients he now alleges may have been involved in sanctions violations.  2d Supp. Marcellus Decl., Attachment B (ECF No. 79-1, at 14-18).  Upon closer review, the material attached to Mr. Marcellus's declaration is substantially different from the actual email he sent OFAC in 2012, which I have attached hereto as Exhibit A, and which specifically does not include the same list of entities to which he refers in his declaration.

15.     To conduct my comparison, I reviewed the email message in question not only in my archived email records, but also in the archived records of other OFAC employee recipients of the email in question (none of whom still work at OFAC), which I obtained through the agency's information technology division.  The first two pages of the email attached to Mr. Marcellus's declaration match the corresponding section of the email that was sent to OFAC. *Compare* ECF No. 79-1, at 14-15, *with* Exhibit A at 1-2 (through numbered item 2).  The remaining material in the email attached to Mr. Marcellus's declaration, however, is completely different from the remainder of the email message (and attachment) that OFAC actually received.  *Compare* ECF No. 79-1, at 16-18, *with* Exhibit A at 1-5 (after numbered item 2).  I have reviewed my email correspondence and that of several of my former colleagues with Mr. Marcellus and could not locate material that matches the lists on the last three pages of the document attached to Mr. Marcellus's declaration.  From a visual inspection of the attachment to the Marcellus declaration, it appears that the document has been printed and scanned, rather than produced in native format.

16.     The email message Mr. Marcellus actually sent to OFAC described documents that Mr. Knight would be able to provide relating to accounts and activity by known Iranian banks and companies on SCB's foreign-exchange electronic system (*e.g.*, Bank Melli, Bank Saderat), and attached notes relating to the Bank's relationship with Bank Markazi, Iran's central bank. This material is consistent with what Relator's complaint later alleged and OFAC investigated.

17.     The material that was not part of Mr. Marcellus's email consists of a list of "Further Files we have," which appears to include summaries of some of the documents that OFAC received from Relator in connection with the *qui tam* complaint, ECF No. 79-1, at 16; and, more importantly—as relevant here—two pages listing what appear to be various SCB clients, *id.* at 17-18. This list is presumably what Mr. Marcellus is referring to in his declaration when he incorrectly claims that he "gave OFAC and Mr. Manfull names of numerous entities to investigate in [his] September 19, 2012 email," 2d Supp. Marcellus Decl. ¶ 7; *accord id.* ¶ 9(a). Only a few of the entities on that list were identified by Relator or Mr. Chandra in connection with the *qui tam* complaint—known Iranian entities whose transactions with SCB were reviewed by OFAC as part of its investigation. Moreover, Mr. Marcellus does not allege any connection to any alleged leaked SARs. Thus, it is not clear what relevance this list has to Relator's latest motion, which pertains to the BuzzFeed Article and the alleged leaked SARs it discusses.

18.     Moreover, even if Mr. Marcellus had sent OFAC this list in 2012, it would not have changed our assessment of the prior investigation. Upon examination, the list seems to include (as further explained below): (i) known Iranian entities, including several known Iranian banks—of which nearly all were included in Relator's original allegations and reviewed as part of the *qui tam* investigation or whose accounts SCB appears to have largely blocked or closed by

2007 (according to the chart attached to Mr. Chandra's declaration, discussed below); many of these entities were also addressed in SCB's wind-down reports submitted to OFAC before Relator's *qui tam* complaint (which described permissible post-2007 transactions); (ii) what the Bank seems to have characterized as possibly Iranian entities or entities with possibly improper Iranian affiliations, nearly all of whose accounts SCB appears to have blocked or closed by 2007 (as noted in Mr. Chandra's chart); and (iii) non-Iranian entities for which SCB found no improper affiliations with Iran (as noted in Mr. Chandra's chart). Thus, Mr. Marcellus's list does not support Relator's claim that SCB conducted violative Iran-related transactions with its Iranian clients after 2007 or that any alleged SARs would support this accusation.

***Chart Attached to Mr. Chandra's Declaration***

19.     Mr. Chandra, for his part, attaches to his latest declaration (Supp. Chandra Decl., Ex. A) a spreadsheet that he claims is the result of an internal SCB investigation into "Iranian entities and Iran-linked entities in Dubai that were in the SCB customer base." Supp. Chandra Decl. ¶ 4; *see also* Relator Letter at 1 (describing the document as the result of an "internal SCB review identifying 30 SCB Dubai customers with clear Iranian connections"). As Mr. Chandra explained it at the time to the FBI agent working on the SCB investigation (recounted in the agent's latest declaration), however, this chart was actually prepared as part of the Bank's response to the Government's investigation of Relator's allegations. The findings of this chart are indeed, with respect to identified Iranian entities, consistent with SCB's presentations and disclosures to OFAC and the other investigating agencies.

20.     In particular, Mr. Chandra's chart identifies many known Iranian entities (*e.g.*, known Iranian banks, Mapna International, (Iran) Ministry of Economic Affairs and Finance), some of which were previously disclosed by Relator and  reviewed as part of the *qui tam*

10

investigation or whose accounts were largely either closed or blocked by 2007 according to the chart (code "BLI" in the far-right column, indicating that further transactions out of the account would be restricted without approval); many of these entities are also described in SCB's wind-down reports . The chart also includes a number of what the Bank appears to characterize as possibly Iranian clients or entities with possibly improper Iranian affiliations (*e.g.*, Sanat Chimie Novin and Iran & Dubai Company LLC), some of which are known to be affiliated with Iran; the chart indicates the Bank had also largely closed or blocked those accounts by 2007. The remaining entities on the list appear to be non-Iranian customers that the Bank either concluded were not Iranian (*e.g.*, Archirodon Construction, a Greek construction company) or entities whose accounts it had blocked or closed or with whom it no longer had a relationship. Thus, Mr. Chandra's chart does not appear to provide evidence of SCB engaging in transactions through U.S. jurisdiction with Iranian clients after 2007 (the subject of Relator's original allegations).

21.     In any case, none of these entities are alleged to be related to any alleged leaked SARs that Mr. Marcellus claims are described in the BuzzFeed Article.

*Other Alleged Iranian Entities*

22.     Mr. Marcellus's latest declaration claims that the thousands of entities listed in the various client lists and transaction registers that Relator provided to the Government were Iranian, fronts for Iranian entities, or conducted U.S. dollar transactions with Iranian entities after 2007 because of their supposed connection to the Bank's "Iran group." 2d Supp. Marcellus Decl. ¶ 8 (claiming that *all* of these entities were "Iranian front companies domiciled in other locations, known Iranian entities, and unrelated entities transacting with known Iranian entities"). This is plainly not what Relator indicated to the Government about these entities at the time—in the complaint or disclosure statement, or the interviews of Messrs. Knight and Marcellus.

11

23.     Nor is it a plausible allegation, as many of the documents do not relate to such a group at SCB, and—as I noted previously, and as Mr. Chandra explained to the FBI agent at the time—the other documents pertain to a group at SCB's Dubai branch that handled non-U.A.E.-based clients from Iran and other "Significant Non-Presence Countries" in which the Bank did not have an office, including Kuwait and other Middle Eastern countries.  Supp. Manfull Decl. ¶ 22; 3d Supp. Komar Decl. ¶ 16 & Ex. 6 at 2.  Moreover, these documents include many entities that are clearly non-Iranian and have no apparent connection to Iran.[9]

24.     Only a few of the entities listed in Relator's documents have any apparent connection to Iran and many of these were identified by name by Relator during the investigation.  OFAC and the other agencies reviewed the Bank's transactions with these clients and did not find evidence of wrongdoing.

25.     Mr. Marcellus claims that Relator identified to the Government the Dubai-based petrochemical company that was one of the subjects of OFAC's 2019 settlement.  As I have explained previously, this is incorrect.  Supp. Manfull Decl. ¶ 28.  Messrs. Knight, Marcellus, and Chandra never identified this entity to the Government, and it is not listed, even incidentally, in any of the documents they provided to OFAC.  Mr. Marcellus claims that Caspian Chemical Company FZCO, an entity that is listed in one of the documents (though never identified by Relator), is a corporate affiliate of the petrochemical company.  He is incorrect.  OFAC and the other investigating agencies examined the corporate affiliation of the petrochemical company as

---

[9] While Relator's counsel may have described some of Mr. Chandra's documents as including certain Kuwaiti and other non-Iranian clients serving as potential intermediaries in transactions involving Iranian entities, *see* Koenigsburg Memorandum (ECF No. 79-4), at 3, as the Government explained in its opposition to the instant motion, that description misunderstands the relevant documents as Mr. Chandra himself explained them to the FBI agent.  *See* Gov't Opp. [ECF No. 73] at 14-15.  Counsel's misunderstand was based on a misapprehension of the nature of the Bank's Iran and Significant Non-Presence Countries group.

part of their investigation and concluded that although their names are similar, the petrochemical company is not related to Caspian Chemical.

26.     Other entities mentioned in the various declarations include known Iranian-affiliated entities such as Well Services of Iran (Schlumberger Methods) and Nestle Iran PJSC, whose connections to Iran were recognized and reviewed during the investigation or as part of the wind-down reports, and which cannot be characterized as front companies. 2d Supp. Marcellus Decl. ¶ 9(b); Supp. Knight Decl. ¶ 3. According to the information OFAC received, and consistent with Mr. Chandra's chart, SCB had largely closed its accounts for these companies by 2007, or engaged in only permissible wind-down transactions thereafter.[10] Conversely, Mr. Marcellus also claims that certain entities are Iranian front companies when they are clearly not, such as the Bank D'Algerie (Algeria's central bank). 2d Supp. Marcellus Decl. ¶ 9(c).

27.     Moreover, none of these entities are alleged to be related to any alleged leaked SARs that Mr. Marcellus claims are described in the BuzzFeed article.

* * *

28.     Ultimately, Relator has not supplied evidence that the unsubstantiated claims in the BuzzFeed Article corroborate or relate to Relator's allegations of undisclosed transactions for Iranian or SDN clients in violation of OFAC's sanctions. OFAC and other agencies carefully investigated Relator's allegations at the time and did not find they provided evidence of sanctions violations.

---

[10] As for Tanootas Taban Engineering Company, as I explained previously, Relator did not specifically identify this entity to OFAC. Supp. Manfull Decl. ¶ 27. An entity with a similar name, however, was disclosed to OFAC by SCB before the Relator filed its *qui tam* complaint.

13

29.    Relator's repeated distortions of its allegations in a futile attempt to revise them to match the findings of OFAC and other agencies from the separate investigation that led to the 2019 settlements are without merit.  I and other OFAC personnel have spent hundreds of hours of agency time and countless agency resources responding to and refuting Relator's misstatements over the past year which would otherwise have been used to support active sanctions investigations and other agency priorities.  Any further expenditure of such resources, as would be required by further discovery or depositions in connection with this matter, would be detrimental to OFAC priorities.

Dated: Washington, D.C.
         March 2, 2021

ALEXANDRE MANFULL
Assistant Director
Sanctions Compliance and Evaluation
Office of Compliance and Enforcement
Office of Foreign Assets Control

14

**Exhibit K to McSweeney Declaration –
Filed Under Seal**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                          Plaintiff,                  Case No. 18 Civ. 11117 (PAE)

           v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVIICES
CORPORATION,

                          Defendants.

-------------------------------------------------------------x

### DECLARATION OF DAVID J. SCANTLING

      DAVID J. SCANTLING, pursuant to 28 U.S.C. § 1746, declares as follows subject to the penalties of perjury:

### I. FORENSIC ASSIGNMENT AND SUMMARY CONCLUSIONS

      1.     I submit this declaration in support of Relator Brutus Trading LLC's ("Relator's") motion to vacate the judgment entered in the above-captioned matter. The statements included in this declaration are based on my own personal knowledge of threat finance, intelligence analysis, payment systems, software and database engineering, telecommunications networks, information retrieval, and forensic accounting.[1]

      2.     I have been asked by Relator to provide my expert opinion regarding the contents of certain transactional electronic data from defendant Standard Chartered Bank PLC ("SCB"),

---

[1]     I am providing this declaration as part of my ongoing commitment to *pro bono* public service. Accordingly, I have not received, nor will I accept, any form of compensation from Relator for my work on this declaration.

1

which the Relator provided to the United States Government, (the "Government") in 2012 and 2013 ("Brutus Data"). Those conclusions are based on my comprehensive forensic and technical analysis of the Brutus Data, including a thorough examination of all relevant data and metadata, with a particular focus on a recently extracted set of at least 512,721 unique transactional records ("Newly Extracted Data").

3.      Based upon that work, I have:

- identified over **3.3 million** previously undisclosed transactional records, deduplicated to 512,721 unique records, contained in hidden pivot table caches, which are concealed within SCB Excel spreadsheets; and

- further isolated **906 Iranian-related** transactions (identified as such by SCB in the bank's own records) between January 2008 and March 2012 totaling approximately **$9.6 billion U.S. dollars** and involving entities and individuals subject to international sanctions), including, as discussed below, 92 transactions involving contemporaneously U.S. sanctioned entities. That $9.6 billion sum does *not* fully reflect the approximately $100 billion U.S. dollars in Iran-related foreign exchange transactions that Relator's Julian Knight has independently identified from the Newly Extracted Data.[2]

4.      The Newly Extracted Data I have reviewed include numerous SCB transactions with and on behalf of Iranian banks, Iranian companies, and Middle Eastern money exchanges that, according to the U.S. Dep't of Treasury's Office of Financial Assets Control ("OFAC"), finance designated foreign terrorist organizations ("FTOs")[3] such as the IRCG, IRCG-Quds Force,

---

[2]      My understanding is that Mr. Knight is providing a declaration to the Court explaining what the Newly Extracted Data demonstrates regarding SCB Iran-related foreign exchange transactions.

[3]      The U.S. Dep't of State designates a "Foreign Terrorist Organization" under section 219 of the Immigration and Nationality Act ("INA") (8 U.S.C. § 1189). To be designated as an FTO, an organization must engage in terrorist activity or terrorism, as defined in the INA, and must threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States.

Hezbollah, HAMAS, and Speicallly Desingated Global Terrorist ("SDGT")[4] organizations like the Taliban.

5.     For example, they include SCB's transactions with a Pakastani fertilizer company that, according to the U.S Dep't of Defense, was known for selling explosive materials to Al Qaeda and Haqqani Network fronts and subsequently used by the Taliban to build the roadside bombs that killed or maimed thousands of U.S. and U.K. military personnel in Afghanistan.[5]

6.     They also document SCB's use of funds that it borrowed from the United States during the 2007–2009 global monetary crisis, in connection with the Federal Reserve Bank's Term Auction Facility ("TAF") program to help fund the money-laundering and sanctions evasion operations of the Central Bank of Iran ("CBI").

7.     The Newly Extracted Data simply cannot be reconciled with the Government's representations to the Court in this matter that the Brutus Data contains no evidence of undisclosed sanctions violations.

## II.   BACKGROUND AND PROFESSIONAL EXPERIENCE

8.     Since 2012, I have worked as an independent intelligence analyst, researcher, and technical advisor to various commercial and government clients.

9.     During this period, my project work has covered threat finance, anti-money laundering, counter-financing of terrorism, open-source intelligence, forensic analysis, and electronic discovery market segments.

---

[4]     Exec. Ord. No. 13,224.

[5]     *Terrorist Networks in Pakistan and the Proliferation of IEDs: Hearing Before the Subcomm. on Near Eastern and South and Central Asian Affairs, S. Comm. on Foreign Relations*, 112th Cong. 2 (2012) (statement of Lt. Gen. Michael Barbero).

10.     I have extensive experience conducting forensic examinations of financial transactions to identify evidence of terrorist financing and violations of sanctions laws.

11.     From 1984 to 1991, I served in the U.S. Air Force, both on active duty and in the reserves. I was awarded the Air Force Achievement Medal and National Defense Service Medal. In October 1991, I was honorably discharged from the U.S. Air Force. In May 1991, I earned a Bachelor of Arts degree from the University of Notre Dame.

12.     From 1992 to 1994, I worked for agencies within the U.S. Intelligence Community as a technical intelligence advisor conducting operations in various foreign countries.

13.     From 1995 to 2002, I worked in the commercial banking sector as a software engineer and technical architect for, among other information technology companies, IBM and Hewlett-Packard. During this period, I managed an Internet payment services and electronic funds transfer company that was regulated by the U.S. Department of the Treasury's Office of Comptroller of the Currency.

14.     From 2003 to 2005, I worked for agencies within the U.S. Intelligence Community as a technical intelligence advisor conducting operations in various foreign countries.

15.     From 2006 to 2008, I worked as a Highly Qualified Expert and civilian federal employee at the U.S. Department of Defense. During this period, I held the equivalent civilian rank of a two-star general, and I served as the lead DoD executive for business systems and networks in the U.S. Central Command area-of-operations.

16.     During that period, I led a team from the Office of the Secretary of Defense, Defense Intelligence Agency and Iraq Threat Finance Cell that successfully disrupted and eliminated terrorist financing networks and bomb-making supply-chains across Iraq, including insurgent cells run by Al Qaeda in Iraq, Islamic State, and Iraqi Shia militia groups. By conducting

4

forensic examinations of financial transactions using Excel and leveraging my expertise in database architecture and data analysis, we were able to uncover patterns of terrorist financing and sanctions evasion, ultimately leading to the disruption of these networks and a significant reduction in their terrorist capabilities.

17.    I received the Secretary of Defense Medal for Outstanding Public Service from then-Secretary of Defense Robert Gates for my counter-threat finance work in Iraq. In my last position with DoD, I served at the Pentagon as Assistant Deputy Under Secretary of Defense for Expeditionary Business Systems.

18.    From 2008 to 2009, I worked for agencies within the U.S. Intelligence Community as a technical intelligence advisor conducting operations in various foreign countries.

19.    From 2009 to 2010, I worked as a technical advisor to the U.S. Navy's Naval Air Systems Command. During that period, I deployed to Afghanistan and conducted operational testing and evaluations of U.S. Navy and Air Force airborne electronic warfare systems that were used for jamming commercial cellular telecommunications networks to counter, among other things, improvised explosive devices and explosively formed penetrators.

20.    In 2011, I deployed to Iraq and Afghanistan as a technical advisor to the Pentagon's Task Force for Business and Stability Operations. During that period, I assisted DoD personnel with the information technology and cyber-security components, including Excel-based data analytics and structured query language ("SQL")-based database searches, of their various economic development and counter-insurgency mission areas.

21.    Furthermore, my understanding of financial messaging systems like SWIFT, and my knowledge of electronic funds transfers, correspondent banking, and CHIPS clearing and settlement have been critical in identifying instances of sanctions evasion and money laundering.

By examining the technical details of these transactions, including the specific messaging formats and data fields used, I have been able to uncover attempts to conceal the true nature of illicit transactions and identify the ultimate beneficiaries of these funds.

22.     In support of my work for the U.S. Government, I was granted a Top Secret/Sensitive Compartmented Information security clearance by agencies within the U.S. Intelligence Community.

23.     Although my knowledge of terrorist financing, money laundering, and sanctions evasion includes information I reviewed during my government service, my expert opinion, as stated in this declaration, is based solely on public source and commercial source information.

### III.   DOCUMENTS AND SOURCES REVIEWED

24.     I have reviewed documents, data, and metadata contained in a sub-set of Relator's SCB files, including Excel spreadsheets, Word documents, PowerPoint presentations, Adobe PDF documents, and e-mail messages involving over 160 hours of technical effort.

25.     My primary focus was on the seventy-two SCB files that Relator has advised me it produced to the U.S. Government.

26.     Specifically, the following ten SCB files which Relator produced to the U.S. Government in December 2012:

    a.  "CLIENT, BRANCH & USER SETUP.xlsx"
    b.  "CLIENT, BRANCH & USER SETUP -2009.xlsx"
    c.  "Regional Bank Target Client List2006.xls"
    d.  "MENA Customerwise Sales Report- Jan 09.xlsx"
    e.  "Bank report – Dec 09 CB.xlsx"
    f.  "UAE DIB – Faisal.xls"
    g.  "Hot Cold All.xlsx"
    h.  "Prospective Clients.xls"
    i.  "Prospective Clients New.xls"

> j. "Cash and Trade Corporates Client Groups FX Revenues_6 Sep 2010_MENA_V1.xlsx"

27.    And I reviewed the following fifty-six SCB files which Relator produced to the U.S. Government in September 2013:

> a. "Performance Summary -Iran(SNPC)[numbered 1–12 and 14–50]['.xls' or '.xlsx' file extension]"; (49 Excel spreadsheets)
> b. "Sundry.xlsx";
> c. "MENA April to Dec 2012.xlsx";
> d. "GCS MENA 2012-01-01 30.xls";
> e. "Iran Air TS_1.doc";
> f. "depos 19th august showing difference.xlsx";
> g. "Saderat Client Agreement.pdf"; and,
> h. "UnitWise Vs DPL Recon_31 May-2011.xlsx"

28.    A more detailed technical analysis of the Brutus Data, which I incorporate by reference into this declaration, is annexed hereto as an Addendum.

29.    As described above, these files include over 3.3 million hidden transactional records, dated between January 2, 2008, and August 31, 2012, relating to SCB's banking activities with its customers and counter-party banks in, among other banking segments, foreign exchange, trade finance, Eurodollar[6] deposits, and cross-border electronic funds transfers.

30.    Based on SCB's detailed spreadsheet records, originally populated with data from the bank's internal database systems, I have identified 92 transactions involving entities in Iran that were contemporaneously sanctioned by the U.S. Dep't of Treasury or U.S. Dep't of State

---

[6]    Eurodollars are defined as "deposit liabilities, denominated in dollars, of banks outside the United States." *See*, Milton Friedman, *The Euro-Dollar Market: Some First Principles*, FEDERAL RESERVE BANK OF ST. LOUIS (July 1971), at 17, https://files.stlouisfed.org/files/htdocs/publications/review/71/07/Principles_Jul1971.pdf .See also, *Citibank v. Wells Fargo Asia*, 495 U.S. 660, 662–63 (1990) ("Eurodollars are United States dollars that have been deposited with a banking institution located outside the United States, with a corresponding obligation on the part of the banking institution to repay the deposit in United States dollars.").

under various U.S. Government sanctions programs, including OFAC's Specially Designated Nationals ("SDN") list.[7]

**A. SCB's Hidden Transactional Records**

31.    My forensic analysis of SCB's Microsoft Excel spreadsheet files unveiled a staggering number of hidden transactional records and revealed deeply troubling connections to sanctioned entities and terrorist organizations.[8]

32.    I successfully extracted over 3.3 million transactional records from the "pivot table caches", explained below, that were concealed within numerous Excel files from SCB Dubai.

**1. Excel File Contents**

33.    The following table is a breakout of the 3,375,798 hidden transactional records that I extracted from 53 of SCB's Excel files that Relator had produced to the U.S. Government in December 2012 and September 2013:

---

[7]    OFAC's Specially Designated Nationals ("SDN") list is a critical tool used for identifying individuals, groups, and entities that are owned or controlled by, or acting for or on behalf of, targeted countries, such as Iran, as well as terrorists, narcotics traffickers, and those engaged in activities related to the proliferation of weapons of mass destruction. When OFAC places an individual or entity on the SDN list, their assets within U.S. jurisdiction are frozen, and U.S. persons are generally prohibited from engaging in any transactions or dealings with them. This prohibition extends to entities that are fifty percent or more owned, directly, or indirectly, by one or more SDNs. Financial institutions like SCB, among others, that are subject to U.S. jurisdiction must screen their transactions and customers against the SDN list to ensure they are not engaging in prohibited dealings. The SDN list is part of the broader framework of U.S. economic sanctions, which are designed to advance America's national security, foreign policy, and economic objectives. In the case of Iran, the United States has imposed comprehensive sanctions in response to Iran's nuclear weapons, ballistic missile, and drone programs; support for international terrorism; and human rights abuses. *See*, "Specially Designated Nationals List", OFFICE OF FOREIGN ASSETS CONTROL (2024), https://sanctionslist.ofac.treas.gov/Home/SdnList.

[8]    When Relator initially searched SCB's Excel files between 2012 and 2019, it employed two search methods: the built-in search functionality of Microsoft's Windows 8, Windows 8.1, and Windows 10 operating systems and Excel's own search feature within each spreadsheet. However, the search function on neither system delves into the underlying XML structure of the file to index the contents of the pivot table caches. Relator, not being forensic technical experts, could not reasonably have known about the limitations of these search tools regarding hidden data in Excel files.

| Date Range of Transactions | Hidden Records | Value of Hidden Records | SCB Filename |
|---|---|---|---|
| Jan. 1, 2009, to Jul. 31, 2010 | 24,262 | $660,623,587,379.55 U.S. dollars | "Cash and Trade Corporates Client Groups FX Revenues_6 Sep 2010_MENA_V1.xlsx" |
| Jan. 2009, to Jan 31, 2009 | 8,245 | $49,585,463.34 U.S. dollars | "MENA Customerwise Sales Report- Jan 09.xls" |
| Oct. 17, 2006, to Aug. 19, 2009 | 1,568 | $2,776,538,825.29 U.S. dollars | "depos 19th august showing difference.xlsx" |
| Jan. 2, 2012, to Jan. 30, 2012 | 64,006 | $166,557,512,823.70 U.S. dollars | "GCS MENA 2012-01-01 – 30.xls" |
| Jan. 2, 2012, to Mar. 20, 2012 | 32,972 | $65,159,906,674.75 U.S. dollars | "Performance Summary -Iran(SNPC)1.xlsx" |
| Jan. 2, 2008, to Dec. 31, 2008 | 52,921 | $154,787,260,499.86 U.S. dollars | "Performance Summary -Iran(SNPC)2.xls" |
| Jan. 2, 2012, to Feb. 20, 2012 | 21,131 | $54,555,886,673.25 U.S. dollars | "Performance Summary -Iran(SNPC)3.xlsx" |
| Jan. 2, 2012, to Feb. 29, 2012 | 26,986 | $56,791,072,710.94 U.S. dollars | "Performance Summary -Iran(SNPC)4.xlsx" |
| Jan. 3, 2011, to Oct. 14, 2011 | 127,580 | $152,292,237,252.56 U.S. dollars | "Performance Summary -Iran(SNPC)5.xlsx" |
| Jan. 3, 2011, to Oct. 26, 2011 | 132,382 | $317,875,719,588.58 U.S. dollars | "Performance Summary -Iran(SNPC)6.xlsx" |
| Jan. 3, 2011, to Oct. 31, 2011 | 140,540 | $329,770,232,625.91 U.S. dollars | "Performance Summary -Iran(SNPC)7.xlsx" |
| Jan. 3, 2011, to Nov. 25, 2011 | 151,000 | $341,971,005,446.72 U.S. dollars | "Performance Summary -Iran(SNPC)8.xlsx" |
| Jan. 3, 2011, to Nov. 30, 2011 | 155,349 | $346,613,279,106.53 U.S. dollars | "Performance Summary -Iran(SNPC)9.xlsx" |
| Jan. 3, 2011, to Nov. 14, 2011 | 145,960 | $335,745,886,310.24 U.S. dollars | "Performance Summary -Iran(SNPC)10.xlsx" |
| Jan. 3, 2011, to May 18, 2011 | 55,393 | $170,930,580,431.93 U.S. dollars | "Performance Summary -Iran(SNPC)11.xlsx" |
| Jan. 3, 2011, to May 24, 2011 | 57,445 | $174,631,430,077.74 U.S. dollars | "Performance Summary -Iran(SNPC)12.xlsx" |
| Jan. 3, 2011, to Mar. 15, 2011 | 18,765 | $30,576,137,222.96 U.S. dollars | "Performance Summary -Iran(SNPC)14.xlsx" |
| Jan. 3, 2011, to Mar. 28, 2011 | 23,876 | $76,007,951,333.87 U.S. dollars | "Performance Summary -Iran(SNPC)15.xlsx" |
| Jan. 3, 2011, to Mar. 31, 2011 | 27,116 | $88,029,493,093.75 U.S. dollars | "Performance Summary -Iran(SNPC)16.xlsx" |
| Jan. 3, 2011, to Jun. 16, 2011 | 68,430 | $201,031,517,180.69 U.S. dollars | "Performance Summary -Iran(SNPC)17.xlsx" |
| Jan. 3, 2011, to Jun. 24, 2011 | 71,683 | $207,942,565,397.87 U.S. dollars | "Performance Summary -Iran(SNPC)18.xlsx" |
| Jan. 3, 2011, to Jun. 30, 2011 | 77,055 | $222,043,633,386.97 U.S. dollars | "Performance Summary -Iran(SNPC)19.xlsx" |

| Date Range of Transactions | Hidden Records | Value of Hidden Records | SCB Filename |
|---|---|---|---|
| Jan. 3, 2011, to Jul. 15, 2011 | 83,640 | $232,571,489,569.30 U.S. dollars | "Performance Summary -Iran(SNPC)20.xlsx" |
| Jan. 3, 2011, to Jul. 22, 2011 | 86,159 | $236,432,818,454.61 U.S. dollars | "Performance Summary -Iran(SNPC)21.xlsx" |
| Jan. 3, 2011, to Jul. 29, 2011 | 91,006 | $244,326,946,756.66 U.S. dollars | "Performance Summary -Iran(SNPC)22.xlsx" |
| Jan. 3, 2011, to Jan. 17, 2011 | 3,010 | $17,350,040,204.06 U.S. dollars | "Performance Summary -Iran(SNPC)23.xlsx" |
| Jan. 3, 2011, to Feb. 15, 2011 | 5,626 | $25,426,240,424.40 U.S. dollars | "Performance Summary -Iran(SNPC)24.xlsx" |
| Jan. 3, 2011, to Feb. 15, 2011 | 7,729 | $28,132,329,828.44 U.S. dollars | "Performance Summary -Iran(SNPC)25.xlsx" |
| Jan. 3, 2011, to Feb. 28, 2011 | 12,434 | $54,716,440,531.99 U.S. dollars | "Performance Summary -Iran(SNPC)26.xlsx" |
| Jan. 3, 2011, to Dec. 15, 2011 | 161,731 | $355,577,077,718.49 U.S. dollars | "Performance Summary -Iran(SNPC)27.xlsx" |
| Jan. 3, 2011, to Dec. 23, 2011 | 164,674 | $359,506,450,017.62 U.S. dollars | "Performance Summary -Iran(SNPC)28.xlsx" |
| Jan. 3, 2011, to Aug. 15, 2011 | 97,403 | $254,244,400,426.28 U.S. dollars | "Performance Summary -Iran(SNPC)29.xlsx" |
| Jan. 3, 2011, to Aug. 25, 2011 | 101,880 | $263,233,953,090.03 U.S. dollars | "Performance Summary -Iran(SNPC)30.xlsx" |
| Jan. 3, 2011, to Aug. 31, 2011 | 106,268 | $267,839,721,007.12 U.S. dollars | "Performance Summary -Iran(SNPC)31.xlsx" |
| Jan. 3, 2011, to Apr. 15, 2011 | 33,287 | $97,484,192,422.63 U.S. dollars | "Performance Summary -Iran(SNPC)32.xlsx" |
| Jan. 3, 2011, to Apr. 27, 2011 | 39,568 | $119,247,491,987.10 U.S. dollars | "Performance Summary -Iran(SNPC)33.xlsx" |
| Jan. 3, 2011, to Apr. 30, 2011 | 46,850 | $157,856,342,778.13 U.S. dollars | "Performance Summary -Iran(SNPC)34.xlsx" |
| Jan. 4, 2010, to Sep. 14, 2010 | 60,514 | $113,693,245,426.21 U.S. dollars | "Performance Summary -Iran(SNPC)35.xlsx" |
| Jan. 4, 2010, to Sep. 22, 2010 | 65,536 | $118,132,098,780.69 U.S. dollars | "Performance Summary -Iran(SNPC)36.xlsx" |
| Jan. 4, 2010, to Sep. 22, 2010 | 65,536 | $125,749,480,771.49 U.S. dollars | "Performance Summary -Iran(SNPC)37.xlsx" |
| Jan. 4, 2010, to Oct. 11, 2010 | 66,651 | $130,210,812,302.35 U.S. dollars | "Performance Summary -Iran(SNPC)38.xlsx" |
| Jan. 4, 2010, to Oct. 22, 2010 | 69,832 | $137,570,721,782.82 U.S. dollars | "Performance Summary -Iran(SNPC)39.xlsx" |
| Jan. 4, 2010, to Oct. 31, 2010 | 72,741 | $145,812,483,063.41 U.S. dollars | "Performance Summary -Iran(SNPC)40.xlsx" |
| Jan. 4, 2010, to Nov. 10, 2010 | 75,440 | $153,704,760,016.69 U.S. dollars | "Performance Summary -Iran(SNPC)41.xlsx" |

| Date Range of Transactions | Hidden Records | Value of Hidden Records | SCB Filename |
|---|---|---|---|
| Jan. 4, 2010, to Nov. 25, 2010 | 77,337 | $158,709,147,818.52 U.S. dollars | "Performance Summary -Iran(SNPC)42.xlsx" |
| Jan. 4, 2010, to Nov. 30, 2010 | 79,227 | $167,090,904,740.30 U.S. dollars | "Performance Summary -Iran(SNPC)43.xlsx" |
| Jan. 4, 2010, to May 13, 2010 | 39,418 | $157,839,114,028.79U.S. dollars | "Performance Summary -Iran(SNPC)44.xls" |
| Jan. 4, 2010, to May 24, 2010 | 41,743 | $171,464,856,086.88 U.S. dollars | "Performance Summary -Iran(SNPC)45.xls" |
| Jan. 4, 2010, to May 31, 2010 | 44,882 | $72,996,511,759.26 U.S. dollars | "Performance Summary -Iran(SNPC)46.xls" |
| Jan. 4, 2010, to Mar. 10, 2010 | 23,136 | $68,117,864,909.36 U.S. dollars | "Performance Summary -Iran(SNPC)47.xls" |
| Jan. 4, 2010, to Mar. 18, 2010 | 21,013 | $81,329,904,170.10 U.S. dollars | "Performance Summary -Iran(SNPC)48.xls" |
| Jan. 4, 2010, to Mar. 25, 2010 | 22,766 | $92,541,145,060.80 U.S. dollars | "Performance Summary -Iran(SNPC)49.xls" |
| Jan. 4, 2010, to Mar. 31, 2010 | 24,096 | $104,099,879,799.07 U.S. dollars | "Performance Summary -Iran(SNPC)50.xls" |

## 2. SCB's Iran Group and "Project Green"

34.    Relator alleged that SCB's Iran Group, a specialized unit within the bank's Middle East and North Africa ("MENA") Origination and Client Coverage ("OCC") team, was instrumental in facilitating the bank's illicit transactions with sanctioned Iranian entities.

35.    Composed of senior managers with extensive knowledge of the Iranian market and client relationships, the Iran Group was responsible for overseeing and maintaining SCB's lucrative Iranian business portfolio, which generated hundreds of millions of dollars in revenue for the bank.

36.    According to New York's Department of Financial Services ("DFS"), at the heart of the Iran Group's operations was ensuring the smooth functioning of "Project Green", SCB's

covert scheme to evade U.S. sanctions by processing payments for Iranian clients while concealing their involvement.[9]

37.     The following table, based on the Newly Extracted Data, shows the entities that SCB's "Iran Group" did business with between January 2008 and March 2012 and the bank coded as relating to "Iran" in its internal platforms:

| Entity Name | Location | Volume | Type | Total Value |
|---|---|---|---|---|
| Arab Petroleum Investments Corporation | Riyad, Saudi Arabia | 4 | Interest rate swap, term deposit | $10,666,667 |
| Arian Sea Scent | Tehran, Iran | 20 | Term deposit | [not listed] |
| Attijariwafa Bank | Casablanca, Morocco | 16 | FX option | $168,008,410 |
| Bader al Mulla and Brothers Company WLL | Kuwait City, Kuwait | 62 | FX forward, spot | $424,684,538 |
| Bank Tejarat | Tehran, Iran | 5 | Trade finance | $93,000,000 |
| Banque d'Algerie | Algiers, Algeria | 46 | Interest rate swap, FX option, spot | $631,692,007 |
| Banque de Commerce et de Placements SA | Dubai, UAE | 1 | FX forward | $115,000 |
| Banque Marocaine du Commere Exterieur ("BCME") | Casablanca, Morocco | 1 | FX spot | $1,633,542 |
| Blue Com Trading Company LLC | Dubai, UAE | 4 | FX forward | $614,966 |
| CDG Capital SA | Casablanca, Morocco | 4 | Interest rate swap | $55,537,866 |
| Commercial International Bank | Cairo, Egypt | 17 | Interest rate swap, FX option | $297,283,894 |
| Dalahoo Engineering and Manufacturing Company ("DEMCO") | Tehran, Iran | 24 | Term deposit | [not listed] |
| Darman Yab Omid Company LTD | Tehran, Iran | 23 | Term deposit | [not listed] |
| DSGS FZCO | Dubai, UAE | 3 | FX spot | $109,102 |
| IFIC Holding AG | Dusseldorf, Germany | 23 | Term deposit | [not listed] |
| Iran Aseman Company | Tehran, Iran | 23 | Term deposit | [not listed] |
| Iran Industrial Exchange Company | Jebel Ali, UAE | 1 | FX forward | $67,818 |
| Khorasan Steel Company | Neyshabur, Iran | 1 | Trade finance | $209,000,000 |
| Khouzestan Steel Company | Ahvaz, Iran | 15 | FX forward | 63,702,164 |
| Kuwait Automotive Imports Company WLL | Kuwait City, Kuwait | 19 | Interest rate swap, FX forward, option, spot, | $19,934,939 |

[9]     *See*, REPORT ON INVESTIGATION OF PROMONTORY FINANCIAL GROUP, LLC, NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES (2015), https://www.dfs.ny.gov/system/files/documents/2020/03/promontory_inv_rpt _201508.pdf

| Entity Name | Location | Volume | Type | Total Value |
|---|---|---|---|---|
| Kuwait Projects Holding Company KSC | Kuwait City, Kuwait | 24 | FX spot | $260,000,000 |
| MAPNA International FZE | Dubai, UAE | 33 | FX forward | $1,570,051 |
| MH Alshaya Company WLL | Kuwait City, Kuwait | 176 | Term deposit, FX forward, spot | $221,217,742 |
| Minerex General Trading Company LLC | Dubai, UAE | 1 | FX forward | $122,558 |
| Mobile Telecommunications Company KSC | Kuwait City, Kuwait | 1 | FX swap | $3,303,000,000 |
| Mohamed Naser Al Sayer and Sons Company WLL | Kuwait City, Kuwait | 66 | FX forward, option, spot | $356,552,822 |
| National Aluminium Products Company SAO | Muscat, Oman | 4 | FX derivative | [not listed] |
| National Bank of Egypt | Cairo, Egypt | 16 | Interest rate swap, FX option | $50,085,968 |
| National Iranian Tanker Company ("NITC") | Tehran, Iran | 1 | Trade finance | $23,263,352 |
| Oil Industries Engineering and Construction | Tehran, Iran | 1 | Trade finance | $145,535,570 |
| Oriental Oil Company FZE | Dubai, UAE | 2 | FX forward | $2,327,071 |
| Parsian High Voltage Substations Development Company | Tehran, Iran | 1 | FX forward | $1,739,485 |
| Parsian International Establishment | Tehran, Iran | 23 | Term deposit | [not listed] |
| Petropars LTD | Tehran, Iran | 1 | FX forward | $8,125,797 |
| Retail International Company WLL | Kuwait City, Kuwait | 13 | FX forward, option, spot | 18,641,666 |
| Techno Parts FZCO | Dubai, UAE | 3 | FX forward | $845,348 |
| The Public Warehousing Company KSC | Kuwait City, Kuwait | 212 | FX forward, option, spot | $3,220,456,848 |
| United Arab Shipping Company SAG | Kuwait City, Kuwait | 12 | Term deposit, FX spot | $40,849 |
| Yusuf A Alghanim and Sons WLL | Kuwait City, Kuwait | 4 | FX spot | $512,808 |

38.    In total, between 2008 and 2012, SCB's Iran Group processed at least 906 Iran-related foreign exchange, trade finance, and term deposit transactions worth a total of $9,590,088,848 U.S. dollars.[10]

---

[10]    Of the 906 "Iran"-coded transactions, seven were with three Iranian entities that OFAC would later designate for funding and materially supporting the IRGC: Bank Tejarat, National Iranian Tanker Company, and Petropars LTD.

39.     SCB's nearly $10 billion U.S. dollars in post-2007 Iran-related business powerfully indicates that the bank's Iran Group not only continued to service existing Iranian clients but also onboarded new clients and developed new business opportunities in Iran.

### 3.  SCB's Post-2007 Business with FTO Front Companies

40.     Based on my forensic analysis of the Newly Extracted Data, I have also compiled the following summary of SCB's post-2007 SCB direct and indirect transactions involving known front companies of U.S. designated foreign terrorist organizations ("FTOs"):

| Entity Name | High-Risk Description | SCB's Post-2007 Business |
|---|---|---|
| Tajco LTD | On December 9, 2010, OFAC designated Tajco LTD, an import-export company based in Banjul, Gambia, as a Specially Designated Global Terrorist ("SDGT") for providing millions of dollars in financial support to Hezbollah. Tajco is owned and operated by Ali Tajideen, Husayn Tajideen, and Kassem Tajideen, who are brothers and prominent Hezbollah supporters and financiers.[11] | Between 2008 and 2010, SCB Gambia maintained U.S. dollar ("USD") and Gambian dalasi ("GMD") denominated bank accounts for Tajco LTD, identified by SCB group ID number "*****7865", and processed funds transfers worth millions of U.S. dollars through SWIFT's Viriginia data center, CHIPS in New York, and SCB New York. Further, in August 2010, SCB Dubai processed a foreign exchange transaction worth a total of $290,803.56 U.S. dollars for the benefit of Tajco's transactional account, number "*****9201". |
| Euro African Group LTD | On May 17, 2018, OFAC designated Euro African Group LTD, a petroleum company based in Banjul, Gambia, as an SDGT for being owned by Mohammad Ibrahim Bazzi. Mr. Bazzi is a key Hezbollah financier who, along with Hezbollah's representative to Iran, Abdallah Safi-Al-Din, worked with the Central Bank of Iran between 2009 and 2010 to expand banking access between Iran and Lebanon. Mr. Bazzi serves as the Managing Director and majority shareholder of Euro African Group.[12] | Between 2008 and 2010, SCB Gambia maintained USD and GMD denominated bank accounts for Euro African Group LTD, identified by SCB group ID number "*****7340", and processed funds transfers worth millions of U.S. dollars through SWIFT's data center in Virginia, CHIPS in New York, and SCB New York. Further, between January 2009 and June 2010, SCB Dubai processed 73 foreign exchange transactions worth a total of $16,659,286.07 U.S. dollars for the benefit of Euro African Group's transactional account, number "*****7701". |
| Fatima Group | On November 25, 2011, the *Washington Post* reported that Fatima Group, a | Between 2008 and 2012, SCB Pakistan maintained USD and Pakistani rupee ("PKR") |

---

11     Press Release, *Treasury Targets Hizballah Network in Africa*, U.S. Dep't of Treasury (May 27, 2009), https://home.treasury.gov/news/press-releases/tg149.

12     Press Release, *Treasury Targets Key Hizballah Financing Network and Iranian Conduit*, U.S. Dep't of Treasury (May 17, 2018), https://home.treasury.gov/news/press-releases/sm0388.

14

| Entity Name | High-Risk Description | SCB's Post-2007 Business |
|---|---|---|
| | fertilizer production conglomerate based in Pakistan, manufactured almost all the calcium ammonium nitrate ("CAN") used by the Taliban in its improvised explosive devices ("IEDs"). Further, in 2011, the Taliban's use of CAN produced by two of Fatima Group's subsidiaries—Fatima Fertilizer Company LTD and PakArab Fertilizer PVT LTD—wounded about 3,200 U.S. troops in IED attacks across Afghanistan.[13] Fatima sold CAN to entities it knew were fronts for FTOs Al Qaeda and the Haqqani Network. In 2011, U.S. Dep't of Defense officials informed Fatima that its CAN was being used to create bombs killing U.S. troops in Afghanistan. Yet, Fatima refused to take measures, such as adding identifying dyes, to help stem the flow of CAN into Afghanistan. | denominated bank accounts for, respectively, Fatima Fertilizer Company LTD, identified by account number "****5590", and PakArab Fertilizers PVT LTD, identified by account number "***0133". For each entity, SCB processed funds transfers worth millions of U.S. dollars through SWIFT's data center in Virginia, CHIPS in New York, and SCB New York. Further, between January and August 2009, SCB Pakistan processed 10 trade finance transactions for Fatima Fertilizer which generated profit for the bank worth total of $467,080 U.S. dollars. And in April 2009, SCB Pakistan processed a trade finance transaction for PakArab Fertilizers which generated profit for the bank worth $31,000 U.S. dollars. |
| Lebanese Canadian Bank SAL | In February 2011, the U.S. Dep't of Treasury's Financial Crimes Enforcement Network ("FinCEN") took significant action against Lebanese Canadian Bank ("LCB"), designating it as a "financial institution of primary money laundering concern" under Section 311 of the USA PATRIOT Act. [14] This designation was based on FinCEN's finding that LCB played a key role in facilitating the money laundering activities of an international narcotics trafficking and money laundering network with ties to Hezbollah. In December 2011, the U.S. Dep't of Justice ("DoJ") filed a civil Amended Complaint against LCB and other related parties, seeking nearly half a billion dollars in civil money laundering penalties and forfeiture of illicit funds. DoJ alleged that, from approximately January 2007 to early 2011, LCB used the U.S. financial system to launder narcotics trafficking and other criminal proceeds through the | SCB maintained at least four Eurodollar accounts for LCB, including account numbers "***4308", "***4556", "***4929", and "***4005". SCB processed four Eurodollar deposit transactions for these LCB accounts worth a total of $68,879,495.50 between September 22, 2008 and October 22, 2008. |

---

[13]     Greg Jaffe, *To Stop Afghan Bombs, a Focus on Pakistani Fertilizer*, Washington Post, (Nov. 25, 2011), https://wapo.st/4dexbd5.

[14]     Notice of Finding, *Lebanese Canadian Bank SAL is a Financial Institution of Primary Money Laundering Concern*, Financial Crimes Enforcement Network (Feb. 2011), https://www.fincen.gov/sites/default/files/shared/LCBNoticeofFinding.pdf.

| Entity Name | High-Risk Description | SCB's Post-2007 Business |
|---|---|---|
| | United States for the benefit of Hezbollah-controlled money laundering channels.[15] | |

### a) Tajco LTD.

41.    Tajco LTD is owned and controlled by the Tajideen brothers: Ali, Husayn, and Kassim Tajideen. (Tajco's credit report is attached as Exhibit A)

42.    In May 2009, OFAC designated Kassim Tajideen as a Specially Designated Global Terrorist ("SDGT") for being a major financial contributor to Hezbollah.[16]

43.    In December 2010, OFAC designated Ali and Husayn Tajideen as SDGTs for their roles as top Hezbollah financiers in Africa.[17]

44.    The U.S. Dep't of Treasury has confirmed that the Tajideen brothers are part of Hezbollah's Business Affairs Component ("BAC"), which funds and supports Hezbollah's terrorist activities.

45.    Further, Tajco is identified as a key entity used by the Tajideen network to generate millions of dollars for Hezbollah.

46.    As of February 2007, Kassim Tajideen owned Tajco and used the proceeds to provide millions of dollars to Hezbollah.

47.    Husayn Tajideen co-owned Tajco's Gambia branch and served as its managing director, while Ali Tajideen was a co-owner of the company's Lebanon branch.

---

[15]    *United States v Lebanese Canadian Bank*, 11 Civ. 9186 (PAE) (S.D.N.Y.).

[16]    Press Release, *Treasury Targets Hizballah Network in Africa*, U.S. DEP'T OF TREASURY (May 27, 2009), https://home.treasury.gov/news/press-releases/tg149.

[17]    Press Release, *Treasury Targets Hizballah Financial Network*, U.S. DEP'T OF TREASURY (Dec. 9, 2010), https://home.treasury.gov/news/press-releases/tg997.

48.    This demonstrates the Tajideen brothers' direct control over Tajco in multiple countries.

49.    According to OFAC, Ali Tajideen used Tajco in Lebanon since at least December 2007 to purchase and develop properties on behalf of Hezbollah, establishing a mechanism to invest in real estate and generate funds for the terrorist group.

50.    Tajco's subsidiary, Kairaba Supermarket in The Gambia, shares the same manager and address as Tajco, indicating it is an integrated part of the Tajideens' network of Hezbollah-linked companies.

51.    Tajco is associated with a Lebanese clan named in a 2002 UN Security Council Report as being involved in blood diamond smuggling and money laundering to fund Hezbollah and other terrorist groups.[18]

52.    This further evidences Tajco's long history of involvement in illicit activities to financially support Hezbollah.

53.    Between 2008–2010, SCB Gambia and SCB Dubai maintained Eurodollar accounts for Tajco and processed millions of dollars in transactions through the U.S. financial system on the company's behalf.

54.    In 2010, SCB Dubai also processed a $290,803.56 foreign exchange transaction for Tajco.

55.    This financial activity shows Tajco's substantial financial operations, international reach, and access to the U.S. financial system, likely enabling the company to covertly move funds to Hezbollah.

---

[18]    Final Report of the Panel of Experts on the Illegal Exploitation of Natural Resources and Other Forms of Wealth of the Democratic Republic of the Congo (2002), transmitted by Letter dated 16 October 2002 from the Chairman of the Security Council, 9, U.N. Doc. S/2002/1146 (Oct. 8, 2002).

56.    OFAC designation of at least seven other Tajideen-owned companies in Lebanon, Africa, and the British Virgin Islands ("BVI") as SDGTs clearly demonstrates the broad scope of the Tajideen network's financial support for Hezbollah across several continents.

57.    OFAC's related designations underscore Tajco's position as a key commercial asset within Hezbollah's money-laundering and terrorist financing network.

**b) Euro African Group LTD.**

58.    Euro African Group LTD is controlled by Muhammad Bazzi, who OFAC designated as an SDGT for being a key Hezbollah financier and facilitator.[19] (Euro African Group's credit report is attached as Exhibit B)

59.    As a prominent Hezbollah BAC operative, Bazzi has provided millions of dollars to Hezbollah and has worked closely with other Hezbollah financiers like Adham Tabaja (also an OFAC designated SDGT) on oil ventures in Iraq to generate funds for the terrorist group.[20]

60.    Euro African Group held exclusive rights to import fuel to The Gambia between 2008 and 2013 and held a fuel supply deal with the country's state-run utility.

61.    This dominant market position enabled the company to generate substantial revenues that could be diverted to support Hezbollah.

---

[19]    Press Release, *Treasury Targets Key Hizballah Financing Network and Iranian Conduit*, U.S. DEP'T OF TREASURY (May 17, 2018), https://home.treasury.gov/news/press-releases/sm0388.

[20]    *See*, Press Release, *Treasury Sanctions Hizballah Front Companies and Facilitators in Lebanon and Iraq*, U.S. DEP'T OF TREASURY (Jun. 10, 2015), https://home.treasury.gov/news/press-releases/jl0069; *see, also*, Press Release, *Treasury Targets Sanctions Evasion Conduits for Major Hizballah Financiers*, U.S. DEP'T OF TREASURY (Apr. 24, 2019), https://home.treasury.gov/news/press-releases/sm668.

62.     In 2013, Euro African Group made multiple payments totaling $2.55 million U.S. dollars to a foundation controlled by the then-President of Gambia, likely as part of a corrupt arrangement to maintain its exclusive fuel import rights.[21]

63.     These suspicious payments point to Euro African Group's involvement in corruption and illicit financial activities.



64.     According to OFAC, Muhammad Bazzi's close business ties to FTO IRGC, as evidenced by his efforts to coordinate an oil venture in Iraq between Hezbollah and FTO IRGC-

---

[21]     *The Great Gambia Heist*, ORGANIZED CRIME AND CORRUPTION REPORTING PROJECT (Mar. 27, 2019), https://www.occrp.org/en/greatgambiaheist/.

Quds Force in 2010, indicate that Euro African Group may was also used to financially support Iran's terrorist foreign policies.

65.    Between 2008 and 2012, SCB Gambia maintained Eurodollar and Gambian dalasi ("GMD") denominated bank accounts for Euro African Group LTD, processing funds transfers worth millions of U.S. dollars through SWIFT's data center in Culpepper, Virginia, CHIPS in New York, and SCB New York.

66.    Additionally, between January 2009 and June 2010, SCB Dubai processed 73 foreign exchange transactions worth a total of $16,659,286.07 U.S. dollars for the benefit of Euro African Group's transactional account, number "******7701".

### c)  Fatima Group.

67.    Fatima Group, including Fatima Fertilizer and PakArab Fertilizer, is the largest producer of calcium ammonium nitrate ("CAN") fertilizer in Pakistan and knowingly supplied massive quantities of CAN to fronts for FTO al-Qaeda, FTO Haqqani Network, and the Taliban, despite being fully aware that the CAN was being used to manufacture improvised explosive devices ("IEDs") and other bombs deployed against U.S. forces in Afghanistan.[22]

68.    Fatima sold an estimated 200 tons of CAN annually that was used to produce IEDs, with its product accounting for a staggering 70–80 percent of all IEDs used against Coalition troops.

69.    According to the U.S. Dep't of Defense's Joint Improvised Explosive Device Defeat Organization (JIEDDO"), this made Fatima the single most significant source of explosives precursors for these terrorist organizations.

---

[22]    *Terrorist Networks in Pakistan and the Proliferation of IEDs: Hearing Before the Subcomm. on Near Eastern and South and Central Asian Affairs, S. Comm. on Foreign Relations,* 112th Cong. 2 (2012) (statement of Lt. Gen. Michael Barbero).

70.    When confronted by U.S. officials in 2011 about the devastating impact of its CAN on American lives, Fatima displayed a disregard for U.S. causalties in Afghanistan and an unwillingness to cooperate.

71.    For instance, according to JIEDDO, the company refused to implement basic measures like dying the CAN to assist in tracking smuggling routes, falsely claiming that the Pakistani government opposed such steps.[23]

72.    Fatima then quickly cut off all contact with U.S. officials after a few initial meetings, despite pledges to coordinate with the U.S.

73.    According to the U.S. Dep't of Defense, this clearly demonstrated Fatima's lack of concern for how its products were being used by terrorist groups to kill and maim U.S. service members.[24]

74.    From 2008 to 2012, SCB Pakistan and SCB Dubai provided extensive financial services to Fatima Fertilizer and its subsidiary PakArab Fertilizers, maintaining bank accounts and processing numerous high-value foreign exchange transactions for the companies.

75.    Further, SCB moved millions of dollars through these accounts via SWIFT, correspondent accounts at SCB New York and key U.S. payment systems like CHIPS and Fedwire, enabling Fatima to access the U.S. financial system to facilitate its business operations.

76.    According to Relator's Newly Extracted Data, SCB generated substantial profits from these services, including over $450,000 U.S. dollars from just ten Fatima foreign exchange

---

[23]    *Terrorist Networks in Pakistan and the Proliferation of IEDs: Hearing Before the Subcomm. on Near Eastern and South and Central Asian Affairs, S. Comm. on Foreign Relations,* 112th Cong. 2 (2012) (statement of Lt. Gen. Michael Barbero).

[24]    *Id.*

21

transactions in 2009, while Fatima was actively supplying CAN to terrorist groups attacking U.S. forces across Afghanistan.

77.     Even more troubling, in January 2013, Lieutenant General Michael Barbero, head of JIEDDO, personally briefed senior SCB executives at SCB New Yorks offices about Fatima's undeniable role in providing critical bomb-making materials to terrorists in Afghanistan.[25]

78.     According to Lt. Gen. Barbero, SCB's response was "utterly useless," as it continued to maintain its lucrative banking relationship with Fatima and showed complete indifference to the U.S. Government's dire warnings.[26]

79.     Further, this demonstrates SCB disregarded crystal-clear evidence that its client was directly enabling deadly attacks against American troops in Afghanistan.[27]

### d)  Lebanese Canadian Bank SAL.

80.     Lebanese Canadian Bank SAL ("LCB"), founded in 1960 and headquartered in Beirut, Lebanon, was a mid-sized commercial bank operating within the Lebanese financial sector.

81.     As of 2011, the bank had over 600 employees and total assets exceeding $5 billion, making it the eighth-largest bank in Lebanon.

82.     According to FATF, as a significant participant in the Lebanese banking sector, LCB was required to comply with applicable Lebanese laws and regulations, including those related to anti-money laundering ("AML") and combating the financing of terrorism ("CFT").

---

[25]     Adam Luck, *US General Claims He Told Standard Chartered its Client Helped the Taliban—But the Bank did Nothing*, THIS IS MONEY (London) (Dec. 8, 2019), https://www.thisismoney.co.uk/money/news/article-7767683/US-general-told-Standard-Chartered-client-helped-Taliban-did-nothing.html.

[26]     *Id.*

[27]     *Id.*

83. The Banque du Liban (Central Bank of Lebanon) was responsible for ensuring that LCB and other Lebanese banks adhered to these regulations and maintained adequate internal controls to mitigate financial crime risks.[28]

84. According to the U.S. Drug Enforcement Administration ("DEA"), LCB maintained accounts and provided financial services to individuals and companies belonging to Hezbollah's BAC, which manages the terrorist group's illicit business and financial activities worldwide.[29]

85. The U.S. Dep't of Justice ("DoJ"), alleged that LCB was a "favored bank" for key Hezbollah institutions, operatives, and facilitators.[30]

86. According to OFAC, LCB participated in Hezbollah's trade-based money laundering schemes by knowingly providing financial services to companies and individuals that were laundering narcotics proceeds and other illicit funds on behalf of Hezbollah and the Ayman Joumaa criminal network.[31]

---

[28]    *See*, "BDL Role and Function", BANQUE DU LIBAN (2024), https://www.bdl.gov.lb/roleandfunction.php.

[29]    Press Release, *DEA and European Authorities Uncover Massive Hizballah Drug and Money Laundering Scheme*, DRUG ENFORCEMENT ADMINISTRATION (Feb. 1, 2016), https://www.dea.gov/press-releases/2016/02/01/dea-and-european-authorities-uncover-massive-hizballah-drug-and-money.

[30]    *United States v. Lebanese Canadian Bank SAL*, 11 Civ. 9186 (PAE) (S.D.N.Y.), ECF 1 (Verified Complaint).

[31]    Press Release, *Treasury Identifies Lebanese Canadian Bank Sal as a "Primary Money Laundering Concern"*, U.S. DEP'T OF TREASURY (Feb. 10, 2011), https://home.treasury.gov/news/press-releases/tg1057.



87.     Further, according to DoJ, LCB facilitated hundreds of millions of dollars in money laundering through channels including bulk cash smuggling from West Africa and used car purchases in the U.S.

88.     LCB disregarded anti-money laundering rules for Hezbollah-linked accounts, granted exemptions allowing large cash transactions without proper reporting, and in some cases bank managers were complicit in the laundering activity.

89.     LCB owned subsidiaries, like Prime Bank LTD in Gambia, that served as Hezbollah's preeminent money laundering vehicles in West Africa, providing the terrorist group access to the international financial system.[32]

90.     According to DEA, LCB also maintained accounts for senior Hezbollah officials, including Abdallah Safieddine, the head of Hezbollah's Tehran-based envoy and a key conduit between Hezbollah and the IRGC.[33]

91.     Further, Mr. Safieddine was allegedly involved in providing Iran and Hezbollah operatives access to LCB and its management.

92.     LCB was a crucial cog in Hezbollah's illicit financial apparatus, knowingly providing extensive support to the terrorist group's BAC networks in Lebanon and abroad.

93.     By granting Hezbollah access to the U.S. and international financial systems, LCB enabled the terrorist group to launder vast sums of criminal proceeds to fund its violent activities.

94.     Relator's Newly Extracted Data reveals that, between 2008 and 2011, SCB Dubai maintained at least four Eurodollar accounts for LCB, including account numbers "***4308", "***4556", "***4929", and "***4005".

95.     Further, SCB Dubai processed four Eurodollar deposit transactions for these LCB accounts worth a total of $68,879,495.50 U.S. dollars between September 22, 2008, and October 22, 2008.

---

[32]     Notice of Finding, *Lebanese Canadian Bank SAL is a Financial Institution of Primary Money Laundering Concern*, FINANCIAL CRIMES ENFORCEMENT NETWORK (Feb. 2011), https://www.fincen.gov/sites/default/files/shared/LCBNoticeofFinding.pdf.

[33]     Press Release, *Drug Investigations Lead to Treasury 311 Patriot Act Designation Against Lebanese Bank Tied to Hizballah*, DRUG ENFORCEMENT ADMINISTRATION (Feb. 10, 2011), https://www.dea.gov/press-releases/2011/02/10/drug-investigations-lead-treasury-311-patriot-act-designation-against.

96.     In addition, according to the *Banker's Almanac*, between 2008 and 2011, SCB New York maintained a U.S. dollar-denominated correspondent account for LCB, number "********7001".

97.     Relator's Newly Extracted Data reveals that SCB Dubai maintained Eurodollar account, number "***2579", for LCB's Prime Bank LTD (Banjul, Gambia).

### e) Additional connections to FTOs

98.     I have further identified from the Newly Extracted Data Eurodollar bank accounts, foreign exchange transactions, and trade finance records that establish clear business relationships and financial dealings between SCB and companies and individuals associated with, majority-owned by, or serving as fronts for the following notorious FTOs:

    a.  Hezbollah (FTO 1997);
    b.  Al Qaeda (FTO 1999);
    c.  HAMAS (FTO 1997);
    d.  ISIS (formerly Al Qaeda in Iraq) (FTO 2004);
    e.  Kata`ib Hezbollah (FTO 2009)
    f.  IRGC (FTO 2019);
    g.  IRGC–QF (FTO 2019), and,
    h.  Asa`ib Ahl al-Haq (FTO 2021).

99.     Those connections trigger grave concerns about SCB's apparent involvement in the direct and indirect financing of terrorist groups that have killed American and UK military personnel and innocent civilians in Iraq and Afghanistan.[34]

---

[34]     However, I must emphasize that my analysis of Relator's Newly Extracted Data is still at a preliminary stage. The painstaking work of fully investigating and documenting SCB's potential terror financing exposure and alleged money-laundering activities has only just begun and numerous leads must be pursued to trace the ultimate sources and beneficiaries of these transactions. With the vast trove of SCB data still to be analyzed, it is highly likely that Relator will uncover further evidence of the bank's ties to FTOs and other OFAC sanctioned individuals and entities.

### 4. SCB's Online Foreign Exchange Platform

100.    Relator's Newly Extracted Data also clearly reveals that SCB provided the following Iranian entities access to its online foreign exchange platform, OLT–3,[35] enabling them to conduct cross-border financial transactions with the bank *from within Iran* from 2008 to 2009:

- Khorasan Steel Company (Neyshabur, Iran);
- Khouzestan Steel Company (Ahvaz, Iran);
- Parisian High Voltage Substations Development Company (Tehran, Iran); and
- Petropars LTD (Tehran, Iran).[36]

## B. SCB's "Sundry" Account

101.    I conducted a thorough entity name resolution process for over 20,000 foreign exchange transactional records in SCB's Excel file titled "Sundry.xlsx" that were linked to SCB Dubai's internal "sundry" foreign exchange reconciliation account.

---

[35]    In January 2013, Relator's Julian Knight described SCB's OLT–3 foreign exchange platform to the FBI as follows:

> In the OLT–3 System a client would login and enter a request for pricing on a foreign exchange trade. The trader would respond and price the trade. Subsequently, the client could decide to execute the trade and the trader would then record the trade in the system. Clients did not have to use the OLT–3 System and could rather call-in pricing requests. If a client called in the appropriate client information was provided for the foreign exchange trade.

(Interview of Julian Knight by SA Mathew Komar, FD–302a, FEDERAL BUREAU OF INVESTIGATION, Jan. 16, 2013, ECF No. 87–1.)

[36]    On June 10, 2010, OFAC designated Petropars LTD, a key subsidiary of IRGC-controlled NIOC, under the Iranian Transactions Regulations to implement UN Security Council Resolution 1929, which targeted entities helping Iran fund its nuclear and missile programs and evade sanctions. *See* Fact Sheet, *U.S. Treasury Department Targets Iran's Nuclear and Missile Programs*, U.S. DEP'T OF TREASURY (Jun. 16, 2010), https://home.treasury.gov/news/press-releases/tg747. In 2010, Iranian Transactions Regulations ("ITR") represented the main body of U.S. regulations that implement the broad sanctions program against Iran. In October 2012, OFAC amended and reissued the ITR as the Iranian Transactions and Sanctions Regulations to implement the blocking measures imposed by E.O. 13599 and new Iran sanctions legislation passed by Congress in the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 and the Iran Threat Reduction and Syria Human Rights Act of 2012.

102.    This analysis allowed me to uncover the true nature of the parties involved in these foreign exchange transactions in one of SCB Dubai's internal sundry accounts.

103.    FAL Oil LTD (Dubai, UAE) ("FAL Oil") is one example.

104.    On January 13, 2012, the U.S. Dep't of State sanctioned FAL Oil under the Iran Sanctions Act for providing "over $70 million in refined petroleum to Iran over multiple shipments in late 2010."[37]

105.    According to the U.S. Dep't of Treasury, FAL Oil is a front company for the IRGC-controlled National Iranian Oil Company ("NOIC").[38]

106.    Yet, as my analysis of the "Sundry.xlsx" discloses, SCB maintained a Eurodollar account for FAL Oil, number "***1265", and processed thirteen post-sanction USD/AED, EUR/AED, and SGD/AED FX spot and forward transactions worth a total notional value of $9,811,552.78 U.S. dollars between March 5, 2012, and September 7, 2012.

107.    Further, my analysis of the Newly Extracted Evidence shows that, between January 2, 2008, and January 5, 2012, SCB processed 314 foreign exchange transactions for FAL Oil worth a total notional value of $3,059,171,977.11 U.S. dollars.

108.    Crucially, my resolution of entities in the "Sundry.xlsx" file revealed that SCB Dubai processed five Singapore dollar ("SGD") to UAE dirham ("AED") foreign exchange transactions for FAL Oil after it was sanctioned in January 2012.

109.    These transactions appear to be directly related to FAL Oil's sanctioned activities.

---

[37]    Press Release, *Three Companies Sanctioned Under the Amended Iran Sanctions Act*, U.S. DEP'T OF STATE (Jan. 12, 2012), https://2009-2017.state.gov/e/eb/rls/fs/2012/180645.htm.

[38]    Press Release, *Treasury Submits Report to Congress on NIOC and NITC*, U.S. DEP'T OF TREASURY (Sep. 24, 2012), https://home.treasury.gov/news/press-releases/tg1718. ("[T]he Treasury Department has determined that the National Iranian Oil Company (NIOC) is an agent or affiliate of Iran's Islamic Revolutionary Guard Corps (IRGC)")

110.    In January 2012, the U.S. Dep't of State sanctioned two other companies along with FAL Oil:

    a.  Kuo Oil, based in Singapore, was sanctioned for providing over $25 million in refined petroleum to Iran; and,

    b.  Zhenrong Zhuhai, a Chinese company, was sanctioned as the largest supplier of refined petroleum products to Iran, brokering the delivery of over $500 million in gasoline.[39]

111.    Given Kuo Oil's involvement in providing refined petroleum to Iran and its base in Singapore, SCB Dubai's SGD transactions raise serious concerns about the bank's potential role in facilitating Kuo Oil's sanctioned activities for the CBI and IRGC–controlled NIOC.

112.    SCB Dubai's processing of transactions for sanctioned entities through sundry accounts constitutes a clear violation of U.S. sanctions regulations, irrespective of the currency involved or the specific banking channel used.

113.    Because SCB Dubai relies on its correspondent banking relationship with SCB New York to access the U.S. financial system for processing, clearing, and settling cross-border Eurodollar payment transactions, any transactions processed by SCB Dubai that involve sanctioned parties, directly or indirectly, and included at least one leg of transaction processed by SCB New York are subject to U.S. sanctions regulations.

C.  **Examples of Other Revealed Iranian Transactions**

5.  **Central Bank of Iran (Tehran, Iran)**

114.    Bank Markazi Jomhouri Islami Iran ("Bank Markazi"), also known as the Central Bank of the Islamic Republic of Iran ("CBI"), is the country's central bank, responsible for

---

[39]    Fact Sheet, *Three Companies Sanctioned Under the Amended Iran Sanctions Act*, U.S. DEP'T OF STATE (Jan. 12, 2012), https://2009-2017.state.gov/e/eb/rls/fs/2012/180645.htm.

formulating and implementing monetary and credit policies, maintaining price stability, and supervising Iran' payment systems and government-owned and commercial banks.[40]

115.    SCB Dubai maintained at least nine Eurodollar bank accounts for CBI, including numbers "*****1201", "***4045", "***2025", "***3472", "***1365", "***6723", "***4045", "***0123", and "***1961".

116.    According to Relator's Newly Extracted Data, SCB Dubai processed at least two trade finance transactions for CBI worth a total SCB profit value of $50,679.00 U.S. dollars between December 1, 2009, and December 31, 2009.

117.    In September 2019, OFAC designated CBI under E.O. 13,224 for providing "billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC–QF) and its terrorist proxy, Hizballah."[41]

**6.  Bank Tejarat (Tehran, Iran)**

118.    Bank Tejarat, Iran's third-largest bank, was established in 1979 through the merger of Bank Bazargani and several other domestic and international banks following the nationalization of Iran's banking sector during the Islamic Revolution.[42]

119.    SCB Dubai maintained at least eight Eurodollar bank accounts for Bank Tejarat, including numbers "***6043", "***1099", "***4406", "***1796", "***8577", "***5432", "***0889", and "***9713".

---

[40]    *See*, "About the Bank", CENTRAL BANK OF IRAN (2024), https://www.cbi.ir/page/GeneralInformation.aspx.

[41]    Press Release, *Treasury Sanctions Iran's Central Bank and National Development Fund*, U.S. DEP'T OF TREASURY (Sep. 20, 2019), https://home.treasury.gov/news/press-releases/sm780.

[42]    *See*, "History", BANK TEJARAT (2024), https://www.tejaratbank.ir/general_content/1520653-History.html.

120.     Relator's Newly Extracted Data shows that SCB Dubai processed eight project export and structured finance transactions for Bank Tejarat worth a total notional value of $93,000,000 U.S. dollars between January 1, 2009, and August 31, 2009.

121.     On January 23, 2012, the U.S. Dep't of Treasury designated Bank Tejarat under E.O. 13382 for providing financial services to previously designated Bank Mellat, the Export Development Bank of Iran, the Islamic Republic of Iran Shipping Lines, and the Ministry of Defense for Armed Forces Logistics.[43]

**7. National Iranian Tanker Company (Tehran, Iran)**

122.     The National Iranian Tanker Company ("NITC") is a subsidiary of the National Iranian Oil Company ("NIOC") and is responsible for transporting Iranian crude oil exports.[44]

123.     According to the U.S. Dep't of Treasury, NITC has played a significant role in generating revenue for the ("IRGC–QF") and Hezbollah by coordinating with the IRGC–QF on the loading of NIOC-provided oil and working with Hezbollah on logistics and pricing for oil shipments to Syria.[45]

124.     Further, NITC personnel, including its Managing Director Nasrollah Sardashti, have worked closely with IRGC–QF officials and Hezbollah to facilitate these shipments.

125.     To obfuscate its involvement, NITC has also set up front companies in UAE.[46]

---

[43]     Press Release, *Treasury Designates Major Iranian State-Owned Bank*, U.S. DEP'T OF TREASURY (Jan. 23, 2012), https://home.treasury.gov/news/press-releases/tg1397.

[44]     OFAC ADVISORY TO THE MARITIME PETROLEUM SHIPPING COMMUNITY, OFFICE OF FOREIGN ASSETS CONTROL (2019), https://ofac.treasury.gov/media/46006/download?inline.

[45]     Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force*, U.S. DEP'T OF TREASURY (Oct. 26, 2020), https://home.treasury.gov/news/press-releases/sm1165.

[46]     *Id.*

126.    SCB Dubai maintained a Eurodollar bank account for NITC and processed 10 structured trade finance transactions worth a total of $23,263,352.30 U.S. dollars between January 1, 2009, and August 31, 2009.

127.    In October 2020, OFAC designated NITC as an SDGT under E.O. 13224.[47]

**8.    Khorasan Steel Complex Company (Nishapur, Iran)**

128.    Khorasan Steel Company ("KSC") is one of Iran's largest steel producers, located in the northeastern province of Razavi Khorasan.[48]

129.    Established in 1989, the KSC operates an integrated steel plant that produces a wide range of steel products, including hot-rolled coils, cold-rolled coils, galvanized sheets, and rebar with an annual production capacity of around 1.5 million tons of steel.

130.    Relator's Newly Extracted Data reveals that SCB Dubai maintained a Eurodollar bank account for KSC, number "4488261" and processed a structured trade finance transaction worth $209,000,000 U.S. dollars on June 30, 2009.

131.    In January 2020, OFAC designated KSC pursuant to E.O. 13,871 for operating in the iron, steel, aluminum, or copper sectors of Iran.[49]

---

[47]    Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force*, U.S. DEP'T OF TREASURY (Oct. 26, 2020), https://home.treasury.gov/news/press-releases/sm1165.

[48]    *See*, "History", KHORASAN STEEL COMPLEX COMPANY (2024), https://www.kscco.ir/en/history.

[49]    Press Release, *Treasury Targets Iran's Billion Dollar Metals Industry and Senior Regime Officials*, U.S. DEP'T OF TREASURY (Jan. 10, 2020), https://home.treasury.gov/news/press-releases/sm870.

132.    By targeting these major metal producers, OFAC aimed to disrupt a significant source of revenue that the Iranian regime relies on to fund and support its nuclear program, missile development, terrorism and terrorist proxy networks, and malign regional influence.

133.    The designation of KSC was part of a broader set of actions taken by the U.S. Dep't of Treasury which also included designations of senior Iranian regime officials, a network of China- and Seychelles-based entities, and a vessel involved in the purchase, sale, and transfer of Iranian metals products.[50]

### 9. Khouzestan Steel Company (Ahvaz, Iran)

134.    Khouzestan Steel Company ("Khouzestan Steel") was founded in 1973 as a state-owned enterprise as part of Iran's efforts to industrialize and expand its steel production capabilities.[51]

135.    Located in the southwestern Iranian city of Ahvaz, Khouzestan Steel is one of the largest steel producers in the Middle East, with an annual production capacity of around 3.5 million tons of steel products, including hot and cold-rolled coils, sheets, and tinplate.[52]

136.    SCB Dubai maintained two Eurodollar bank accounts for Khouzestan Steel, numbers "***4730" and "***5496".

137.    Relator's Newly Extracted Data show that SCB Dubai processed thirteen forward EUR/USD transactions, one interest rate swap EUR/USD transaction, and one spot EUR/USD

---

[50]    Press Release, *Treasury Targets Iranian UAV Program, Steel Industry, and Automobile Companies in Response to Unprecedented Attack on Israel*, U.S. DEP'T OF TREASURY (Apr. 18, 2024), https://home.treasury.gov/news/press-releases/jy2270.

[51]    *See*, "Introduction", KHOUZESTAN STEEL COMPANY (2024), https://www.ksc.ir/en/introduction.

[52]    *Id.*

transaction for Khouzestan Steel worth a total notional value of $63,702,163.57 U.S. dollars between January 7, 2008, and May 31, 2009.

138.    Further, Khouzestan Steel logged on to SCB's OLT–3 foreign exchange platform via the Internet to initiate and execute the fourteen forward and swap transactions.

139.    In January 2020, OFAC designated Khouzestan Steel under E.O. 13,871[53] for providing "billions of dollars annually" which supports the Iranian regime's "funding of global terrorism", ballistic missile and drone programs, and pursuit of nuclear weapons.[54]

140.    In July 2020, *Radio Farda* reported that the IRGC owned 49 percent of Khousestan Steel and was attempting to "illegally acquire" the remaining 51 percent.[55]

141.    Further, in April 2024, OFAC designated numerous affiliates of Khouzestan Steel under E.O. 13,871 in response to Iran's "unprecedented" ballistic missile and drone attack against Israel on April 13, 2024.[56]

**10. Banque d'Algerie (Central Bank of Algeria)**

142.    Relator's Newly Extracted Data record that SCB processed 44 foreign exchange transactions for the Banque d'Algerie, account number "***7349", worth a total of $726,729,007.47 U.S. dollars between January 10, 2008, and November 29, 2011.

---

[53]     Exec. Order No. 13,871, *Imposing Sanctions with Respect to the Iron, Steel, Aluminum, and Copper Sectors of Iran*, 31 C.F.R. § 562, Appendix B (May 8, 2019).

[54]     Press Release, *Treasury Targets Iran's Billion Dollar Metals Industry and Senior Regime Officials, U.S. Dep't of Treasury*, U.S. DEP'T OF TREASURY (Jan. 10, 2020), https://home.treasury.gov/news/press-releases/sm870.

[55]     *Iran's IRGC Trying Illegally To Take Ownership Of Major Steel Producer*, RADIO FARDA (Jul. 11, 2020), https://en.radiofarda.com/a/exclusive-iran-s-irgc-trying-illegally-to-take-ownership-of-major-steel-producer/30720865.html.

[56]     Press Release, *Treasury Targets Iranian UAV Program, Steel Industry, and Automobile Companies in Response to Unprecedented Attack on Israel*, U.S. DEP'T OF TREASURY (Apr. 18, 2024), https://home.treasury.gov/news/press-releases/jy2270.

143.    Each of these foreign exchange transactions was apparently for the ultimate benefit of the Central Bank of Iran, account number "*****1201", thereby helping Iran circumvent U.S. economic sanctions and launder money generated by IRGC-controlled NIOC's crude oil sales.

144.    Another SCB transaction involving Banque d'Algerie is especially noteworthy.

145.    During the height of the 2007–2009 global monetary crisis, SCB's New York branch required substantial "lender of last resort" funding from the Federal Reserve Bank of New York ("FRBNY"), which acts as part of the U.S. central bank. (see FRBNY's TAF loan data for SCB at Exhibit C)

146.    To alleviate the severe liquidity shortages faced by domestic and foreign banks during this period, the Federal Reserve implemented, among other programs, the Term Auction Facility ("TAF") program, which provided short-term loans to banks in need of emergency funding.[57]

147.    According to FRBNY, between February 28, 2008, and June 3, 2009, SCB borrowed an aggregate sum of $859,450,000,000 U.S. dollars under FRBNY's TAF program.

148.    During this period, SCB maintained an average daily outstanding loan balance of $1,864,100,000 U.S. dollars, highlighting the extent to which SCB relied on the U.S. Government's financial support to remain solvent and survive the monetary crisis.

149.    On January 29, 2009, SCB received emergency TAF funding in the amount of $2,550,000,000 U.S. dollars from FRBNY.

150.    On the same day, SCB processed a foreign exchange transaction worth $14,625,102.10 U.S. dollars with its counterparty Central Bank of Algeria, account number

---

[57]    *Term Auction Facility (TAF)*, BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM (2024), https://www.federalreserve.gov/regreform/reform-taf.htm.

"4217349", for the ultimate benefit of the Central Bank of Iran, account number "*****1201", indicating that funds provided by the U.S. Government, and ultimately backed by American taxpayers, were used to facilitate illicit transactions for the Iranian regime.

## IV. SUMMARY AND CONCLUSIONS

151. Relator's Newly Extracted Data, consisting of at least 512,571 unique transactional records, when thoroughly examined, expose deeply troubling connections between SCB and numerous OFAC sanctioned entities, U.S. Dep't of State designated foreign terrorist organizations ("FTOs"), and State Sponsor of Terrorism Iran.

152. The discovery of SCB's apparent misconduct in processing transactions for individuals and companies linked to terrorist groups such as Hezbollah, Al Qaeda, HAMAS, and the IRGC, among others, raises grave concerns about the bank's role in facilitating the flow of funds to these dangerous organizations.

153. Furthermore, Relator's Newly Extracted Data suggests that SCB may have used funds borrowed from the U.S. Government during the 2007–2009 global financial crisis to process transactions for the Central Bank of Iran, potentially undermining the very sanctions put in place to prevent such illicit activities.

154. The implications of Relator's Newly Extracted Data and these forensic findings cannot be overstated.

155. By seemingly allowing sanctioned entities and FTO front companies to access the U.S. financial system, SCB has undermined the effectiveness of international sanctions regimes and potentially enabled the financing of terrorist activities that threaten the lives of innocent civilians and military personnel.

156.    Moreover, the concealment of such a vast number of transactions suggests a deliberate effort to obscure illicit activities and evade detection, further compounding the severity of SCB's apparent misconduct.

157.    The importance of this forensic analysis lies not only in uncovering the hidden records but also in highlighting the urgent need for further investigation and accountability.

\* \* \* \* \* \*

I reserve the right to amend this declaration and the opinions herein upon the production or availability of additional information.

Executed on May 20, 2024, in Akron, Ohio.

David J. Scantling

COMPANY STATUS REPORT
=====================

CO. NAME : TAJCO LTD (Correct)
           TAJCO (Requested)

---

ADDRESS

Building :  Dohat Building, 1st Floor

Street   :  62 Buckle Street / Liberation Avenue (formerly Wellington
Street)

P.O. Box :  2176
Town     :  Banjul
Country  :  Gambia

Telephone:  (220) 420 2191
Fax      :  (220) 420 2190
E-Mail   :  info@tajco-ltd.com / lowanah@tajco-ltd.com

Trading Styles :  Kairaba Shopping Centre

---

SENIOR COMPANY PERSONNEL

|    | Name              | Position          |
|----|-------------------|-------------------|
| 1. | Hussein Tajideen  | Managing Director |
| 2. | Hassan Tajideen   | General Manager   |

Total Employees : 300

---

PAYMENTS

No complaints have been heard regarding payments from local suppliers
or banks.

Subject is a well established family owned company, operating since
1993 and is regarded one of Gambia's biggest supermarket operators.

We consider it is acceptable to deal with subject for SMALL amounts.
However, in view of lack of financial information we recommend

international suppliers exercise a degree of caution where larger or protracted dealings are envisaged.

Opinion on maximum credit : DALASI 800,000 (higher amounts may be considered with full fiscal disclosure)

Trade risk assessment : Normal (see above comments)

It is normal accepted practice for international suppliers to deal on secured terms with Gambian importers.

---

PRINCIPAL BANKERS

NAME     : STANDARD CHARTERED BANK (GAMBIA) LIMITED

Branch   : 8/10 ECOWAS Avenue
P.O. Box : 259
Town     : Banjul

Telephone: (220) 422 8681
Fax      : (220) 422 7714

---

FINANCIAL INFORMATION

KEY FINANCIAL DATA

                              2007        2006
                               (In DALASI)

PROFIT & LOSS ACCOUNT
Sales turnover                20,000,000   20,000,000

Private companies in Gambia are not required to publish or disclose balance sheets. The following is the latest financial information offered by the subject :

Sales Turnover      : DALASI 20,000,000 — 2006 — exact
                    : DALASI 20,000,000 — 2007 — approx

Net Profit          : not given but stated to be profitable

Later results were declined.

Financial year ends 31 March.

---

LEGAL STATUS AND HISTORY

Date Started : 1993

Capital : not given

Limited Liability Company with the following shareholders :

|  | Percentage |
|---|---|
| 1. Hussein Tajideen | 50% |
| 2. Hassan Tajideen (brother of the above) | 50% |

The nationality of the above shareholders was not disclosed.

---

ACTIVITIES

The Company is involved in the following activities :

Importers, exporters, wholesalers and retailers of commodities such as flour, vegetable oil, rice and sugar, as well as frozen chicken and chicken leg quarters, frozen fish, frozen meat, frozen vegetables and fresh fruits, ice cream and iron rods.

Imports from UK, Germany, Italy and France.

Exports to Guinea Bissau.

---

FACILITIES

The Company has the following facilities :

Administrative offices located at the heading address, as well as three warehouses in Banjul and two big stores for food items and supermarket products for wholesale in Banjul at Bund Road in Mile II area. Each warehouse contains either bags of sugar, flour or rice all stored in different warehouses according to their type.

Subject also has a cold room and a warehouse in The Kanifing Industrial Area. The cold room is mainly used for frozen items. In addition to that we have a big store for iron rods.

Subject also has a large supermarket, Kairaba Shopping
Centre, which is said to be the biggest supermarket in the country.

Subject also has a small mini-market located in Serrekunda, the main
market area and another one in Banjul, the capital and business city.

---

BRANCH OFFICES

Kairaba Shopping Centre
Kairaba Avenue
Pipe Line Section
Tel: (220) 437 2359
Fax: (220) 437 1134
Email: kaishopcentre@tajco-ltd.com

---

SPECIAL NOTE

You enquired on : TAJCO

Please note the correct details are as per heading.

==================================================================

Every effort is made to ensure that the information given herein is
accurate, but no legal responsibility is accepted for any error or
omission in the text.

==================================================================

COMPANY STATUS REPORT
=====================

CO. NAME : EURO AFRICAN GROUP LTD

---

ADDRESS

Building :  Standard Chartered Bank Building, 2nd Floor

Street   :  Kairaba Avenue

Town     :  Banjul
Country  :  Gambia

Telephone:  (220) 439 6288 / (220) 776 7611 / 660 6607 (mobile)
Fax      :  (220) 439 6276
E-Mail   :  manhal@eagl.gm

---

SENIOR COMPANY PERSONNEL

| | Name | Position |
|---|---|---|
| 1. | Muhammed Bazzi | Managing Director |
| 2. | Manhal Oueidat | General Manager |
| 3. | Mr. Walter | Financial Manager |

---

PAYMENTS

Current trade experience of payments has not been traced.

Reportedly subject is the country's largest supplier of fuel.

The company has declined to provide financial information or to
reveal any details relative to the extent of their operations.

Opinion on maximum credit : Although nothing detrimental has been
                            heard we have insufficient basis on which
                            to speak for unsecured credit and
                            recommend dealing on cash or prepaid
                            basis.

Trade risk assessment : No classification (see above comments)

Opinion on the credit figure of US DLRS 200,000 - 90 days :

See above comments.

It is normal accepted practice for international suppliers to deal on secured terms with Gambian importers.

---

PRINCIPAL BANKERS

NAME     : STANDARD CHARTERED BANK GAMBIA LIMITED

Branch   : Banjul Branch
Street   : Ecowas Avenue No. 8
P.O. Box : 259
Town     : Banjul

Telephone: (220) 420 2929
Fax      : (220) 420 2692

Subject also has an account with the following bank :

Trust Bank
Banjul

---

FINANCIAL INFORMATION

Private companies in Gambia are not required to disclose financial statements. These have been requested from the company but they have not been made available as the subject regards this information as strictly confidential.

---

LEGAL STATUS AND HISTORY

Date Started : 2005 (not confirmed)

Capital : not given

Limited Liability Company with the following shareholders :

1.  Muhammed  Bazzi
    (Lebanese national)

2. Other undisclosed shareholders

The exact shareholding structure was not disclosed.

Affiliated companies of Euro African Group Ltd :

Associates

1. Gam Petroleum Storage Facility Co. Ltd
   Standard Chartered House Building, 2nd Floor
   Kairaba Avenue
   Banjul
   Tel: (220) 439 6288 / (220) 776 7611 / 660 6607/1 (mobile)
   Fax: (220) 439 6276

2. Global Electric Company

3. Comium Gambia Ltd
   Kairaba Avenue No. 27
   Serrekunda
   Banjul
   Gambia
   Tel: (220) 660 1601 / 702 7777 (mobile)

4. Global Management System Inc

---

ACTIVITIES

The Company is involved in the following activities :

Importers and distributors of fuel.

Subject did not provide the names of the countries from which they
import.

Subject did not disclose terms of payment.

Subject does not export, all sales are domestic.

---

FACILITIES

The Company has the following facilities :

Office premises located at the heading address.

---

SPECIAL NOTE

You have given:

TEL: 00204 202 191

Please note the correct contact telephone numbers are as per 'Address' section.

Interviewed : Manhal Oueidat, General Manager.

================================================================

Every effort is made to ensure that the information given herein is accurate, but no legal responsibility is accepted for any error or omission in the text.

================================================================

| | |
|---|---|
| **Standard Chartered PLC** | Standard Chartered PLC |
| **Ticker** | STAN LN Equity |
| **Includes Loans to:** | Standard Chartered Bank/New York |
| **Identified in Fed Documents as:** | STANDARD CHARTERED BK NY BR |
| **Capital Raised From Home Governments** | |
| **Programs** | TAF |
| **Country** | Britain |
| **Industry** | Banking |
| **Average Daily Balance** | $836.65      (in millions) |
| **From February 26, 2008 to June 4, 2009** | |
| **Peak Amount of Debt** | $2,850.00      (in millions) |
| **Peak Date** | Thursday, November 6, 2008 |
| **Number of Days In Debt to the Fed** | 462 |

| Date | Loan Amount (in millions) | Market Cap (in millions) | Percent of Market Cap | Term Auction Facility (TAF) (in millions) |
|---|---|---|---|---|
| Tuesday, February 26, 2008 | $0.00 | $47,585.26 | 0.00% | $0.00 |
| Wednesday, February 27, 2008 | $0.00 | $47,604.41 | 0.00% | $0.00 |
| Thursday, February 28, 2008 | $200.00 | $47,313.58 | 0.42% | $200.00 |
| Friday, February 29, 2008 | $200.00 | $46,848.96 | 0.43% | $200.00 |
| Saturday, March 1, 2008 | $200.00 | $46,848.96 | 0.43% | $200.00 |
| Sunday, March 2, 2008 | $200.00 | $46,848.96 | 0.43% | $200.00 |
| Monday, March 3, 2008 | $200.00 | $45,606.47 | 0.44% | $200.00 |
| Tuesday, March 4, 2008 | $200.00 | $45,228.67 | 0.44% | $200.00 |
| Wednesday, March 5, 2008 | $200.00 | $46,756.79 | 0.43% | $200.00 |
| Thursday, March 6, 2008 | $200.00 | $46,509.46 | 0.43% | $200.00 |
| Friday, March 7, 2008 | $200.00 | $45,763.72 | 0.44% | $200.00 |
| Saturday, March 8, 2008 | $200.00 | $45,763.72 | 0.44% | $200.00 |
| Sunday, March 9, 2008 | $200.00 | $45,763.72 | 0.44% | $200.00 |
| Monday, March 10, 2008 | $200.00 | $44,767.34 | 0.45% | $200.00 |
| Tuesday, March 11, 2008 | $200.00 | $45,996.14 | 0.43% | $200.00 |
| Wednesday, March 12, 2008 | $200.00 | $47,213.61 | 0.42% | $200.00 |
| Thursday, March 13, 2008 | $950.00 | $46,463.82 | 2.04% | $950.00 |
| Friday, March 14, 2008 | $950.00 | $45,878.64 | 2.07% | $950.00 |
| Saturday, March 15, 2008 | $950.00 | $45,878.64 | 2.07% | $950.00 |
| Sunday, March 16, 2008 | $950.00 | $45,878.64 | 2.07% | $950.00 |
| Monday, March 17, 2008 | $950.00 | $42,439.01 | 2.24% | $950.00 |
| Tuesday, March 18, 2008 | $950.00 | $46,136.97 | 2.06% | $950.00 |
| Wednesday, March 19, 2008 | $950.00 | $46,751.58 | 2.03% | $950.00 |
| Thursday, March 20, 2008 | $950.00 | $47,033.02 | 2.02% | $950.00 |
| Friday, March 21, 2008 | $950.00 | $47,033.02 | 2.02% | $950.00 |
| Saturday, March 22, 2008 | $950.00 | $47,033.02 | 2.02% | $950.00 |
| Sunday, March 23, 2008 | $950.00 | $47,033.02 | 2.02% | $950.00 |
| Monday, March 24, 2008 | $950.00 | $47,033.02 | 2.02% | $950.00 |
| Tuesday, March 25, 2008 | $950.00 | $50,496.57 | 1.88% | $950.00 |
| Wednesday, March 26, 2008 | $950.00 | $49,705.36 | 1.91% | $950.00 |
| Thursday, March 27, 2008 | $1,350.00 | $50,774.26 | 2.66% | $1,350.00 |
| Friday, March 28, 2008 | $1,350.00 | $49,557.43 | 2.72% | $1,350.00 |
| Saturday, March 29, 2008 | $1,350.00 | $49,557.43 | 2.72% | $1,350.00 |
| Sunday, March 30, 2008 | $1,350.00 | $49,557.43 | 2.72% | $1,350.00 |
| Monday, March 31, 2008 | $1,350.00 | $48,270.23 | 2.80% | $1,350.00 |

| | | | |
|---|---|---|---|
| Tuesday, April 1, 2008 | $1,350.00 | $50,377.69 | 2.68% | $1,350.00 |
| Wednesday, April 2, 2008 | $1,350.00 | $51,423.87 | 2.63% | $1,350.00 |
| Thursday, April 3, 2008 | $1,350.00 | $50,833.94 | 2.66% | $1,350.00 |
| Friday, April 4, 2008 | $1,350.00 | $50,800.71 | 2.66% | $1,350.00 |
| Saturday, April 5, 2008 | $1,350.00 | $50,800.71 | 2.66% | $1,350.00 |
| Sunday, April 6, 2008 | $1,350.00 | $50,800.71 | 2.66% | $1,350.00 |
| Monday, April 7, 2008 | $1,350.00 | $50,561.19 | 2.67% | $1,350.00 |
| Tuesday, April 8, 2008 | $1,350.00 | $49,921.12 | 2.70% | $1,350.00 |
| Wednesday, April 9, 2008 | $1,350.00 | $49,378.48 | 2.73% | $1,350.00 |
| Thursday, April 10, 2008 | $600.00 | $48,257.28 | 1.24% | $600.00 |
| Friday, April 11, 2008 | $600.00 | $47,692.84 | 1.26% | $600.00 |
| Saturday, April 12, 2008 | $600.00 | $47,692.84 | 1.26% | $600.00 |
| Sunday, April 13, 2008 | $600.00 | $47,692.84 | 1.26% | $600.00 |
| Monday, April 14, 2008 | $600.00 | $46,599.13 | 1.29% | $600.00 |
| Tuesday, April 15, 2008 | $600.00 | $46,528.72 | 1.29% | $600.00 |
| Wednesday, April 16, 2008 | $600.00 | $47,799.38 | 1.26% | $600.00 |
| Thursday, April 17, 2008 | $600.00 | $47,597.09 | 1.26% | $600.00 |
| Friday, April 18, 2008 | $600.00 | $49,251.15 | 1.22% | $600.00 |
| Saturday, April 19, 2008 | $600.00 | $49,251.15 | 1.22% | $600.00 |
| Sunday, April 20, 2008 | $600.00 | $49,251.15 | 1.22% | $600.00 |
| Monday, April 21, 2008 | $600.00 | $48,010.23 | 1.25% | $600.00 |
| Tuesday, April 22, 2008 | $600.00 | $48,634.58 | 1.23% | $600.00 |
| Wednesday, April 23, 2008 | $600.00 | $49,123.73 | 1.22% | $600.00 |
| Thursday, April 24, 2008 | $1,000.00 | $49,552.32 | 2.02% | $1,000.00 |
| Friday, April 25, 2008 | $1,000.00 | $50,385.62 | 1.98% | $1,000.00 |
| Saturday, April 26, 2008 | $1,000.00 | $50,385.62 | 1.98% | $1,000.00 |
| Sunday, April 27, 2008 | $1,000.00 | $50,385.62 | 1.98% | $1,000.00 |
| Monday, April 28, 2008 | $1,000.00 | $50,382.16 | 1.98% | $1,000.00 |
| Tuesday, April 29, 2008 | $1,000.00 | $49,253.60 | 2.03% | $1,000.00 |
| Wednesday, April 30, 2008 | $1,000.00 | $50,204.96 | 1.99% | $1,000.00 |
| Thursday, May 1, 2008 | $1,000.00 | $50,989.16 | 1.96% | $1,000.00 |
| Friday, May 2, 2008 | $1,000.00 | $52,382.30 | 1.91% | $1,000.00 |
| Saturday, May 3, 2008 | $1,000.00 | $52,382.30 | 1.91% | $1,000.00 |
| Sunday, May 4, 2008 | $1,000.00 | $52,382.30 | 1.91% | $1,000.00 |
| Monday, May 5, 2008 | $1,000.00 | $52,382.30 | 1.91% | $1,000.00 |
| Tuesday, May 6, 2008 | $1,000.00 | $52,485.77 | 1.91% | $1,000.00 |
| Wednesday, May 7, 2008 | $1,000.00 | $51,297.10 | 1.95% | $1,000.00 |
| Thursday, May 8, 2008 | $1,400.00 | $50,803.64 | 2.76% | $1,400.00 |
| Friday, May 9, 2008 | $1,400.00 | $50,499.76 | 2.77% | $1,400.00 |
| Saturday, May 10, 2008 | $1,400.00 | $50,499.76 | 2.77% | $1,400.00 |
| Sunday, May 11, 2008 | $1,400.00 | $50,499.76 | 2.77% | $1,400.00 |
| Monday, May 12, 2008 | $1,400.00 | $50,809.74 | 2.76% | $1,400.00 |
| Tuesday, May 13, 2008 | $1,400.00 | $50,877.62 | 2.75% | $1,400.00 |
| Wednesday, May 14, 2008 | $1,400.00 | $49,718.78 | 2.82% | $1,400.00 |
| Thursday, May 15, 2008 | $1,400.00 | $50,187.41 | 2.79% | $1,400.00 |
| Friday, May 16, 2008 | $1,400.00 | $51,335.39 | 2.73% | $1,400.00 |
| Saturday, May 17, 2008 | $1,400.00 | $51,335.39 | 2.73% | $1,400.00 |
| Sunday, May 18, 2008 | $1,400.00 | $51,335.39 | 2.73% | $1,400.00 |
| Monday, May 19, 2008 | $1,400.00 | $51,633.42 | 2.71% | $1,400.00 |
| Tuesday, May 20, 2008 | $1,400.00 | $50,899.31 | 2.75% | $1,400.00 |
| Wednesday, May 21, 2008 | $1,400.00 | $49,770.86 | 2.81% | $1,400.00 |

| | | | |
|---|---|---|---|
| Thursday, May 22, 2008 | $1,400.00 | $50,448.14 | 2.78% | $1,400.00 |
| Friday, May 23, 2008 | $1,400.00 | $49,766.61 | 2.81% | $1,400.00 |
| Saturday, May 24, 2008 | $1,400.00 | $49,766.61 | 2.81% | $1,400.00 |
| Sunday, May 25, 2008 | $1,400.00 | $49,766.61 | 2.81% | $1,400.00 |
| Monday, May 26, 2008 | $1,400.00 | $49,766.61 | 2.81% | $1,400.00 |
| Tuesday, May 27, 2008 | $1,400.00 | $51,076.49 | 2.74% | $1,400.00 |
| Wednesday, May 28, 2008 | $1,400.00 | $51,246.67 | 2.73% | $1,400.00 |
| Thursday, May 29, 2008 | $1,400.00 | $51,252.03 | 2.73% | $1,400.00 |
| Friday, May 30, 2008 | $1,400.00 | $52,751.16 | 2.65% | $1,400.00 |
| Saturday, May 31, 2008 | $1,400.00 | $52,751.16 | 2.65% | $1,400.00 |
| Sunday, June 1, 2008 | $1,400.00 | $52,751.16 | 2.65% | $1,400.00 |
| Monday, June 2, 2008 | $1,400.00 | $51,011.92 | 2.74% | $1,400.00 |
| Tuesday, June 3, 2008 | $1,400.00 | $50,462.54 | 2.77% | $1,400.00 |
| Wednesday, June 4, 2008 | $1,400.00 | $48,753.02 | 2.87% | $1,400.00 |
| Thursday, June 5, 2008 | $1,550.00 | $48,388.62 | 3.20% | $1,550.00 |
| Friday, June 6, 2008 | $1,550.00 | $46,396.13 | 3.34% | $1,550.00 |
| Saturday, June 7, 2008 | $1,550.00 | $46,396.13 | 3.34% | $1,550.00 |
| Sunday, June 8, 2008 | $1,550.00 | $46,396.13 | 3.34% | $1,550.00 |
| Monday, June 9, 2008 | $1,550.00 | $46,650.17 | 3.32% | $1,550.00 |
| Tuesday, June 10, 2008 | $1,550.00 | $45,450.78 | 3.41% | $1,550.00 |
| Wednesday, June 11, 2008 | $1,550.00 | $42,614.22 | 3.64% | $1,550.00 |
| Thursday, June 12, 2008 | $1,550.00 | $45,059.27 | 3.44% | $1,550.00 |
| Friday, June 13, 2008 | $1,550.00 | $45,428.98 | 3.41% | $1,550.00 |
| Saturday, June 14, 2008 | $1,550.00 | $45,428.98 | 3.41% | $1,550.00 |
| Sunday, June 15, 2008 | $1,550.00 | $45,428.98 | 3.41% | $1,550.00 |
| Monday, June 16, 2008 | $1,550.00 | $45,790.44 | 3.38% | $1,550.00 |
| Tuesday, June 17, 2008 | $1,550.00 | $44,827.25 | 3.46% | $1,550.00 |
| Wednesday, June 18, 2008 | $1,550.00 | $43,156.33 | 3.59% | $1,550.00 |
| Thursday, June 19, 2008 | $2,050.00 | $42,056.06 | 4.87% | $2,050.00 |
| Friday, June 20, 2008 | $2,050.00 | $42,118.25 | 4.87% | $2,050.00 |
| Saturday, June 21, 2008 | $2,050.00 | $42,118.25 | 4.87% | $2,050.00 |
| Sunday, June 22, 2008 | $2,050.00 | $42,118.25 | 4.87% | $2,050.00 |
| Monday, June 23, 2008 | $2,050.00 | $42,431.27 | 4.83% | $2,050.00 |
| Tuesday, June 24, 2008 | $2,050.00 | $41,836.78 | 4.90% | $2,050.00 |
| Wednesday, June 25, 2008 | $2,050.00 | $43,903.98 | 4.67% | $2,050.00 |
| Thursday, June 26, 2008 | $2,050.00 | $41,058.87 | 4.99% | $2,050.00 |
| Friday, June 27, 2008 | $2,050.00 | $41,043.17 | 4.99% | $2,050.00 |
| Saturday, June 28, 2008 | $2,050.00 | $41,043.17 | 4.99% | $2,050.00 |
| Sunday, June 29, 2008 | $2,050.00 | $41,043.17 | 4.99% | $2,050.00 |
| Monday, June 30, 2008 | $2,050.00 | $40,483.05 | 5.06% | $2,050.00 |
| Tuesday, July 1, 2008 | $2,050.00 | $39,776.10 | 5.15% | $2,050.00 |
| Wednesday, July 2, 2008 | $2,050.00 | $39,529.89 | 5.19% | $2,050.00 |
| Thursday, July 3, 2008 | $2,200.00 | $40,755.05 | 5.40% | $2,200.00 |
| Friday, July 4, 2008 | $2,200.00 | $39,342.63 | 5.59% | $2,200.00 |
| Saturday, July 5, 2008 | $2,200.00 | $39,342.63 | 5.59% | $2,200.00 |
| Sunday, July 6, 2008 | $2,200.00 | $39,342.63 | 5.59% | $2,200.00 |
| Monday, July 7, 2008 | $2,200.00 | $40,348.99 | 5.45% | $2,200.00 |
| Tuesday, July 8, 2008 | $2,200.00 | $39,306.06 | 5.60% | $2,200.00 |
| Wednesday, July 9, 2008 | $2,200.00 | $41,278.44 | 5.33% | $2,200.00 |
| Thursday, July 10, 2008 | $2,200.00 | $40,922.17 | 5.38% | $2,200.00 |
| Friday, July 11, 2008 | $2,200.00 | $37,941.33 | 5.80% | $2,200.00 |

| | | | |
|---|---|---|---|
| Saturday, July 12, 2008 | $2,200.00 | $37,941.33 | 5.80% | $2,200.00 |
| Sunday, July 13, 2008 | $2,200.00 | $37,941.33 | 5.80% | $2,200.00 |
| Monday, July 14, 2008 | $2,200.00 | $39,136.94 | 5.62% | $2,200.00 |
| Tuesday, July 15, 2008 | $2,200.00 | $38,046.61 | 5.78% | $2,200.00 |
| Wednesday, July 16, 2008 | $2,200.00 | $38,320.06 | 5.74% | $2,200.00 |
| Thursday, July 17, 2008 | $1,900.00 | $41,939.89 | 4.53% | $1,900.00 |
| Friday, July 18, 2008 | $1,900.00 | $43,845.24 | 4.33% | $1,900.00 |
| Saturday, July 19, 2008 | $1,900.00 | $43,845.24 | 4.33% | $1,900.00 |
| Sunday, July 20, 2008 | $1,900.00 | $43,845.24 | 4.33% | $1,900.00 |
| Monday, July 21, 2008 | $1,900.00 | $44,432.13 | 4.28% | $1,900.00 |
| Tuesday, July 22, 2008 | $1,900.00 | $43,727.42 | 4.35% | $1,900.00 |
| Wednesday, July 23, 2008 | $1,900.00 | $46,314.01 | 4.10% | $1,900.00 |
| Thursday, July 24, 2008 | $1,900.00 | $45,067.23 | 4.22% | $1,900.00 |
| Friday, July 25, 2008 | $1,900.00 | $44,011.72 | 4.32% | $1,900.00 |
| Saturday, July 26, 2008 | $1,900.00 | $44,011.72 | 4.32% | $1,900.00 |
| Sunday, July 27, 2008 | $1,900.00 | $44,011.72 | 4.32% | $1,900.00 |
| Monday, July 28, 2008 | $1,900.00 | $42,728.39 | 4.45% | $1,900.00 |
| Tuesday, July 29, 2008 | $1,900.00 | $41,665.70 | 4.56% | $1,900.00 |
| Wednesday, July 30, 2008 | $1,900.00 | $43,754.01 | 4.34% | $1,900.00 |
| Thursday, July 31, 2008 | $1,850.00 | $43,681.56 | 4.24% | $1,850.00 |
| Friday, August 1, 2008 | $1,850.00 | $41,907.46 | 4.41% | $1,850.00 |
| Saturday, August 2, 2008 | $1,850.00 | $41,907.46 | 4.41% | $1,850.00 |
| Sunday, August 3, 2008 | $1,850.00 | $41,907.46 | 4.41% | $1,850.00 |
| Monday, August 4, 2008 | $1,850.00 | $39,711.91 | 4.66% | $1,850.00 |
| Tuesday, August 5, 2008 | $1,850.00 | $42,820.14 | 4.32% | $1,850.00 |
| Wednesday, August 6, 2008 | $1,850.00 | $42,752.16 | 4.33% | $1,850.00 |
| Thursday, August 7, 2008 | $1,850.00 | $43,474.37 | 4.26% | $1,850.00 |
| Friday, August 8, 2008 | $1,850.00 | $43,668.47 | 4.24% | $1,850.00 |
| Saturday, August 9, 2008 | $1,850.00 | $43,668.47 | 4.24% | $1,850.00 |
| Sunday, August 10, 2008 | $1,850.00 | $43,668.47 | 4.24% | $1,850.00 |
| Monday, August 11, 2008 | $1,850.00 | $43,495.64 | 4.25% | $1,850.00 |
| Tuesday, August 12, 2008 | $1,850.00 | $40,242.46 | 4.60% | $1,850.00 |
| Wednesday, August 13, 2008 | $1,850.00 | $37,041.34 | 4.99% | $1,850.00 |
| Thursday, August 14, 2008 | $1,850.00 | $38,363.46 | 4.82% | $1,850.00 |
| Friday, August 15, 2008 | $1,850.00 | $37,741.13 | 4.90% | $1,850.00 |
| Saturday, August 16, 2008 | $1,850.00 | $37,741.13 | 4.90% | $1,850.00 |
| Sunday, August 17, 2008 | $1,850.00 | $37,741.13 | 4.90% | $1,850.00 |
| Monday, August 18, 2008 | $1,850.00 | $37,537.85 | 4.93% | $1,850.00 |
| Tuesday, August 19, 2008 | $1,850.00 | $35,198.32 | 5.26% | $1,850.00 |
| Wednesday, August 20, 2008 | $1,850.00 | $35,628.94 | 5.19% | $1,850.00 |
| Thursday, August 21, 2008 | $1,850.00 | $36,120.35 | 5.12% | $1,850.00 |
| Friday, August 22, 2008 | $1,850.00 | $37,205.80 | 4.97% | $1,850.00 |
| Saturday, August 23, 2008 | $1,850.00 | $37,205.80 | 4.97% | $1,850.00 |
| Sunday, August 24, 2008 | $1,850.00 | $37,205.80 | 4.97% | $1,850.00 |
| Monday, August 25, 2008 | $1,850.00 | $37,205.80 | 4.97% | $1,850.00 |
| Tuesday, August 26, 2008 | $1,850.00 | $36,597.42 | 5.06% | $1,850.00 |
| Wednesday, August 27, 2008 | $1,850.00 | $37,645.42 | 4.91% | $1,850.00 |
| Thursday, August 28, 2008 | $1,500.00 | $38,591.06 | 3.89% | $1,500.00 |
| Friday, August 29, 2008 | $1,500.00 | $38,540.54 | 3.89% | $1,500.00 |
| Saturday, August 30, 2008 | $1,500.00 | $38,540.54 | 3.89% | $1,500.00 |
| Sunday, August 31, 2008 | $1,500.00 | $38,540.54 | 3.89% | $1,500.00 |

| | | | |
|---|---|---|---|
| Monday, September 1, 2008 | $1,500.00 | $38,062.54 | 3.94% | $1,500.00 |
| Tuesday, September 2, 2008 | $1,500.00 | $37,872.33 | 3.96% | $1,500.00 |
| Wednesday, September 3, 2008 | $1,500.00 | $37,586.61 | 3.99% | $1,500.00 |
| Thursday, September 4, 2008 | $1,500.00 | $35,688.45 | 4.20% | $1,500.00 |
| Friday, September 5, 2008 | $1,500.00 | $34,486.29 | 4.35% | $1,500.00 |
| Saturday, September 6, 2008 | $1,500.00 | $34,486.29 | 4.35% | $1,500.00 |
| Sunday, September 7, 2008 | $1,500.00 | $34,486.29 | 4.35% | $1,500.00 |
| Monday, September 8, 2008 | $1,500.00 | $37,478.94 | 4.00% | $1,500.00 |
| Tuesday, September 9, 2008 | $1,500.00 | $37,977.10 | 3.95% | $1,500.00 |
| Wednesday, September 10, 2008 | $1,500.00 | $36,440.87 | 4.12% | $1,500.00 |
| Thursday, September 11, 2008 | $1,000.00 | $35,486.64 | 2.82% | $1,000.00 |
| Friday, September 12, 2008 | $1,000.00 | $36,661.03 | 2.73% | $1,000.00 |
| Saturday, September 13, 2008 | $1,000.00 | $36,661.03 | 2.73% | $1,000.00 |
| Sunday, September 14, 2008 | $1,000.00 | $36,661.03 | 2.73% | $1,000.00 |
| Monday, September 15, 2008 | $1,000.00 | $35,241.09 | 2.84% | $1,000.00 |
| Tuesday, September 16, 2008 | $1,000.00 | $35,217.25 | 2.84% | $1,000.00 |
| Wednesday, September 17, 2008 | $1,000.00 | $34,898.82 | 2.87% | $1,000.00 |
| Thursday, September 18, 2008 | $1,000.00 | $34,720.79 | 2.88% | $1,000.00 |
| Friday, September 19, 2008 | $1,000.00 | $40,831.77 | 2.45% | $1,000.00 |
| Saturday, September 20, 2008 | $1,000.00 | $40,831.77 | 2.45% | $1,000.00 |
| Sunday, September 21, 2008 | $1,000.00 | $40,831.77 | 2.45% | $1,000.00 |
| Monday, September 22, 2008 | $1,000.00 | $39,178.04 | 2.55% | $1,000.00 |
| Tuesday, September 23, 2008 | $1,000.00 | $38,493.05 | 2.60% | $1,000.00 |
| Wednesday, September 24, 2008 | $1,000.00 | $38,451.52 | 2.60% | $1,000.00 |
| Thursday, September 25, 2008 | $2,500.00 | $37,589.19 | 6.65% | $2,500.00 |
| Friday, September 26, 2008 | $2,500.00 | $36,600.50 | 6.83% | $2,500.00 |
| Saturday, September 27, 2008 | $2,500.00 | $36,600.50 | 6.83% | $2,500.00 |
| Sunday, September 28, 2008 | $2,500.00 | $36,600.50 | 6.83% | $2,500.00 |
| Monday, September 29, 2008 | $2,500.00 | $31,932.04 | 7.83% | $2,500.00 |
| Tuesday, September 30, 2008 | $2,500.00 | $34,057.84 | 7.34% | $2,500.00 |
| Wednesday, October 1, 2008 | $2,500.00 | $35,087.04 | 7.13% | $2,500.00 |
| Thursday, October 2, 2008 | $2,500.00 | $34,159.08 | 7.32% | $2,500.00 |
| Friday, October 3, 2008 | $2,500.00 | $35,262.68 | 7.09% | $2,500.00 |
| Saturday, October 4, 2008 | $2,500.00 | $35,262.68 | 7.09% | $2,500.00 |
| Sunday, October 5, 2008 | $2,500.00 | $35,262.68 | 7.09% | $2,500.00 |
| Monday, October 6, 2008 | $2,500.00 | $31,259.60 | 8.00% | $2,500.00 |
| Tuesday, October 7, 2008 | $2,500.00 | $32,643.03 | 7.66% | $2,500.00 |
| Wednesday, October 8, 2008 | $2,500.00 | $28,521.86 | 8.77% | $2,500.00 |
| Thursday, October 9, 2008 | $2,500.00 | $28,421.91 | 8.80% | $2,500.00 |
| Friday, October 10, 2008 | $2,500.00 | $24,134.76 | 10.36% | $2,500.00 |
| Saturday, October 11, 2008 | $2,500.00 | $24,134.76 | 10.36% | $2,500.00 |
| Sunday, October 12, 2008 | $2,500.00 | $24,134.76 | 10.36% | $2,500.00 |
| Monday, October 13, 2008 | $2,500.00 | $29,539.51 | 8.46% | $2,500.00 |
| Tuesday, October 14, 2008 | $2,500.00 | $32,925.98 | 7.59% | $2,500.00 |
| Wednesday, October 15, 2008 | $2,500.00 | $28,858.12 | 8.66% | $2,500.00 |
| Thursday, October 16, 2008 | $2,500.00 | $24,885.72 | 10.05% | $2,500.00 |
| Friday, October 17, 2008 | $2,500.00 | $26,620.94 | 9.39% | $2,500.00 |
| Saturday, October 18, 2008 | $2,500.00 | $26,620.94 | 9.39% | $2,500.00 |
| Sunday, October 19, 2008 | $2,500.00 | $26,620.94 | 9.39% | $2,500.00 |
| Monday, October 20, 2008 | $2,500.00 | $27,514.18 | 9.09% | $2,500.00 |
| Tuesday, October 21, 2008 | $2,500.00 | $24,878.00 | 10.05% | $2,500.00 |

| | | | | |
|---|---|---|---|---|
| Wednesday, October 22, 2008 | $2,500.00 | $21,937.26 | 11.40% | $2,500.00 |
| Thursday, October 23, 2008 | $2,500.00 | $20,583.77 | 12.15% | $2,500.00 |
| Friday, October 24, 2008 | $2,500.00 | $17,095.66 | 14.62% | $2,500.00 |
| Saturday, October 25, 2008 | $2,500.00 | $17,095.66 | 14.62% | $2,500.00 |
| Sunday, October 26, 2008 | $2,500.00 | $17,095.66 | 14.62% | $2,500.00 |
| Monday, October 27, 2008 | $2,500.00 | $15,153.66 | 16.50% | $2,500.00 |
| Tuesday, October 28, 2008 | $2,500.00 | $15,520.69 | 16.11% | $2,500.00 |
| Wednesday, October 29, 2008 | $2,500.00 | $21,262.95 | 11.76% | $2,500.00 |
| Thursday, October 30, 2008 | $2,500.00 | $22,492.46 | 11.11% | $2,500.00 |
| Friday, October 31, 2008 | $2,500.00 | $23,369.66 | 10.70% | $2,500.00 |
| Saturday, November 1, 2008 | $2,500.00 | $23,369.66 | 10.70% | $2,500.00 |
| Sunday, November 2, 2008 | $2,500.00 | $23,369.66 | 10.70% | $2,500.00 |
| Monday, November 3, 2008 | $2,500.00 | $22,645.48 | 11.04% | $2,500.00 |
| Tuesday, November 4, 2008 | $2,500.00 | $24,311.38 | 10.28% | $2,500.00 |
| Wednesday, November 5, 2008 | $2,500.00 | $23,316.10 | 10.72% | $2,500.00 |
| Thursday, November 6, 2008 | $2,850.00 | $21,312.99 | 13.37% | $2,850.00 |
| Friday, November 7, 2008 | $2,850.00 | $21,096.07 | 13.51% | $2,850.00 |
| Saturday, November 8, 2008 | $2,850.00 | $21,096.07 | 13.51% | $2,850.00 |
| Sunday, November 9, 2008 | $2,850.00 | $21,096.07 | 13.51% | $2,850.00 |
| Monday, November 10, 2008 | $2,850.00 | $19,949.28 | 14.29% | $2,850.00 |
| Tuesday, November 11, 2008 | $2,850.00 | $18,899.74 | 15.08% | $2,850.00 |
| Wednesday, November 12, 2008 | $2,850.00 | $17,087.59 | 16.68% | $2,850.00 |
| Thursday, November 13, 2008 | $2,850.00 | $15,267.46 | 18.67% | $2,850.00 |
| Friday, November 14, 2008 | $2,850.00 | $16,385.00 | 17.39% | $2,850.00 |
| Saturday, November 15, 2008 | $2,850.00 | $16,385.00 | 17.39% | $2,850.00 |
| Sunday, November 16, 2008 | $2,850.00 | $16,385.00 | 17.39% | $2,850.00 |
| Monday, November 17, 2008 | $2,850.00 | $15,460.41 | 18.43% | $2,850.00 |
| Tuesday, November 18, 2008 | $2,850.00 | $15,693.52 | 18.16% | $2,850.00 |
| Wednesday, November 19, 2008 | $2,850.00 | $15,778.60 | 18.06% | $2,850.00 |
| Thursday, November 20, 2008 | $2,850.00 | $15,564.11 | 18.31% | $2,850.00 |
| Friday, November 21, 2008 | $2,850.00 | $15,990.54 | 17.82% | $2,850.00 |
| Saturday, November 22, 2008 | $2,850.00 | $15,990.54 | 17.82% | $2,850.00 |
| Sunday, November 23, 2008 | $2,850.00 | $15,990.54 | 17.82% | $2,850.00 |
| Monday, November 24, 2008 | $2,850.00 | $15,674.52 | 18.18% | $2,850.00 |
| Tuesday, November 25, 2008 | $2,850.00 | $18,370.39 | 15.51% | $2,850.00 |
| Wednesday, November 26, 2008 | $2,850.00 | $17,105.19 | 16.66% | $2,850.00 |
| Thursday, November 27, 2008 | $2,850.00 | $19,219.27 | 14.83% | $2,850.00 |
| Friday, November 28, 2008 | $2,850.00 | $21,129.43 | 13.49% | $2,850.00 |
| Saturday, November 29, 2008 | $2,850.00 | $21,129.43 | 13.49% | $2,850.00 |
| Sunday, November 30, 2008 | $2,850.00 | $21,129.43 | 13.49% | $2,850.00 |
| Monday, December 1, 2008 | $2,850.00 | $17,557.03 | 16.23% | $2,850.00 |
| Tuesday, December 2, 2008 | $2,850.00 | $18,227.75 | 15.64% | $2,850.00 |
| Wednesday, December 3, 2008 | $2,850.00 | $18,348.25 | 15.53% | $2,850.00 |
| Thursday, December 4, 2008 | $2,850.00 | $18,260.43 | 15.61% | $2,850.00 |
| Friday, December 5, 2008 | $2,850.00 | $18,257.51 | 15.61% | $2,850.00 |
| Saturday, December 6, 2008 | $2,850.00 | $18,257.51 | 15.61% | $2,850.00 |
| Sunday, December 7, 2008 | $2,850.00 | $18,257.51 | 15.61% | $2,850.00 |
| Monday, December 8, 2008 | $2,850.00 | $19,055.86 | 14.96% | $2,850.00 |
| Tuesday, December 9, 2008 | $2,850.00 | $19,250.13 | 14.81% | $2,850.00 |
| Wednesday, December 10, 2008 | $2,850.00 | $18,120.32 | 15.73% | $2,850.00 |
| Thursday, December 11, 2008 | $2,850.00 | $19,138.60 | 14.89% | $2,850.00 |

| Date | | | |
|---|---|---|---|
| Friday, December 12, 2008 | $2,850.00 | $18,131.81 | 15.72% | $2,850.00 |
| Saturday, December 13, 2008 | $2,850.00 | $18,131.81 | 15.72% | $2,850.00 |
| Sunday, December 14, 2008 | $2,850.00 | $18,131.81 | 15.72% | $2,850.00 |
| Monday, December 15, 2008 | $2,850.00 | $18,657.32 | 15.28% | $2,850.00 |
| Tuesday, December 16, 2008 | $2,850.00 | $18,605.07 | 15.32% | $2,850.00 |
| Wednesday, December 17, 2008 | $2,850.00 | $19,173.14 | 14.86% | $2,850.00 |
| Thursday, December 18, 2008 | $2,850.00 | $21,225.74 | 13.43% | $2,850.00 |
| Friday, December 19, 2008 | $2,850.00 | $20,841.61 | 13.67% | $2,850.00 |
| Saturday, December 20, 2008 | $2,850.00 | $20,841.61 | 13.67% | $2,850.00 |
| Sunday, December 21, 2008 | $2,850.00 | $20,841.61 | 13.67% | $2,850.00 |
| Monday, December 22, 2008 | $2,850.00 | $21,101.59 | 13.51% | $2,850.00 |
| Tuesday, December 23, 2008 | $2,850.00 | $21,407.46 | 13.31% | $2,850.00 |
| Wednesday, December 24, 2008 | $2,850.00 | $21,012.17 | 13.56% | $2,850.00 |
| Thursday, December 25, 2008 | $2,850.00 | $21,012.17 | 13.56% | $2,850.00 |
| Friday, December 26, 2008 | $2,850.00 | $21,012.17 | 13.56% | $2,850.00 |
| Saturday, December 27, 2008 | $2,850.00 | $21,012.17 | 13.56% | $2,850.00 |
| Sunday, December 28, 2008 | $2,850.00 | $21,012.17 | 13.56% | $2,850.00 |
| Monday, December 29, 2008 | $2,850.00 | $22,315.66 | 12.77% | $2,850.00 |
| Tuesday, December 30, 2008 | $2,850.00 | $22,783.93 | 12.51% | $2,850.00 |
| Wednesday, December 31, 2008 | $2,850.00 | $24,176.03 | 11.79% | $2,850.00 |
| Thursday, January 1, 2009 | $2,850.00 | $24,176.03 | 11.79% | $2,850.00 |
| Friday, January 2, 2009 | $2,850.00 | $23,836.16 | 11.96% | $2,850.00 |
| Saturday, January 3, 2009 | $2,850.00 | $23,836.16 | 11.96% | $2,850.00 |
| Sunday, January 4, 2009 | $2,850.00 | $23,836.16 | 11.96% | $2,850.00 |
| Monday, January 5, 2009 | $2,850.00 | $25,600.92 | 11.13% | $2,850.00 |
| Tuesday, January 6, 2009 | $2,850.00 | $28,284.75 | 10.08% | $2,850.00 |
| Wednesday, January 7, 2009 | $2,850.00 | $26,496.34 | 10.76% | $2,850.00 |
| Thursday, January 8, 2009 | $2,850.00 | $24,792.78 | 11.50% | $2,850.00 |
| Friday, January 9, 2009 | $2,850.00 | $24,882.41 | 11.45% | $2,850.00 |
| Saturday, January 10, 2009 | $2,850.00 | $24,882.41 | 11.45% | $2,850.00 |
| Sunday, January 11, 2009 | $2,850.00 | $24,882.41 | 11.45% | $2,850.00 |
| Monday, January 12, 2009 | $2,850.00 | $24,681.02 | 11.55% | $2,850.00 |
| Tuesday, January 13, 2009 | $2,850.00 | $23,017.60 | 12.38% | $2,850.00 |
| Wednesday, January 14, 2009 | $2,850.00 | $20,599.92 | 13.84% | $2,850.00 |
| Thursday, January 15, 2009 | $2,550.00 | $21,196.19 | 12.03% | $2,550.00 |
| Friday, January 16, 2009 | $2,550.00 | $21,348.34 | 11.94% | $2,550.00 |
| Saturday, January 17, 2009 | $2,550.00 | $21,348.34 | 11.94% | $2,550.00 |
| Sunday, January 18, 2009 | $2,550.00 | $21,348.34 | 11.94% | $2,550.00 |
| Monday, January 19, 2009 | $2,550.00 | $19,402.68 | 13.14% | $2,550.00 |
| Tuesday, January 20, 2009 | $2,550.00 | $18,303.38 | 13.93% | $2,550.00 |
| Wednesday, January 21, 2009 | $2,550.00 | $19,950.69 | 12.78% | $2,550.00 |
| Thursday, January 22, 2009 | $2,550.00 | $21,041.01 | 12.12% | $2,550.00 |
| Friday, January 23, 2009 | $2,550.00 | $19,590.97 | 13.02% | $2,550.00 |
| Saturday, January 24, 2009 | $2,550.00 | $19,590.97 | 13.02% | $2,550.00 |
| Sunday, January 25, 2009 | $2,550.00 | $19,590.97 | 13.02% | $2,550.00 |
| Monday, January 26, 2009 | $2,550.00 | $20,995.43 | 12.15% | $2,550.00 |
| Tuesday, January 27, 2009 | $2,550.00 | $21,446.88 | 11.89% | $2,550.00 |
| Wednesday, January 28, 2009 | $2,550.00 | $23,871.91 | 10.68% | $2,550.00 |
| Thursday, January 29, 2009 | $2,000.00 | $22,861.54 | 8.75% | $2,000.00 |
| Friday, January 30, 2009 | $2,000.00 | $24,021.57 | 8.33% | $2,000.00 |
| Saturday, January 31, 2009 | $2,000.00 | $24,021.57 | 8.33% | $2,000.00 |

| | | | |
|---|---|---|---|
| Sunday, February 1, 2009 | $2,000.00 | $24,021.57 | 8.33% | $2,000.00 |
| Monday, February 2, 2009 | $2,000.00 | $22,440.68 | 8.91% | $2,000.00 |
| Tuesday, February 3, 2009 | $2,000.00 | $23,153.43 | 8.64% | $2,000.00 |
| Wednesday, February 4, 2009 | $2,000.00 | $23,995.58 | 8.33% | $2,000.00 |
| Thursday, February 5, 2009 | $2,000.00 | $23,799.55 | 8.40% | $2,000.00 |
| Friday, February 6, 2009 | $2,000.00 | $24,037.81 | 8.32% | $2,000.00 |
| Saturday, February 7, 2009 | $2,000.00 | $24,037.81 | 8.32% | $2,000.00 |
| Sunday, February 8, 2009 | $2,000.00 | $24,037.81 | 8.32% | $2,000.00 |
| Monday, February 9, 2009 | $2,000.00 | $25,337.31 | 7.89% | $2,000.00 |
| Tuesday, February 10, 2009 | $2,000.00 | $23,449.16 | 8.53% | $2,000.00 |
| Wednesday, February 11, 2009 | $2,000.00 | $22,430.64 | 8.92% | $2,000.00 |
| Thursday, February 12, 2009 | $2,000.00 | $22,019.70 | 9.08% | $2,000.00 |
| Friday, February 13, 2009 | $2,000.00 | $21,563.92 | 9.27% | $2,000.00 |
| Saturday, February 14, 2009 | $2,000.00 | $21,563.92 | 9.27% | $2,000.00 |
| Sunday, February 15, 2009 | $2,000.00 | $21,563.92 | 9.27% | $2,000.00 |
| Monday, February 16, 2009 | $2,000.00 | $21,064.31 | 9.49% | $2,000.00 |
| Tuesday, February 17, 2009 | $2,000.00 | $19,151.22 | 10.44% | $2,000.00 |
| Wednesday, February 18, 2009 | $2,000.00 | $18,603.90 | 10.75% | $2,000.00 |
| Thursday, February 19, 2009 | $2,000.00 | $18,745.20 | 10.67% | $2,000.00 |
| Friday, February 20, 2009 | $2,000.00 | $17,891.24 | 11.18% | $2,000.00 |
| Saturday, February 21, 2009 | $2,000.00 | $17,891.24 | 11.18% | $2,000.00 |
| Sunday, February 22, 2009 | $2,000.00 | $17,891.24 | 11.18% | $2,000.00 |
| Monday, February 23, 2009 | $2,000.00 | $18,206.76 | 10.98% | $2,000.00 |
| Tuesday, February 24, 2009 | $2,000.00 | $17,845.31 | 11.21% | $2,000.00 |
| Wednesday, February 25, 2009 | $2,000.00 | $18,184.70 | 11.00% | $2,000.00 |
| Thursday, February 26, 2009 | $2,200.00 | $18,469.05 | 11.91% | $2,200.00 |
| Friday, February 27, 2009 | $2,200.00 | $18,064.04 | 12.18% | $2,200.00 |
| Saturday, February 28, 2009 | $2,200.00 | $18,064.04 | 12.18% | $2,200.00 |
| Sunday, March 1, 2009 | $2,200.00 | $18,064.04 | 12.18% | $2,200.00 |
| Monday, March 2, 2009 | $2,200.00 | $15,611.51 | 14.09% | $2,200.00 |
| Tuesday, March 3, 2009 | $2,200.00 | $16,788.57 | 13.10% | $2,200.00 |
| Wednesday, March 4, 2009 | $2,200.00 | $19,414.01 | 11.33% | $2,200.00 |
| Thursday, March 5, 2009 | $2,200.00 | $19,152.30 | 11.49% | $2,200.00 |
| Friday, March 6, 2009 | $2,200.00 | $20,135.77 | 10.93% | $2,200.00 |
| Saturday, March 7, 2009 | $2,200.00 | $20,135.77 | 10.93% | $2,200.00 |
| Sunday, March 8, 2009 | $2,200.00 | $20,135.77 | 10.93% | $2,200.00 |
| Monday, March 9, 2009 | $2,200.00 | $19,650.75 | 11.20% | $2,200.00 |
| Tuesday, March 10, 2009 | $2,200.00 | $21,152.15 | 10.40% | $2,200.00 |
| Wednesday, March 11, 2009 | $2,200.00 | $20,906.35 | 10.52% | $2,200.00 |
| Thursday, March 12, 2009 | $2,200.00 | $21,382.14 | 10.29% | $2,200.00 |
| Friday, March 13, 2009 | $2,200.00 | $22,691.01 | 9.70% | $2,200.00 |
| Saturday, March 14, 2009 | $2,200.00 | $22,691.01 | 9.70% | $2,200.00 |
| Sunday, March 15, 2009 | $2,200.00 | $22,691.01 | 9.70% | $2,200.00 |
| Monday, March 16, 2009 | $2,200.00 | $22,729.53 | 9.68% | $2,200.00 |
| Tuesday, March 17, 2009 | $2,200.00 | $22,725.45 | 9.68% | $2,200.00 |
| Wednesday, March 18, 2009 | $2,200.00 | $22,572.06 | 9.75% | $2,200.00 |
| Thursday, March 19, 2009 | $2,200.00 | $25,064.65 | 8.78% | $2,200.00 |
| Friday, March 20, 2009 | $2,200.00 | $24,559.84 | 8.96% | $2,200.00 |
| Saturday, March 21, 2009 | $2,200.00 | $24,559.84 | 8.96% | $2,200.00 |
| Sunday, March 22, 2009 | $2,200.00 | $24,559.84 | 8.96% | $2,200.00 |
| Monday, March 23, 2009 | $2,200.00 | $25,525.85 | 8.62% | $2,200.00 |

| Date | | | |
|---|---|---|---|
| Tuesday, March 24, 2009 | $2,200.00 | $25,650.62 | 8.58% | $2,200.00 |
| Wednesday, March 25, 2009 | $2,200.00 | $24,567.17 | 8.96% | $2,200.00 |
| Thursday, March 26, 2009 | $2,200.00 | $24,101.50 | 9.13% | $2,200.00 |
| Friday, March 27, 2009 | $2,200.00 | $23,443.00 | 9.38% | $2,200.00 |
| Saturday, March 28, 2009 | $2,200.00 | $23,443.00 | 9.38% | $2,200.00 |
| Sunday, March 29, 2009 | $2,200.00 | $23,443.00 | 9.38% | $2,200.00 |
| Monday, March 30, 2009 | $2,200.00 | $21,509.64 | 10.23% | $2,200.00 |
| Tuesday, March 31, 2009 | $2,200.00 | $23,508.92 | 9.36% | $2,200.00 |
| Wednesday, April 1, 2009 | $2,200.00 | $24,081.74 | 9.14% | $2,200.00 |
| Thursday, April 2, 2009 | $2,200.00 | $28,551.91 | 7.71% | $2,200.00 |
| Friday, April 3, 2009 | $2,200.00 | $28,042.65 | 7.85% | $2,200.00 |
| Saturday, April 4, 2009 | $2,200.00 | $28,042.65 | 7.85% | $2,200.00 |
| Sunday, April 5, 2009 | $2,200.00 | $28,042.65 | 7.85% | $2,200.00 |
| Monday, April 6, 2009 | $2,200.00 | $26,805.22 | 8.21% | $2,200.00 |
| Tuesday, April 7, 2009 | $2,200.00 | $25,169.17 | 8.74% | $2,200.00 |
| Wednesday, April 8, 2009 | $2,200.00 | $25,688.33 | 8.56% | $2,200.00 |
| Thursday, April 9, 2009 | $1,400.00 | $27,372.18 | 5.11% | $1,400.00 |
| Friday, April 10, 2009 | $1,400.00 | $27,372.18 | 5.11% | $1,400.00 |
| Saturday, April 11, 2009 | $1,400.00 | $27,372.18 | 5.11% | $1,400.00 |
| Sunday, April 12, 2009 | $1,400.00 | $27,372.18 | 5.11% | $1,400.00 |
| Monday, April 13, 2009 | $1,400.00 | $27,372.18 | 5.11% | $1,400.00 |
| Tuesday, April 14, 2009 | $1,400.00 | $28,997.46 | 4.83% | $1,400.00 |
| Wednesday, April 15, 2009 | $1,400.00 | $28,441.01 | 4.92% | $1,400.00 |
| Thursday, April 16, 2009 | $1,400.00 | $28,337.49 | 4.94% | $1,400.00 |
| Friday, April 17, 2009 | $1,400.00 | $28,153.81 | 4.97% | $1,400.00 |
| Saturday, April 18, 2009 | $1,400.00 | $28,153.81 | 4.97% | $1,400.00 |
| Sunday, April 19, 2009 | $1,400.00 | $28,153.81 | 4.97% | $1,400.00 |
| Monday, April 20, 2009 | $1,400.00 | $26,017.94 | 5.38% | $1,400.00 |
| Tuesday, April 21, 2009 | $1,400.00 | $26,528.17 | 5.28% | $1,400.00 |
| Wednesday, April 22, 2009 | $1,400.00 | $27,354.47 | 5.12% | $1,400.00 |
| Thursday, April 23, 2009 | $1,100.00 | $26,877.99 | 4.09% | $1,100.00 |
| Friday, April 24, 2009 | $1,100.00 | $27,531.03 | 4.00% | $1,100.00 |
| Saturday, April 25, 2009 | $1,100.00 | $27,531.03 | 4.00% | $1,100.00 |
| Sunday, April 26, 2009 | $1,100.00 | $27,531.03 | 4.00% | $1,100.00 |
| Monday, April 27, 2009 | $1,100.00 | $26,443.58 | 4.16% | $1,100.00 |
| Tuesday, April 28, 2009 | $1,100.00 | $25,782.53 | 4.27% | $1,100.00 |
| Wednesday, April 29, 2009 | $1,100.00 | $28,040.14 | 3.92% | $1,100.00 |
| Thursday, April 30, 2009 | $1,100.00 | $29,674.59 | 3.71% | $1,100.00 |
| Friday, May 1, 2009 | $1,100.00 | $29,943.99 | 3.67% | $1,100.00 |
| Saturday, May 2, 2009 | $1,100.00 | $29,943.99 | 3.67% | $1,100.00 |
| Sunday, May 3, 2009 | $1,100.00 | $29,943.99 | 3.67% | $1,100.00 |
| Monday, May 4, 2009 | $1,100.00 | $29,943.99 | 3.67% | $1,100.00 |
| Tuesday, May 5, 2009 | $1,100.00 | $32,997.28 | 3.33% | $1,100.00 |
| Wednesday, May 6, 2009 | $1,100.00 | $35,948.16 | 3.06% | $1,100.00 |
| Thursday, May 7, 2009 | $1,100.00 | $35,833.45 | 3.07% | $1,100.00 |
| Friday, May 8, 2009 | $1,100.00 | $36,971.63 | 2.98% | $1,100.00 |
| Saturday, May 9, 2009 | $1,100.00 | $36,971.63 | 2.98% | $1,100.00 |
| Sunday, May 10, 2009 | $1,100.00 | $36,971.63 | 2.98% | $1,100.00 |
| Monday, May 11, 2009 | $1,100.00 | $34,484.35 | 3.19% | $1,100.00 |
| Tuesday, May 12, 2009 | $1,100.00 | $34,086.79 | 3.23% | $1,100.00 |
| Wednesday, May 13, 2009 | $1,100.00 | $31,851.74 | 3.45% | $1,100.00 |

**[JA-196]**

| | | | | |
|---|---|---|---|---|
| Thursday, May 14, 2009 | $1,100.00 | $34,527.66 | 3.19% | $1,100.00 |
| Friday, May 15, 2009 | $1,100.00 | $33,870.76 | 3.25% | $1,100.00 |
| Saturday, May 16, 2009 | $1,100.00 | $33,870.76 | 3.25% | $1,100.00 |
| Sunday, May 17, 2009 | $1,100.00 | $33,870.76 | 3.25% | $1,100.00 |
| Monday, May 18, 2009 | $1,100.00 | $37,104.36 | 2.96% | $1,100.00 |
| Tuesday, May 19, 2009 | $1,100.00 | $37,706.19 | 2.92% | $1,100.00 |
| Wednesday, May 20, 2009 | $1,100.00 | $37,469.19 | 2.94% | $1,100.00 |
| Thursday, May 21, 2009 | $700.00 | $36,347.49 | 1.93% | $700.00 |
| Friday, May 22, 2009 | $700.00 | $36,627.27 | 1.91% | $700.00 |
| Saturday, May 23, 2009 | $700.00 | $36,627.27 | 1.91% | $700.00 |
| Sunday, May 24, 2009 | $700.00 | $36,627.27 | 1.91% | $700.00 |
| Monday, May 25, 2009 | $700.00 | $36,627.27 | 1.91% | $700.00 |
| Tuesday, May 26, 2009 | $700.00 | $37,308.71 | 1.88% | $700.00 |
| Wednesday, May 27, 2009 | $700.00 | $38,046.91 | 1.84% | $700.00 |
| Thursday, May 28, 2009 | $700.00 | $37,375.93 | 1.87% | $700.00 |
| Friday, May 29, 2009 | $700.00 | $39,202.18 | 1.79% | $700.00 |
| Saturday, May 30, 2009 | $700.00 | $39,202.18 | 1.79% | $700.00 |
| Sunday, May 31, 2009 | $700.00 | $39,202.18 | 1.79% | $700.00 |
| Monday, June 1, 2009 | $700.00 | $40,334.03 | 1.74% | $700.00 |
| Tuesday, June 2, 2009 | $700.00 | $40,364.62 | 1.73% | $700.00 |
| Wednesday, June 3, 2009 | $700.00 | $39,050.14 | 1.79% | $700.00 |
| Thursday, June 4, 2009 | $0.00 | $38,704.84 | 0.00% | $0.00 |

## ADDENDUM:  DETAILED TECHNICAL ANALYSIS

FORENSIC ANALYSIS OF SCB'S FILES PRODUCED BY RELATOR TO THE U.S. GOVERNMENT

### A.  Extraction of Hidden Transactional Records from SCB's Excel Files

#### 1.  Interaction between Excel and Networked Databases:

1.      Microsoft's Excel is a versatile spreadsheet application that offers powerful features for data analysis and reporting.

2.      One of Excel's key capabilities is its ability to connect to and retrieve data from various sources, including networked databases like the relational databases underlying SCB's Centralized Online Real-time Exchange ("CORE") banking system[1] (named "electronic Branch Banking System" or "eBBS") and foreign exchange platform (named "On-Line Trading–3" or "OLT–3").

3.      To establish a connection between Excel and a networked database, users can leverage Excel's built-in data connection tools.

4.      These tools allow Excel users to specify the database type, server name, authentication credentials, and other necessary parameters to create a secure network connection.

5.      Once the connection is set up, Excel can communicate with the database using structured query language ("SQL") or other database-specific protocols.

---

[1]      A CORE banking system is a centralized system that enables banks to perform essential banking services such as, among other things, opening and managing accounts, processing deposits and withdrawals, and calculating interest. The "real-time" aspect of a CORE banking system ensures that the effect of any transaction is reflected immediately in the relevant accounts, providing up-to-date information about balances and transactions. A bank's centralized, real-time processing of transactions is crucial for modern banking operations, enabling efficient and accurate management of customer data and payments across multiple branches and delivery channels. *See, for example*, Julian Alcazar, Sam Baird, Emma Cronenweth, Fumiko Hayashi, and Ken Isaacson, CORE BANKING SYSTEMS AND OPTIONS FOR MODERNIZATION, FEDERAL RESERVE BANK OF KANSAS                    CITY                    (Feb.                    28,                    2024), https://www.kansascityfed.org/Payments%20Systems%20Research%20Briefings/documents/10016/PaymentsSystemResearchBriefing24AlcazarBairdCronenwethHayashiIsaacson0228.pdf.

6.      With an active database connection, users can import data from the networked database into Excel worksheets.

7.      This process involves querying the database to retrieve specific subsets of data based on user-defined criteria.

8.      For example, a user could write an SQL query to extract all foreign exchange transactions from SCB'\'s OLT–3 platform within a specific date range and import that data into an Excel worksheet.

9.      Once the data is imported into Excel, users can leverage the application's extensive features for data manipulation, analysis, and visualization.

10.     This includes creating pivot tables, generating charts and graphs, performing calculations, and applying formatting to the data like in SCB's Excel file named "Cash and Trade Corporates Client Groups FX Revenues_6 Sep 2010_MENA_V1".

11.     This file includes a worksheet with the following chart showing a breakdown of SCB'\'s foreign exchange volumes by geographic location:



12.    The data in the above chart shows Excel's flexibility in allowing SCB's users to transform the raw data from the bank's eBBS and OLT–3 databases into meaningful insights and reports.

13.    SCB's eBBS and OLT–3 systems are critical components of the bank's core banking infrastructure, handling a wide range of transactional data.

14.    eBBS, as the bank's central electronic banking system, stores comprehensive data on customer accounts, transactions, and balances.

15.    This includes data on deposits, withdrawals, transfers, loans, and other basic banking activities.

16.    OLT–3, as SCB's online foreign exchange trading platform, handles more specialized data related to foreign exchange transactions.

17.    This includes data on currency pairs traded, amounts, rates, counterparties, and timestamps for each trade.

18.    OLT–3 also stores data on related hedging activities and derivatives contracts.

19.    Both eBBS and OLT–3 databases store this transactional data in structured tables, with each row representing a unique transaction and columns for the various attributes of that transaction.

20.    These databases are typically hosted on secure servers and accessed by front-end applications for day-to-day use by bank staff.

21.    For data to flow from eBBS and OLT–3 into Excel, a user must first establish a connection between Excel and these databases.

22.    This is typically done through Excel's built-in data connection features, which allow users to specify the server, database, and login credentials.

3

23.     Once connected, users can query the databases and pull selected data into Excel.

24.     The specific data pulled into Excel depends on the user's query. For example, a user could pull all foreign exchange trades above a certain dollar amount from OLT–3 for a given time period.

25.     Or they could pull all transactions associated with a specific customer account from eBBS.

26.     The queried data is typically imported into Excel as a table in a worksheet.

27.     Once in Excel, users can manipulate, analyze, and visualize the data using Excel's various features.

28.     They can also set up automated data refreshes, where Excel will periodically re-query the database to pull in updated data.

29.     Normally, at a multinational financial institution like SCB, robust internal controls should govern these data flows between eBBS, OLT–3, and Excel.

30.     Access to SCB's internal databases should be strictly controlled based on user roles and permissions.

31.     The bank's sensitive data should be encrypted both at rest in the databases and in transit to Excel.

32.     Data pulled into Excel should be subject to SCB's data loss prevention ("DLP") controls to prevent unauthorized exfiltration.

33.     However, Relator's analysis suggests significant gaps in SCB's controls around these data flows.

34.     The presence of massive amounts of sensitive transaction data in Excel files, including data on sanctioned entities, suggests that SCB's controls were either inadequate or poorly enforced.

35.     The extraction of data from eBBS and OLT–3 into Excel appears to have been largely unconstrained, allowing users to pull in data on sanctioned transactions without triggering any alarms.

36.     Once in Excel, this data seems to have been stored without appropriate protection, as evidenced by the unencrypted pivot table caches.

37.     The data flows between SCB's core systems and Excel represent a significant vulnerability in the bank's sanctions compliance controls.

38.     By allowing uncontrolled extraction of sensitive data into an environment like Excel, which lacks robust audit trails and access controls, SCB created opportunities for sanctions violations to occur and be concealed.

39.     Relator's findings suggest that SCB either failed to recognize the sanctions risks inherent in these data flows, or worse, actively exploited these vulnerabilities to evade sanctions controls.

40.     The systematic nature of the data issues uncovered, spanning multiple years and involving thousands of transactions, points to a serious and sustained breakdown in SCB's internal controls.

### Purpose and Function of Excel's pivot tables.

41.     Pivot tables are one of the most powerful and widely used features in Microsoft Excel for summarizing and analyzing large datasets.

42.     They allow users to dynamically explore and visualize data by dragging and dropping fields, applying filters, and aggregating values.

5

43.     However, a significant capability behind pivot tables lies in the "pivot table cache", a hidden component that plays a crucial role in their performance and functionality with networked database applications like SCB's eBBS and OLT–3.

44.     When a pivot table is created, Excel generates a pivot table cache that stores a compressed replica of the source data.

45.     This cache is essentially a snapshot and optimized version of the original data, designed to improve the speed and efficiency of pivot table operations.

46.     The pivot table cache acts as a reference for the pivot table, providing it with the necessary data to perform calculations and data manipulations.

47.     It is important to note that data stored in the pivot table cache is not readily visible to end users.

48.     The pivot cache is stored in a separate part of the Excel file from the visible worksheets, typically in a binary format.

49.     This storage format compresses the data, reducing file size and improving performance.

50.     However, it also makes the cached data less readily visible to anyone inspecting the file.

51.     The process of extracting data from SCB's pivot table caches required technical expertise in understanding the structure of Excel files, working with XML, and utilizing specialized tools for data extraction and analysis.

52.     The significance of this process cannot be overstated.

53.     By extracting data from the pivot table caches, I uncovered a substantial volume of transactional records that were not immediately visible in the Excel worksheets themselves.

54. These hidden records, sourced from SCB's eBBS CORE banking system and OLT–3 foreign exchange platform, provided valuable insights into the bank's activities and transactions between 2008 and 2012.

55. SCB's Newly Extracted Data, consisting of at least 512,721 unique foreign exchange transactional records, serves as crucial evidence in support of Relator's case.

56. As a whistleblower, Relator obtained these internal SCB files from Julian Knight (who received them in the ordinary course of his employment with the bank), and it appears that SCB failed to disclose to the U.S. Government the extensive use of pivot table caches to store transactional records in a way that end users, including regulators, would not be able to easily access them.

57. The fact that these records were only uncovered through advanced forensic analysis conducted by Relator underscores the importance of thorough, independent investigations into the bank's activities and highlights the potential for deception and concealment within SCB's data practices.

58. Furthermore, the nature of SCB's hidden transactional data, which includes dealings with sanctioned entities, high-risk jurisdictions, and potential terrorist financing, indicates that SCB may have been actively concealing illicit activities.

59. The sheer volume of concealed data—over 3.3 million transactional records involving foreign exchange, trade finance, and Eurodollar placements and deposits—suggests that this was not a mere oversight but rather a systematic effort to obscure potentially incriminating information.

60. The fact that the U.S. Government claims that it did not extract and analyze these hidden records after receiving the files from Relator raises questions about the depth and

effectiveness of their investigation and underscores the critical role of whistleblowers in exposing misconduct.

61.     The strategic concealment of vast amounts of transactional data within pivot table caches and hidden worksheets, coupled with SCB's apparent failure to disclose this practice to the U.S. Government, suggests a concerted effort by the bank to evade regulatory scrutiny and maintain plausible deniability.

62.     By burying incriminating records in hard-to-find places and not proactively disclosing the existence of these hidden data caches, SCB appears to have created a veneer of compliance while simultaneously engaging in prohibited transactions and relationships.

63.     This behavior not only undermines the effectiveness of international sanctions regimes but also erodes the trust and stability of the global financial system as a whole, highlighting the crucial importance of whistleblower-driven investigations in uncovering financial misconduct.

**B. Forensic Accounting and Threat Finance Analysis of SCB's Individual Files**

**1. Scope of Review**

64.     As described above, I have conducted a thorough examination of the documents, data, and metadata contained within seventy-two SCB files provided to me by Relator.

65.     As discussed above, the SCB files I reviewed encompass a diverse range of file formats, including:

- *Microsoft Excel spreadsheets*. I have scrutinized the content, structure, and metadata of SCB's Excel files, paying special attention to the pivot tables and their underlying data sources and caches. This involved examining the worksheets, formulas, and hidden data stored within worksheets and the pivot table caches.
- *Microsoft Word documents*. I have reviewed the text, formatting, and metadata of SCB's Word documents to identify any relevant

8

information related to SCB's banking practices, policies, or transactions.

- *Microsoft PowerPoint presentations.* I have analyzed the content, slide layouts, and metadata of the PowerPoint files to uncover any pertinent information or data related to SCB's operations or Relator's allegations.
- *Adobe PDF documents.* I have examined the text, images, and metadata of the PDF files to extract any relevant data or information that supports the Relator's case against SCB.

**2. Focus on Relator's Production of SCB's Files to the U.S. Government.**

66.     As per Relator's guidance, I have placed primary emphasis on sixty-six of the seventy-two SCB files that Relator has confirmed were produced to the U.S. Government.

67.     I have examined each of these seventy-two files, applying my expertise in data analysis and forensic examination to extract and interpret the relevant information.

68.     This targeted approach has allowed me to concentrate my efforts on the most critical files and data that form the basis of Relator's allegations against SCB, including the following activities:

    a.  Identify key pieces of evidence that support Relator's claims regarding SCB's illicit banking practices and transactions;

    b.  Uncover hidden data and metadata that appear to have been overlooked in the initial review by the U.S. Government, such as the transactional data stored within the pivot table caches of SCB's Excel files;

    c.  Analyze the content and context of SCB's documents to establish a clear narrative and timeline of events related to Relator's allegations;

    d.  Highlight any discrepancies, inconsistencies, or "red flags" within the produced files that warrant further investigation or support Relator's case.

**3. SCB Files Containing Hidden Pivot Table Caches and Worksheets**

69.     The following SCB Excel files, produced by Relator the U.S. Government in 2012 and 2013, contain hidden pivot table caches and worksheets.

a) *SCB Excel file titled "Performance Summary -Iran(SNPC)2.xls"*

1) *Overview of file content.*

70.     This SCB Excel spreadsheet file, titled "Performance Summary - Iran(SNPC)2.xlsx", details its Iran Group's foreign exchange, trade finance, and deposit business between January 2, 2008, and December 31, 2008.

71.     The visible worksheets list entities that the bank coded as relating to "Iran" in its internal database systems such as eBBS and OLT–3.

72.     The file contains two pivot tables, two hidden pivot table caches, and one hidden unnamed worksheet ("Sheet 3").

73.     For instance, the following screenshot, from the "RM Summary" worksheet, shows one of the pivot tables that was visible to the U.S. Government in the Excel file indicating SCB''s Iran-related revenue for the period was $818,654,000 U.S. dollars: (in the screenshot, U.S. dollar amounts are shown in thousands, $000)



74.     The hidden pivot table cache underlying the above pivot table contains 52,922 foreign exchange transactional records with an aggregate notional value of $161,211,444,280.46 U.S. dollars.

75. The second pivot table cache underlying the second pivot table, visible in the "FX Double Count" worksheet, contains 14,349 foreign exchange transactional records worth a total 2008 revenue value to SCB of $7,278,210,141.57 U.S. dollars.

   *2) Analysis of file content.*

76. SCB's hidden foreign exchange transactional records show that, between January 2008 and November 2008, SCB's Dubai branch processed 220 Iran-related transactions (as defined by SCB), totaling $913,458,507.53 U.S. dollars, on behalf of entities and individuals located in Iran and other high-risk jurisdictions.

77. Key concerning factors and "red flags" include:

- *Direct transactions with Iranian entities.* SCB maintained Eurodollar accounts for and processed transactions on behalf companies located in Iran, including Khouzestan Steel Company, Parsian High Voltage Substations Development Company, and Petropars LTD.
- *Use of SCB's online platform.* All of the Iranian entities, as well as some in UAE, used SCB's OLT–3 online trading platform to directly process their transactions in U.S. dollars. This suggests SCB may have knowingly provided Iranian parties with access to the U.S. financial system.
- *Types of transactions.* Beyond normal account activity, SCB facilitated high-risk trade finance, foreign exchange trading, and derivatives transactions like FX forwards, swaps, options for these entities.

78. In summary, the scale, nature, and origination of these transactions raise serious concerns that SCB was continuing to systematically process foreign exchange and Eurodollar payment transactions for sanctioned entities, including their respective front companies, and allowing them access to the U.S. financial system, as alleged by the Relator.

### 3) Entity transaction summaries.

79.     *Iran.* SCB processed sixteen foreign exchange transactions for customers in Iran worth a total of $13,412,445.59. Notably, the respective Iranian entities processed all sixteen transactions using SCB's OLT–3 online trading platform.

    a.  SCB maintained a Eurodollar account for Khouzestan Steel Company (Ahvaz, Iran), number "***4730", and processed fourteen Iran-related EUR/USD FX forward transactions worth an aggregate nominal value of $3,547,163.59 U.S. dollars between January 7, 2008, and August 18, 2008. Notably, all fourteen of these transactions were processed by Khouzestan Steel Company using SCB's OLT–3 online trading platform.

    b.  SCB maintained a Eurodollar account for Parsian High Voltage Substations Development Company (Tehran, Iran), number "***7165", and processed one Iran-related EUR/AED FX forward transaction worth an aggregate nominal value of $1,739,485 U.S. dollars on February 26, 2008. Notably, this transaction was processed by Parsian High Voltage Substations Development Company using SCB's OLT–3 online trading platform.

    c.  SCB maintained a Eurodollar account for Petropars LTD (Tehran, Iran), number "***6681", and processed one Iran-related EUR/AED FX forward transaction worth an aggregate nominal value of $8,125,797 U.S. dollars on January 21, 2008. Notably, this transaction was processed by Petropars LTD using SCB's OLT–3 online trading platform.

80.     *Algeria.*

    a.  SCB maintained a Eurodollar account for Banque d'Algerie ("Central Bank of Algeria") (Algiers, Algeria), number "***7349", and processed twenty-two Iran-related EUR/USD FX option and interest rate swap transactions worth an aggregate nominal value of $351,179,905.37 U.S. dollars between January 10, 2008, and August 27, 2008.

81.     *Egypt.*

    a.  SCB maintained a Eurodollar correspondent account for Commercial International Bank (Cairo, Egypt), number "***3218", and processed thirteen Iran-related interest rate swap and FX option transactions worth

an aggregate nominal value of $127,059,782.27 U.S. dollars between January 30, 2008, and June 30, 2008.

    b.  SCB maintained a Eurodollar correspondent account for National Bank of Egypt (Cairo, Egypt), number "***0378", and processed sixteen Iran-related interest rate swap and FX option transactions worth an aggregate nominal value of $50,085,967.50 U.S. dollars between May 22, 2008, and August 25, 2008.

82.  *Kuwait.*

    a.  SCB maintained a Eurodollar account for Kuwait Automotive Imports Company WLL (Safat, Kuwait), number "***8926", and processed nineteen Iran-related USD/KWD and USD/JPY interest rate swap, FX option, FX forward, and FX spot transactions worth an aggregate nominal value of $19,934,939.14 U.S. dollars between March 31, 2008, and November 3, 2008.

    b.  SCB maintained a Eurodollar account for M. H. Alshaya Company WLL (Safat, Kuwait), number "***5370", and processed five Iran-related GBP/USD FX forward and FX spot transactions worth an aggregate nominal value of $ 20,301,375.00 U.S. dollars between January 24, 2008, and August 13, 2008.

    c.  SCB maintained a Eurodollar account for Mohamed Naser Al-Sayer and Son (Safat, Kuwait), number "***1857", and processed sixty-three Iran-related USD/KWD and USD/JPY FX forward, FX option, and FX spot transactions worth an aggregate nominal value of $108,498,821.71 U.S. dollars between July 17, 2008, and November 13, 2008.

    d.  SCB maintained a Eurodollar account for Retail International Company WLL (Safat, Kuwait), number "***4412", and processed five Iran-related FX option and FX forward transactions worth an aggregate nominal value of $15,437,850 U.S. dollars between August 14, 2008, and December 11, 2008.

83.  *Morocco.*

    a.  SCB maintained a Eurodollar correspondent account for Attijariwafa Bank (Casablanca, Morocco), number "***9888", and processed sixteen Iran-related FX option transactions worth an aggregate nominal value of $168,008,410 U.S. dollars between March 11, 2008, and August 8, 2008.

    b.  SCB maintained a Eurodollar account for CDG Captial (Rabat, Morocco) and processed four Iran-related interest rate swap transactions

13

worth an aggregate nominal value of $55,537,866 U.S. dollars between January 23, 2008, and March 5, 2008.

84. *Oman.*

    a. SCB maintained a Eurodollar account for National Aluminium Production Company SAO (Rusayl, Oman) and processed four Iran-related FX derivative contract transactions worth an aggregate nominal value of $90,000 U.S. dollars between August 7, 2008, and August 27, 2008.

85. *Saudi Arabia.*

    a. SCB maintained a Eurodollar account for Arab Petroleum Investments Corporation (Dammam, Saudi Arabia) and processed one Iran-related interest rate swap transaction worth an aggregate nominal value of $10,666,667 U.S. dollars on May 22, 2008.

86. *United Arab Emirates.*

    a. SCB maintained a Eurodollar account for Banque de Commerce et de Placements SA, Dubai Branch (Dubai, UAE), number "***3815", and processed one Iran-related FX forward transaction worth $115,000 U.S. dollars on March 31, 2008.

    b. SCB maintained a Eurodollar account for Blue Com Trading Company LLC (Dubai, UAE), number "***8322", and processed four Iran-related FX forward transactions worth an aggregate nominal value of $614,965.99 U.S. dollars between August 4, 2008, and November 19, 2008. Notably, all four of these transactions were processed by Blue Com Trading Company (LLC) using SCB's OLT–3 online trading platform.

    c. SCB maintained a Eurodollar account for DSGS FZCO (Dubai, UAE), number "***6962", and processed three Iran-related FX spot transactions worth an aggregate nominal value of $109,102.49 U.S. dollars between February 27, 2008, and March 26, 2008. Notably, two of these transactions were processed by DSGS FZCO using SCB's OLT–3 online trading platform.

    d. SCB maintained a Eurodollar account for Iran Industrial Exchange Company (Jebel Ali, UAE), number "*****0345", and processed one Iran-related FX forward transaction worth an aggregate nominal value of $67,818.03 U.S. dollars on May 5, 2008.

    e. SCB maintained a Eurodollar account for MAPNA International FZE

14

(Dubai, UAE), number "***4762", and processed two Iran-related EUR/USD and EUR/AED FX forward transactions worth an aggregate nominal value of $348,943.66 U.S. dollars between January 24, 2008, and June 16, 2008. Notably, two of these transactions were processed by MAPNA International FZE using SCB's OLT–3 online trading platform.

f. SCB maintained a Eurodollar account for Minerex General Trading Company LLC (Dubai, UAE), number "***1743", and processed one Iran-related USD/AED FX forward transaction worth an aggregate nominal value of $122,557.63 U.S. dollars on January 16, 2008. Notably, this transaction was processed by Minerex General Trading Company LLC using SCB's OLT–3 online trading platform.

g. SCB maintained a Eurodollar account for Oriental Oil Company FZE (Dubai, UAE), number "***5141", and processed two Iran-related FX forward transactions worth an aggregate nominal value of $2,327,071 U.S. dollars between January 21, 2008, and May 29, 2008. Notably, both of these transactions were processed by Oriental Oil Company FZE using SCB's OLT–3 online trading platform.

h. SCB maintained a Eurodollar account for Techno Parts FZCO (Dubai, UAE), number "***4363", and processed three Iran-related FX forward transactions worth an aggregate nominal value of $845,348 U.S. dollars between January 31, 2008, and May 19, 2008. Notably, all three of these transactions were processed by Techno Parts FZCO using SCB's OLT–3 online trading platform.

**b) 2010 Iran Group Excel files.**

87.    The following Iran Group Excel spreadsheets contain hidden pivot table caches for

2010, containing a total of at least 867,422 hidden transactional records:

| SCB Filename | Date Range | Hidden Transactions |
|---|---|---|
| "Performance Summary -Iran(SNPC)47.xlsx" | Jan. 4, 2010, to Mar. 10, 2010 | 23,136 |
| "Performance Summary -Iran(SNPC)48.xlsx" | Jan. 4, 2010, to Mar. 18, 2010 | 25,283 |
| "Performance Summary -Iran(SNPC)49.xlsx" | Jan. 4, 2010, to Mar. 25, 2010 | 27,036 |
| "Performance Summary -Iran(SNPC)50.xlsx" | Jan. 4, 2010, to Mar. 31, 2010 | 28,366 |
| "Performance Summary -Iran(SNPC)44.xlsx" | Jan. 4, 2010, to May 13, 2010 | 43,688 |
| "Performance Summary -Iran(SNPC)45.xlsx" | Jan. 4, 2010, to May 24, 2010 | 46,014 |

15

| SCB Filename | Date Range | Hidden Transactions |
|---|---|---|
| "Performance Summary -Iran(SNPC)46.xlsx" | Jan. 4, 2010, to May 31, 2010 | 44,882 |
| "Performance Summary -Iran(SNPC)35.xlsx" | Jan. 4, 2010, to Sep. 14, 2010 | 60,468 |
| "Performance Summary -Iran(SNPC)36.xlsx" | Jan. 4, 2010, to Sep. 22, 2010 | 62,068 |
| "Performance Summary -Iran(SNPC)37.xlsx" | Jan. 4, 2010, to Sep. 30, 2010 | 65,535 |
| "Performance Summary -Iran(SNPC)38.xlsx" | Jan. 4, 2010, to Oct. 11, 2010 | 66,604 |
| "Performance Summary -Iran(SNPC)39.xlsx" | Jan. 4, 2010, to Oct. 22, 2010 | 69,784 |
| "Performance Summary -Iran(SNPC)40.xlsx" | Jan. 4, 2010, to Oct. 31, 2010 | 72,694 |
| "Performance Summary -Iran(SNPC)41.xlsx" | Jan. 4, 2010, to Nov. 10, 2010 | 75,394 |
| "Performance Summary -Iran(SNPC)42.xlsx" | Jan. 4, 2010, to Nov. 25, 2010 | 77,290 |
| "Performance Summary -Iran(SNPC)43.xlsx" | Jan. 4, 2010, Nov. 30, 2010 | 79,180 |

### c) 2011 Iran Group Excel files.

88.     The following Iran Group Excel spreadsheets contain hidden pivot table caches for

2011, containing a total of at least 2,292,113 hidden transactional records:

| SCB Filename | Date Range | Number of Hidden Transactions |
|---|---|---|
| "Performance Summary -Iran(SNPC)23.xlsx" | Jan. 3, 2011, to Jan. 17, 2011 | 2,954 |
| "Performance Summary -Iran(SNPC)24.xlsx" | Jan. 3, 2011, to Jan. 31, 2011 | 5,570 |
| "Performance Summary -Iran(SNPC)25.xlsx" | Jan. 3, 2011, to Feb. 15, 2011 | 7,673 |
| "Performance Summary -Iran(SNPC)26.xlsx" | Jan. 3, 2011, to March 31, 2011 | 12,378 |
| "Performance Summary -Iran(SNPC)14.xlsx" | Jan. 3, 2011, to May 13, 2011 | 18,708 |
| "Performance Summary -Iran(SNPC)15.xlsx" | Jan. 4, 2011, to May 24, 2011 | 23,820 |
| "Performance Summary -Iran(SNPC)16.xlsx" | Jan. 4, 2011, to May 31, 2011 | 27,060 |
| "Performance Summary -Iran(SNPC)32.xlsx" | Jan. 4, 2011, to Sep. 22, 2011 | 33,231 |
| "Performance Summary -Iran(SNPC)33.xlsx" | Jan. 4, 2011, to Sep. 22, 2011 | 39,512 |

| SCB Filename | Date Range | Number of Hidden Transactions |
|---|---|---|
| "Performance Summary -Iran(SNPC)34.xlsx" | Jan. 4, 2011, to Sep. 30, 2011 | 46,794 |
| "Performance Summary -Iran(SNPC)11.xlsx" | Jan. 4, 2011, to Oct. 11, 2011 | 55,337 |
| "Performance Summary -Iran(SNPC)12.xlsx" | Jan. 4, 2011, to Oct. 22, 2011 | 57,390 |
| "Performance Summary -Iran(SNPC)17.xlsx" | Jan. 4, 2011, to Oct. 31, 2011 | 68,374 |
| "Performance Summary -Iran(SNPC)18.xlsx" | Jan. 4, 2011, to Nov. 10, 2011 | 71,627 |
| "Performance Summary -Iran(SNPC)19.xlsx" | Jan. 4, 2011, to Nov. 25, 2011 | 76,999 |
| "Performance Summary -Iran(SNPC)20.xlsx" | Jan. 4, 2011, Nov. 30, 2011 | 83,584 |
| "Performance Summary -Iran(SNPC)21.xlsx" | Jan. 4, 2011, to May 24, 2011 | 86,103 |
| "Performance Summary -Iran(SNPC)22.xlsx" | Jan. 4, 2011, to May 24, 2011 | 90,951 |
| "Performance Summary -Iran(SNPC)29.xlsx" | Jan. 4, 2011, to May 24, 2011 | 97,347 |
| "Performance Summary -Iran(SNPC)30.xlsx" | Jan. 4, 2011, to May 24, 2011 | 101.824 |
| "Performance Summary -Iran(SNPC)31.xlsx" | Jan. 4, 2011, to May 24, 2011 | 106,212 |
| "Performance Summary -Iran(SNPC)5.xlsx" | Jan. 4, 2011, to May 24, 2011 | 127,524 |
| "Performance Summary -Iran(SNPC)6.xlsx" | Jan. 4, 2011, to May 24, 2011 | 132,326 |
| "Performance Summary -Iran(SNPC)7.xlsx" | Jan. 4, 2011, to May 24, 2011 | 140,385 |
| "Performance Summary -Iran(SNPC)10.xlsx" | Jan. 4, 2011, to May 24, 2011 | 145,900 |
| "Performance Summary -Iran(SNPC)8.xlsx" | Jan. 4, 2011, to Nov. 25, 2011 | 150,944 |
| "Performance Summary -Iran(SNPC)9.xlsx" | Jan. 4, 2011, to Nov. 30, 2011 | 155,293 |
| "Performance Summary -Iran(SNPC)27.xlsx" | Jan. 4, 2011, to Dec. 15, 2011 | 161,675 |
| "Performance Summary -Iran(SNPC)28.xlsx" | Jan. 4, 2011, Dec. 25, 2011 | 164,618 |

*d)  2012 Iran Group Excel files.*

89.    The following Iran Group Excel spreadsheets contain hidden pivot table caches for

2012, containing a total of at least 100,949 hidden transactional records:

17

| SCB Filename | Date Range | Number of Hidden Transactions |
|---|---|---|
| "Performance Summary -Iran(SNPC)3.xlsx" | Jan. 2, 2012, to Feb. 20, 2012 | 22,266 |
| "Performance Summary -Iran(SNPC)4.xlsx" | Jan. 2, 2012, to Feb. 20, 2012 | 36,362 |
| "Performance Summary -Iran(SNPC)1.xlsx" | Jan. 2, 2012, to Mar. 20, 2012 | 42,321 |

### 1) SCB File Titled "Performance Summary -Iran(SNPC)1.xlsx".

90.     This SCB Excel spreadsheet file, titled "Performance Summary - Iran(SNPC)1.xlsx", details its Iran Group's foreign exchange, trade finance, and deposit business between January 1, 2012, and March 20, 2012.

91.     The visible worksheets list entities that the bank coded as relating to "Iran" in its internal database systems such as eBBS and OLT–3.

92.     The file contains two pivot tables, two hidden pivot table caches, and one hidden unnamed worksheet ("Sheet 3").

93.     For instance, the following screenshot, from the "RM Summary" worksheet, shows one of the pivot tables that was visible to the U.S. Government in the Excel file, indicating SCB'̕s Iran-related revenue for the period was $9,669,290 U.S. dollars: (in the screenshot, U.S. dollar amounts are shown in thousands, $000)



18

94.     The hidden pivot table cache underlying the above pivot table contains 32,950 foreign exchange transactional records with an aggregate notional value of $84,062,156,991.71 U.S. dollars.

95.     The second pivot table cache underlying the second pivot table, visible in the "FX Double Count" worksheet, contains 9,480 foreign exchange transactional records worth a total Q1 2012 revenue value to SCB of $806,341.87 U.S. dollars.

96.     The following SCB Excel files from 2008 each contain a sub-set of the transactions in this file:

97.     Based on SCB's hidden pivot table cache data, the five most frequently occurring currency pairs in the foreign exchange transactions are:

- U.S. dollar to UAE dirham ("USD/AED").
- EU euro to UAE. dirham ("EUR/AED").
- British pound to UAE dirham ("GBP/AED").
- E.U. euro to U.S. dollar ("EUR/USD").
- British pound to U.S. dollar ("GBP/USD").

98.     Other notable currency pairs include:

- UAE dirham to Saudi riyal ("AED/SAR").
- UAE dirham to Kuwaiti dinar ("AED/KWD").
- UAE dirham to Indian rupee ("AED/INR").
- Qatari riyal to U.A.E. dirham ("QAR/AED").
- U.S. dollar to Saudi riyal ("USD/SAR").
- U.S. dollar to Kuwaiti dinar ("USD/KWD").
- Omani rial to UAE dirham ("OMR/AED").
- Bahraini dinar to UAE dirham ("BHD/AED").
- U.S. dollar to Swiss franc ("USD/CHF").
- Canadian dollar to UAE dirham ("CAD/AED").
- Japanese yen to UAE dirham ("JPY/AED").

### 2) *Analysis of file content.*

99.     *IFIC Holding AG.* According to the U.S. Dep't of Treasury, IFIC Holding AG is a Dusseldorf, Germany-based entity that has been identified as being wholly-owned by Iran Foreign Investment Company ("IFIC").

100.    On August 3, 2010, OFAC designated IFIC Holding AG as "owned or controlled by the Government of Iran" and added it to the SDN list.[2]

101.    IFIC Holding AG serves as a key foreign investment arm for the Iranian regime and its status as a German-registered entity provides a veneer of legitimacy to obfuscate its true ownership and control by Iran.

102.    This corporate structure allows Iran to manage and expand its international holdings while sidestepping sanctions and avoiding scrutiny.

103.    While portraying itself as an innocuous holding company, IFIC Holding AG is assessed by OFAC to be an integral component of Iran's efforts to access foreign markets, secure goods, and materials, and generate revenues in support of the regime's priorities.

104.    The entity allegedly exploits its base in Germany, an international financial and commercial hub, to engage with unsuspecting European and global partners.

105.    As a cut-out for the Iranian government, IFIC Holding AG allegedly participates in Iran's documented efforts to evade sanctions, procure illicit goods, and finance destabilizing activities.

---

[2]     Press Release, *Treasury Identifies 21 Entities Determined to be Owned or Controlled by the Government of Iran Treasury Exposes Iran's Foreign Trade Network,Identifies Entities Operating in Belarus, Germany, Iran, Italy, Japan and Luxembourg*, U.S. DEP'T OF TREASURY (Aug. 3, 2010), https://home.treasury.gov/news/press-releases/tg811.

106.    *MAPNA International FZE.* MAPNA International FZE, based in Dubai, UAE, is a key subsidiary of Iran's MAPNA Group, a major conglomerate involved in the development of power, oil and gas, and railroad projects.

107.    While portraying itself as a legitimate industrial enterprise, MAPNA Group and its network of over thirty subsidiaries are assessed to be ultimately owned or controlled by the Government of Iran.

108.    The MAPNA Group is a key component of Iran's Defense Industries Organization ("MODAFL") and IRGC procurement chain.

109.    MODAFL serves as the principal procurement arm of Iran's military and terror apparatus.[3]

110.    Abbas Aliaabadi, Chairman of MAPNA International FZE and President of the Mapna Group, is a former member of the Iranian Ministry of Construction Jihad and the Iranian Air Force.

111.    Mr. Aliaabadi was also instrumental in the creation of Hezbollah during his tenure with the Ministry of Culture & Islamic Guidance and maintains close links to the IRGC.

112.    In 2011, the British government listed MAPNA Group and several of its subsidiaries as entities of concern for procurement activities related to weapons of mass destruction ("WMD").

113.    MAPNA International FZE, operating out of the UAE, is suspected of serving as a key facilitator for MAPNA Group's international activities, including procurement efforts and engagement with foreign partners..

---

[3]    Press Release, *United States Disrupts Large Scale Front Company Network Transferring Hundreds of Millions of Dollars and Euros to the IRGC and Iran's Ministry of Defense*, U.S. DEP'T OF TREASURY (Mar. 26, 2019), https://home.treasury.gov/news/press-releases/sm639.

### 3) Entity transaction summaries.

114. *Iran.* SCB processed eight time-deposit transactions which generated interest income for SCB worth a total of $142,444.76.

- SCB maintained a Eurodollar account for Arian Sea Scent (Tehran, Iran), number "***1121", and processed two Iran-related time deposit transactions between January 31, 2012, and February 29, 2012, which generated interest income for SCB worth $12,904.98 U.S. dollars.
- SCB maintained a Eurodollar account for Darman Yab Omid Company LTD (Tehran, Iran), number "***7569", and processed two Iran-related time deposit transactions between January 31, 2012, and February 29, 2012, which generated interest income for SCB worth $21,726 U.S. dollars.
- SCB maintained a Eurodollar account for Dalahoo–Rahgostar Engineering & Manufacturing Company ("DEMCO") (Tehran, Iran), number "***1387", and processed two Iran-related time deposit transactions between January 31, 2012, and February 29, 2012, which generated interest income for SCB worth $80,043.56 U.S. dollars.
- SCB maintained a Eurodollar account for Iran Aseman Airlines Company (Tehran, Iran), number "***6855", and processed two Iran-related time deposit transactions between January 31, 2012, and February 29, 2012, which generated interest income for SCB worth $27,770.22 U.S. dollars.

115. *Germany.*

- SCB maintained a Eurodollar account for IFIC Holding AG (Dusseldorf, Germany), number "***4676", and processed two Iran-related time deposit transactions worth an aggregate nominal value of $0.00 U.S. dollars on January 31, 2012, which generated interest income for SCB worth $4,106,251.02 U.S. dollars.

116. *Kuwait.*

- SCB maintained a Eurodollar account for Bader Almulla & Brothers Company WLL (Kuwait City, Kuwait), number "***4439", and processed seven Iran-related FX spot transactions worth an aggregate nominal value of $18,735,498.86 U.S. dollars between January 3, 2012, and February 16, 2012.

22

- SCB maintained a Eurodollar account for Kuwait Projects Holding Company KSC (Kuwait City, Kuwait), number "***4242", and processed sixteen Iran-related FX spot transactions worth an aggregate nominal value of $260,000,000 U.S. dollars between February 20, 2012, and February 29, 2012.

- SCB maintained a Eurodollar account for The Public Warehousing Company KSC (Kuwait City, Kuwait), number "***4129", and processed twenty-seven Iran-related FX spot and forward transactions worth an aggregate nominal value of $77,379,295.98 U.S. dollars between January 17, 2012, and March 20, 2012.

117. *Liechtenstein.*

- SCB maintained a Eurodollar account for Parsian International Establishment (Vaduz, Liechtenstein), number "***5474", and processed two Iran-related time deposit transactions between January 31, 2012, and February 29, 2012, which generated interest income for SCB worth $13,623.74 U.S. dollars.

118. *United Arab Emirates.*

- SCB maintained a Eurodollar account for MAPNA International FZE (Dubai, UAE), number "***4762", and processed two Iran-related time deposit transactions between January 31, 2012, and February 29, 2012.

## 4. SCB File "Sundry.xlsx"

### a) Overview of file content

119.   This SCB Excel file comprises one worksheet with 132 columns that contain a wide array of information pertaining to SCB's foreign exchange transactions, audit data, and various transaction-related parameters.

120.   The dataset also encompasses several key SCB foreign exchange metrics in various cells, including "SpotMargin" and other relevant attributes, which are instrumental in SCB's monitoring and analyzing the characteristics and performance of individual transactions.

23

121.    Data in these cells provide insights into the various SCB security measures, processing methodologies, and reporting frameworks employed by the bank in managing its foreign exchange transactions.

b) *Analysis of file content.*

122.    SCB's use of "sundry" accounts and other unusual booking practices appears to have served as a mechanism for obfuscating the involvement of sanctioned parties and high-risk transactions.

123.    By pooling multiple transactions together under a generic "sundry" label, SCB made it more difficult to identify the specific counterparties and nature of each transaction.

124.    In a typical banking environment, transactions are booked under specific client or account names, allowing for clear traceability and monitoring.

125.    However, SCB's practice of aggregating transactions under a "sundry" account effectively anonymized the individual transactions, making it much harder to detect those involving sanctioned entities.

126.    This pooling of transactions apparently allowed SCB to continue processing payments for sanctioned parties without triggering red flags in their compliance systems or during external audits.

127.    Moreover, the geographic distribution of SCB's income booking for these transactions deviates significantly from what one would expect based on the counterparties involved.

128.    Transactions involving Iranian entities, for example, are often booked through SCB's UAE branch rather than its Iranian branch.

129.    This abnormal booking pattern suggests an effort to distance these transactions from direct association with sanctioned jurisdictions.

24

130.    By booking Iran Group entity transactions through the UAE, SCB exploited the UAE's reputation as a global financial hub to lend an air of legitimacy to these transactions.

131.    This booking structure, combined with the use of "sundry" accounts, created additional layers of opacity around SCB's Project Green Iran-related business, further obscuring it from regulatory scrutiny.

132.    When examining SCB's metrics for government-linked accounts, significant discrepancies emerge between the expected and observed patterns.

133.    Government entities, particularly central banks, typically engage in large, frequent transactions directly linked to their domestic economy.

134.    As such, one would expect to see these transactions concentrated in the entity's home jurisdiction and currency.

135.    However, SCB's files reveal a much more dispersed pattern of activity for these government accounts.

136.    Transactions are often booked through multiple SCB branches across different regions, with no clear connection to the entity's home country.

137.    Moreover, the currencies involved are often inconsistent with what one would expect based on the entity's domestic economy, with a high prevalence of USD and EUR transactions even for entities in countries with their own strong currencies.

138.    This discrepancy suggests that SCB may have been using these government accounts as a conduit for processing transactions on behalf of other, potentially sanctioned, parties.

139.    By intermixing legitimate government transactions with more questionable flows, SCB could have exploited the expected legitimacy of these accounts to evade closer scrutiny.

140.    SCB's "sundry" accounts, abnormal geographic booking, and inconsistent metrics for government-linked accounts all point to a deliberate effort to conceal the true nature and scope of its sanctions-related business.

141.    These practices allowed SCB to maintain a veneer of compliance while continuing to process transactions for sanctioned entities and high-risk jurisdictions.

142.    The systematic nature of these obfuscation techniques, as evidenced across multiple SCB files and over a sustained time period, belies any claim of mere technical glitches or isolated oversights.

143.    Rather, it suggests a concerted, bank-wide effort to evade sanctions controls and deceive regulators.

### c)  SCB's potential justifications for its sundry accounts.

144.    SCB might attempt to provide alternative explanations to the U.S. Government for the significant volume of transactions with Iran Group entities in the "sundry" account, such as:

- *Legitimate business purposes.* SCB might claim that these transactions were related to permissible, non-sanctioned business activities, and thus did not violate U.S. sanctions regulations.
- *Reliance on internal controls.* The bank may argue that its internal compliance systems and procedures were sufficient to ensure that any transactions processed through the "sundry" account were properly screened and vetted for sanctions compliance.
- *Immateriality of violations.* SCB might characterize any potential sanctions violations in the "sundry" account as minor, isolated incidents that do not reflect a larger pattern of misconduct or systemic compliance failures.

145.    However, the evidence uncovered by my entity resolution analysis of the "Sundry.xlsx" file directly challenges these potential explanations:

26

a. The sheer volume and frequency of transactions with Iran Group entities in the "sundry" account belies any claim of isolated incidents or immaterial violations.

b. The data reveals a sustained pattern of SCB using this account to process transactions for Iran Group clients, suggesting a deliberate, systematic practice rather than occasional lapses.

c. As discussed above, the use of the "sundry" account itself, which appears to have been used to pool and process transactions in a way that obscured the involvement of Iran Group parties, suggests a deliberate effort by SCB to circumvent sanctions controls and avoid scrutiny.

**5. SCB's conduct was fundamentally inconsistent with claims of robust internal compliance procedures and a commitment to transparency -- SCB File Named "MENA April to Dec 2012.xlsx"**

146.    This SCB Excel file, titled "MENA April to Dec 2012.xlsx", contains foreign exchange transactional records spot trades executed by SCB Dubai for clients in 2012.

147.    The list includes over 1,700 Standard Chartered Bank customers across the Middle East, Africa, and Asia regions, including:

**6. SCB File Named "GCS MENA 2012-01-01 30.xls"**

148.    The pivot table cache data contains 64,006 trades executed by SCB Dubai between January 2, 2012, and January 30, 2012, across various products, including FX spots, forwards, swaps, options, commodities, rates, corporate deposits.

**7. SCB File Titled "depos 19th august showing difference.xlsx"**

149.    This SCB file contains various worksheets related to financial data concerning deposits and deals involving customers and institutions in UAE and DIFC.

150.    The Excel file's worksheets include:

- "UAE - ALM CTD": Contains data on customer deposits, including customer names, deal dates, account types, and financial figures such as principal amounts, interest rates, and accrued earnings.
- "UAE – OCC": Provides information on customers and their details, along with unit, department, and client segment categorization.

27

- "DIFC - ALM CTD": Similar to the UAE ALM CTD sheet, but specific to DIFC, it lists deposits, deals, and associated financial metrics.
- "DIFC – OCC": Includes customer details, unit information, and other attributes for DIFC customers.
- "Mapping": Appears to provide a mapping of various codes and identifiers, potentially linking different sheets or metrics.

151.    Overall, the document offers an extensive overview of the deposits and deals involving customers and institutions, categorized by regions and types, along with various financial metrics.

### 8. SCB Files "CLIENT, BRANCH & USER SETUP.xlsx" and "CLIENT, BRANCH & USER SETUP -2009.xlsx"

#### a) *Overview of file content.*

152.    These SCB Excel files contain data for setting up clients, branches, and users for financial transactions.

153.    Each file includes three main worksheets: "Branch", "Client", and "User".

154.    The "Branch" worksheet details the structure of SCB's various branches, including branch codes, types, parent branches, and operational settings such as contract limits and foreign exchange limits.

155.    The "Client" worksheet outlines SCB's client information, including segment types, client names, and account setups, such as settlement instructions and credit checks.

156.    The "User" sheet details information on SCB's users associated with these clients, including user codes, names, types, and privileges, creating a complete overview of the client, branch, and user setup for the bank's operational and management purposes.

### b) Analysis of file content.

157.    The spreadsheets reveal that in 2009, Bank Saderat Iran had three active user accounts assigned to its employees—Hamid Khalaizadeh, Madhula Bhatia, and Haresh Bhatia—for accessing SCB's OLT–3 foreign exchange platform.

158.    According to Relator, because SCB's OLT–3 system is an online platform used for quoting foreign exchange pairs in U.S. dollars, it is primarily utilized when a client requires a U.S. dollar bridge for their transactions.

159.    Uniquely, the three Bank Saderat Iran employees have "To Be Advised" listed for their Contract Limit and Settlement Limit, which is not the case for other users.

160.    Furthermore, the profit and contract currency for Bank Saderat Iran's foreign exchange trades is designated as U.S. dollars.

161.    The spreadsheet's "Branch" column, which indicates the SCB branch responsible for handling the trades, lists "To Be Advised" for the Bank Saderat Iran employees.

162.    Additional columns in the spreadsheet provide further insights into the account setup:

- The "Privilege Groups" column specifies the account's associated SCB Dubai market group.
- The "Max Logons" column indicates the maximum number of simultaneous logins permitted for each user.

### 9.  SCB File "MENA Customerwise Sales Report- Jan 09.xlsx"

### a) Overview of file content.

163.    The Excel file "MENA Customerwise Sales Report- Jan 09" contains several sheets, each with different types of data:

- *Summary.* This worksheet contains a Corporate & Institutions Revenue Summary Report for the year-to-date as of January 2009. It features columns for different business groups and regions such as UAE, DBU,

29

OBU, DIFC, Qatar, Oman, Iran, Jordan, Pakistan, and some summary columns about sales figures in different contexts.

- *Customerwise Report.* This worksheet provides a detailed customer-wise sales report for the MENA region for the year-to-date 2009. It includes various metrics across different unnamed columns, which may represent financial figures, customer identifiers, or transaction details.

- *Mapping.* This sheet contains mappings for customer class codes. It lists customer codes and associates them with different levels of customer categories like Corporates, Middle Market, and specific types like Commercial Real Estate.

164. Each sheet focuses on various aspects of customer and sales data across different geographical locations and business units within the MENA region.

**b) Analysis of file content.**

165. The "Summary" worksheet presents a comprehensive breakdown of all SCB's business units operating in the Middle East, which includes the Iranian business unit listed in Column J.

166. This Iranian business unit generates substantial profits during the month of January 2009.

167. The profits are categorized and presented by various product types.

168. Notably, the values displayed in the spreadsheet are denominated in thousands of U.S. Dollars, providing a clear understanding of the financial scale of the transactions.

169. One specific product, labeled as "CORP ADV," generates a significant amount of $344,000 U.S. dollars in revenue for SCB from Iran in January 2009.

170. Further investigation reveals that this product apparently represents a new loan advance extended to an Iranian entity during that month.

171. The spreadsheet also includes a "Customerwise Report" worksheet, which presents a detailed breakdown of customer accounts attributable to sales for each of SCB's business units.

10.  **SCB File "Bank report – Dec 09 CB.xlsx"**

  *a)  Overview of file content.*

172.    The document titled "Bank report - Dec 09 CB.xlsx" is an Excel file containing data related to the banking operations of a financial institution as of December 2009.

173.    Additionally, it contains data on transaction volumes, client segments, and market analyses, offering comprehensive insights into the bank's performance and strategies for that period.

174.    This document serves as an essential reference for understanding the financial health and operational strategies of the institution at the end of 2009.

  *b)  Recurring involvement of Iran Group entities.*

175.    Across multiple SCB files, there is a consistent presence of Iranian individuals, companies, and government-linked entities, particularly those connected to the Central Bank of Iran ("CBI").

176.    The repeated appearance of SCB's Iran Group clients, often in combination with high-risk jurisdictions like the UAE, suggests that the bank's dealings with Iran were not one-off occurrences but rather part of a larger pattern of engagement that persisted despite the escalating OFAC sanctions against the country.

177.    This trend raises serious concerns about SCB's adherence to international sanctions and its ability to effectively manage the risks associated with doing business with Iran Group's Project Green entities.

  *c)  Analysis of file content.*

  - *Iranian exposure*. The file reveals significant financial exposure to Iranian government entities, particularly the Central Bank of Iran ("CBI"). This suggests a substantial level of financial activity and

engagement with CBI during a period when Iran was subject to extensive international sanctions.

- *Geographic distribution of Iranian business.* Relator's new evidence indicates that SCB's Iranian business was primarily booked through its UAE offices, with the relationship managed by the Iran Group staff. This raises potential red flags, as the UAE has historically been identified as a jurisdiction of concern for illicit financial flows, particularly in relation to Iran.

- *Inconsistent income figures.* There are notable discrepancies in the income figures reported for the Iranian central bank across different data records. For instance, one CBI record shows total profit of $36,421 U.S dollars, yet another shows $4,274 of CBI profit booked in Singapore. This inconsistency merits deeper investigation to rule out any potential misreporting or efforts to conceal the true extent of the relationship.

- *Other sanctioned jurisdictions.* Beyond Iran, the file reveals SCB's financial exposure to several other countries that have faced sanctions or heightened AML/CFT scrutiny, such as Sudan, Syria, and Myanmar.

- *Unusual booking arrangements.* In several instances, income from certain government entities is booked across multiple SCB locations globally, sometimes in jurisdictions seemingly unrelated to the entity's home country.

- *Concentration of risk.* The file demonstrates a significant concentration of SCB's financial exposure to government entities and central banks. Given the inherently higher risk profile of such politically exposed persons ("PEPs") and state-owned entities from an AML/CFT perspective, this concentration warrants enhanced due diligence and ongoing monitoring to mitigate potential compliance risks.

**11. SCB File "Cash and Trade Corporates Client Groups FX Revenues_6 Sep 2010_MENA_V1.xlsx"**

*a) Overview of file content.*

178.    This SCB internal Excel file, titled "Cash and Trade Corporates Client Groups FX Revenues_6 Sep 2010_MENA_V1.xlsx" document is a spreadsheet detailing foreign exchange ("FX") revenues and volumes from Cash and Trade Corporate clients across various booking locations, with a focus on the Middle East and North Africa ("MENA") region.

179.    The data covers monthly FX revenues and volumes for each client from January 2009 through July 2010, as well as full-year 2009 and year-to-date 2010 totals.

180.    Clients are identified by group ID numbers and names.

181.    A comprehensive analysis of the SCB files reveals a disturbing pattern of the bank maintaining Eurodollar accounts and processing transactions for entities based in high-risk jurisdictions, particularly those with known ties to Iran.

182.    The recurring appearance of certain geographic regions, such as the UAE, and the involvement of Iranian Government-linked entities across multiple files suggest that SCB's compliance failures were not isolated incidents but rather indicative of systemic issues in the bank's due diligence and risk management processes.

**b) Analysis of file content.**

183.    For SCB, this file contains the following potential "red flags" worth noting:

- *High-risk geographies.* Many of the booking locations and client entities appear to be based in higher-risk emerging markets across the Middle East, Africa, and Asia. SCB New York would need to exercise heightened due diligence on transactions and client activity emanating from these jurisdictions to mitigate potential money laundering, terrorist financing, and sanctions evasion risks.
- *Large transaction volumes.* Some of the monthly and annual FX volumes for certain clients are very large, in the tens or hundreds of millions of U.S. dollars.
- *Government-linked entities.* A number of the group names suggest clients may be government-affiliated entities, central banks, sovereign wealth funds or state-owned enterprises. Transactions with these types of clients, especially in high-risk geographies, carry elevated risks due to the potential for corruption and money laundering by politically exposed persons ("PEPs").
- *Defense and infrastructure sectors.* Some SCB clients appear to be involved in sensitive industries like defense contracting, energy and extractives, and large infrastructure projects. These sectors have

33

historically been vulnerable to bribery, corruption and money laundering risks that likely complicated SCB's compliance obligations.

- *Potential NGOs and charities.* A few group names indicate the client may be a charitable organization or NGO. These types of entities can pose heightened risks, as some charities have been exploited for terrorist financing or as fronts for sanctions evasion. SCB should have carefully verified the legitimacy of these organizations.

- *Unusual patterns or concentrations.* The presence of very large FX transactions concentrated in particular months or a pattern of activity inconsistent with the client's profile could raise red flags. SCB New York should monitor for unusual spikes or volumes that don't align with expected activity.

## C. Summary of SCB File Analysis

184.    The recurring presence of SCB's Iran Group, Project Green, and UAE booking center across multiple files paints a disturbing picture of the bank's extensive and sustained exposure to sanctioned entities and high-risk jurisdictions.

185.    Despite escalating U.S. sanctions against Iran between 2008 and 2012, SCB appears to have not only maintained but actively cultivated its Iran Group relationships over many years.

186.    Quantifying SCB's Iran exposure reveals the staggering scale of the problem.

187.    Across just a sample of the files analyzed, thousands of transactions worth billions of dollars flow between SCB and Iranian entities, many of which are directly linked to the Iranian government or sanctioned individuals.

188.    In the "Performance Summary" file for 2012 alone, there are over 42,000 Iran-related transactions totaling over $84 billion U.S. dollars.

189.    The "UAE - ALM CTD" and "UAE - OCC" worksheets further illustrate the extent to which Iranian business was routed through SCB's UAE operations.

190.    The pivot caches in these files contain tens of thousands of additional transactions, painting a picture of a major Iranian sanctions evasion hub operating out of Dubai.

191.    This Iranian business, particularly when booked through the UAE, carries significantly elevated sanctions and illicit finance risks.

192.    Iran's status as a comprehensively sanctioned jurisdiction means that any Iranian transactions, whether with government entities, private companies, or individuals, should be treated as extremely high-risk and subject to enhanced due diligence ("EDD").

193.    Moreover, the UAE, particularly Dubai, has long been recognized as a jurisdiction of concern for money laundering and sanctions evasion.

194.    The emirate's role as a global trading hub, combined with its historically lax regulatory environment, has made it an attractive waypoint for illicit flows from Iran and other high-risk countries.

195.    SCB's heavy reliance on its UAE branch for booking Iranian business should have been a clear red flag warranting intensified scrutiny.

196.    Despite these risks, SCB not only maintained its Iranian relationships but seems to have proactively sought to expand them through initiatives like Project Green.

197.    Mentioned across several files, Project Green appears to be a concerted effort by SCB to onboard and service more Iranian clients, even as international sanctions on Iran were tightening.

198.    The fact that Project Green was still active as late as 2012, as evidenced in the "Performance Summary" files, is particularly alarming.

199.    By this time, the severity of US and international sanctions on Iran had significantly escalated, with the US imposing comprehensive secondary sanctions that threatened penalties against even non-US entities doing business with Iran.

200.    This backdrop makes SCB's failure to wind down its Iranian relationships all the more egregious.

201.    A prudent and compliant financial institution would have been rapidly scaling back its Iranian exposure in line with the escalating sanctions.

202.    Instead, SCB appears to have doubled down, maintaining extensive ties to Iranian entities and booking ever-larger volumes of transactions through high-risk centers like Dubai.

203.    This pattern of behavior, visible across multiple files and years, strongly suggests that SCB's sanctions breaches were not the result of mere negligence or isolated failures in compliance.

204.    Rather, they point to a systematic, management-directed effort to evade sanctions and maintain lucrative business with Iran at any cost.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                         Plaintiff,             Case No. 18 Civ. 11117 (PAE)

       v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVIICES
CORPORATION,

                        Defendants.

-------------------------------------------------------------x

### DECLARATION OF JULIAN M. KNIGHT

     JULIAN M. KNIGHT, pursuant to 28 U.S.C. § 1746, declares as follows subject to the penalties of perjury:

### I.  BACKGROUND AND PROFESSIONAL EXPERIENCE

    **1.**    I am a principal of relator Brutus Trading, LLC ("Brutus"), and I make this declaration in support of Brutus's motion to vacate the judgment in the above-captioned matter on the grounds that it resulted from a demonstrable fraud on the Court. The statements included in this declaration are based on my own personal knowledge of global banking and foreign exchange trading and Iranian-related terror financing.

    **2.**    In 2011, I left Standard Chartered Bank ("SCB") in my position as Global Head of Transaction Banking FX (foreign exchange). I was a Global Manager based in the DIFC (Dubai International Finance Center) Branch in the UAE (number 1 DIFC, Dubai UAE). I regularly worked out of my second office at 1 Marina Bay Financial Centre in Singapore.

1

3.      I have over 30 years of experience in Banking and Finance following a career in the UK Military. I have lived and worked in the following financial centers for major Global Banks and Hedge Funds: London UK; New York USA; Singapore; and Dubai UAE. In my career I have been Global Head of FX at Fimat International Banque for 8 years, Global Head of FX at Man Group PLC, Global Head of Agency FX Trading at Societe Generale in NY.  I am currently resident in the UK.

4.      In the UK Military I was positively vetted by the UK Ministry of Defense and held clearance authority to levels of Flash and Top Secret. In the UK, I currently hold the highest clearance level of criminal record check, which was performed by the Church of England for my role as a Senior Safeguarding Officer to extremely vulnerable people.

5.      On July 16, 2023, I was introduced to David Scantling by a mutual colleague. We were at the time working to assist in instructing of the families of UK and US military victims of Iranian sponsored terrorism – particularly in the Middle East – about the notable linkages in the flow of money between the Iranian regime and banks. We of course focused on my former employer, Standard Chartered Bank.

## II.  DECLOAKING SCB DATA FILES

6.      On July 16, 2023 I began to upload a large amount of data onto a specialized database known as Logikcull. The data were divided into a range of different file types. At that time, I communicated with Mr. Scantling regarding those data files ("Files").

7.      The reorganization of our data allowed us to run unique searches in the form of hit reports on the entire data set. The "Hit reports" were related to known Iran Republican Guard Corps. ("IRGC") super facilitator entities – entities that control the network required to move illicit funds around the world, such as Khatam- Al- Anbia.  The IRGC has been designated by the US government as a foreign terrorist organization ("FTO") since 2019.

2

8.      When the Hit reports were completed, Mr. Scantling, my colleague Mr. Robert Marcellus and I began closely examining the "Hits" and the Files from which they were retrieved. This led us to understand that many pieces of data were "cloaked" within the Files, *i.e.*, embedded in the electronic spreadsheets and concealed from view. This phenomenon was pertinent to Excel files.[1]

9.      At this stage, our focus changed to decloaking the Files that we had initially analyzed. By July 19, 2023, we had decloaked our first range of Excel spreadsheets, including the Files that had been provided to the US government entitled FX Revenues for Cash and Trade Corporates FINAL 22 July 2010, MENA Customerwise Jan2009, and MENA Apr to Dec 2012.

10.     The initial exercise with Mr. Scantling was completed by July 25, 2023. Our interaction with Mr. Scantling continued on October 24, 2023, when we began focusing on Files we had previously analyzed related to Mr. Reza Zarrab, a former Standard Chartered Bank client and a known affiliate of the IRGC.

11.     The further work of decloaking the Files continued on November 13, 2023. By December 19, 2023, Mr. Scantling had decloaked approximately 50 Files and we began to re-order our data into a more convenient database known as Airtable. This work continued at a steady pace through late December 2023 and early January 2024.

12.     By February 2024, we had isolated over 500,000 unique transactional records spanning from 2008 through 2013. To date, I have identified at least 20,000 unique FX transactions involving USD vs FX transactions between SCB Dubai/SCB NY and Iranian-related[2] clients.

---

[1]      At that time, neither Mr. Marcellus nor I was familiar with the more sophisticated features of the Excel program. Although a limited number of pivot tables containing data were evident on the program's surface interface, we were not aware of or able to access data caches underlying numerous levels of pivot tables that were embedded in the Excel spreadsheet. It was therefore not until Mr. Scantling instructed us on how to access those data files in July 2023 that we first became aware of the cloaked data.

[2]      For the purposes of this declaration, "Iranian-related" is defined as *beneficially owned by Iran or Iranian persons and trading from or with Iran*.

Those transactions comprise approximately **$100 Billion** in notional value.[3] They also include transactions with as Specially Designated Nationals ("SDNs"), Specially Designated Global Terrorists ("SDGTs"), and the financiers of major FTOs.

### III.   EXPERT ANALYSIS OF THE NEWLY EXTRACTED DATA

13.     I have spent over 5 months analyzing the newly extracted data from the following files:

    a.  "Cash and Trade Corporates Client Groups FX Revenues_6 Sep 2010_MENA_V1.xlsx"
    b.  "Performance Summary -Iran(SNPC)[numbered 1–12 and 14–50]['.xls' or '.xlsx' file extension]"; (49 Excel spreadsheets)
    c.  "Sundry.xlsx";
    d.  "MENA April to Dec 2012.xlsx";
    e.  "GCS MENA 2012-01-01 30.xls";
    f.  "GIS MENA 2010-05-01.xls";
    g.  "depos 19th august showing difference.xlsx";
    h.  "TB clients min 10k.xlsx"
    i.  "Dubai_pos_limits_extern_credit_chk29"

14.     Those transactions occurred between 2008 and 2013.

15.     They are typical FX Transactions for Spot value (2 days settlement after transaction) or Forward value or Eurodollar deposits (USD deposits made from overseas entities for a term duration).

16.     Both financial instruments utilize the US Fedwire system for settlement. Both instruments require SWIFT MT 300 series messages (transaction forms used by the SWIFT funds transfer system). SWIFT Category 3 FIN messages (electronic interbank messages used by the

---

[3]      I understand that Mr. David Scantling has identified an Excel file pivot table (which was visible to the U.S. Government) that documents $9,669,290 U.S. dollars in profit from SCB's 2012 Iran-related revenue. Underlying that pivot table, Scantling found a hidden data cache containing 32,950 foreign exchange transactional records with an aggregate notional value of $84,062,156,991.71 U.S. dollars. *See* Declaration of David J. Scantling, dated May 20, 2024, at Addendum ¶¶ 94, 188.  That sum is a portion of the $100 Billion of Iranian-related transactions that I have identified for the period 2008 to 2012

SWIFT system) enabled SCB to efficiently confirm, settle, and manage various treasury transactions. That has been the mechanism for confirmation of FX Transactions since the late 1990's. As a former Global Head of FX, I am very familiar with that process. To the best of my knowledge, in the previous US government investigations into SCB, SWIFT Category 3 FIN messages (MT 300 type) have never been analyzed.

17.    SCB's Iranian-related clients fall into 3 categories: SDNs; clients coded by SCB as included in the bank's Iran Group business division, and SCB clients that are beneficially owned by Iranian individuals or an Iranian company (directly or indirectly), irrespective of whether they were specifically included on OFAC's list of SDNs ("SDN List").

18.    There were 92 illegal FX transactions with then-known SDNs – namely: Iran Aseman; IFIC Holding AG; the Central Bank of Iran (Bank Markazi); Bank Tejerat; and the Petrochemical Commercial Company (UK and Dubai branches).

19.    In addition to those explicit SDN transactions, there were 73 illegal transactions for Euro African Group Limited, a Gambian front company for the FTO Hezbollah. There were also transactions in 2009 for TAJCO, a previously designated SGDT that is also owned by Hezbollah.

20.    There were 2,500 FX transactions with SCB "Iran Group" coded entities – namely: Dalahoo Engineering and Manufacturing Company ("DEMCO"); Iran Industrial Exchange Company; Darman Yab Omid Company LTD; Oil Industries Engineering and Construction; Parsian High Voltage Substations Development Company; Parsian International Establishment and Petropars Ltd.

21.    There were 6,300 FX transactions with Iranian-related clients - namely: Amesco (1456 transactions); Crescent Petroleum (332 transactions); Petrochem Mid East (460 transactions); Petrofac Ltd (3324 transactions); and Al Masood Oil ISS Co (613 transactions).

22.     There were over 1000 FX transactions for Rosy Blue Diamonds/Trading, which is a known Hamas front company (1055 transactions).

23.     This subset of Iranian-related transactions involving the following front companies wholly owned by SDNs: FAL Oil (300 transactions); Dragon Oil (644 transactions) (both front companies for National Iranian Oil Company NIOC); and Diamonds Steel (front for Alborz Steel).

24.     Of the 20,000 newly extracted transactions, a large percentage (approximately 65%) were done via OLT3, the SCB Online Trading System. Those transactions occurred *in or after 2008.*

25.     SCB earned jaw-dropping commissions for many of the cloaked transactions. For example, in 2009 and 2010, SCB completed approximately $16,659,285 in EUR vs. USA FX transactions for the Euro African Group Limited deals and earned $504,881 in commissions for doing so. The total commission that SCB typically would have charged corporate clients for similar FX transactions would have been approximately $825. That sort of extreme profiteering is known as "gouging," and is commonplace in bank transactions involving known terrorist organizations.

* * * * * *

Executed on May 20th, 2024, in Lincolnshire. UK

Julian M. Knight

6

Case 1:18-cv-11117-PAE     Document 106     Filed 05/31/24     Page 1 of 2



**McSweeney Cynkar & Kachouroff, PLLC**
TRIAL & APPELLATE LAWYERS

Patrick M. McSweeney
(804) 937-0895
patrick@mck-lawyers.com

Powhatan Office
3358 John Tree Hill Road
Powhatan, Virginia

May 31, 2024

*By ECF delivery*

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square, Room 2201
New York, New York 10007

Re. U.S. ex rel. Brutus Trading LLC v. Standard Chartered Bank, 18 Civ. 11117 (PAE)

Dear Judge Engelmayer:

This firm represents Brutus Trading LLC, the relator in the above-referenced action ("Brutus"). Pursuant to Rule 6 of the SDNY Electronic Case Filing Rules &amp; Instructions, and Rule 4B of Your Honor's Individual Practices, we respectfully submit this letter motion seeking leave to file under seal Exhibit J to the Declaration of Patrick M. McSweeney, dated May31, 2024 ("Exhibit J"). We also respectfully seek an order directing the Clerk of the Court to take Exhibit J into physical custody. The reasons for those requests are as follows:

First, Exhibit J contains numerous electronic spreadsheets that record millions of banking transactions executed by defendant Standard Chartered Bank ("SCB") for or on behalf of numerous SCB clients. That information contains bank account numbers and transactional details involving SCB clients and other third parties. As such, in addition to core evidence of SCB's misconduct, Exhibit J also contains sensitive data that is not relevant to these proceedings. To protect the economic privacy of innocent third parties, we respectfully request that the Court accepts Exhibit J under seal.

Second, because the electronic data contained in Exhibit J is exceptionally voluminous (approximately 3.5 Gigabytes), Brutus cannot upload it onto PACER. Brutus therefore respectfully requests that the Court permit Brutus to file Exhibit J with the Clerk's Office under seal by submitting it on a physical external drive, such as a data stick.

Case 1:18-cv-11117-PAE     Document 106     Filed 05/31/24     Page 2 of 2

The Honorable Paul A. Engelmayer
May 31, 2024
Page Two

     We appreciate the Court's consideration of this letter motion.

                Respectfully submitted,

                Patrick M. McSweeney

                Counsel for Brutus Trading, LLC

Case 1:18-cv-11117-PAE    Document 107    Filed 06/04/24    Page 1 of 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA *ex rel.*.
BRUTUS TRADING, LLC,

                                   Plaintiffs,                      18 Civ. 11117 (PAE)

                    -v-                                             ORDER

STANDARD CHARTERED BANK ET AL.,

                                   Defendants.

---

PAUL A. ENGELMAYER, District Judge:

        On May 31, 2024, relator Brutus Trading, LLC ("Brutus") filed a motion to set aside

judgment under Federal Rule of Civil Procedure 60(d)(3).  Dkt. 106.  The Court directs the

Government to file a response by June 25, 2024; and Brutus to file a reply by July 9, 2024.

        SO ORDERED.

                                                *Paul A. Engelmayer*

                                          _____
                                          Paul A. Engelmayer
                                          United States District Judge

Dated: June 4, 2024
        New York, New York

Case 1:18-cv-11117-PAE     Document 108     Filed 06/05/24     Page 1 of 2



**McSweeney Cynkar & Kachouroff, PLLC**
TRIAL & APPELLATE LAWYERS

Patrick M. McSweeney
(804) 937-0895
patrick@mck-lawyers.com

Powhatan Office
3358 John Tree Hill Road
Powhatan, Virginia

June 5, 2024

*By ECF delivery*

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square, Room 2201
New York, New York 10007

Re. U.S. ex rel. Brutus Trading LLC v. Standard Chartered Bank, 18 Civ. 11117 (PAE)

Dear Judge Engelmayer:

We write respectfully on behalf of Brutus Trading LLC, the relator in the above-referenced action ("Brutus"), in follow-up to the letter motion that Brutus filed on May 31, 2024. In an abundance of caution, Brutus requested that the Court accept the critical evidence in Exhibit K, which I mistakenly referred to as Exhibit J in that letter, underlying its Rule 60(d)(3) motion under seal and permit Brutus to submit Exhibit K to the Clerk using an electronic data storage device. Neither the Government nor Standard Chartered Bank has responded to my May 31, 2024, letter motion, which suggests that neither takes a position on the request.

Whether the content of Exhibit K should remain under seal is a separate issue. The scheduling order that Your Honor issued today regarding the Rule 60(d)(3) motion does not address our filing request. Because Exhibit K supports Brutus's request to reopen the case and is, therefore, a core component of the record, we respectfully request that the Court enter an order prescribing the method by which Brutus may file the extraordinary amount of electronic data contained in Exhibit K with the Clerk so that the exhibit is included in the record that the parties are to address in the submissions which were ordered today.

The Honorable Paul A. Engelmayer
June 5, 2024
Page Two


We appreciate the Court's consideration of this request.

Respectfully submitted,

Patrick M. McSweeney

Counsel for Brutus Trading, LLC



**McSweeney Cynkar & Kachouroff, PLLC**
TRIAL & APPELLATE LAWYERS

Patrick M. McSweeney
(804) 937-0895
patrick@mck-lawyers.com

Powhatan Office
3358 John Tree Hill Road
Powhatan, Virginia

June 5, 2024

*By ECF delivery*

The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square, Room 2201
New York, New York 10007

Re. U.S. ex rel. Brutus Trading LLC v. Standard Chartered Bank, 18 Civ. 11117 (PAE)

Dear Judge Engelmayer:

We write respectfully on behalf of Brutus Trading LLC, the relator in the above-referenced action ("Brutus"), in follow-up to the letter motion that Brutus filed on May 31, 2024. In an abundance of caution, Brutus requested that the Court accept the critical evidence in Exhibit K, which I mistakenly referred to as Exhibit J in that letter, underlying its Rule 60(d)(3) motion under seal and permit Brutus to submit Exhibit K to the Clerk using an electronic data storage device. Neither the Government nor Standard Chartered Bank has responded to my May 31, 2024, letter motion, which suggests that neither takes a position on the request.

Whether the content of Exhibit K should remain under seal is a separate issue. The scheduling order that Your Honor issued today regarding the Rule 60(d)(3) motion does not address our filing request. Because Exhibit K supports Brutus's request to reopen the case and is, therefore, a core component of the record, we respectfully request that the Court enter an order prescribing the method by which Brutus may file the extraordinary amount of electronic data contained in Exhibit K with the Clerk so that the exhibit is included in the record that the parties are to address in the submissions which were ordered today.

The Honorable Paul A. Engelmayer
June 5, 2024
Page Two

We appreciate the Court's consideration of this request.

Respectfully submitted,

Patrick M. McSweeney

Counsel for Brutus Trading, LLC

Granted. Counsel can file Exhibit K under seal.  Additionally, counsel is permitted
to submit Exhibit K via an electronic storage device by either mailing or
delivering it to the Thurgood Marshall Courthouse, 40 Centre Street, New York,
New York 10007.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge
June 6, 2024

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*86 Chambers Street*
*New York, New York 10007*

June 20, 2024

BY ECF
The Honorable Paul A. Engelmayer
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

      Re:   *United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.,*
           No. 18 Civ. 11117 (PAE)

Dear Judge Engelmayer:

    This Office represents the United States of America (the "Government") in the above-referenced action filed by relator Brutus Trading, LLC ("Relator"), against Standard Chartered Bank pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733. After this Court's dismissal of Relator's claims and denial of a previous Rule 60 motion—based on an exceptionally detailed factual record—was upheld by the Second Circuit and the U.S. Supreme Court denied certiorari, Relator has now moved to vacate the judgment dismissing its claim under Federal Rule of Civil Procedure 60(d)(3), outrageously claiming that the Government committed "fraud upon the court." The Court has requested the Government's response by June 25. ECF No. 107.

    The Government respectfully requests a two-week extension—until July 9—to respond to Relator's motion, and proposes that the deadline for the Relator's reply brief also be pushed back by two weeks, to July 23. The undersigned has been preparing for a trial that was scheduled to begin on July 15, which is no longer likely to proceed on that date. Accordingly, the Government needs additional time to prepare its submission, which will explain why there is no merit to Relator's allegations of bad faith or fraud by the Government, and why Relator's belated submission should be rejected due to Relator's lack of diligence in timely pursuing its arguments during the extensive prior briefing in this case. Relator consents to the extension request.

    I thank the Court for its consideration of this request.

             Respectfully,

             DAMIAN WILLIAMS
             United States Attorney

    By:      s/Jean-David Barnea
           JEAN-DAVID BARNEA
           Assistant United States Attorney
           Telephone: (212) 637-2679
           Email: Jean-David.Barnea@usdoj.gov

Page 2

cc:    Counsel for Relator (by ECF)
       Counsel for Defendants (by ECF)



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

June 20, 2024

<u>BY ECF</u>
The Honorable Paul A. Engelmayer
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

> Re:   *United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.*,
>         No. 18 Civ. 11117 (PAE)

Dear Judge Engelmayer:

This Office represents the United States of America (the "Government") in the above-referenced action filed by relator Brutus Trading, LLC ("Relator"), against Standard Chartered Bank pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733. After this Court's dismissal of Relator's claims and denial of a previous Rule 60 motion—based on an exceptionally detailed factual record—was upheld by the Second Circuit and the U.S. Supreme Court denied certiorari, Relator has now moved to vacate the judgment dismissing its claim under Federal Rule of Civil Procedure 60(d)(3), outrageously claiming that the Government committed "fraud upon the court." The Court has requested the Government's response by June 25. ECF No. 107.

The Government respectfully requests a two-week extension—until July 9—to respond to Relator's motion, and proposes that the deadline for the Relator's reply brief also be pushed back by two weeks, to July 23. The undersigned has been preparing for a trial that was scheduled to begin on July 15, which is no longer likely to proceed on that date. Accordingly, the Government needs additional time to prepare its submission, which will explain why there is no merit to Relator's allegations of bad faith or fraud by the Government, and why Relator's belated submission should be rejected due to Relator's lack of diligence in timely pursuing its arguments during the extensive prior briefing in this case. Relator consents to the extension request.

I thank the Court for its consideration of this request.

Granted.

SO ORDERED.

*Paul A. Engelm[signature]*

PAUL A. ENGELMAYER
United States District Judge
June 20, 2024

Respectfully,

DAMIAN WILLIAMS
United States Attorney

s/Jean-David Barnea
JEAN-DAVID BARNEA
Assistant United States Attorney
Telephone: (212) 637-2679
Email: Jean-David.Barnea@usdoj.gov

Case 1:18-cv-11117-PAE      Document 112      Filed 06/24/24      Page 1 of 1



McSweeney Cynkar & Kachouroff, PLLC
TRIAL & APPELLATE LAWYERS

<u>By ECF</u>                                                                                  June 24, 2024
The Honorable Paul A. Engelmayer
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

　　　　　　Re:　　*United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank et al.*
　　　　　　　　　No. 1:18-cv-11117 (PAE)

Dear Judge Engelmayer:

　　　　I am counsel to Brutus Trading LLC, the relator in this case. We recently consented to the
request of Assistant United States Attorney Jean-David Barnea for an extension of time for the
Government's response to our pending motion to set aside the judgment in this case, an
extension the Court has granted. We were frankly concerned that AUSA Barnea is continuing to
serve as counsel for the United States in this case as he is now a fact witness regarding the
supposedly "detailed factual record" the Government created through demonstrably false and
misleading sworn statements submitted by government officials, which he orchestrated. Indeed,
we seek to depose AUSA Barnea, along with the other government officials involved. *See*
Relator's Memorandum of Law in Support of Motion to Set Aside Judgement, at 17 [Doc. No.
102].

　　　　Given AUSA Barnea's part in the facts of this case, continuation of his role as counsel
for the United States in this case – especially in preparing the response of the United States to
our motion -- is untenable and improper. If necessary, we are prepared to make a motion to
disqualify him. However, we respectfully request a pre-motion conference regarding
disqualification as soon as possible in the hope a formal motion will not be necessary.

　　　　　　　　　　　　　　　　　Respectfully submitted,
　　　　　　　　　　　　　　　　　<u>/s/ Patrick M. McSweeney</u>
　　　　　　　　　　　　　　　　　Patrick M. McSweeney
　　　　　　　　　　　　　　　　　McSweeney, Cynkar & Kachouroff, PLLC
　　　　　　　　　　　　　　　　　3358 John Tree Hill Road
　　　　　　　　　　　　　　　　　Powhatan, VA 23139
　　　　　　　　　　　　　　　　　(804) 937-0895
　　　　　　　　　　　　　　　　　patrick@mck-lawyers.com
　　　　　　　　　　　　　　　　　*Counsel for Relator*

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

June 24, 2024

BY ECF

The Honorable Paul A. Engelmayer
United States District Judge
United States Courthouse
40 Foley Square
New York, NY 10007

> Re:   *United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank, et al.*,
> No. 18 Civ. 11117 (PAE)

Dear Judge Engelmayer:

   This Office represents the United States of America (the "Government") in the above-referenced action filed by relator Brutus Trading, LLC ("Relator"), against Standard Chartered Bank pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733. I write in response to Relator's letter, dated June 24, 2024, seeking a pre-motion conference on whether the undersigned should be disqualified in representing the Government in connection with Relator's recent motion to vacate the judgment of dismissal in this case. ECF No. 112. Because Relator's motion to vacate is frivolous, as is its request to conduct discovery in connection with that motion, there is no basis to disqualify counsel for the Government. The undersigned has consulted with the Chief of this Office's Civil Division, Jeffrey Oestericher, who has concluded there is no basis on which to recuse myself in this matter.

   I thank the Court for its ongoing consideration of this matter.

Respectfully,

DAMIAN WILLIAMS
United States Attorney

By:   ___s/Jean-David Barnea_____
JEAN-DAVID BARNEA
Assistant United States Attorney
Telephone:  (212) 637-2679
Email: Jean-David.Barnea@usdoj.gov

cc:   Counsel for Relator (by ECF)
      Counsel for Defendants (by ECF)



**McSweeney Cynkar & Kachouroff, PLLC**

TRIAL & APPELLATE LAWYERS

By ECF                                                               June 25, 2024
The Honorable Paul A. Engelmayer
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

      Re:   *United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank et al.*
           No. 1:18-civ-11117 (PAE)

Dear Judge Engelmayer:

      I write respectfully on behalf of Brutus Trading LLC ("Brutus"), the relator in the above-referenced case, in response to the Government's opposition to a pre-motion conference addressing the disqualification of AUSA Barnea. AUSA Barnea is a central fact witness to the asserted fraud on the Court and, because it is reasonable to conclude that his own actions are implicated in that misconduct, he has a highly personal stake in the outcome of these proceedings. He should not serve as the Government's counsel here. His refusal to recuse himself requires Brutus to file a formal motion to disqualify him, which we intend to submit promptly.

      Brutus is mindful that the anticipated motion could affect the Government's opposition to the pending Rule 60(d)(3) motion. I also inform the Court that Brutus will move, pursuant to Fed. R. Evid. 706(a), for the Court to appoint an independent expert to conduct a thorough forensic examination of the digital files that Brutus submitted to the Government in 2012 and 2013. Such a motion is timely because Brutus has continued to decloak the Bank's electronic spreadsheets, which is a complicated process. Brutus will submit additional evidence of hundreds of thousands of hidden transactions. Much more decloaking remains to be done. The Court may wish to establish separate or coordinated briefing schedules on the motion to disqualify (which is obviously a threshold issue), the motion to vacate, and the motion to appoint an independent expert.

      Counsel for Brutus is opposed to using letter motions to engage in posturing, as AUSA Barnea has done in asserting in his June 24, 2024, letter to the Court that the motion to vacate the judgment filed by Brutus is "frivolous." There is nothing "frivolous" about exposing a rogue bank's hundreds if not thousands of hidden, terrorist-related transactions. Brutus' motion is supported by two massive declarations by expert forensic specialists identifying thousands of hidden transactions that have provided funding for Hamas and other state-sponsored terrorists who have murdered and maimed thousands of innocent people across the world, including American citizens and military personnel. All these records are contained in documentation Brutus submitted to the Government in 2012 and 2013. The only thing "frivolous" in these circumstances is the Government's examination of the evidence provided by Brutus. Supposedly expert government investigatory agencies apparently lacked the forensic

sophistication needed to explore electronic records of terrorist-funding concealed by their banking enablers.

At bottom, there is an appropriate process to address the merits of the motion to vacate. Letters to the Court should not be the place for counsel to exchange unseemly characterizations of an opponent's claims.

Respectfully submitted,
/s/ Patrick M. McSweeney
Patrick M. McSweeney
McSweeney, Cynkar & Kachouroff, PLLC
3358 John Tree Hill Road
Powhatan, VA 23139
(804) 937-0895
patrick@mck-lawyers.com
*Counsel for Relator*

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                             Plaintiff,                    Case No. 18 Civ. 11117 (PAE)

           v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVIICES
CORPORATION,

                             Defendants.

-------------------------------------------------------------x

**NOTICE OF MOTION**

      PLEASE TAKE NOTICE, that upon the Memorandum of Law, dated July XX, 2024, the declaration of Julian Knight and the exhibits annexed thereto, and upon all the prior papers and proceedings had herein, relator Brutus Trading, LLC ("Brutus") will move this Court, before the Hon. Paul A. Engelmayer, at the United States District Courthouse located at 40 Foley Square, New York, New York 10007, on a date and at a time to be designated by the Court, for an Order pursuant to Federal Rule of Civil Procedure 7(b)(1) disqualifying Assistant United States Attorney Jean-David Barnea, counsel for plaintiff United States of America (the "Government"), from continuing to represent the Government in this action.

PLEASE TAKE FURTHER NOTICE, that pursuant to Federal Rule of Civil Procedure 6, the Government's opposing papers, if any, must be filed by July 12, 2024, and Brutus' reply must be filed by July 19, 2024.

Dated: July 1, 2024

*Patrick M. McSweeney*

_____

Patrick M. McSweeney
Robert J. Cynkar
McSweeney Cynkar & Kachouroff PLLC
3358 John Tree Hill Road
Powhatan, VA 23139
(804) 937-0895
*Attorneys for Relator Brutus Trading LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                    Plaintiff,                 Case No. 18 Civ. 11117 (PAE)

        v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVIICES
CORPORATION,

                    Defendants.

----------------------------------------------------------------x

**DECLARATION OF JULIAN M. KNIGHT**

    JULIAN M. KNIGHT, pursuant to 28 U.S.C. § 1746, declares as follows subject to the penalties of perjury:

    1.     I am a principal of relator Brutus Trading, LLC ("Brutus") in the above-captioned action, and I make this declaration in support of Brutus's motion to appoint a neutral, independent expert to perform a comprehensive forensic analysis ("Independent Expert") on the electronic transactional data that Brutus gave to plaintiff United States of America (the "Government") in 2012 and 2013 ("Brutus Data"). Brutus also seeks to allocate the costs of an Independent Expert entirely to the Government.

    2.     I presently reside in the United Kingdom and I am not a wealthy person. In 2011, I left my position as Global Head of Transaction banking FX for Standard Charted Bank ("SCB"). During the Government's investigation of SCB in 2013 for violations of U.S. sanctions laws, the

Government improperly disclosed my identity as a whistleblower to SCB. Thereafter, SCB "blackballed" me in the global banking industry, making it impossible for me to secure employment in that sector. Now, I operate a small family farm and I am working to launch a start-up business in renewable resources.

3.     Neither Brutus nor I could possibly afford to pay any portion of the costs associated with retaining an Independent Expert. We simply do not have sufficient income or savings to pay expert fees. Indeed, Brutus has relied entirely on David Scantling's *pro bono* services to perform a forensic analysis of only a small percentage of the Brutus Data.

4.     If required, I could provide additional personal financial to the Court.

Executed on July 1, 2024 in Lincolnshire, UK

_____

Julian M. Knight

CamScanner

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                              Plaintiff,              Case No. 18 Civ. 11117 (PAE)

              v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVIICES
CORPORATION,

                              Defendants.

------------------------------------------------------------x

### DECLARATION OF ROBERT MARCELLUS

    ROBERT MARCELLUS, pursuant to 28 U.S.C. § 1746, declares as follows subject to the penalties of perjury:

    1.    I am a principal of relator Brutus Trading, LLC ("Brutus") in the above-captioned action, and I make this declaration in support of Brutus' motion to appoint a neutral, independent, expert to perform a comprehensive forensic analysis ("Independent Expert") on the electronic transactional data that Brutus gave to plaintiff United States of America (the "Government") in 2012 and 2013 ("Brutus Data"). Brutus also seeks to allocate the costs of an Independent Expert entirely to the Government.

    2.    I presently reside on a small farm in rural Virginia and I am not a wealthy person. I formerly operated my own financial trading firm, which is now largely defunct.

3.      Neither Brutus nor I could possibly afford to pay any portion of the costs associated with retaining an Independent Expert.  We simply do not have sufficient income or savings to pay expert fees.  Indeed, Brutus has relied entirely on David Scantling's *pro bono* services to perform a forensic analysis of only a small percentage of the Brutus Data.

4.      If required, I could provide addition financial information to the Court.

Dated: July 1, 2024

_____

Robert Marcellus

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA *ex rel.*
BRUTUS TRADING, LLC,

                       Plaintiff,                 Case No. 18 Civ. 11117 (PAE)

        v.

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD
CHARTERED TRADE SERVIICES
CORPORATION,

                       Defendants.

-------------------------------------------------------------x

### DECLARATION OF PATRICK M. McSWEENEY

    PATRICK M. McSWEENEY, pursuant to 28 U.S.C. § 1746 and subject to the penalties of perjury, declares as follows:

    1.     I am counsel to Relator Brutus Trading LLC ("Brutus") in the above-captioned action, and I submit this declaration in support of Brutus's motion to disqualify AUSA Jean-David Barnea from further representing plaintiff United States of America in this action.

    2.     Annexed hereto as Exhibit A is a true and correct copy of email correspondence between David Koenigsberg and Bob Marcellus and Julian Knight, dated December 13, 2012. Any associated waiver of attorney-client privilege is strictly limited to the contents of this email.

    3.     Annexed hereto as Exhibit B. is a true and correct copy of email correspondence between David Koenigsberg and Bob Marcellus and Julian Knight, dated December 14, 2012. Any associated waiver of attorney-client privilege is strictly limited to the contents of this email.

4.      Annexed hereto as Exhibit C is a true and correct copy of email correspondence between David Koenigsberg and Jean-David Barnea, dated December 17, 2012.

5.      Annexed hereto as Exhibit D is a true and correct copy of correspondence between Daniel S. Alter and H. Rodgin Cohen and Samuel W. Seymour, dated December 20, 2012.

6.      Annexed hereto as Exhibit E is a true and correct copy of email correspondence between David Koenigsberg and Jean-David Barnea, dated December 27, 2012.

7.      Annexed hereto as Exhibit F is a true and correct copy of a chain of email correspondence between David Koenigsberg and Bob Marcellus and Julian Knight, dated between December 27, 2012 and January 3, 2013.  Any associated waiver of attorney-client privilege is strictly limited to the contents of this email chain.

8.      Annexed hereto as Exhibit G is a true and correct copy of email correspondence between David Koenigsberg and Jean-David Barnea, dated January 9, 2013.

8.      Annexed hereto as Exhibit H is a true and correct copy of the Declaration of Special Agent Matthew F. Komar, dated November 21, 2019, without exhibits.

9.      Annexed hereto as Exhibit I is a true and correct copy of correspondence between Jean-David Barnea and the Hon. Paul A. Engelmayer, dated December 11, 2019.

10.     Annexed hereto as Exhibit J is a true and correct copy of the Declaration of Elizabeth Nochlin, dated February 28, 2020, without exhibits.

Dated: July 1, 2024
        Powhatan, VA


*Patrick M. McSweeney*

_____
Patrick M. McSweeney

Case 1:18-cv-11117-PAE     Document 115-4     Filed 07/01/24     Page 3 of 38

**David Koenigsberg**

| | |
|---|---|
| **From:** | David Koenigsberg |
| **Sent:** | Thursday, December 13, 2012 1:44 PM |
| **To:** | Bob Marcellus; 'Lynton Knight' |
| **Cc:** | John Menz |
| **Subject:** | Brutus |

Bob and Julian

FYI, I am meeting with Assistant U.S. Attorney Heidi Wendel, Chief of the Civil Frauds Unit for the Southern District of New York, Friday morning at 9:15 am, to discuss our matter.

I will let you know how it goes.

Thank you.

David



**David A. Koenigsberg/Partner**
MENZ BONNER KOMAR & KOENIGSBERG LLP
444 Madison Avenue, 39th Floor
New York, New York 10022
T- 212.223.2100/F- 212.223.2185
C- 914.819.8469
dkoenigsberg@mbkklaw.com
www.mbkklaw.com

*Please note new firm name, web site and e-mail address.*

Note:  This electronic mail may contain information that is privileged, confidential or exempt from disclosure under applicable law.  Any dissemination, copying or use of this electronic mail by or to anyone other than the designated and intended recipient(s) is unauthorized.  If you received this message in error, then please delete it from your system and contact the sender immediately.  Thank you.  E-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged.

IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Exhibit A

Case 1:18-cv-11117-PAE     Document 115-4     Filed 07/01/24     Page 4 of 38

---

**David Koenigsberg**

---

| | |
|---|---|
| **From:** | David Koenigsberg |
| **Sent:** | riday, December 14, 2012 12:  PM |
| **To:** | Bob Marcellus; 'Lynton Knight ' |
| **Cc:** | John Menz |
| **Subject:** |        Meeting |
| **ttac ments:** | 2012 12 14 Brutus  endel Pre  iling Letter  d |

Julian and Bob

I met with AUSA Wendel this morning for about 15 minutes  I e   lained to her about the settlements with NYS and the US   overnment, that stated SCB  sto  ed doing business with Iran in      , my client had SCB documents indicating they were doing business with Iran in       and   9, that we had been in contact with the NYA    and Danny Alter and that following the announcement of the US settlements this week, that Danny was working on the matter based on our information.  She said that it would be no   roblem once we file to coordinate with the NYA    and we did not need an order from the court to do so.

She was very e  cited by the case and issues, was   leased that we want to file with her office.  She said she will review the Chief of the Civil Division and will get someone assigned to work on it.  I gave her a co  y of the attached letter.  She said she would hold off s  eaking outside the office until we have a chance to file our case, which I will try to do on Monday.    verall, it was a very successful meeting.

Best regards,

David



**David A. Koenigsberg/Partner**
MENZ BONNER KOMAR & KOENIGSBERG LLP
444 Madison Avenue, 39th Floor
New York, New York 10022
T- 212.223.2100/F- 212.223.2185
C- 914.819.8469
dkoenigsberg@mbkklaw.com
www.mbkklaw.com

*Please note new firm name, web site and e-mail address.*

Note:  This electronic mail may contain information that is privileged, confidential or exempt from disclosure under applicable law.  Any dissemination, copying or use of this electronic mail by or to anyone other than the designated and intended recipient(s) is unauthorized.  If you received this message in error, then please delete it from your system and contact the sender immediately.  Thank you.  E-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged.

IRS CIRCULAR 230 DISCLOSURE:  To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Exhibit B

**David Koenigsberg**

| | |
|---|---|
| **From:** | Barnea, Jean David           Jean David Barnea  usdo gov |
| **Sent:** | Monday, December 1 , 2012  :0  PM |
| **To:** | David Koenigsberg |
| **Cc:** | endel,  eidi |
| **Subject:** |    e  rel  Brutus v    tandard   hartered |

David

I ve been assigned to this case.  Was the com  laint filed today  I think you told Heidi that was the  lan   Can you   lease send me a stam  ed co  y with the case number and the assigned  udge

 ooking forward to working with you on this.  It looks interesting.

 J.D.

Jean David  J.D.  Barnea
Assistant United States Attorney
Southern District of New York
  Chambers Street,   rd floor
New York, NY 1
Tel.   1         9
Fa     1          1
  mail Jean David.Barnea   usdo .gov

Exhibit C



NEW YORK STATE
**DEPARTMENT** *of*
**FINANCIAL SERVICES**

Andrew M. Cuomo
Governor

Benjamin M. Lawsky
Superintendent

December 20, 2012

**By Electronic Mail**

H. Rodgin Cohen, Esq.
Samuel W. Seymour, Esq.
Sullivan & Cromwell, LLP
125 Broad Street
New York, New York 10004

Re:    *Standard Chartered Bank*

Dear Messrs. Cohen and Seymour:

The New York State Department of Financial Services ("DFS" or the "Department") has received certain information regarding your client, Standard Chartered Bank ("SCB"), which, if accurate, raises serious concerns for the Department. The information, if accurate, indicates that SCB was until recently more extensively involved in U.S. dollar clearing activities in New York on behalf of Iranian entities than SCB previously disclosed to DFS. This information relates to possible misconduct beyond "wire stripping," and raises the specter that SCB may have also performed illegal dollar clearing services on behalf of other sanctioned entities, none of which the September Consent Order addressed.

Accordingly, in order to determine whether a full scale investigation into the matter is necessary, we request a meeting on January 10, 2013, to receive a comprehensive presentation in response to the questions posed on the annexed agenda. We emphasize that this meeting is intended only as a preliminary discussion in what could result in extensive proceedings.

Consequently, the Department directs SCB to maintain the integrity of, and access to, all documents, including but not limited to, books, records, reports, minutes, audit information, data files, emails, correspondence, memoranda, transaction documents, presentations, manuals, training materials, marketing materials, customer lists, employee compensation files and other historical materials that directly or indirectly document U.S. dollar clearing activities by SCB involving any country, entity, or individual who was subject to OFAC sanctions during the period January 1, 2002, to the present. This instruction applies to SCB's global operations.

Thank you for your cooperation. If you have any questions, do not hesitate to contact us.

Very truly yours,

Daniel S. Alter
General Counsel

Cc: Gaurav Vasisht

Exhibit D

### Agenda for SCB's January 10, 2012, Presentation to DFS

- "Project Green" – please describe and explain the formation, purpose, design, staff structure, period of operation, and current status of Project Green. The information should identify the SCB officers primarily responsible for Project Green (including but not limited to Stuart Horsewood, Vikram Kukreja and Hira Tauqeer Akbar), the members of SCB's senior management team who have been involved in oversight and bank policy related to Project Green, and all SCB clients' assisted by procedures implemented pursuant to Project Green.

- "Transaction Bank Sundry Foreign Exchange Account" – please describe the origin and function of this account and any relationship that it might have to the operations of SCB's New York Branch.

- "OLT3 System" – please describe the origin, operation, and function of this system and any relationship that it might have to the operations of SCB's New York Branch.

- "Straight 2 Bank" or "S2B System" – please describe the origin, operation, and function of this system and any relationship that it might have to the operations of SCB's New York Branch.

- "SCI Customer ID Number" – please describe the origin, operation, and function of this system and any relationship that it might have to the operations of SCB's New York Branch. Also, for the period January 1, 2002 to the present, please identify the name and SCI Customer ID Number of any SCB client that has been designated by OFAC as a Specially Designated National ("SDN").

- "Export Finance Transaction" – please describe the general nature and structure of such transactions, and the types of customer services that SCB provides in connection with them. Also, for the period January 1, 2002 to the present, please identify any SCB Export Finance Transaction involving U.S. dollar clearing services and any SCB client that has been designated by OFAC as an SDN.

- "Structured Trade Finance Transaction" – please describe the general nature and structure of such transactions, and the types of customer services that SCB provides in connection with them. Also, for the period January 1, 2002 to the present, please identify any SCB Structured Trade Finance Transaction involving U.S. dollar clearing services and any SCB client that has been designated by OFAC as an SDN.

- "Letter of Credit Transaction" – please describe the general nature and structure of such transactions, and the types of customer services that SCB provides in connection with them. Also, for the period January 1, 2002 to the present, please identify any SCB Letter of Credit Transaction involving U.S. dollar clearing services and any SCB client that has been designated by OFAC as an SDN.

- "Cash Management Transaction" – please describe the general nature and structure of such transactions, and the types of customer services that SCB provides in connection with them. Also, for the period January 1, 2002 to the present, please identify any SCB Cash Management Transaction involving U.S. dollar clearing services and any SCB client that has been designated by OFAC as an SDN.

- "Lebanese Coursing Transaction" – please describe the general nature and structure of such transactions, and the types of customer services that SCB provides in connection with them. Also, for the period January 1, 2002 to the present, please identify any SCB Lebanese Coursing Transaction involving U.S. dollar clearing services and any SCB client that has been designated by OFAC as an SDN, including but not limited to Iranian, Syrian, Lebanese, and Libyan entities or individuals.

- "On-line Trading and Foreign Exchange Trading Limits" – please describe any system or service that permits SCB clients to execute foreign exchange transactions within pre-approved U.S. dollar limits by independently and remotely accessing SCB's exchange and trading systems. Also, for the period January 1, 2002 to the present, please identify any client for which SCB has provided such service and that has been designated by OFAC as an SDN. Further, please provide the specific number of transactions and respective notional amounts for each such SCB client.

**David Koenigsberg**

| | |
|---|---|
| **From:** | Barnea, Jean David        Jean David Barnea   usdo gov |
| **Sent:** | Thursday, December 2 , 2012  :1  PM |
| **To:** | David Koenigsberg |
| **Subject:** | : Brutus  ontact n o |

Thanks.
  J.D.

**From:** David Koenigsberg [mailto:dkoenigsberg@mbkklaw.com]
**Sent:** Thursday, December 27, 2012 10:26 AM
**To:** Barnea, Jean-David (USANYS)
**Subject:** Brutus/Contact Info

JD

Thank you for your call this morning.

Below is the contact information for   andy and Danny

  andall M. Fo  ,  s .
Bureau Chief
Ta   ayer  rotection Bureau
State of New York
  ffice of the Attorney   eneral
1   Broadway,   5th Floor
New York, NY 1     1
  hone:   1   1     1
Fa : 1     1
  mail:   andall.Fo     ag.ny.gov

And

Daniel Alter,  s .
  eneral Counsel
N.Y. De  artment of Financial Services
  ne State Street,   th Floor
New York, NY 1
  hone:   1        1
  mail:  daniel.alter   dfs.ny.gov

I will find out dates when my clients are available to come to NY.

Thank you.

David

                                                                    *Exhibit E*



**David A. Koenigsberg/Partner**
MENZ BONNER KOMAR & KOENIGSBERG LLP
**444 Madison Avenue, 39th Floor**
**New York, New York 10022**
**T- 212.223.2100/F- 212.223.2185**
**C- 914.819.8469**
dkoenigsberg@mbkklaw.com
www.mbkklaw.com

*Please note new firm name, web site and e-mail address.*

Note: This electronic mail may contain information that is privileged, confidential or exempt from disclosure under applicable law. Any dissemination, copying or use of this electronic mail by or to anyone other than the designated and intended recipient(s) is unauthorized. If you received this message in error, then please delete it from your system and contact the sender immediately. Thank you. E-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521 and is legally privileged.

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

**David Koenigsberg**

| | |
|---|---|
| **From:** | David Koenigsberg |
| **Sent:** | Thursday, January 3, 2013 10:0  M |
| **To:** | 'Lynton Knight '; 'Bob Marcellus ' |
| **Cc:** | John Menz |
| **Subject:** | : Dates |

I s oke to Danny and he said that he has coordinated with the US Attorney and that he and the NY A  will attend the meeting on the 1 th. I told him you would be available on the 15th if he wanted, and he said he would think about that.

        riginal Message
From: ynton night mailto:lyntonknight19  hotmail.com
Sent: Sunday, December    , 1  :  AM
To: David  oenigsberg Bob Marcellus
Cc: John Men
Sub ect:  e: Dates

I have booked to arrive on Jan 1  at 1    and will de art on Jan 1  at 1  55

So if we could get all meetings in that week would be great  I have allowed some e tra days as u can see if we need s illover etc    riginal Message
From: David  oenigsberg  dkoenigsberg  mbkklaw.com
Date: Thu,   Dec  1 1 : 9:55
To: lyntonknight19  hotmail.com   bob  richmondgrou fundco.com
Cc:  men  mbkklaw.com
Sub ect:  : Dates


    I will let the AUSA know and get back to you to confirm before you buy a  lane ticket.

        riginal Message
From: ynton night mailto:lyntonknight19  hotmail.com
Sent: Thursday, December   , 1 1 :19  M
To: David  oenigsberg Bob Marcellus
Cc: John Men
Sub ect:  e: Dates


  et s go for 1  th then  I will arrive ahead of that to give us some  lanning time Can we coordinate with Danny for 1  or 1  etc
        riginal Message
From: David  oenigsberg  dkoenigsberg  mbkklaw.com
Date: Thu,   Dec  1 1 : 1:1
To: lyntonknight19  hotmail.com    bob  richmondgrou fundco.com
Cc:  men  mbkklaw.com
Sub ect: Dates

Exhibit F

Julian:  I checked with the AUSA for Jan.    1   and it turns out he is not available those dates.  He suggested Jan. 1  , 1  ,     m ,    or  5   m .
He is available the morning of Jan.   , but he and I would have to rearrange some other a    ointments, but that is a
 ossibility.

    et me know what dates work for you and he will then check with others on his end.

    David


    MB
    www.mbkklaw.com   htt  :  www.mbkklaw.com      htt  :  www.mbkklaw.com       David A.  oenigsberg    artner  Men
    Bonner  omar     oenigsberg
        Madison Avenue,   9th Floor
    New York, New York 1
    T   1  .  1     F   1  .   1 5
    C  91  . 19.     9
    dkoenigsberg    mbkklaw.com
    www.mbkklaw.com   htt  :  www.mbkklaw.com

     lease note new firm name, web site and e  mail address.
    _____

     Note:  This electronic mail may contain information that is   rivileged, confidential or e  em  t from disclosure under
 a    licable law.  Any dissemination, co  ying or use of this electronic mail by or to anyone other than the designated and
 intended reci  ient s  is unauthori ed.  If you received this message in error, then    lease delete it from your system and
 contact the sender immediately.  Thank you.     mail is covered by the    lectronic Communications   rivacy Act, 1   U.S.C.
        51    5 1 and is legally   rivileged.

 I S CI CU A      DISC   SU  : To ensure com  liance with re  uirements im  osed by the I  S, we inform you that any
 U.S. ta    advice contained in this communication  including any attachments  is not intended or written to be used, and
 cannot be used, for the   ur ose of i  avoiding   enalties under the Internal   evenue Code or  ii    romoting, marketing or
 recommending to another   arty any transaction or matter addressed herein.
 _____

**David Koenigsberg**

| | |
|---|---|
| **From:** | David Koenigsberg |
| **Sent:** | Thursday, January 3, 2013 10:0  M |
| **To:** | 'Lynton Knight '; 'Bob Marcellus ' |
| **Cc:** | John Menz |
| **Subject:** | : Dates |

I s oke to Danny and he said that he has coordinated with the US Attorney and that he and the NY A  will attend the meeting on the 1 th.  I told him you would be available on the 15th if he wanted, and he said he would think about that.

riginal Message
From:  ynton  night mailto:lyntonknight19  hotmail.com
Sent: Sunday, December    ,  1  :  AM
To: David  oenigsberg  Bob Marcellus
Cc: John Men
Sub ect:  e: Dates

I have booked to arrive on Jan 1  at 1   and will de art on Jan 1  at 1  55

So if we could get all meetings in that week would be great  I have allowed some e tra days as u can see if we need
s illover etc    riginal Message
From: David  oenigsberg  dkoenigsberg  mbkklaw.com
Date: Thu,   Dec  1 1 : 9:55
To:  lyntonknight19  hotmail.com   bob  richmondgrou fundco.com
Cc:  men  mbkklaw.com
Sub ect:  : Dates


I will let the AUSA know and get back to you to confirm before you buy a  lane ticket.

riginal Message
From:  ynton  night mailto:lyntonknight19  hotmail.com
Sent: Thursday, December   ,  1  1 :19  M
To: David  oenigsberg  Bob Marcellus
Cc: John Men
Sub ect:  e: Dates

 et s go for 1  th then  I will arrive ahead of that to give us some  lanning time Can we coordinate with Danny for 1  or
1  etc
riginal Message
From: David  oenigsberg  dkoenigsberg  mbkklaw.com
Date: Thu,   Dec  1 1 : 1:1
To:  lyntonknight19  hotmail.com    bob  richmondgrou fundco.com
Cc:  men  mbkklaw.com
Sub ect: Dates

Exhibit G

Julian: I checked with the AUSA for Jan.   1  and it turns out he is not available those dates.  He suggested Jan. 1 , 1 ,   m ,   or 5  m .
He is available the morning of Jan.   , but he and I would have to rearrange some other a   ointments, but that is a  ossibility.

 et me know what dates work for you and he will then check with others on his end.

David


MB
www.mbkklaw.com   htt :  www.mbkklaw.com    htt :  www.mbkklaw.com    David A.  oenigsberg   artner  Men Bonner  omar   oenigsberg
      Madison Avenue,  9th Floor
New York, New York 1
T  1 . . 1   F  1 . . 1 5
C  91 . . 19.   9
dkoenigsberg   mbkklaw.com
www.mbkklaw.com   htt :  www.mbkklaw.com

 lease note new firm name, web site and e mail address.
_____

 Note:  This electronic mail may contain information that is   rivileged, confidential or e em t from disclosure under a   licable law.  Any dissemination, co  ying or use of this electronic mail by or to anyone other than the designated and intended reci ient s  is unauthori ed.  If you received this message in error, then   lease delete it from your system and contact the sender immediately.  Thank you.   mail is covered by the   lectronic Communications  rivacy Act, 1  U.S.C.
      51   5 1 and is legally  rivileged.

 I S CI CU A   DISC  SU  : To ensure com liance with re uirements im osed by the I S, we inform you that any U.S. ta  advice contained in this communication  including any attachments  is not intended or written to be used, and cannot be used, for the  ur ose of i avoiding  enalties under the Internal  evenue Code or  ii  romoting, marketing or recommending to another  arty any transaction or matter addressed herein.
_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*<br>BRUTUS TRADING, LLC,<br><br>      Plaintiff,<br><br>   v.<br><br>STANDARD CHARTERED BANK, STANDARD<br>CHARTERED PLC, and STANDARD<br>CHARTERED TRADE SERVICES<br>CORPORATION,<br><br>      Defendants. | No. 18 Civ. 11117 (PAE) |

## DECLARATION OF SPECIAL AGENT MATTHEW F. KOMAR

I, Special Agent Matthew F. Komar of the Federal Bureau of Investigation, hereby

declare the following pursuant to 28 U.S.C. § 1746:

1.  I have been a Special Agent with the Federal Bureau of Investigation ("FBI")

since 2008. From December 2010 to November 2014, I was assigned to a squad designated to

investigate securities fraud, money laundering and other financial crimes in New York, New

York. Since December of 2014, I have been assigned to the FBI's office in Cleveland, Ohio.

2.  In December 2012, I was assigned as the lead agent in assisting the Civil Division

of the U.S. Attorney's Office for the Southern District of New York ("SDNY") in investigating

the allegations in a *qui tam* complaint filed by relator Brutus Trading, LLC (the "Relator"),

against Standard Chartered Bank, Standard Chartered plc, and Standard Chartered Trade

Services Corporation (together, "SCB" or the "Bank") in a case captioned *United States ex rel.*

*Brutus Trading LLC v. Standard Chartered Bank et al.*, No. 12 Civ. 9160 (KBF) (S.D.N.Y.).

Exhibit H

3.      Starting in June 2011, I also served as the case agent for an investigation of SCB by the Criminal Division of the U.S. Attorney's Office for the District of Columbia and what is now known as the Money Laundering and Asset Recovery Section of the U.S. Department of Justice's Criminal Division (together, "DOJ"). This investigation initially resulted in a Deferred Prosecution Agreement between the Bank and DOJ dated December 10, 2012 (the "2012 DPA"). *See* Exhibit 1. After the *qui tam* complaint was filed, I assisted DOJ in its investigation of the Relator's allegations to determine whether SCB had violated the DPA and/or committed additional crimes. And, as further explained below, beginning in August 2013 until I left New York in 2014, I participated in a separate aspect of the investigation of SCB's conduct that ultimately—several years after my departure—resulted in an Amended Deferred Prosecution Agreement with the Bank on April 9, 2019 (the "2019 DPA").

4.      I make this declaration based on my own personal knowledge as well as a review of documents relating to these investigations, in support of the motion by the United States of America (the "United States") to dismiss the Relator's second amended complaint in the above-captioned case. This declaration does not set forth all of my knowledge of the matters discussed herein. All dates and amounts set forth are approximate and to the best of my recollection, unless otherwise noted.

### A. The 2012 DPA with SCB and the Associated Investigation

5.      In January 2010, SCB approached federal and state authorities to self-report that it had facilitated transactions in violation of U.S. sanctions laws. As a result, FBI and DOJ began an investigation of the Bank relating to this disclosure, to which I was assigned beginning in June 2011. Other federal and state agencies also began parallel investigations. The investigations uncovered, among other things, that, from 2001 to 2007, SCB had conspired to violate U.S. economic sanctions laws and processed a large number of illegal payments through

2

the U.S. financial system on behalf of entities subject to U.S. economic sanctions. As relevant here, SCB processed U.S. dollar transactions on behalf of several Iranian banks and companies, but altered the associated wire-transaction records to remove references to sanctioned countries or entities or processed the payments in a non-transparent manner so as to minimize the chances that the transactions would be caught by other banks' sanctions filters and blocked, rejected, or stopped for further investigation. The Bank informed DOJ that it had formally ended its relationships with customers based in Iran in 2006 (in U.S. dollars) and at the end of 2007 (in all other currencies).

6.      On December 10, 2012, SCB entered into the 2012 DPA with DOJ, which was filed in the U.S. District Court for the District of Columbia, *see United States v. Standard Chartered Bank*, No. 12 Cr. 262 (JEB) (D.D.C.). As part of the 2012 DPA, the Bank acknowledged that it had facilitated at least $227 million worth of illegal transactions, and agreed to forfeit $227 million to the United States. Among other things, the Bank also agreed to implement improved monitoring for sanctions violations. Around the same time as the 2012 DPA, several of the other agencies that were investigating similar misconduct at SCB also announced resolutions of their investigations, including the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the Board of Governors of the Federal Reserve System (the "Federal Reserve"), and the New York County District Attorney's Office ("DANY"), as well as what is now known as the New York State Department of Financial Services ("DFS"), which had publicly announced its findings a few months earlier.

**B.  The Relator's First *Qui Tam* Complaint and Disclosure Statement**

7.      On December 17, 2012, approximately one week after the 2012 DPA and certain other agreements were finalized, the Relator—an entity created for the purpose of the lawsuit,

3

whose members are Julian Knight, a former SCB employee, and Robert Marcellus, a friend of

Mr. Knight's who had banking experience—filed its original *qui tam* complaint under seal. *See*

Exhibit 2.

      8.    The Relator's complaint alleged that the Bank had misled DOJ and OFAC leading

up to the 2012 DPA and 2012 OFAC settlement agreement by failing to disclose certain

sanctions-violative transactions in which it had engaged with Iranian entities after 2007.[1]  The

complaint alleged that, despite its commitment to have ended its relationships with Iranian banks

and companies located in Iran in 2006-07, the Bank continued to knowingly facilitate U.S. dollar

transactions for its preexisting Iranian clients for several years after that date.

      9.    Specifically, the Relator claimed that after 2007, SCB had knowingly facilitated

specific trade-finance and foreign-exchange transactions on behalf of Iranian government

agencies (such as Bank Markazi, which is Iran's central bank, and entities affiliated with the

"Ministry of Energy of Iran Group"), and state-owned and private Iranian banks (such as Bank

Saderat) and energy groups (such as the National Iranian Tanker Company and the Iranian

Offshore Engineering Company)—including several that OFAC had listed as Specially

Designated Nationals, *i.e.*, persons or entities with whom financial transactions in U.S. dollars

are specifically prohibited.  According to the Relator, these illegal transactions were part of an

SCB program known as Project Green, which was run by high-level Bank officials and was

designed to hide evidence of these transactions, including by booking the revenue the Bank

earned from them in a special "sundry" account and by failing to include the clients' internal

---

[1] Relator amended its complaint on November 14, 2014, solely to add a claim that SCB
had also misled the Federal Reserve in the same respect with regard to that agency's 2012
resolution with the Bank. *See* Exhibit 3.

customer identification numbers in the associated records. The Relator claimed that Project Green was wound down in 2012, in the lead-up to the 2012 DPA.

10.     Along with the *qui tam* complaint, the Relator provided SDNY with a disclosure statement that attached several internal SCB documents that Mr. Knight asserted were in his possession when he left the Bank. These documents included customer lists of SCB's Dubai branch that, as the Relator pointed out, included the Iranian entities described above. These documents also showed, according to the Relator, that the Bank had facilitated certain trade-finance and foreign-exchange transactions for these clients after 2007. Finally, the disclosure statement listed several current and former SCB employees who, according to the Relator, could corroborate the allegations in the *qui tam* complaint.

**C. The Investigation of the Relator's Allegations**

11.     Shortly after the Relator's complaint was filed, SDNY notified several other agencies, including DOJ, OFAC, the Federal Reserve, DANY, and DFS, of the Relator's allegations and SDNY's investigation into them, and these other agencies began their own parallel investigations. As mentioned above, I was assigned as the lead agent both to the SDNY investigation of the *qui tam* complaint and to DOJ's parallel criminal investigation of the Bank.

12.     Our investigation began with a joint interview of Mr. Knight and Mr. Marcellus on January 16, 2013, which representatives from each of the above agencies attended. Mr. Knight told us that he had worked at SCB's Dubai branch from January 2009 to November 2011. He reported that, during that time, he had spoken with Bank employees about Project Green and was told it was related to sanctions evasion. He also described contacts between Bank employees and Iranian entities. He stated that he was not aware of any SCB accounts opened for

Iranian clients while he was at the Bank, but had heard that some SCB employees may have used their own names to open accounts for Iranian entities.

13.     Mr. Knight described some of the documents attached to the disclosure statement and described in the *qui tam* complaint. According to these documents, he believed Iranian banks had active login capabilities for SCB's online foreign-exchange system at least as of 2009. These and other Iranian banks appeared on customer lists of SCB's Dubai branch that Relator provided. Other documents he discussed appeared to reflect trade-finance and foreign-exchange transactions in U.S. dollars in 2008 and 2009 between SCB and Iranian banks, government agencies, and companies, such as the National Iranian Tanker Company and corporate entities associated with the "Iranian Ministry of Energy Group." All of the entities referenced by these documents that Mr. Knight brought to our attention were clearly identifiable as Iranian or based in Iran.

14.     Mr. Marcellus told us that he had never worked at SCB, but was knowledgeable about the mechanics of foreign-exchange transactions. He told us that when a bank such as SCB converted one non-U.S. dollar currency to another, especially currencies that were not commonly traded such as the United Arab Emirates dirham, it likely converted first into U.S. dollars and then into the other currency. Relatedly, Mr. Knight explained that any transactions at SCB involving U.S. dollars would have necessarily had to involve the Bank's New York branch.

15.     Mr. Knight further stated that when he learned of the government investigation that led to the 2012 DPA, after he left the Bank, he reviewed Bank documents still in his possession, and decided to file a *qui tam* complaint. Mr. Knight also provided the names of several SCB employees who he said could corroborate his allegations.

6

16.     After the interview, the Relator provided SDNY with additional SCB documents of the same type as those attached to the disclosure statement. These documents, which were shared with DOJ, FBI, and other agencies, showed similar information regarding possible transactions involving Iranian clients of SCB.

17.     DOJ, SDNY, and other agencies made several requests for information and documents to the Bank relating to the Relator's allegations, including a Civil Investigative Demand ("CID") issued by SDNY on February 4, 2013. In addition, after coordinating with the Relator's then-counsel, SDNY sent the Bank copies of most of the documents the Relator had provided with the disclosure statement, to request the Bank's explanation of them. I understand that these documents were first cleaned of metadata connecting them to Mr. Knight by the Relator's counsel.

18.     Over the next several months, SCB produced hundreds of thousands of pages of documents in response to these requests, which I and other members of the investigative team reviewed. We also obtained certain documents directly from former SCB employees whom we contacted, which we also reviewed.

19.     Furthermore, counsel for SCB gave two presentations, on February 8 and April 24, 2013, that addressed the transactions alleged by the Relator to be sanctions violations that the Bank failed to disclose before the 2012 DPA. At these presentations, the Bank's counsel reiterated that SCB had committed not to enter into any *new* U.S. dollar transactions with Iranian clients after 2006 and in other currencies after 2007, but that its existing commitments with those clients could not always be immediately broken off. Thus, most of the documents the Relator had provided related to the "wind down" of SCB's pre-2007 business with Iranian clients.

20.    In some instances, SCB had open transactions and commitments with its Iranian clients that were outstanding when the Bank suspended its business with them, such as outstanding loans, trade transactions (letters of credit), and bank accounts. It therefore sought to wind down those transactions in a manner compliant with U.S. sanctions rules by, for example, permitting its Iranian clients to repay their outstanding loans from the Bank in currencies other than U.S. dollars, or to withdraw their existing balances from bank accounts that were otherwise blocked.[2] These clients, who had ongoing wind-down transactions with the Bank, continued to be included in client lists and the like until the underlying transactions were completely unwound. The Bank further reiterated that it had disclosed many of these clients and their associated wind-down activity to DOJ and OFAC in 2011 as part of the investigation that led to the 2012 DPA.

21.    SCB also disclosed that it had facilitated certain other U.S. dollar transactions for these clients as an intermediary between two foreign banks, which was permitted under OFAC rules until mid-2008. As for the access that Iranian banks and other entities may have had to conduct transactions using SCB's online foreign-transaction system, the Bank explained that these entities had not engaged in any such transactions since early 2007, and indeed were not given access to a new online banking system set up in late 2007 to which other SCB clients were transitioned.

---

[2] Furthermore, the Bank explained that its internal reporting currency was the U.S. dollar, so that any transaction in any currency would be reflected in the Bank's records in its U.S. dollar value, even when the transaction actually took place in another currency. Moreover, in some of the documents, the category or heading of "Iran" confusingly referred to customers from certain third-party countries, such as Kuwait and others in addition to Iran, that were managed from the Bank's Dubai office, and thus some of the entities under this heading were neither Iranian nor subject to sanctions.

8

22. The documents produced by the Bank included several "wind down" reports, which detailed how its pre-2007 business with Iranian clients was wound down over the following years, including several such reports that the Bank had previously provided to DOJ and OFAC, as discussed above. DOJ, SDNY, and the other agencies selected a sample of these transactions and asked SCB to provide more detailed information about them. In response, the Bank produced records regarding these transactions as well as an independent report analyzing them, which confirmed the Bank's account of the transactions as wind-down activity.

23. Furthermore, we interviewed many current and former employees of SCB, including most of the employees the Relator suggested that we contact. Among other things, we learned that Project Green was the internal name that SCB had given to the matter that ultimately led to the 2012 DPA and related settlements.

24. Our investigation into the Relator's allegations largely wrapped up in August 2013. That investigation did not lead us to uncover any evidence of sanctions violations or violations of the 2012 DPA of the types alleged by the Relator. Instead, we found that the information provided by the Relator related almost entirely to the Bank's winding down of its preexisting transactions with Iranian clients in a manner that did not appear to violate the U.S. sanctions laws, or to the presence of Iranian entities on client lists and similar types of records without any evidence that these clients had engaged in any illegal transactions. We also verified that the Bank had previously disclosed most of the specific customer relationships at issue to DOJ and OFAC.

25. Based on these findings, SDNY and DOJ concluded that they were not able to corroborate or validate the Relator's allegations. SDNY informed Relator's counsel that it had not been able to substantiate the Relator's allegations, and intended to decline to intervene in the

9

*qui tam.* Furthermore, DOJ informed the Bank's counsel that it did not need to finish producing privilege logs for documents it had withheld from its productions in response to the CID and other requests.

### D. New Evidence Separately Emerges of Potential Sanctions Violations by SCB

26.     In 2013, I was also the case agent assigned to a separate, ongoing criminal investigation of another financial institution for providing financial services in violation of U.S. economic sanctions laws.

27.     On or about August 15, 2013, this other financial institution disclosed to DOJ and FBI information relating to certain U.S. dollar transactions it had processed involving a Dubai-based petrochemical company with Iranian links, which had a prior banking relationship with SCB, and its Iranian owner.

28.     This information was promptly disclosed to the team responsible for the 2012 DPA with SCB, as well as to SDNY.

29.     None of the information provided by the Relator prompted this disclosure by this other financial institution or led, even indirectly, to the DOJ's identification of the petrochemical company as an entity whose financial transactions would be subject to U.S. economic sanctions.

### E. The Investigation of SCB's Connection with the Petrochemical Company

30.     Shortly after learning, from the investigation of the other financial institution, about SCB's connection with the petrochemical company, DOJ and FBI asked SCB in August 2013 for information about its dealings with the company and its knowledge about the company's Iranian connections. The petrochemical company was registered as a Dubai corporate entity, and ultimately owned by an Iranian national who had a Dubai residence permit.

31.     SDNY informed the Relator's counsel that the Government was investigating new information from another source, and had decided to keep the *qui tam* complaint under seal so as not to interfere with this investigation, and in recognition of the possibility that this new investigation might corroborate some of the Relator's allegations.

32.     Over the following months, the Bank produced documents in response to the investigating agencies' requests regarding its client relationship with the petrochemical company, as well as its "know your customer" ("KYC") processes at the Bank's Dubai branch, which I and the other members of the investigative team reviewed.  Furthermore, we interviewed current and former SCB employees regarding, among other things, the Bank's relationship with the petrochemical company and KYC procedures in Dubai.

33.     As a result of this investigation, we identified Bank records indicating that the petrochemical company was a front for an Iranian energy company.  This evidence included, among other things, a fax transmission from the petrochemical company's president to SCB's Dubai branch requesting that the Bank execute a U.S. dollar transaction from the company's account.  The fax header indicated that it was sent from an Iranian number and suggested to the Bank's employees that the company was connected to Iran.

**F.  The SCB Investigation Expands**

34.     Based on the discovery of the fax transmission from the president of the petrochemical company, in the spring of 2014, DOJ requested information from the Bank regarding faxes received by SCB's Dubai branch that requested the execution of U.S. dollar transactions and had headers indicating they were received from Iranian numbers.  A review of those fax transmissions showed that a substantial number of them came from a small number of customers, who became the focus of the next phase of our investigation.

11

35. Those customers included two Dubai-incorporated companies controlled by an Iranian national who ordinarily resided in Iran named Mahmoud Reza Elyassi, who had a Dubai residence permit. This was the first time the investigating agencies learned of potential wrongdoing by Mr. Elyassi in connection with this investigation.

36. I understand that over the following several years, DOJ and FBI investigated the Bank's relationships with Mr. Elyassi's companies and others like it, but I was not part of that investigation. I understand that this investigation ultimately led to the 2019 DPA. Other FBI colleagues, including Special Agent Wayne C. Boddy, were the lead agents on the investigation in its later stages.

### G. The Relator's Second *Qui Tam* Complaint

37. I am aware that on September 19, 2017, the Relator voluntarily withdrew its *qui tam* case after it had been unsealed. The following year, the Relator filed a second *qui tam* action against SCB, which it amended twice, most recently on September 23, 2019. In the latest second amended *qui tam* complaint, which I have reviewed, the Relator alleges that its original complaint and disclosures were the source of the information that led to the agency investigations of SCB that culminated in the 2019 DPA and other related settlement agreements. This is not correct.

38. First, the investigation of SCB that ultimately led to the 2019 DPA began after SDNY, DOJ, and FBI had initially determined that they could not corroborate the allegations in the original *qui tam* complaint, and the subsequent investigation prompted by the disclosure of the Bank's relationship with the petrochemical company did not change that determination.

39. Furthermore, as explained above, the investigation that led to the 2019 DPA began as a result of the information DOJ and FBI learned from the separate, ongoing

investigation of a different financial institution, which revealed that SCB had a client relationship with the petrochemical company with Iranian connections discussed above. This led to the broader investigation of faxed instructions for U.S. dollar payments from Iran and other sanctioned countries, which I understand was one of the principal bases for the 2019 DPA.

40.     Moreover, the Relator's allegations are different in kind from what was uncovered in the later investigation of SCB. While the Relator claimed that the Bank continued after 2007 to process illegal transactions in U.S. dollars for its known, preexisting Iranian clients, our recent investigation found that the Bank, among other things, knowingly and willfully violated U.S. economic sanctions laws by processing U.S. dollar transactions through the United States on behalf of customers of SCB's Dubai branch with known Iranian connections. Most of these violations were the result of deficiencies in SCB's compliance program that allowed customers to order U.S. dollar transactions via fax and online payment instructions from Iran and other sanctioned countries. The criminal conspiracy that serves as the basis for the 2019 DPA primarily involved two former employees of SCB's Dubai branch who conspired to help the Bank's Iran-connected customers process U.S. dollar transactions through the United States in violation of U.S. law.

41.     With regard to Mr. Elyassi in particular, although the Relator notes that his name appears on certain client lists of SCB's Dubai branch that the Relator provided to SDNY in connection with its original *qui tam* complaint, that was not the reason why Mr. Elyassi and his activities became subject to investigation. It is true that Mr. Elyassi's name and companies appear on these client lists, among more than 1,400 other Bank clients. But at the time these lists were provided to SDNY, the Relator indicated that they were significant because they included the known Iranian entities identified in the Relator's disclosure statement and discussed during

13

our interview with Mr. Knight and Mr. Marcellus. During our investigation of the Relator's *qui tam* allegations, the Relator never identified or pointed to Mr. Elyassi's name on those lists, or suggested that we should look into any of the hundreds of other listed Dubai-based SCB clients, including Mr. Elyassi's companies, and never suggested that Mr. Elyassi or his companies had engaged in any wrongdoing.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:          November 21, 2019
                Cleveland, Ohio

                                Matthew F. Komar
                                Special Agent
                                Federal Bureau of Investigation

14