# 25-115

# United States Court of Appeals for the Second Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

BRUTUS TRADING, LLC,

*Relator-Appellant,*

v.

STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED TRADE SERVICES CORPORATION,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR RELATOR-APPELLANT

AIDALA, BERTUNA & KAIMINS, P.C.
*Attorneys for Relator-Appellant*
546 Fifth Avenue, Suite 6
New York, NY 10036
(212) 486-0011
judgeleventhal@aidalalaw.com

3194



ELECTRONIC
PARALEGAL

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ............................................................................1

JURISDICTION ...........................................................................................3

ISSUES PRESENTED FOR REVIEW ..............................................................3

STATEMENT OF THE CASE .........................................................................5

    A. The Government's Motion to Dismiss the SAC..............................6

        *1. FBI Special Agent Komar*........................................................7

        *2. Alexandre Manfull (OFAC)*....................................................8

        *3. Patrick M. Bryan (Federal Reserve Board)* ............................9

        *4. Elizabeth Nochlin (NYS Department of Financial Services)* .................10

    B. Brutus's Motion for an Indicative Ruling ....................................11

        *1. FBI Special Agent Komar*......................................................11

        *2. Alexandre Manfull (OFAC)*..................................................12

    C. The Decloaked Data ....................................................................14

        *1. Decloaked FX Transactions* ..................................................15

        *2. Specific Examples of Disturbing SCB post-2007 Transactions* ...............16

    D. The Rule 60(d) Motion and Brutus's Requests for Related Relief ..............19

        *1. The Rule 60(d) Motion*..........................................................19

        *2. The Disqualification and Independent Expert Motions* ............................20

i

*3. The Motion to Unseal Exhibit K* ...........................................21

    E. The District Court's Rulings.............................................22

SUMMARY OF ARGUMENT ...................................................23

STANDARDS OF REVIEW ......................................................24

ARGUMENT

I.   THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING THE
RULE 60(d) MOTION WITHOUT ALLOWING BRUTUS DISCOVERY ................25

    A. Governing Legal Principles....................................25

    B. The District Court Abused its Discretion by Denying the Rule 60(d)
Motion Without At Least Granting Brutus Discovery ...........................27

       *1. The Decloaked Data is Compelling Evidence that the Government
Defrauded the Court*....................................................28

       *2. There is a Strong Basis to Conclude that the Government
Knowingly Misled the Court* ............................................31

       *3. Discovery is Especially Warranted Because Brutus was Denied
Discovery Throughout All Prior Proceedings in this Case* ...............38

II.  THE DISTRICT COURT IMPROPERLY DENIED THE UNSEALING MOTION .........42

    A. Governing Legal Principles....................................42

    B. The District Court Failed to Determine Whether and to What Extent
the Presumptions of Public Access Apply to Exhibit K .........................45

III.  THIS COURT SHOULD REASSIGN THE CASE TO A DIFFERENT DISTRICT
JUDGE ON REMAND.....................................................48

CONCLUSION ...............................................................54

TABLE OF AUTHORITIES

*Page(s)*

**Cases:**

*Attestor Master Value Fund LP v. Argentina*,
    113 F.4th 220 (2d Cir. 2024) *cert. denied* ___U.S.___.
    2025 WL 299527 (Jan. 27, 2025). .................................................24, 28, 42, 44

*Bernstein v. Bernstein Litowitz Berger & Grossman LLP*,
    814 F.3d 132 (2d Cir. 2016) ..........................................................24, 42, 43, 45

*Borzilleri v. Bayer Healthcare Pharmaceuticals, Inc.*,
    24 F.4th 32 (1st Cir. 2022) ...............................................................................27

*Brown v. Maxwell*,
    929 F.3d 41 (2d Cir. 2019) ..................................................................43, 45, 46

*Buon v. Spindler*,
    65 F.4th 64 (2d Cir. 2023) ................................................................................28

*Centauri Shipping, Ltd. v. Western Bulk Carriers KS*,
    528 F. Supp.2d 197 (S.D.N.Y. 2007) ..............................................................35

*Christine Asia Co. Ltd. v. Ma*,
    718 Fed. App'x 20 (2d Cir. 2017) ....................................................................33

*Cleveland Hair Clinic, Inc. v. Puig*,
    200 F.3d 1063 (7th Cir. 2000) .........................................................................35

*Courthouse News Serv. v. Corsones*,
    __ F.4th __, 2025 WL 758028 (2d Cir. March 11, 2025) ...........................47

*Cullen v. United States*,
    194 F.3d 401 (2d Cir. 1999) .............................................................................48

*Demjanjuk v. Petrovsky*,
    10 F.3d 338 (6th Cir. 1993) *cert. denied* 513 U.S. 914 (1994) ..............34, 49

*Deutz Corp. v. Engine Distribs., Inc.*,
  2019 WL 13207635 (N.D. Ga. Nov. 18, 2019),
  *aff'd* 846 Fed. App'x 883 (11 Cir. 2021)......................................................47

*F.T.C. v. Standard Financial Mgmt. Corp.*,
  830 F.2d 404 (1st Cir. 1987)......................................................................44

*Gambale v. Deutsche Bank AG*,
  377 F.3d 133 (2d Cir. 2004) ......................................................................45

*Gleason v. Jandrucko*,
  860 F.2d 556 (2d Cir. 1988) ................................................................25, 38

*H.K. Porter Co. v. Goodyear Tire & Rubber Co.*,
  536 F.2d 1115 (6th Cir. 1976) ...................................................................26

*Hadges v. Yonkers Racing Corp.*,
  48 F.3d 1320 (2d Cir. 1995) ................................................................24, 25

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
  322 U.S. 238 (1944)............................................................................29, 41

*In re Advanced Battery Technologies, Inc.*,
  781 F.3d 638 (2d Cir. 2015) ......................................................................32

*In re Barclays PLC Sec. Litig.*,
  2024 WL 757385 (S.D.N.Y. Feb. 23, 2024) ..............................................32

*Indiana Public Retirement Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016) *cert. dismissed* 585 U.S. 1001 (2018) ......... 33-34

*Intern'l Technologies Marketing, Inc. v. Verint Sys. Ltd.*,
  991 F.3d 361 (2d Cir. 2021) ......................................................................25

*King v. First American Investigations, Inc.*,
  287 F.3d 91 (2d Cir.) *cert. denied* 537 U.S. 960 (2002) ........................25, 26

*LabMD, Inc. v. Tiversa, Inc.*,
  2016 WL 3695381 (N.D. Ga. May 12, 2016) ..............................................26

iv

*Leber-Krebs, Inc. v. Capitol Records*,
    779 F.2d 895 (2d Cir. 1985) ...................................................25, 38

*Logan v. City of New York*,
    736 F.3d 118 (2d Cir. 2013) *vac'd in part on other grounds*,
    743 F.3d 362 (2d Cir. 2014) ...................................................48, 53

*Lugosch v. Pyramid Co. of Onandaga*,
    435 F.3d 110 (2d Cir. 2006) ...................................42, 43, 44, 45, 46

*Marco Destin, Inc. v. Levy*,
    111 F.4th 214 (2d Cir. 2024) *cert. denied* ___ U.S.___,
    2025 WL 663716 (March 3, 2025)...........................................40, 41

*Matter of New York Times Co.*,
    828 F.2d 110 (2d Cir. 1987) *cert. denied* 485 U.S. 977 (1988) .............43, 46

*Mazzei v. The Money Store*,
    62 F.4th 88 (2d Cir. 2023) ...................................................26, 38, 39

*Newsday LLC v. Cty. of Nassau*,
    730 F.3d 156 (2d Cir. 2013) ...................................42, 43, 44, 46

*Oklahoma Firefighters Pension and Retirement Sys. v. Musk*,
    2023 WL 6393865 (S.D.N.Y. Sep. 29, 2023) ...............................34

*Pearson v. First NH Mortg. Corp.*,
    200 F.3d 30 (1st Cir. 1999)..........................................................26

*Pescatore v. Pan Am. World Airways, Inc.*,
    97 F.3d 1 (2d Cir. 1996) ..............................................................49

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ..........................................................32

*Rusk v. New York State Thruway Auth.*,
    2021 WL 230917 (W.D.N.Y. Jan. 22, 2021) .........................26, 38

*Shcherbakovskiy v. Da Capo Al Fine, Ltd.*,
    490 F.3d 130 (2d Cir. 2007) ...................................................49, 52

*Staehr v. Hartford Financial Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008) ............................................................37

*Tiverton Bd. of License Commissioners v. Pastore*,
    469 U.S. 238 (1985)................................................................34, 35

*Tyler v. City of Kingston*,
    74 F.4th 57 (2d Cir. 2023) ..............................................................37

*United States ex rel. Brutus Trading v. Standard Chartered Bank*,
    2020 WL 3619050 (S.D.N.Y. July 2, 2020).....................................5, 6, 7, 10

*United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank*,
    2021 WL 4772142 (S.D.N.Y. Oct. 13, 2021)..........................................11, 12

*Brutus Trading LLC v. Standard Chartered Bank*,
    2023 WL 5344973 (2d Cir. August 21, 2023), *cert. denied*
    144 S. Ct. 1011 (2024)..............................................................13, 27

*United States v. Amodeo*,
    71 F.3d 1044 (2d Cir. 1995) ...........................................................45

*United States v. Aponte*,
    31 F.3d 86 (2d Cir. 1994) .............................................................30

*United States v. City of New York*,
    717 F.3d 72 (2d Cir. 2013) ............................................................52

*United States v. Demott*,
    513 F.3d 55 (2d Cir. 2008) ............................................................53

*United States v. Dijbo*,
    730 Fed. App'x 52 (2d Cir. 2018) .....................................................53

*United States v. Joyce*,
    542 F.2d 158 (2d Cir. 1976) *cert. denied sub nom. Teri v. United States*,
    429 U.S. 1100 (1977) .................................................................32

*United States v. Shaffer Equipment Co.*,
    11 F.3d 450 (4th Cir. 1993) ......................................................34, 35, 39

*United States v. Universita*,
   298 F.2d 365 (2d Cir.) *cert. denied* 370 U.S. 950 (1962) .............................33

**Rules, Laws & Statutes:**

28 U.S.C. § 1291 ...................................................................................................3

28 U.S.C. § 1331 ...................................................................................................3

31 U.S.C. § 3703(c)(2) ..........................................................................................6

31 U.S.C. § 3729 ................................................................................................3, 5

Fed. R. Civ. P. 60(d) .............................................................................1, 11, 24, 25

Fed. R. Civ. P. 62.1 .....................................................................................11, 13

Fed. R. Evid. 706 ................................................................................................21

Federal Rule of Civil Procedure 11 ......................................................................51

PRELIMINARY STATEMENT

Relator-appellant Brutus Trading LLC ("Brutus") appeals from an opinion and final order of the United States District Court for the Southern District of New York (Engelmayer, *J.*), entered on November 13, 2024 (the "Order"). (Joint Appendix ("JA") 19, 552-62). In relevant part, the Order denied Brutus's motion, pursuant to Fed. R. Civ. P. 60(d)(3), to set aside the judgment dismissing an action under the federal False Claims Act (the "Rule 60(d) Motion"), which Brutus had pursued against defendants-appellees Standard Chartered Bank, Standard Chartered PLC, and Standard Charted Trade Services Corporation (collectively "SCB" or the "Bank"). The Rule 60(d) Motion argued that plaintiff-appellee United States of America (the "Government") secured the dismissal by defrauding the district court. In a footnote, the Order also denied a motion by the Times of London, which Brutus joined, to unseal digital evidence that had been deeply embedded in SCB's electronic spreadsheets. Those concealed records exposed SCB's vast criminal activity in transacting many billions of U.S. dollars with Iran and global terrorist organizations (the Unsealing Motion"). The Bank's client terror groups included the Islamic Revolutionary Guard Corps ("IRGC"), Hezbollah, Hamas, the Taliban, and al Qaeda.

This case is important. The somewhat modest question of first impression presented regarding the availability of discovery in support of the Rule 60(d) Motion

is made profound by the circumstances in which it arose. Any genuine allegation that the Government has misled a court is gravely serious. But when the Government's deception involves suppressing extensive and uncontested proof of a massive terrorist financing scheme run through the U.S. banking system, the claim demands close and unbiased review. Here, the district court eschewed any scrutiny, much less a rigorous assessment of the evidence before it.

To compound its error, the district court also refused to unseal even part of the digital records that revealed SCB's grievous misconduct. That proof was submitted by Brutus as an exhibit to the Rule 60(d) Motion. Despite the exhibit being a judicial document to which both the common law and First Amendment presumptions of access apply, the district court summarily denied the Unsealing Motion without performing anything even close to the careful analysis mandated by law. The district court's refusal to unseal the evidence put any verification of the Bank's criminal conduct – a matter of acute public concern – beyond the public's reach.

By being the conduit through which many billions of U.S. dollars illegally poured into murderous hands, SCB enabled the Iranian nuclear weapons program to advance, the tunnels of Gaza to be dug, and the manufacture of roadside bombs that killed numerous American military personnel in Afghanistan. Those are just a few of the slaughterous feats made possible by the Bank's mercenary scheme – a criminal enterprise about which the Government intentionally misled the district court and

*this* Court in Brutus's prior appeal. And, perversely, although the lethality of SCB's Iran business was staggering, it is the *proof* of those crimes that is now imprisoned in the district court's safe.

In a concerted effort, the Government ably sabotaged the judicial process in this case – or so it thought. To repair the damage, this Court must vacate the Order and remand the action to a different district judge for further proceedings.

## JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3729 *et seq.* This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because this proceeding is a timely appeal from a final order of the district court.

## ISSUES PRESENTED FOR REVIEW

1.  In the Rule 60(d) Motion, Brutus presented extensive and concrete proof that the Government had grossly misled the district court by insisting that the digital records provided by Brutus did *not* contain any evidence of additional SCB sanctions violations. That statement was false. An in-depth, forensic analysis performed by a former high-ranking U.S. Defense Department expert sharply demonstrated otherwise. His study revealed that SCB' spreadsheets contained hidden records of thousands of transactions, involving many billions of U.S. dollars, between the Bank and sanctioned Iranian entities, including notorious terrorist

groups.  Tellingly, the Government's opposition to the Rule 60(d) Motion *never* disputed the existence, authenticity, or accuracy of those concealed transactions.

Under those circumstances, did the district court abuse its discretion by denying the Rule 60(d) Motion without permitting Brutus to take discovery concerning the Government's false and misleading representations?  Yes.

2.    Brutus submitted SCB's electronic spreadsheets in digital format as an exhibit to the Rule 60(d) Motion.  Initially, Brutus requested that the district court seal the exhibit because Brutus was unable to redact the identifying account information (as required by the district court's rules) for the millions of records contained in the spreadsheets.  Along with illegal transactions, the electronic data also included dealings with innocent clients.  Brutus expressly reserved its right, however, to revisit its sealing request later in the litigation.

Did the district court err in refusing to unseal the exhibit, thereby leaving the entire submission inaccessible to the public, without: (a) determining whether the common law and First Amendment presumptions of public access to judicial documents applied to the SCB spreadsheets; and (b) performing the required case-specific analyses for ensuring such access?  Yes.

3.    Throughout the district court proceedings, the district judge demonstrated a palpable bias by making unsupported, disparaging, and injudicious

statements about Brutus's claims and by issuing rulings against Brutus that were seemingly retaliatory.

To avoid even the appearance of bias on remand, should this Court reassign the case to a different district judge?  Yes.

## STATEMENT OF THE CASE

In 2012, SCB entered into a deferred prosecution agreement with the U.S. Department of Justice ("2012 DPA") to resolve the Bank's admitted illegal practice of "deceptively facilitating U.S. Dollar transactions by Iranian clients, in violation of U.S. sanctions and various New York and federal banking regulations."  *United States ex rel. Brutus Trading v. Standard Chartered Bank*, 2020 WL 3619050, at *1 (S.D.N.Y. July 2, 2020) ("*Brutus Trading I*").  SCB told the Government that it had stopped that unlawful conduct in 2007.  *See id*.  But soon after the parties signed the 2012 DPA, Brutus gave the Government SCB digital spreadsheets, which showed that the Bank had continued its criminal dealings with Iran until at least 2013 (the "Brutus Data").  *Id.*

On November 29, 2018, Brutus filed this *qui tam* action against SCB, claiming that the Bank violated the False Claims Act, 31 U.S.C. § 3729 *et seq.*  (JA 3); s*ee also Brutus Trading I*, 2020 WL 3619050, at *3.[1]  In sum and substance, Brutus

---

[1] Brutus had previously commenced an FCA action against SCB in 2012.  In 2017, Brutus dismissed that action without prejudice.  *See Brutus Trading I*, 2020 WL 3619050, at *1.

alleged that SCB had "misled the Government in negotiating the 2012 DPA." *Id.* at 1. Brutus filed a second amended complaint on September 20, 2019 (the "SAC"). (JA 6, 355-539); *see also Brutus Trading I*, 2020 WL 3619050, at *2. Among other things, the SAC additionally alleged that: (1) the Brutus Data led to *another* DPA with SCB in 2019 concerning undisclosed sanctions violations; and (2) Brutus was entitled to a portion of the increased fines received by the Government. *See Brutus Trading I*, 2020 WL 3619050, at *2.[2]

## A. The Government's Motion to Dismiss the SAC

On November 21, 2019, the Government moved, pursuant to 31 U.S.C. § 3703(c)(2)(A), to dismiss the SAC. (JA 7); *see also Brutus Trading I*, 2020 WL 3619050, at *2. The Government argued, *inter alia*, that Brutus's "allegations did not lead to the discovery of any new [False Claims Act] violations by [SCB] and were not the impetus for the 2013 Investigation." *Id.* at *3. The Government further argued that dismissal was appropriate "because, were the case to proceed to discovery, the Government would be required to expend resources on a matter that it found meritless." *Id.*

---

[2] After the Government received the Brutus Data, it reopened its investigation into SCB's criminal dealings with Iran. The continued investigation resulted in a new DPA with SCB, signed in 2019. *See Brutus Trading I*, 2020 WL 3619050, at *2.

The Government's dismissal motion relied on sworn declarations by: (1) FBI Special Agent Matthew F. Komar; (2) FBI Special Agent Wayne Boddy; (3) Alexandre Manfull, Assistant Director, Sanctions Compliance and Evaluation, Office of Foreign Assets Control ("OFAC"); (4) Patrick Bryan, Assistant General Counsel for Enforcement, Board of Governors of the Federal Reserve System; and (5) Elizabeth Nochlin, Director, Investigations and Intelligence Division, New York State Department of Financial Services (collectively, the "Government Declarants"). *See Brutus Trading I*, 2020 WL 3619050, at *2.

### 1. *FBI Special Agent Komar*

Komar stated categorically that the FBI's investigation of SCB, including the Brutus Data,

> did *not lead us to uncover any evidence of sanctions violations* or violations of the [Government's 2012 Deferred Prosecution Agreement with SCB] of the types alleged by the Relator. Instead, we found that the information provided by the Relator *related almost entirely to the Bank's winding down of its pre-existing transactions with Iranian clients in a manner that did not appear to violate the U.S. sanctions laws, or to the presence of Irian entities on client lists and similar types of records without any evidence that these clients had engaged in any illegal transactions*. We also verified that the Bank had previously disclosed most of the specific customer relationships at issue to DOJ and OFAC.

(JA 47 (emphasis added)).

Komar later reiterated that,

> [a]s explained in my prior declaration, and in the declaration provided by Alexandre Manfull of OFAC, our investigation concluded that

> SCB's post-2007 transactions with [Iranian] entities which were referenced in [Brutus's] documents *were either legitimate wind-down transactions* that the Bank had previously (*i.e.,* before [Brutus] filed its complaint) disclosed to DOJ and OFAC *or otherwise did not appear to violate any sanctions rules.*

(JA 54 (emphasis added)).  Komar also represented that the Government "did *not find evidence that the bank had facilitated improper foreign exchange transactions* with known Iranian entities or that it had hidden such transactions by booking the associated revenue in 'sundry' accounts." (*Id.* (emphasis added)).  He insisted that,

> as part of preparing this declaration, I have re-reviewed [the materials provided by Brutus], *including all "hidden" information I could locate,* and did not see any additional material information that would have been relevant to our investigation, such as information suggesting that any entities other than those [Brutus] brought to our attention at the time were Iranian.

*(Id.* at 55 n.3 (emphasis added)).

### 2.  Alexandre Manfull (OFAC)

Manfull made similar representations.  For example, Manfull stated that the Brutus Data

> showed that seven Iranian entities held U.S. dollar accounts at SCB after January 1, 2008.  Of these, five accounts had no activity after 2007, and the remaining two (Bank Saderat and National Iranian tanker Company) reflected activity that was limited to wind-down obligations, for which Iranian customers' payments to SCB were made in non-U.S. dollar currencies.

(JA 71).  "As for SCB's online foreign-exchange system," he further maintained that "*only one Iranian customer (Bank Saderat) had access to the system after January 1,*

8

*2008*, but SCB access logs showed that this customer did not access the system in that timeframe." (*Id.* (emphasis added)).

> Manfull told the district court that OFAC, having reviewed the Brutus Data,
>
> > concluded that the information [Brutus] provided likely *reflected neither any new business with a U.S. nexus that SCB had entered into with Iran after 2007*, *nor transactions with any SDN*, but rather the bank's wind-down of its pre-2007 relationships with its Iranian clients. Moreover, to the extent any of the transactions between Iranian clients and SCB reflected in [Brutus's] documents were processed through the U.S. financial system, OFAC concluded that those transactions were likely consistent with the "U-turn' general license, and did not constitute apparent violations of OFAC's regulations.

(JA 71-72 (emphasis added); *see also id.* at 89-90). According to Manfull, "OFAC did not have to determine whether" SCB's pre-2007 Iranian clients had access to SCB's online foreign exchange ("FX") system because other federal agencies had "found no evidence that any of the Iran-based clients identified as a result of the [Brutus data] engaged in online foreign-exchange transactions with SCB after 2008." (*Id.* at 79).

### 3. *Patrick M. Bryan (Federal Reserve Board)*

Bryan's statement was succinct. After "participat[ing]in a multiagency investigation of [Brutus's] allegations, including . . . [a] review of the materials provided by [Brutus]," he wrote, the Federal Reserve Board "determined that the information provided by [Brutus] and obtained in connection with the investigation

of its allegations *did not warrant further administrative action by the Board* and did not undermine or otherwise affect the basis for the Board's 2012 Orders." (JA 97).

### 4. Elizabeth Nochlin (NYS Department of Financial Services)

Nochlin's statement placed the actions of the New York State Department of Financial Services and OFAC squarely in lockstep. "While the Department and OFAC cited SCB for a different total number of violations," she declared, "the *difference does not represent a distinction in the investigation* undertaken by the two agencies." (JA 104 (emphasis added)). That difference, she explained, was "based on the different statutes of limitations that apply to the different agencies and their different conclusions regarding the transactions should be included in a settlement given the agencies' respective enforcement priorities." (*Id.*).

Convinced by the Government Declarant's sworn representations, the district court dismissed the SAC. It had "no difficulty finding that the Government [had] proffered a valid government purpose for seeking to dismiss the *qui tam* action – namely, the early termination of actions as to which the Government has determined that the factual allegations are meritless." *Brutus Trading I*, 2020 WL 3619050, at *3. The Court concluded that it had "no basis to doubt[] that the Government undertook a lengthy, costly, and substantial investigation into [relator]'s claims that spanned several years and multiple offices and agencies." *Id.* (internal quotation marks omitted).

10

**B. Brutus's Motion for an Indicative Ruling**

Brutus appealed the SAC's dismissal to this Court. *See United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank*, 2021 WL 4772142, at *1 (S.D.N.Y. Oct. 13, 2021) ("*Brutus Trading II*"). While that appeal was pending, Brutus moved in the district court, pursuant to Fed. R. Civ. P. 62.1, for an indicative ruling ("Rule 62.1 Motion"). *See id.* Based on certain news reports involving SCB's illegal banking transactions with Iran *after 2007*, Brutus argued that the district court should vacate its judgment of dismissal under several provisions of Fed. R. Civ. P. 60. *See id.* In opposing the Rule 62.1 Motion, the Government again submitted a series of declarations by Komar and Manfull. *See id.* at *3.

**1. *FBI Special Agent Komar***

Standing by his story, Komar reiterated that the post-2007 transactions contained in the Brutus Data "were either legitimate wind-down transactions that the Bank had previously disclosed to DOJ and OFAC or otherwise did not appear to violate any sanctions rules." (JA 106). He further restated that the FBI "did not find evidence of any wrongdoing in connection with SCB's foreign-exchange sundry account, nor did it appear that any Iranian client had engaged in foreign-exchange transactions through the Bank's online system after 2007." (*Id.* at 113).

But for the first time, Komar disclosed that the Brutus Data contained 49 files that "were Microsoft Excel spreadsheets containing monthly reports from 2010 to

2012." (*Id.* at 114). He stated that the "reports were in the form of pivot tables that display the information in summary form, which can be expanded to show the underlying full data." *Id.* Komar surmised that those pivot tables "appear[] to be what [Brutus] repeatedly refers to as 'hidden cells' in the documents." (*Id.*). He then stated that the "clients identified as Iranian in these reports consisted largely of the same Iranian entities that had been included in [Brutus's] documents and whose relationships with the Bank had been previously reviewed as part of the investigation into [Brutus'] allegations." (*Id.*). In the same dismissive way, Komar also discussed evidence contained in the Brutus Data "regarding SCB's relationships or potential relationships with known Iranian clients," but again asserted that "none of these documents indicated or suggested that the Bank had engaged in improper U.S. dollar transactions with such clients after 2007." (*Id.* at 115).

### 2. *Alexandre Manfull (OFAC)*

Manfull hammered home the same fundamental point over and over: "OFAC and other agencies investigated [Brutus's] allegations that SCB had continued to process transactions in U.S. dollars with its known Iranian clients after 2007, when the bank had promised it would terminate such business." (JA 24). He unwaveringly insisted that the "investigation concluded that the post-2007 transactions were largely permissible wind-down transactions or otherwise did not constitute [sanctions] violations." (*Id.*). Lest there be any doubt, Manfull underscored that the

12

"the U.S. government's conclusion from its investigation of [Brutus's] allegations" was "that the bank's post-2007 transactions with its known Iranian clients did not give rise to additional Iran sanctions violations charges." (*Id.* at 28); *see also id.* at 139 ("OFAC and *other agencies* carefully investigated [Brutus's] allegations . . . and did not find they provided evidence of sanctions violations." (emphasis added)). And with great indignation, Manfull complained that he "and other OFAC personnel [had] spent hundreds of hours of agency time and countless agency resources responding to and refuting [Brutus's] misstatements . . . which would otherwise have been used to support active sanctions investigations and other agency priorities." (*Id.* at 140).

The district court denied the Rule 62.1 Motion, concluding in relevant part that Brutus had "not demonstrated that the Court's decision to dismiss [Brutus's] claims was the product of any misrepresentation whatsoever." *Brutus Trading II*, 2021 WL 4772142, at *6. This Court affirmed the district court's original dismissal judgment and subsequent order denying the Rule 62.1 Motion, stating that "Brutus's arguments boil down to nothing more than a 'subjective disagreement' with the government's investigation." *Brutus Trading LLC v. Standard Chartered Bank*, 2023 WL 5344973, at *3 (2d Cir. August 21, 2023) (summary order) ("*Brutus Trading III*), *cert. denied* 144 S. Ct. 1011 (2024).

**C. The Decloaked Data.**

In July 2023, Julian Knight, a principal member of Brutus, began working on an unrelated project with David J. Scantling, a former high-ranking Department of Defense official who is a highly accomplished intelligence analyst and forensic investigator specializing in global terror financing. (JA 144-47, 234). When Knight and Robert Marcellus (another Brutus principal) first examined the Brutus Data in 2012, they were unfamiliar with the ability of the Excel spreadsheet program to embed undisclosed data caches using hidden pivot tables. (*Id.* at 149 n.8, 235 n.1). The presence of that high-level, data-management function was not commonly known to ordinary users of Excel spreadsheets. (*Id.* at 149 n.8, 202-03).

The process of "decloaking" (*i.e.*, extracting concealed data embedded in SCB's spreadsheets) was a highly technical and laborious process that required specific expertise. (JA 147-55, 197-232). But once Scantling instructed Knight and Marcellus how to decloak that information, the three men worked together for months to reveal millions of SCB transactions that were hidden within the Bank's electronic spreadsheets. (*Id.* at 235).

By February 2024, Scantling, Knight, and Marcellus identified over 3.3 million previously undisclosed transactional records, of which 500,000 documented unique transactions spanning from *2008 to 2013* ("Decloaked Data"). (JA 143, 235-36). Knight identified at least 20,000 unique FX trades involving USD vs FX

transactions between SCB Dubai/SCB NY and Iran-related clients, comprising *approximately $100 Billion* in notional value. (*Id.* at 235-36). For his part, Scantling isolated more than 906 Iran-related transactions, executed between January 2008 and March 2012, totaling approximately *$9.6 Billion* in value, and which involved entities and individuals subject to international sanctions. (*Id.* at 143, 154-55). Ninety-two of those transactions also involved entities that had been sanctioned before 2007. (*Id.* at 143, 148-49).

### *1. Decloaked FX Transactions*

The 20,000 unique Iran-related FX transactions extracted by Knight were executed between *2008 and 2013* and have the cumulative notional value of $100 Billion. (JA 235-36). SCB performed each of those transaction using its New York branch and the U.S. Fedwire clearing system, and approximately 65% (or 13,000) of them were executed using the OLT3 platform, SCB's online trading system. (*Id.* at 235-36, 238).

Shockingly, those 20,000 FX transactions included thousands of transactions involving Specially Designated Nationals ("SDNs"), Foreign Terrorist Organizations ("FTOs"), and their front companies (including IRGC, Hamas and Hezbollah fronts). (JA 237-38). SDNs and FTOs were subject to strict economic sanctions that forbade users of the U.S. banking system to transact with them. The Decloaked Data contains evidence that SCB charged huge commissions for its

illegal dealings, a method of profiteering known as "gouging" that is commonplace in banking transactions involving known terrorist organizations. (*Id.* at 238).

### 2. *Specific Examples of Disturbing SCB post-2007 Transactions*

Scantling's breakout of nearly *$10 Billion* in Iran-related transactions is chilling. (JA 155-77). It is a catalogue of global terror groups and their financiers. The following is a summary list of SCB's business relationships involving some of those entities:

- **Tajco Ltd.** – funder of Hezbollah terror operations. (*Id.* at 155-59).

- **Euro African Group Ltd.** – funder of Hezbollah terror operations. (*Id.* at 155, 159-61).

- **Fatima Group** – Pakastani fertilizer company that sold explosive chemicals to al-Qaeda, Haqqani Network, and Taliban fronts for manufacturing improvised explosive devices and other bombs used against U.S. troops in Afghanistan. (*Id.* at 155-56, 161-63).

- **Lebanese Canadian Bank SAL** – provider of financial services to Hezbollah. (*Id.* at 156, 163-67).

- **FAL Oil Ltd.** – front company for IRCG-controlled National Iranian Oil Company. (*Id.* at 169-70).

- **Bank Markazi/Central Bank of Iran** – Iranian central bank that funds the IRGC and Hezbollah. (*Id.* at 170-71).

- **Bank Tejarat** – Iranian bank that provides financial services to OFAC designated Iranian shipping and military entities. (*Id.* at 171-72).

- **National Iranian Tanker Company** – exporter of Iranian crude oil and funder of IRGC and Hezbollah. (*Id.* at 172-73).

- **Khorasan Steel Company** – Iranian steel producer and funder of Iran's nuclear program, missile development, terrorism, and terrorist proxy networks. (*Id.* at 173-74).

- **Khouzestan Steel Company** – Iranian steel producer and funder of Iran's nuclear program, missile development, terrorism, and terrorist proxy networks. (*Id.* at 174-75).

- **Banque d'Algerie** – Central Bank of Algeria that processed FX transactions through SCB for the ultimate benefit of the Central Bank of Iran. (*Id.* at 175-77).

Indeed, one especially noteworthy transaction with Banque d'Algerie shows that SCB used money borrowed from the United States Government to fund the Central Bank of Iran. During the height of the 2007–2009 world-wide financial crisis, SCB's New York branch required substantial "lender of last resort" funding from the Federal Reserve Bank of New York ("FRBNY"), which acts as part of the U.S. central bank. To alleviate the severe liquidity shortages faced by domestic and foreign banks during that period, the FRBNY implemented, among other assistance measures, the Term Auction Facility ("TAF") program. The TAF program made short-term loans to banks in need of emergency funding. (JA 176).

According to the FRBNY, between February 28, 2008, and June 3, 2009, SCB borrowed an aggregate sum of $859,450,000,000 U.S. dollars under the TAF

program. During that period, SCB maintained an average daily outstanding loan balance of $1,864,100,000 U.S. dollars, highlighting the extent to which SCB relied on the U.S. Government's financial support to survive the financial crisis. (JA 176).

On January 29, 2009, SCB received emergency TAF funding in the amount of $2,550,000,000 U.S. dollars from the FRBNY. On the same day, SCB processed a FX transaction worth $14,625,102.10 U.S. dollars with its counterparty Central Bank of Algeria, account number "4217349," for the ultimate benefit of the Central Bank of Iran, account number "110051201." Incredibly, those decloaked SCB transactions reveal that funds provided *by the U.S. Government*, and ultimately backed by American taxpayers, were used to facilitate illicit transactions for the Iranian regime. (JA 176-77).

The Decloaked Data also make clear that SCB's crimes were systemic and premeditated. For example, the electronic spreadsheets contain secret, intra-bank instructions by SCB personnel, which expressly direct SCB account managers to falsify bank records. Specifically, they direct SCB bankers to credit enormous U.S. dollar transactions to *Iranian* clients after SCB had ostensibly executed them for the Bank of Algeria. (JA Exhibit K at "Derivatives 2008" (sealed)). For at least 19 such transactions, the Decloaked Data contains directions to "*Cancel-Reclass*" transaction ledger entries "*from UAE to Iran per email advice*." (*Id.* (emphasis added)).

18

### D. The Rule 60(d) Motion and Brutus's Requests for Related Relief

#### 1. The Rule 60(d) Motion

With the Decloaked Data in hand, on May 31, 2024, Brutus filed the Rule 60(d) Motion in the district court. (JA 14). Brutus asked the district court to set aside the judgment dismissing the case because the Government had secured it by fraud. Relying on the Decloaked Data and detailed declarations by Scantling and Knight, Brutus demonstrated that the Government had grossly misrepresented the contents of SCB's electronic spreadsheets to the court. Contrary to the Government's repeated assertions that the Brutus Data contained no evidence of post-2007 Iran-related sanctions violations, Brutus showed that SCB's spreadsheets were, in fact, swollen with many thousands of hidden transaction records involving U.S. dollar transfers to the Iranian military complex and vicious terrorist forces.

Because the spreadsheets included the name and bank account numbers of too many other SCB account holders to redact, Brutus requested and received permission from the district court to file under seal a data stick containing the Decloaked Data ("Exhibit K"). (JA 17, 244-45). Brutus was careful to inform the court, however, that "[w]hether the content of Exhibit K should remain under seal [was] a separate question." (*Id.* at 244). And because the Decloaked Data was compelling evidence of the Government's deception, Brutus further argued that – at

19

a minimum – its request for targeted discovery, including document demands and depositions, was justified.  *See* SDNY Dkt. No. 102.

In opposition, the Government did *not* dispute the contents or accuracy of the Decloaked Data, much less *refute* any of it.  *See* SDNY Dkt. No. 137.  Nor did SCB challenge Brutus's forensic analysis of the Bank's own electronic spreadsheets. Their respective silence was effectively their joint confession.  The Government submitted no new evidence to explain the blatant factual discrepancies between its prior sworn submissions and the Decloaked Data but instead doubled down on those prior statements as being somehow legitimate.  *See id.*

## 2.  *The Disqualification and Independent Expert Motions*

Soon after Brutus filed the Rule 60(d) Motion, it wrote to the district court requesting a conference to address its anticipated motion to disqualify the Assistant U.S. Attorney, who had been the Government's counsel from the outset of the case. (JA 249, 313).  Brutus explained to the district court that it sought a conference in hope of resolving the issue informally and without having to resort to litigation.  (*Id.* at 249, 313).  The Government categorically rejected the proposal, insisting that there was "no basis to disqualify" its counsel and that the motion was "meritless." (*Id.* at 250, 306).  The district court likewise rejected Brutus's request for a pre-motion conference, surmising that both the request, "and the motion itself, appears

[sic.] to be transparent bids to delay this litigation by unnecessarily hampering the Government's response to the pending motion to vacate." (*Id.* at 311).

Brutus made the motion. It explained that one way to demonstrate fraud on the court is to show misconduct by an officer of the court, and therefore the Rule 60(d) Motion necessarily implicated the Government counsel's possible role in any deception. (JA 313). He was unavoidably a fact witness because he was responsible for coordinating the Government's court submissions, and he would have an irreconcilable conflict of interest if he had participated in any misconduct. Consequently, to avoid even the appearance of a conflict, Brutus asked the district court to direct the Government to replace its counsel with a different Assistant U.S. Attorney. *See* SDNY Dkt. No. 128.

Pursuant to Fed. R. Evid. 706(a), Brutus also moved for the appointment of a neutral, independent expert to confirm the contents of the Brutus Data and to assist the district court in understanding the highly technical aspects of decloaking SCB's digital spreadsheets. *See* SDNY Dkt. No. 123. The Government opposed the motion. *See* SDNY Dkt. No. 137.

### 3. *The Motion to Unseal Exhibit K*

While the Rule 60(d) Motion was pending the *Times of London* ("London Times"), a British newspaper, moved to unseal Exhibit K (the "Unsealing Motion"). (JA 333-35). The newspaper argued that Exhibit K is a judicial document to which

the public has a First Amendment and common law right of access.  (*Id.*).  Brutus joined the Unsealing Motion, as did a journalist from the *Jewish Insider* and an investigative reporter from an NBC affiliate station.  (*Id.* at 343-45, 353-54).  The Government took no position on the motion.  (*Id.* at 342).

SCB opposed the motion, suggesting for the first time in many years of litigation that "the provenance, authenticity, and accuracy" of the Brutus Data "*may* be questionable."  (*Id.* at 348 (emphasis added).  The Bank submitted no evidence, however, to support its speculative suggestion.

## E. The District Court's Rulings

In short shrift, the district court denied every motion.  To begin, it rejected the Disqualification Motion, describing Brutus's "contentions [as] meritless, to the point where they verge on vexatious and frivolous."  (JA 547).  The district court then denied the Rule 60(d) Motion, concluding that "Brutus ha[d] not given the Court a basis on which to find that the Government made a false representation to the Court."  (*Id.* at 558).  In the next breath, the district court refused to appoint an independent expert, reasoning that "[t]here is no reason to pursue, let alone subsidize, additional discovery" and finding that "there [were] no open issues to be resolved, much less complex ones."  (*Id.* at 561).  Finally, almost as an afterthought, the district court denied the Unsealing Motion in a footnote, stating "that Exhibit K is properly

maintained under seal, to protect the privacy interests of unrelated third parties." (*Id.* at 562 n.4).

### SUMMARY OF ARGUMENT

The district court abused its discretion by denying the Rule 60(d) Motion without permitting Brutus to take targeted discovery concerning the statements made by the Government Declarants. The Decloaked Data is compelling evidence that the Government misled the district court (and this Court) to believe that SCB's electronic spreadsheets contained no evidence of sanctions violations after 2007. In fact, the Brutus Data contained thousands of hidden illegal post-2007 transactions with sanctioned Iranian entities and numerous global terrorist organizations, which involved many billions of U.S. dollars. Brutus made a more than adequate threshold showing of fraud on the court to compel discovery. *See infra* Point I.

The district court seriously erred in denying the Unsealing Motion. Without determining whether and to what extent the First Amendment and common law presumptions of public access apply to Exhibit K, the district court refused to unseal any part of the more-than-decade-old bank records. Those digital spreadsheets secretly documented SCB's illegal transactions with sanctioned Iranian entities and global terrorist groups. Because Exhibit K was an essential "judicial document" for adjudicating the Rule 60(d) Motion, the district court abused its discretion in leaving it under a blanket seal. *See infra* Point II.

In deciding the Rule 60(d) Motion, the district judge made a series of highly caustic statements disparaging Brutus's claim and the integrity of its attorneys. A reasonable person would believe that the district judge is deeply biased and would be incapable of deciding this case impartially on remand. To avoid that appearance of judicial prejudice, this Court should reassign the case to a different district judge to conduct any further proceedings. *See infra* Point III.

## STANDARDS OF REVIEW

1.     This Court reviews a district court's denial of a motion pursuant to Fed. R. Civ. P. 60 to set aside a judgment based upon a claimed fraud on the court for abuse of discretion. *See Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1326 (2d Cir. 1995).

2.     This Court reviews a district court's sealing or unsealing order by examining the court's factual findings for clear error, its legal determinations *de novo*, and its ultimate decision for abuse of discretion. *See Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 139 (2d Cir. 2016).

3.     A district court abuses its discretion when it bases its ruling on an erroneous view of the law, makes a clearly erroneous assessment of the evidence, or renders a decision that cannot be located within the range of permissible decisions. *See Attestor Master Value Fund LP v. Argentina*, 113 F.4th 220, 227 (2d Cir. 2024), *cert. denied* ___U.S.___. 2025 WL 299527 (Jan. 27, 2025).

## ARGUMENT

# I

## THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING THE RULE 60(d) MOTION WITHOUT ALLOWING BRUTUS DISCOVERY

### A. Governing Legal Principles

In this Circuit, a fraud on the court warranting relief under Fed. R. Civ. P. 60(d) is a uniquely offensive violation that results in a fundamental corruption of the judicial process. "Fraud upon the court as distinguished from fraud on an adverse party is limited to fraud which seriously affects the integrity of the normal process of adjudication." *King v. First American Investigations, Inc.*, 287 F.3d 91, 95 (2d Cir.) (cleaned up), *cert. denied* 537 U.S. 960 (2002). It "embraces only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetuated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." *Hadges.*, 48 F.3d at 1325 (internal quotation marks omitted). As such, "it threatens the very integrity of the judiciary and the proper administration of justice." *Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir. 1988). That said, the doctrine "should be characterized by flexibility and an ability to meet new situations demanding equitable intervention." *Leber-Krebs, Inc. v. Capitol Records*, 779 F.2d 895, 900 (2d Cir. 1985); *see also Intern'l Technologies Marketing, Inc. v. Verint Sys. Ltd.*, 991 F.3d 361, 369 n.7 (2d Cir. 2021) (same).

A fraud on the court must be proven by "clear and convincing evidence." *Mazzei v. The Money Store*, 62 F.4th 88, 93 (2d Cir. 2023); *see also King*, 287 F.3d at 95 (same). But this Court has not addressed whether and under what circumstances discovery is available to a party trying to make that showing. In considering that issue, one district court in this Circuit observed that "[t]here is a dearth of cases discussing a party's right to post-trial or post-judgment discovery other than discovery . . . in aid of enforcing a judgment or execution." *Rusk v. New York State Thruway Auth.*, 2021 WL 230917, at *4 (W.D.N.Y. Jan. 22, 2021) (internal quotation marks omitted).

Before granting post-judgment discovery, some courts "require that the movant make a 'colorable' claim of fraud, while others appear to require a *prima facie* showing." *Id.* (listing cases). Meanwhile, other courts have merely required "some evidence" of fraud before allowing discovery. *See LabMD, Inc. v. Tiversa, Inc.*, 2016 WL 3695381, at *3, 6 (N.D. Ga. May 12, 2016) (granting post-judgment discovery upon showing of "some evidence" of fraud); *cf. H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1122 (6th Cir. 1976) (affirming denial of post-judgment discovery where party failed "to present some proof" of fraud).

The First Circuit has offered guidance on this point. In *Pearson v. First NH Mortg. Corp.*, 200 F.3d 30 (1st Cir. 1999), the court held that "[o]nce the record evidence demonstrates a 'colorable' claim of fraud, the court may exercise its

discretion to permit preliminary discovery and evidentiary proceedings," *id.* at. 35. However, in *Borzilleri v. Bayer Healthcare Pharmaceuticals, Inc.*, 24 F.4th 32 (1st Cir. 2022) – an FCA case – that court adopted a more demanding standard. Where a relator in a FCA case "seeks discovery to establish" that the Government has committed fraud on the court, the First Circuit held, "the court may grant that request only if the relator makes a substantial threshold showing to support his claims," *id.* at 44 (setting discovery standard for hearing on government's motion to dismiss *qui tam* claim over relator's objection).

But this Court need not adopt a definitive discovery standard now. Despite the district court's astonishing disregard for the record, Brutus most certainly made a "substantial threshold showing" of the Government's misconduct, if not a clear and convincing one. *Borzilleri*, 24 F.4th at 44.[3] And that showing was more than enough to compel discovery here.

## B. The District Court Abused its Discretion by Denying the Rule 60(d) Motion Without At Least Granting Brutus Discovery

The district court denied the Rule 60(d) Motion, describing "Brutus's allegations of fraud threadbare." (JA 558). According to the district judge, Brutus did "not give[] the Court a basis on which to find that the Government made a false

---

[3] In its summary order affirming the district court's dismissal decision, this Court relied on the *Borzilleri* standard to conclude that Brutus had not made an adequate showing for discovery. *See Brutus Trading III*, 2023 WL 5344973, at *3.

representation to the Court." (*Id.*). The district judge similarly concluded that the "Court ha[d] not been given any basis to discredit [the Government's] representations," and that Brutus had failed to "supply a basis to determine that the Government acted to deceive or with conscious awareness that its findings were incorrect." (*Id.*).

Those findings are inexplicable and indefensible. They rest on the district court's indifference to the *thousands* of undisputed criminal banking transactions – worth many billions of U.S. dollars and involving known terrorist fronts – that the Government withheld from consideration. Indeed, the Government had affirmatively denied their very existence. But as the *only* digital forensic analysis in the record establishes, the Government's denials "simply cannot be reconciled with" the Decloaked Data. (JA 144). And without any factual support to back the court's contrary findings, they constitute "a clearly erroneous assessment of the evidence," which resulted in a ruling "that cannot be located within the range of permissible decisions." *Attestor Master Value Fund LP*, 113 F.4th at 227 (cleaned up) (stating abuse-of-discretion standard); *see also Buon v. Spindler*, 65 F.4th 64, 74 (2d Cir. 2023) (same).

### 1. The Decloaked Data is Compelling Evidence that the Government Defrauded the Court

To dismiss this case, the Government Declarants insisted that the Brutus Data contained no evidence of SCB's post-2007 violations of Iran sanctions. (JA 24, 28,

28

54-55, 71-72, 79, 89-93, 97, 104, 106, 113-15, 139-40).  On the prior appeal, the Government again relied on that evidence and thereby secured this Court's affirmance of the district court's ruling.  The record is now clear, however, that the Government's statements were riddled with material misrepresentations.  And because those falsehoods were presented to the district court in declarations from no fewer than four federal and state agencies, all coordinated by the U.S. Department of Justice, this case raises the credible specter of "a deliberately planned and carefully executed scheme to defraud" the court of a kind that threatens "the integrity of the judicial process."  *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245-46 (1944).

The Decloaked Data put the lies directly to the Government Declarants in irrefutable detail.  Indeed, the scope and gravity of those misrepresentations are nearly unfathomable.  SCB's own digital spreadsheets show that, between 2008 and 2013, the Bank surreptitiously conducted at least $100 Billion in FX transactions for sanctioned, Iran-related clients.  They also specifically document numerous forbidden SCB transactions that made billions of U.S. dollars available to terrorist operatives around the world.  (JA 143, 235-36).

The Government did *not* contest those facts.  It offered nothing to dispute the extensive forensic analyses submitted by Brutus.  Instead, it simply ignored the explosive content of the Decloaked Data.  The Government's complete silence in

response to those factual revelations should be heard as a loud and damning admission of its misconduct. *See United States v. Aponte*, 31 F.3d 86, 87 (2d Cir. 1994) ("an admission by silence is admissible if there are circumstances which render it more reasonably probable that a man would answer the charge against him than he would not" (internal quotation marks omitted)).

The district judge rejected that commonsense conclusion, satisfied that "the Government has repeatedly detailed its thorough investigation of Standard Chartered and the reasons it found Brutus's evidence, including the spreadsheets that Brutus claims to have 'decloaked,' do not substantiate [Brutus's] allegations." (JA 558). But that logic assumes its conclusion. The Rule 60(d) Motion convincingly challenged the *veracity* of the Government's prior investigative findings – exposing their falsity on a staggering scale. The district court cannot skirt the Government's deception by simply echoing the Government's deception. In the face of incriminating evidence, a fraudster's mere denial of misconduct cannot dispel the charge.

Yet, the district judge found that Brutus had not "given [him] any basis to discredit [the Government's] representations." (JA 559). Instead, the district court erroneously likened the Rule 60(d) Motion to a "*subjective* disagreement with the Government's investigative strategy and ultimate decision," which did "not provide the Court with a basis to second-guess the Government's decision to dismiss the

case." (*Id.* (emphasis added and internal quotation marks omitted)). That is a fundamental mischaracterization of the evidence submitted by Brutus.

There was absolutely nothing "subjective" underlying the Rule 60(d) Motion. Brutus's claim of fraud on the court rests entirely upon *objective* proof (*i.e.*, the Decloaked Data), which the Government never disputed. Documentary evidence of SCB's extensive criminal operations concretely supports an *objective* challenge to the Government's honesty, not some "subjective disagreement" with the Government's story. (JA 559 (internal quotation marks omitted). The district court's contrary determination – that "Brutus has not shown conduct approaching fraud at all, let alone fraud which seriously affects the integrity of the normal process of adjudication" – finds no support in the record. (*Id.* (internal quotation marks omitted)).

### 2. There is a Strong Basis to Conclude that the Government Knowingly Misled the Court

The district court made another clearly erroneous finding. Again, ignoring the Decloaked Data, the district court decided that "Brutus's disagreement with the Government's factual conclusions" failed to "supply a basis to determine that the Government acted to deceive or with conscious awareness that its [representations to the court] were incorrect." (JA 559). For several reasons, that assessment cannot survive even the most superficial challenge.

*First*, the enormity of the Government's misrepresentation is, itself, powerfully indicative of scienter. The Government told both the district court and this Court that the Brutus Data contained no evidence of post-2007 sanction violations. In sharp contrast, the Decloaked Data now undisputedly shows that SCB engaged in approximately $100 Billion in illegal post-2007 Iran-related transactions, including transactions with notorious components of the Iranian military complex and its terrorist proxies. The sheer "magnitude" of that discrepancy "renders less credible" any notion that the Government believed the truth of its representations. *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000); *see also In re Barclays PLC Sec. Litig.*, 2024 WL 757385, *20 (S.D.N.Y. Feb. 23, 2024) ("the magnitude of an alleged fraud can be significant circumstantial evidence of scienter" (internal quotation marks omitted)).

*Second*, "when a party conducts an audit so deficient as to amount to no audit at all, or disregards signs of fraud so obvious that [it] must have been aware of them," a strong inference of fraudulent intent arises. *In re Advanced Battery Technologies, Inc.*, 781 F.3d 638, 644 (2d Cir. 2015); *cf. United States v. Joyce*, 542 F.2d 158, 161 (2d Cir. 1976) (a party's "studied effort to avoid conclusions from surrounding facts is probative of" scienter), *cert. denied sub nom. Teri v. United States*, 429 U.S. 1100 (1977). Taking the Government at its word, that both the FBI and OFAC thoroughly examined the Brutus Data, "it is virtually inconceivable" that the Government was

32

unaware that its representations to both the district court and this Court were blatantly false. *Christine Asia Co. Ltd. v. Ma*, 718 Fed. App'x 20, 23 (2d Cir. 2017) (Summary Order) (corporation's failure to disclose secret meeting with powerful regulators to investors before company's IPO was "strong circumstantial evidence of scienter").

One notable example brings the point home. The Decloaked Data shows that, after 2007, SCB was doing extensive business with Euro African Group Ltd. ("EAG"), a Gambian-based petroleum company controlled by Hezbollah financier Mohammad Ibrahim Bazzi. (JA 155, 159-61). It is public record that EAG's corporate offices are located on the second floor of the *Standard Charted Bank* Building, Kairaba Avenue, Banjul, Gambia. (JA 183). At best, only the most severe case of willful blindness could explain the Government's failure to make and disclose the obvious incriminating connection.

*Third*, the Department of Justice "has a specific *duty not to mislead*" and "should, of course, never make affirmative statements contrary to what it knows to be the truth." *United States v. Universita*, 298 F.2d 365, 367 (2d Cir.) (emphasis added), *cert. denied* 370 U.S. 950 (1962). And yet, the Decloaked Data firmly indicates that the Government "acted at least with a reckless disregard for a known or obvious duty to disclose" crucial information, which also provides solid evidence of fraudulent intent. *Indiana Public Retirement Sys. v. SAIC, Inc.*, 818 F.3d 85, 96

(2d Cir. 2016), *cert. dismissed* 585 U.S. 1001 (2018); *see also Oklahoma Firefighters Pension and Retirement Sys. v. Musk*, 2023 WL 6393865, at *15 (S.D.N.Y. Sep. 29, 2023) (scienter can be shown "through facts that suggest the defendants knew they had a duty to disclose information they withheld" (cleaned up)).

Here, by denying the existence of SCB's cloaked illegal transactions to the district court (and to this Court), the Government unmistakenly violated – and continues to violate – its "general duty of candor and truth." *United States v. Shaffer Equipment Co.*, 11 F.3d 450, 458 (4th Cir. 1993). That breach can constitute fraud on the court, for example, even when it stems from a government attorney's "reckless disregard for [his or her] duty to the court . . . to disclose . . . documents in [the government's] possession." *Demjanjuk v. Petrovsky*, 10 F.3d 338, 350 (6th Cir. 1993) (government attorneys' reckless disregard for duty to disclose exculpatory evidence to court in denaturalization proceedings established fraud on the court), *cert. denied* 513 U.S. 914 (1994). The case against the Government here is much stronger. To be sure, the Decloaked Data expose governmental misconduct that goes beyond a mere "reckless disregard" for the truth.

The immense importance of candor in this case is immeasurable. The Supreme Court has stressed that the duty of candor is the ongoing obligation of every lawyer "to inform the Court of any developments that may conceivably affect the outcome of the litigation." *Tiverton Bd. of License Commissioners v. Pastore*, 469

U.S. 238, 240 (1985) (internal quotation marks omitted). It is a solemn responsibility that "takes its shape from the larger object of preserving the integrity of the judicial system." *Shaffer Equipment Co.*, 11 F.3d at 458.

It should have been more than obvious to the Government that the thousands of unlawful transactions buried deep in the Brutus Data, involving sanctioned Iranian entities and known terrorists, might "conceivably affect the outcome" of this litigation. *Tiverton Bd. of License Commissioners*, 469 U.S. at 240; *see also Shaffer Equipment Co.*, 11 F.3d at 458-59 (government attorney breached duty of candor by failing to disclose that expert witness misrepresented his credentials); *Cleveland Hair Clinic, Inc. v. Puig*, 200 F.3d 1063, 1067-68 (7th Cir. 2000) (counsel breached duty of candor by failing to inform court of simultaneously filed state court action); *Centauri Shipping, Ltd. v. Western Bulk Carriers KS*, 528 F. Supp.2d 197, 202 (S.D.N.Y. 2007) (Sullivan, *J.*) (counsel breached duty of candor by failing to inform court of false statement in declaration). And yet, to date, the Government has still not said anything about the Decloaked Data or even that they exist. Its utter lack of candor leaves fraudulent intent hanging heavily over this case.

With the recent release of a startling publication by the U.S. Senate Judiciary Committee, that cloud has become much darker. On March 4, 2025, the Committee's majority staff and its chairman, Senator Charles E. Grassley, issued a report entitled, *State Department Obstruction of Law Enforcement Action Against*

*Iran's Weapons of Mass Destruction and Ballistic Missile Programs Under Then-Secretary of State Johnn Kerry* (the "Senate Judiciary Report").[4]  Relying on Justice Department and FBI email records and statements by government whistleblowers, the Senate Judiciary Report concludes that, during 2015 through 2016, the State Department's "brazen political calculus forced the FBI to stand down on efforts to arrest and indict individuals who provided support for Iran's nuclear and ballistic missile programs."  (SPA 48).

Specifically, the Committee found that, "before and after the Iran Nuclear Deal was finalized, the State Department prevented the FBI and other U.S. law enforcement agencies from enforcing U.S. sanctions and export control violations against Iranians."  (SPA 4).  According to the report, "the email records expose that the FBI and Justice Department [officials] failed to stop [the State Department's] political interference and obstruction."  (*Id.* at 48).  Quoting from a whistleblower's account, the Committee summarizes the dire consequences of stymying those law enforcement efforts:  "'Tragically, the constant unlawful interference hindered and obstructed hundreds of investigations into thousands of illegal acts, all of which benefited the Iranian regime, its military, and proxies.'"  (*Id.*).

---

[4]The Senate Judiciary Report is found online at: https://www.grassley.senate.gov/imo/media/doc/grassley_report_state_dept_obstruction_of_law_enforcement_action_against_iran.pdf.  For the Court's convenience, Brutus has included a copy of the report in the special appendix ("SPA") to its brief.

The federal criminal investigation into SCB's Iran-related sanctions violations spanned between 2012 and 2019. (JA 40). As reported by the Senate Judiciary Committee, the Government's forced cessation of similar investigations occurred right in the middle of that period. Hence, it is not at all far-fetched to ask whether the Government had some related, undisclosed interest in downplaying the severity of SCB's sanctions violations, perhaps as part of "put[ting] political considerations of the Iran Nuclear Deal above U.S. national security." (SPA 32).

Although this Court may not take judicial notice of the Senate Judiciary Committee's substantive findings, it may take notice that the Committee is probing the Government for evidence of secretly suppressed Iran sanctions enforcement in the last decade. *See Staehr v. Hartford Financial Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("it is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents" (emphasis in original)); *see also Tyler v. City of Kingston*, 74 F.4th 57, 62 & n.4 (2d Cir. 2023) (taking judicial notice that "Common Council allocated time for public comment" because it was listed on Common Council's public agenda). That fact makes a difference here. Brutus's convincing proof of the Government's fraudulent intent is surely enhanced by the Senate Judiciary Committee's own suspicion that the Government covertly scuttled Iran sanctions investigations while publicly claiming to proceed with them full steam.

37

### 3. Discovery is Especially Warranted Because Brutus was Denied Discovery Throughout All Prior Proceedings in this Case

A party cannot pursue a claim of fraud on the court where there was "an adequate opportunity to redress the alleged fraud in the prior action." *Mazzei*, 62 F.4th at 93; *see also Gleason*, 860 F.2d at 560 (same). But where, as here, "there was *no* opportunity" to "fully litigate[]" that claim "in the original action," a party may set aside the judgment by showing that the court was defrauded. *Gleason*, 860 F.2d at 560; *see also Leber-Krebs, Inc.*, 779 F.2d at 899 (vacating judgment where plaintiff "had no opportunity to set aside" order procured by fraud on the court in prior proceedings); *Rusk*, 2021 WL 230917, at *6 ("[f]raud on the court [can] be found" where party had no opportunity to challenge misrepresentation in prior action). Stated slightly differently, "to prove fraud on the court, a litigant must have been prevented from fully and fairly presenting her case." *Mazzei*, 62 F.4th at 94.

In this case, Brutus was barred from effectively challenging the Government's fraud because: (1) under the FCA, it had *no* right to take discovery; and (2), when Brutus moved for leave to take discovery, the Government opposed the motion, and the district court denied it. *See* SDNY Dkt. No. 47. The fact that Brutus could not test the truth of the Government's argument should be dispositive. Absent that safeguard in the adversarial system, the Government could (and did) "abuse[] the [judicial] process at a level that is utterly inconsistent with the orderly administration

of justice." *Shaffer Equipment Co.*, 11 F.3d at 462. That conduct is fraud on the court.

*Mazzei* emphasizes that, "[o]ur adversarial process relies on the parties to keep one another in check. It affords them broad discovery and disclosure supervised by judicial officers, reinforced by sanctions as well as other truth-seeking tools." *Mazzei*, 62 F.4th at 95. Not in this case. Brutus had no resort to "truth-seeking tools" to keep the Government "in check," much less "broad discovery." *Id.*

For its part, the district court turned a blind eye to Brutus's lopsided battle. Without even acknowledging the problem,[5] the district court peremptorily insisted that "Brutus ha[d] been given ample opportunity to pursue" a claim of fraud on the court. (JA 559). According to the district judge, Brutus had previously tried and "simply failed" to set aside the judgment based upon different evidence *obtained from public news articles*. (*Id.*). But that observation completely sidestepped the critical issue. The district court notably overlooked that Brutus also had no discovery to support its "earlier bid" for Rule 60 relief. (*Id.*).

Finally, the district court concluded that the predicate for the Rule 60(d) Motion – *i.e.*, that Brutus only recently decloaked thousands of SCB's illegal

---

[5] The Rule 60(d) Motion squarely maintained that the Government was able to defraud the court because Brutus was never permitted discovery. *See* SDNY Dkt. No. 142.

transaction hidden deep within the Bank's digital spreadsheets – "cannot be taken seriously." (JA 559). The district judge reasoned that "Brutus has had possession of these materials for years," and that "Brutus, not the Government or the Court, [was] responsible for its decision to wait until recently to pursue the 'decloaking' of the data within these files on which it now relies." (*Id.* at 559-60).[6] That dismissive attitude misapprehends both the facts and the law.

Contrary to the district court's premise, the circumstances of this case were not such that Brutus "could have prevented the fraudulent judgment through proper diligence." *Marco Destin, Inc. v. Levy*, 111 F.4th 214, 220 (2d Cir. 2024) (internal quotation marks omitted), *cert. denied* ___ U.S.___, 2025 WL 663716 (March 3, 2025). The delayed development of this case had nothing to do with diligence. It had everything to do with deception.

Notably, the Government did *not* dispute that: (1) ordinary business professionals, such as Brutus's principals, are generally unaware that Excel spreadsheets can store data deep within their program structures; and (2) Brutus did not learn about that functionality until *2024*, when Julian Knight first met with a trained digital forensic investigator. (JA 235 & n.1). Nor did the Government

---

[6] That statement is both oddly defensive and perversely mistaken. Brutus never suggested that it was the district court's responsibility to pursue decloaking the Bank's digital spreadsheets. And any argument that the Government was not independently required to disclose even the existence of unseen SCB transactional information to the district court ignores the Government's duty of candor.

dispute that the decloaking process involves highly specialized, technical, and arduous work. *See* SDNY Dkt. No. 137. The district court's determination that Brutus negligently "wait[ed] until recently to pursue the 'decloaking' of the data" is therefore both inaccurate and misleading. (JA 375). Indeed, one "cannot easily understand how, under the admitted facts, [a party] should have been expected to do more than it did to uncover the fraud." *Hazel-Atlas Glass Co.*, 322 U.S. at 246.

In any event, "a court has '*discretion*' to vacate a judgment even where the plaintiff was not diligent in the underlying action, at least in cases of particularly brazen fraud on the court." *Marco Destin, Inc.*, 111 F.4th at 221 (emphasis in original). The Decloaked Data expose a brazen fraud. And if ever there were a case in which "public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud," this is it. *Hazel-Atlas Glass Co.*, 322 U.S. at 246. The Government's demonstrable misrepresentations to both the district court and this Court – denying SCB's mercenary pact with international killers – are the type of fraud that "cannot complacently be tolerated consistently with the good order of society." *Id.*

The Rule 60(d) Motion should not have been denied for any claimed lack of diligence, and the district court abused its discretion by ruling otherwise. Accordingly, this Court should vacate the Order with instructions that Brutus may take discovery in support of the Rule 60(d) Motion.

**II**

**THE DISTRICT COURT IMPROPERLY DENIED THE UNSEALING MOTION**

For its last act, the district court agreed with SCB – a recidivist violator of Iran economic sanctions that admittedly and repeatedly lied to federal and state regulators – to shield the Bank's staggering criminality from public scrutiny. That decision is riddled with error. Because the district court's ruling sharply deviates from mandatory legal analyses and flouts the important constitutional and common law presumptions of public access to judicial documents, it must be reversed.

**A. Governing Legal Principles**

The "'presumption of access' to judicial records is secured by two independent sources: the First Amendment and the common law." *Bernstein,* 814 F.3d at 141; *see also Attestor Master Value Fund L.P.*, 113 F.4th at 235. At the threshold, a determination that a particular "'document is a 'judicial document' triggers a presumption of public access, and requires a court to make specific, rigorous findings before sealing the document or otherwise denying public access.'" *Bernstein*, 814 F.3d at 141 (quoting *Newsday LLC v. Cty. of Nassau*, 730 F.3d 156, 167 n.15 (2d Cir. 2013)). To "be designated a judicial document, the item filed must be relevant to the performance of the judicial function and useful in the judicial process." *Lugosch v. Pyramid Co. of Onandaga*, 435 F.3d 110, 119 (2d Cir. 2006) (internal quotation marks omitted). In turn, a document is "relevant to the

42

performance of the judicial function if it would reasonably have a *tendency* to influence a district court's ruling on a motion." *Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) (internal quotation marks omitted and emphasis in original).

The analyses of the constitutional and common law doctrines of public access are "somewhat different." *Bernstein*, 814 F.3d at 141. A "strong form" of the presumption "is rooted in the First Amendment." *Newsday LLC*, 730 F.3d at 163. In considering whether that doctrine applies, courts consider if the documents: (1)"'have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question;" and (2) "'are derived from or are a necessary corollary to the capacity to attend the relevant proceedings.'" *Id.* at 164 (quoting *Lugosch*, 435 F.3d at 120). Once established, the First Amendment presumptive right of access can only be "'overcome by specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim.'" *Id.* at 165 (quoting *Lugosch*, 435 F.3d at 124). This Court has consistently held that "[b]road, general, and conclusory findings are insufficient" to seal a judicial document. *Id.*; *see also Matter of New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987) ("Broad and general findings by the trial court . . . are not sufficient to justify closure."), *cert. denied* 485 U.S. 977 (1988).

A "slightly weaker" presumption of access is afforded by common law. *Newsday LLC*, 730 F.3d at 163. "When the First Amendment protection doesn't apply to court records, the . . . common law right attaches with different weight depending on two factors: (a) the role of the material at issue in the exercise of Article III judicial power and (b) the resultant value of such information to those monitoring the federal courts." *Attestor Master Value Fund LP*, 113 F.4th at 235 (internal quotation marks omitted). That right "is balanced against countervailing interests favoring secrecy," *Newsday LLC*, 730 F.3d at 165, such as the "danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure," *Lugosch*, 435 F.3d at 120 (internal quotation marks omitted). That said, the "appropriateness of making court files accessible is accentuated in cases," like this one, "where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch." *F.T.C. v. Standard Financial Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987).

Importantly, "under either analysis, parties must have a valid reason to seal materials." *Attestor Master Value Fund LP*, 113 F.4th at 235. None exists here.

**B. The District Court Failed to Determine Whether and to What Extent the Presumptions of Public Access Apply to Exhibit K**

Exhibit K is a "judicial document" subject to both presumptions. No one can seriously argue otherwise. Brutus filed Exhibit K in the district court as the factual foundation for the Rule 60(d) Motion. It was undeniably "relevant to the performance of the judicial function," *Bernstein*, 814 F.3d at 139 (internal quotation marks omitted), because it "would reasonably have the *tendency* to influence a district court's ruling on a motion," *Brown*, 929 F.3d at 49. In short, Exhibit K is at the heart of an "adjudication" and should play a central role "in determining litigants' substantive rights." *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995).[7] The presumption of public access to Exhibit K is therefore "at its zenith and thus can be overcome only be extraordinary circumstances." *Berstein*, 814 F.3d at 142 (cleaned up); *see also Gambale v. Deutsche Bank AG*, 377 F.3d 133, 140 (2d Cir. 2004) ("the presumptive right to public observation is at its apogee when asserted with respect to documents relating to matters that directly affect an adjudication" (internal quotation marks omitted)).

---

[7] Applying that logic, pleadings and summary judgment motions are, as a matter of law, judicial documents subject to the presumptive right of access. *See, e.g., Bernstein*, 814 F.3d at 140 (pleadings); *Lugosch*, 435 F.3d at 123 (materials submitted in support of summary judgment). There is no reason to treat Exhibit K any differently.

That being so, the district court "failed to conduct the requisite particularized review" for maintaining judicial documents under seal. *Brown*, 929 F.3d at 44. Instead, without evaluating the central importance of Exhibit K to deciding the Rule 60(d) Motion, it summarily concluded that "Exhibit K is properly maintained under seal[] to protect the interests of unrelated third parties." (JA 377 n.4). But that is precisely the type of broad, conclusory, and general finding that *cannot* justify keeping a judicial document under seal. *See Newsday LLC*, 730 F.3d at 164; *Lugosch*, 435 F.3d at 120. And to the extent that the district court "held that privacy interests outweigh the presumption of public access in each of the" countless transactions contained in the Brutus Data, "that decision – which appears to have been made without particularized review – amounts to an abuse of discretion." *Brown*, 929 F.3d at 50-51; *see also Matter of New York Times Co.*, 828 F.2d at 116 ("wholesale sealing of the motion papers was more extensive than necessary to protect . . . privacy interests of third persons").

There are no "higher values" for First Amendment purposes, or "countervailing factors" in the common law context, to support the seal. The Government took no position on the Unsealing Motion, so clearly there are no personal safety or national security issues at play. (JA 342). And SCB's specious concerns regarding the authenticity of the Decloaked Data are already debunked. Neither the Government nor SCB had ever before challenged the district court's

consideration of Exhibit K on authenticity grounds.  Nor, in opposing the Unsealing Motion, did SCB submit any proof challenging the accuracy of Exhibit K's contents, despite being in the best technical position of any party to do so.

Similarly, the Bank provided no factual basis for keeping the seal in place to protect any hypothetical business information, such as claimed "customer names, contact information, transaction dates, trade volume and revenue information." (JA 377 n.4 (internal quotation marks omitted)).  Certainly, in the First Amendment analysis, the burden is "on the party that delays access [to judicial documents] to justify the delay." *Courthouse News Serv. v. Corsones*, __ F.4th __, 2025 WL 758028, at *5 n.12 (2d Cir. March 11, 2025).  Here, though, that is very likely an impossible burden for SCB to meet, considering that the Decloaked Data are over twelve years old.  It is hard to imagine that the public's right to access judicial documents "does not outweigh[] any potential detriment to SCB or its legitimate clients "from the public docketing of years-old" banking transactions.  *Deutz Corp. v. Engine Distribs., Inc.*, 2019 WL 13207635, at *13 (N.D. Ga. Nov. 18, 2019), *aff'd* 846 Fed. App'x 883 (11 Cir. 2021).

In any event, Brutus made clear to the district court that it would "fully cooperate in implementing narrowly tailored restrictions to the release of transactional data," which would "shield the identity and account numbers of SCB clients" that were neither terrorists nor otherwise subject to sanctions against Iran

and its affiliates. (JA 345). With those reasonable limitations in place, there is absolutely no reason to withhold Exhibit K from public access. Nevertheless, the district court disregarded that practical solution and, instead, arbitrarily preserved a blanket seal.

That decision cannot stand. This Court ought to unseal Exhibit K now, subject to limitations proposed by Brutus. Or, at the very least, the Unsealing Motion should be remanded to the district court for proper consideration.

### III

#### THIS COURT SHOULD REASSIGN THE CASE TO A DIFFERENT DISTRICT JUDGE ON REMAND

If this case is remanded for further proceedings, Brutus respectfully requests that it be reassigned. "Reassigning a case to a different district judge, while not an everyday occurrence, is not unusual in this Circuit. *Logan v. City of New York*, 736 F.3d 118, 128 (2d Cir. 2013) (footnote omitted), *vac'd in part on other grounds*, 743 F.3d 362 (2d Cir. 2014). It "is simply a mechanism that allows the courts to ensure that cases are decided by judges without even an *appearance* of impartiality." *Id.* (emphasis in original); *see also Cullen v. United States*, 194 F.3d 401, 408 (2d Cir. 1999) ("There are occasions when a matter is appropriately remanded to a different

district judge . . . to preserve the appearance of justice." (internal quotation marks omitted)).[8]

In considering reassignment requests, this Court assesses whether: (1) the original judge would reasonably be expected on remand to have a substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected; (2) reassignment is advisable to preserve the appearance of justice; and (3) reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness. *See Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 142 (2d Cir. 2007). Here, the first two factors prevail.

During the Rule 60(d) Motion proceedings, the district judge made a series of intemperate statements that "might reasonably cause an objective observer to question the judge's impartiality." *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 21 (2d Cir. 1996). For example, before the Government had responded to the Rule 60(d) Motion, Brutus advised the district court of its concerns regarding the continuing participation of the Assistant U.S. Attorney who had been representing the Government. (JA 249). Brutus explained that, because the Government's

---

[8] Alternatively, this Court may, on its own motion, appoint a special master to hear and report whether the Government committed fraud on the court during Brutus's prior appeal. *See Demjanjuk*, 10 F.3d at 339 (appointing special master to investigate and report if government attorneys defrauded court of appeals by failing to disclose exculpatory evidence, which resulted in the affirmance of an extradition order)

counsel had been involved in submitting the Government's misleading statements to the court, he would be a key fact witness. (*Id.*). Trying to avoid impugning the Assistant U.S. Attorney's actions prematurely (and perhaps needlessly), Brutus requested a pre-motion conference with the district court "in the hope that a formal motion [would] not be necessary." (*Id.*).

The Government rejected the proposed conference. (JA 250). Brutus again explained its concern to the district court, emphasizing that, because the Government's counsel was "a central fact witness to the asserted fraud on the Court and, because it [was] reasonable to conclude that his own actions [were] implicated in that misconduct, he ha[d] a highly personal stake in the outcome of these proceedings." (JA 251).

The district court's response was unreasonably caustic. It "reject[ed] the request for the premotion conference," insisting that "[t]he motion for a premotion conference, and the proposed motion itself, appear[ed] to be a transparent bid to delay th[e] litigation by unnecessary hampering the Government's response to the pending motion to vacate." (JA 311 (footnote omitted). And before the motion was even fully briefed, the court also expressed doubt that "Brutus Trading [could] meet the high standard of proof required for motions to disqualify." (*Id.* (internal quotation marks omitted)).

Brutus was constrained to respond to the district court's accusations, respectfully reminding the district judge that:

- one way to demonstrate fraud on the court was to show that the challenged conduct involved an officer of the court and consequently the Government counsel's prior conduct was necessarily implicated by the Rule 60(d) Motion;

- by seeking a premotion conference, Brutus was hoping to resolve the disqualification issue quickly and informally and without resorting to litigation; and

- the Government, not Brutus, sought to extend the motion's briefing schedule.

(JA 313).

The district court denied Brutus's disqualification motion. (JA 540-51). In doing so, the court described Brutus' contentions as "meritless, to the point where they verge[d] on vexatious and frivolous." (*Id.* at 547). It further stated somewhat menacingly that Brutus could renew the motion later, "provided that one can be filed consistent with Federal Rule of Civil Procedure 11." (*Id.* at 549). As for Brutus's argument that Government counsel faced a conflict of interest, the district court rejected it as "undeveloped and specious" because, the judge concluded, Brutus's "allegation of fraud [was] wholly threadbare." (*Id.*).

Those statements were gratuitous, hostile, and lacked any factual basis. They were especially disquieting considering that Brutus had: (1) already submitted extensive and detailed forensic analyses demonstrating that the Government's prior representations to the court were grossly false and misleading; and (2) the

Government had not yet even responded to the Rule 60(d) Motion with any countervailing proof. Remarkably, even after the Government opposed the Rule 60(d) Motion *without* disputing Brutus's forensic evidence, the district court still described Brutus's fraud claim as "threadbare." (JA 558). Contrary to fact, the district judge insisted that Brutus had "not given [it] a basis on which to find that the Government made a false representation." (*Id.*). The district court went so far as to say that Brutus's "claim [could not] be taken seriously." (*Id.* at 559).

This Court has recognized that where "a judge makes an unwarranted venture into factfinding at a preliminary stage and brands a party's evidence as 'incredible' without hearing any witnesses, an objective observer would have a reasonable basis to question the judge's impartiality in assessing that evidence at trial." *United States v. City of New York*, 717 F.3d 72, 100 (2d Cir. 2013) (footnote omitted). In this case, the district court impulsively concluded that Brutus's arguments were "meritless," verging on "vexatious and frivolous," and could possibly support Rule 11 sanctions. (JA 547, 549). It described other arguments in an equally pejorative manner, calling them "threadbare" claims that "cannot be taken seriously." (*Id.* at 558, 559). Those sorts of "visceral judgment[s]" raise serious doubts whether a judge can "take an objective second look," and thus establish that "the appearance of justice would be well-served by reassignment on remand." *Shcherbakovskiy*, 490 F.3d at 142 (district judge's conclusions regarding "appellant's personal credibility, namely that his

denial of control was 'nonsense,' 'drivel,' a 'fraud,' and a 'lie,'" required judge's reassignment on remand).

Here, the district judge's comments can only "be viewed as rising beyond mere impatience and annoyance" and reflecting a deep-seated bias. *Ligon*, 736 F.3d at 128 (internal quotation marks omitted). Consequently, reassignment of this case is abundantly warranted.[9]

---

[9] The "multiple irregularities" in the district court's adjudication of the Rule 60(d) Motion also militate in favor of reassigning the case. *United States v. Dijbo*, 730 Fed. App'x 52, 61 (2d Cir. 2018) (Summary Order). One such instance involved the Unsealing Motion. Brutus requested the opportunity to reply to SCB's submission. (JA 341 n.1). The district court denied that request, stating that the "Court does not authorize replies." (*Id.* at 341). When, for the first time in *12 years*, and without submitting any factual support, SCB attacked the "provenance, authenticity, and accuracy" of the Brutus Data (JA 348), Brutus renewed its request for leave to refute the Bank's objection (*Id.* at 350). The district court denied Brutus's request again (*Id.* at 352) but nevertheless relied on SCB's unsubstantiated "concerns over the purported bank records of dubious accuracy and origin" in refusing to unseal Exhibit K. (*Id.* at 562 n.4 (internal quotation marks omitted). That decision smacked of bias. At the very least, the district court's conduct inappropriately conveyed "a lack of receptivity to [a party's] views and arguments," thereby warranting reassignment of the case now to a different judge. *United States v. Demott*, 513 F.3d 55, 57 (2d Cir. 2008).

Equally irregular was the district court's view that Brutus made "threadbare" allegations that did not provide "a basis on which to find that the Government made a false representation." (JA 559). The district court expressed that view without ever addressing *any* of the decloaked criminal transactions identified by Brutus. As a result, "the circumstances presented here raise enough of a question [regarding the court's potential bias or prejudice] that reassignment is necessary to preserve the appearance of justice." *Dijbo*, 730 Fed. App'x at 61.

## CONCLUSION

For all these reasons, the Order should be vacated, and the case remanded to

a different district judge for further proceedings in which Brutus may take discovery

in support of the Rule 60(d) Motion.

Dated: April 22, 2025

Respectfully submitted,

By: */s/ John M. Leventhal, Esq.*
John M. Leventhal
Aidala, Bertuna, & Kaimins, P.C.
546 Fifth Avenue, Suite 6
New York, NY 10036
Tel. (212) 486-0011
*Attorneys for Relator-Appellant*
*Brutus Trading LLC*

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit, Typeface Requirements and Type-Style Requirements.

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 12,392 words.

2. This document complies with the typeface requirements of Fed. S. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word (2019/Office) in 14-point font, Times New Roman.

Dated: April 22, 2025

Respectfully submitted,

By: */s/ John M. Leventhal, Esq.*
John M. Leventhal
Aidala, Bertuna, & Kaimins, P.C.
546 Fifth Avenue, Suite 6
New York, NY 10036
Tel. (212) 486-0011
*Attorneys for Relator-Appellant*
*Brutus Trading LLC*

# SPECIAL APPENDIX

i

# TABLE OF CONTENTS

Opinion and Order of Hon. Paul A. Engelmayer,
Dated August 12, 2024 (ECF No. 134)........................................................SPA-1

Opinion and Order of Hon. Paul A. Engelmayer,
Dated November 13, 2024, Appealed From (ECF No. 157).....................SPA-13

Majority Staff Report Committee on The Judiciary Chairman
Charles E. Grassley, Dated March 4, 2025, with Exhibits.....................SPA-24

Case 1:18-cv-11117-PAE    Document 134    Filed 08/12/24    Page 1 of 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA *ex rel.* BRUTUS
TRADING, LLC,

                          Plaintiffs,

           -v-

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, *and* STANDARD CHARTERED
TRADE SERVICES CORPORATION,

                         Defendants.

---

18 Civ. 11117 (PAE)

<u>OPINION & ORDER</u>

**PAUL A. ENGELMAYER, District Judge:**

       In this *qui tam* action brought on behalf of the United States, relator Brutus Trading, LLC

("Brutus Trading" or "relator") has alleged that defendants Standard Chartered Bank, Standard

Chartered PLC, and Standard Chartered Trade Services Corporation (together, "defendants" or

"Standard Chartered Bank") engaged in banking practices that violated U.S. sanctions against

Iran. In a July 2020 decision, the Court dismissed Brutus Trading's complaint. It found that the

Government had articulated multiple valid purposes served by dismissal, and that Brutus Trading

had not carried its burden to show that a dismissal would be fraudulent, arbitrary and capricious,

or illegal. After filing a notice of appeal, Brutus Trading moved to reopen the case and moved

for an indicative ruling under Federal Rule of Civil Procedure 62.1 that, had the Court retained

jurisdiction, it would have vacated the dismissal based on disclosures in post-dismissal BuzzFeed

news reports pursuant to Rules 60(b) and (d). Brutus Trading alleged that these news reports

justified vacating the dismissal because they allegedly constituted newly discovered evidence

that exposed the Government's representations in its motion to dismiss filings as untrue. In an

October 2021 decision, the Court denied the motion, finding that the materials Brutus Trading

cited did not contradict the Government's representations. The Second Circuit affirmed both orders.

Brutus Trading now moves to: (1) set aside the Court's prior decision pursuant to Federal Rule of Civil Procedure 60(d)(3), based on the Government's allegedly having committed fraud on the Court by falsely denying that Standard Chartered Bank did not continue conducting illegal transactions after 2007; (2) appoint an independent expert, pursuant to Federal Rule of Evidence 706(a), to perform a forensic analysis on certain electronic transaction data files Brutus Trading previously provided the Government that allegedly demonstrate Standard Chartered Bank's illegal transactions with Iranian entities and foreign terrorist organizations; and (3) disqualify Assistant United States Attorney ("AUSA") Jean-David Barnea as counsel for the Government. Per the briefing schedule proposed by the parties and adopted by the Court, the Court here first resolves—and denies—the motion to disqualify. *See* Dkt. 120. At a later date, the Court will resolve the motions to vacate and to appoint an independent expert.

## I.    Relevant Background

### A.    Motion to Dismiss

The Court assumes familiarity with the facts and procedural history of this case, as extensively reviewed in previous opinions. *See* Dkt. 62 ("July Op."); Dkt. 97 ("October Op."). In brief, this matter stems from defendants' admitted practice, between 2001 and 2007, of deceptively facilitating U.S. Dollar transactions by Iranian clients, in violation of U.S. sanctions and various New York and federal banking regulations. *See* Dkt. 18 ("Second Amended Complaint," or "SAC") ¶¶ 27–32.[1] After a multi-year, multi-agency investigation, defendants entered into a 2012 Deferred Prosecution Agreement ("DPA") with the Department of Justice

---

[1] Except where specified, citations to the docket refer to the docket of 18 Civ. 11117 (PAE).

("DOJ")—and related settlements or consent agreements with the Office of Foreign Asset Control ("OFAC"), the Federal Reserve, the New York County District Attorney's Office ("DANY"), and the New York Department of Financial Services ("DFS")—to resolve the matter. Under these, defendants paid hundreds of millions of dollars in fines and penalties. *See id.* The 2012 DPA was publicly announced on December 10, 2012. *Id.* ¶¶ 29, 31–32.

On December 17, 2012, Brutus Trading—an entity formed by Julian Knight and Robert Marcellus for the purpose of pursuing this action—filed a *qui tam* action assigned to Judge Forrest. Brutus Trading alleged that defendants had misled the Government in negotiating the 2012 DPA. *United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank et al.*, No. 12 Civ. 9160 (KBF) ("*Brutus Trading I*"), Dkt. 36. It alleged that defendants had continued to violate the sanctions after 2007, notwithstanding their representations to the Government that they had ceased to do so. *Id.* ¶¶ 25–34.

In approximately August 2013, the Government informed Brutus Trading's counsel that it intended to decline to intervene in the case. Dkt. 31 ("Nov. 2019 Gov't Mem.") at 8; Dkt. 32 ("Nov. 2019 Komar Decl.") ¶¶ 24–25. The Government kept the complaint under seal, however, while it pursued a separate investigation of potential Iran sanctions violations by defendants (the "2013 Investigation"). Nov. 2019 Gov't Mem. at 8; Nov. 2019 Komar Decl. ¶ 31. On May 10, 2017, Judge Forrest unsealed the case, *Brutus Trading I*, Dkt. 19; on July 14, 2017, the Government notified Judge Forrest that it would not be intervening, *id.*, Dkt. 24. On September 19, 2017, Brutus Trading dismissed its complaint without prejudice. *Id.*, Dkt. 35.

On November 29, 2018, Brutus Trading re-filed its complaint, *see* SAC ¶ 37, which was assigned to this Court, with Judge Forrest having left the bench, Dkt. 1. In March 2019, the Government again declined to intervene, Nov. 2019 Gov't Mem. at 12; the case was later

3

Case 1:18-cv-11117-PAE    Document 134    Filed 08/12/24    Page 4 of 12

unsealed, Dkt. 3. On April 9, 2019, DOJ announced a new DPA (the "2019 DPA") with

defendants—and OFAC, the Federal Reserve, and DFS announced new settlement or consent

agreements with defendants—stemming from the results of the 2013 Investigation. *See* SAC

¶¶ 60–61; *see also* Dkt. 35 ¶¶ 11–16; Dkt. 58 ¶¶ 13–14.

On July 19, 2019, Brutus Trading filed its First Amended Complaint. Dkt. 15 ("FAC").

The FAC, *inter alia*, added the allegation that the 2019 DPA, like the 2012 DPA, "did not

address the broader course of conduct by [defendants] in violation of the Iran sanctions" alleged

by Brutus Trading's complaint. *Id.* ¶ 62. The FAC also advanced a new theory of recovery

based on alleged reverse false claims, *see* 31 U.S.C. § 3729(a)(1)(G), by defendants, FAC ¶¶ 63–

65.

On September 23, 2019, Brutus Trading filed its Second Amended Complaint. The SAC

added allegations that it had been the initial source of the information leading to the 2019 DPA

and related agreements, *see* SAC ¶¶ 64–65, and was thus entitled to a share of the Government's

recovery from those agreements, *id.* ¶ 69.

On November 21, 2019, the Government filed a motion to dismiss the SAC, Dkt. 30, a

supporting memorandum of law, Dkt. 31, and declarations, Dkts. 32–35. On January 10, 2020,

Brutus Trading filed a memorandum of law in opposition, Dkts. 48–49, with attached exhibits

and declarations. On February 28, 2020, the Government filed a reply, Dkt. 54, and associated

exhibits and affirmations, Dkts. 54–58. On March 13, 2020, Brutus Trading filed a sur-reply,

Dkt. 61, with attached exhibits.

On July 2, 2020, the Court granted the Government's motion to dismiss Brutus Trading's

*qui tam* complaint. The Court held that the Government had proffered at least two valid reasons

for dismissal of the suit, and that Brutus Trading had not carried its burden to show that dismissal

4

would be fraudulent, arbitrary and capricious, or illegal. *See* July Op. at 8–9. On August 3, 2020, Brutus Trading filed a notice of appeal. Dkt. 66.

### B. Indicative Motion to Vacate

On October 27, 2020, Brutus Trading filed a motion to reopen the case, Dkt. 67, and a brief in support of its motion for an indicative ruling that, had the Court retained jurisdiction, it would have vacated the dismissal, Dkt. 68. The basis for the motion was a series of Buzzfeed News reports, which it claimed constituted newly discovered evidence and exposed as untrue the Government's representations in support of its motion to dismiss. On October 13, 2021, the Court denied the motion, finding that the new materials did not contradict the Government's representations. *See* October Op.

On November 3, 2023, the Second Circuit affirmed both the dismissal and the order denying the motion to reopen the case. Dkts. 98–100.

### C. Instant Motion

On July 9, 2024, Brutus Trading filed the instant motion to disqualify AUSA Barnea from further representing the Government, Dkt. 127, and a supporting memorandum of law, Dkt. 128 ("Relator Mem.") and declaration, Dkt. 131 ("McSweeney Decl."). On July 15, 2024, the Government filed its opposition. Dkt. 132 ("Gov't Opp."). On July 16, 2024, Brutus Trading filed a reply. Dkt. 133 ("Reply").

The basis for Brutus Trading's motion is the claim that AUSA Barnea, who has represented the Government since December 2012, is at the "center" of the Government's alleged fraud upon the Court, which is the basis for Brutus Trading's pending motion to vacate. Brutus Trading argues that AUSA Barnea, as a purported participant in the fraud, cannot represent the Government in connection with the claims of fraud given that he might be called as a witness in proceedings necessary to resolve the motion to vacate.

5

## II.     Applicable Legal Standards

### A.     Standards Applicable to Motion to Disqualify

"The authority of federal courts to disqualify attorneys derives from their inherent power to 'preserve the integrity of the adversary process.'" *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 126 F. Supp. 3d 413, 418–19 (S.D.N.Y. 2015) (quoting *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005)). "Generally, disqualification motions are disfavored, as they are often interposed for tactical reasons, and . . . even when made in the best faith, such motions inevitably cause delay." *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 281 (S.D.N.Y. 2011) (citation and internal quotation marks omitted). Accordingly, such motions are "subjected to a high standard of proof." *Id.* "Disqualification is only warranted in the rare circumstance where an attorney's conduct 'poses a significant risk of trial taint.'" *Decker v. Nagel Rice LLC*, 716 F. Supp. 2d 228, 231 (S.D.N.Y. 2010) (quoting *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981)). However, "any doubt is to be resolved in favor of disqualification." *John Wiley & Sons*, 126 F. Supp. 3d at 419.

Although federal courts look to state disciplinary rules in considering motions to disqualify, "such rules need not be rigidly applied as they merely provide general guidance." *Mori v. Saito*, 785 F. Supp. 2d 427, 432 (S.D.N.Y. 2011) (citation and internal quotation marks omitted). Rather, "[t]he disqualification of an attorney in order to forestall violation of ethical principles is a matter committed to the sound discretion of the district court." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990).

### B.     Witness-Advocate Rule

Brutus Trading's motion is premised primarily on the witness-advocate rule, as set forth in Rule 3.7 of the New York Rules of Professional Conduct. It provides that, subject to certain exceptions, "[a] lawyer shall not act as advocate before a tribunal in a matter in which the lawyer

6

is likely to be a witness on a significant issue of fact." N.Y. Rules Prof'l Conduct 3.7(a). "When one individual assumes the role of both advocate and witness it '[may] so blur [] the line between argument and evidence that the jury's ability to find facts is undermined.'" *Ramey v. Dist. 141, Int'l Ass'n of Machnists & Aerospace Workers*, 378 F.3d 269, 283 (2d Cir. 2004) (quoting *United States v. Arrington*, 867 F.2d 122, 126 (2d Cir. 1989)). For example, "[a] jury may view an attorney as possessing special knowledge of a case and therefore accord a testifying attorney's arguments undue weight." *MacArthur v. Bank of N.Y.*, 524 F. Supp. 2d 1205, 1208 (S.D.N.Y. 1981).

"Because courts must guard against the tactical use of motions to disqualify counsel, they are subject to fairly strict scrutiny, particularly motions under the witness-advocate rule." *Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009)). Disqualification under Rule 3.7(a) "is triggered only when the attorney actually serves as an advocate before the jury." *Finkel v. Frattarelli Bros.*, 740 F. Supp. 2d 368, 373 (E.D.N.Y. 2010); *see Ramey*, 378 F.3d at 282 ("The advocate-witness rule applies, first and foremost, where the attorney representing the client before a jury seeks to serve as a fact witness *in that very proceeding*."). Additionally, disqualification is warranted only where the testimony given by counsel is necessary. *Finkel*, 740 F. Supp. 2d at 373.

**III.    Discussion**

In moving to disqualify AUSA Barnea, Brutus Trading contends that his continued representation of the Government in connection with the pending motion to set aside the judgment pursuant to Rule 60(d)(3) would violate New York Rules of Professional Conduct 3.7 and 1.7. In that pending motion, Brutus Trading alleges that the Government committed fraud on this Court by falsely denying that Standard Chartered Bank transacted with Iranian entities and foreign terrorist organizations after 2007. Brutus Trading contends that because AUSA

7

Barnea represented the Government throughout the underlying litigation, he participated in the alleged fraud. It argues that AUSA Barnea would be an indispensable fact witness were the Court to conduct an evidentiary hearing in connection with the Rule 60(d)(3) motion.

For several reasons, Brutus Trading's contentions are meritless, to the point where they verge on vexatious and frivolous. They fall far short of the "high standard of proof" necessary to justify disqualification.

### A.    Witness-Advocate Rule

AUSA Barnea's continued representation does not violate the witness-advocate rule embodied in New York Rule of Professional Conduct 3.7 because the Court has not scheduled—and does not have plans to schedule—a trial or evidentiary hearing in the case at which AUSA Barnea would have to testify. In relevant part, New York Rule of Professional Conduct 3.7(a) provides that a "lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact." This rule "prohibits an attorney from representing a party where the attorney will be called as a witness." *Giuffre v. Dershowitz*, 410 F. Supp. 3d 564, 578 (S.D.N.Y. 2019). The "witness-advocate rule is concerned with preventing potential taint *at trial*." *Ross v. Blister*, 09 Civ. 8666, 2009 WL 4907062, at *3 (S.D.N.Y. Dec. 21, 2009).

As the Government rightly notes, there is no trial or evidentiary hearing scheduled in this case. Nor is there any prospect of an upcoming trial or evidentiary hearing. Quite the contrary, the case is currently closed. The Court dismissed it in July 2020 and the Second Circuit affirmed the dismissal. Brutus Trading's current bid to reopen the case almost four years later by filing the pending Rule 60(d)(3) motion is exceptionally unlikely ever to necessitate a trial or even an evidentiary hearing. The Court expects the Rule 60(d)(3) motion to be readily resolved on the papers, without a need for an evidentiary hearing. The Court, notably, did not need to conduct

8

an evidentiary hearing when it resolved (and denied) Brutus Trading's October 2020 motion for an indicative ruling that, had the Court retained jurisdiction, it would have vacated the dismissal based on newly discovered evidence.

Even if there were a colorable basis to project that an evidentiary hearing might be held in the future, with the Court not having scheduled one, under settled case law, it would be premature to disqualify AUSA Barnea based on Brutus Trading's conjecture that his representation of the Government at such a hearing would breach the witness-advocate rule. That is because, at such a preliminary stage, "it is impossible to determine how significant [counsel] might be as a witness or whether he is likely even to be called as a witness; whether his testimony would likely hurt or help his client; or whether his testimony would or would not be cumulative of other witnesses." *Prout v. Vladeck*, 316 F. Supp. 3d 784, 810 (S.D.N.Y. 2018); *see, e.g., id.* ("Here, where there is no record on which to base a disqualification motion, the Court cannot determine with sufficient certainty that defendants have borne their 'high burden' to show that [the attorney's] testimony will be necessary at trial or that the content of that testimony is likely to be prejudicial."); *Gabayzadeh v. Taylor*, 639 F. Supp. 2d 298, 304 (E.D.N.Y. 2009) (denying motion to disqualify where determination "would be merely speculative at this point" in litigation); *Rosefield v. Orentreich*, No. 98 Civ. 2721 (TPG), 1998 WL 567750, at *5–6 (S.D.N.Y. Sept. 4, 1998) (denying motion to disqualify where it was not clear that case would proceed to trial or that counsel would be called to testify; "too much remains unknown").

The Court therefore denies the motion to disqualify on the basis of the witness-advocate rule. There is no risk that AUSA Barnea's continued participation will taint this case. In the improbable event that an evidentiary hearing is one day scheduled, Brutus Trading will be at

liberty to renew such a motion, provided one can then be filed consistent with Federal Rule of Civil Procedure 11.

### B.    Conflict of Interest

Brutus Trading also briefly argues that disqualification is necessary under Rule 1.7(a)(2). That rule provides that "a lawyer shall not represent a client if a reasonable lawyer would conclude that . . . there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests." Brutus Trading declares that "[a]s an alleged participant in the fraud, Barnea should also be disqualified from representing the Government because 'a reasonable lawyer would conclude that there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own . . . personal interests.'" Relator Mem. at 8 n.2 (citing Rule 1.7(a)(2)).

This argument is undeveloped and specious. For one, Brutus Trading's allegation of fraud is wholly threadbare. "A fraud on the court occurs where it is established by clear and convincing evidence 'that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by . . . unfairly hampering the presentation of the opposing party's claim or defense.'" *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 393 (S.D.N.Y. 2010) (quoting *McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002)). The essence of fraud on the court is that "a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process." *Id.* But, even assuming the truth of Brutus Trading's claim that the Government wrongly denied that Standard Chartered Bank conducted unlawful transactions post-2007, that is a far cry from meaning that AUSA Barnea or any other government attorney intentionally deceived the Court. Indeed, in its Rule 60(d)(3) motion

briefing, Brutus Trading claims that "[w]ith the assistance of forensic data analysis, Brutus [Trading] was only recently able to reveal or 'decloak' countless illegal transactions that were hidden deep in the Bank's electronic spreadsheets, which Brutus [Trading] gave to the Government." Dkt 102 at 1. Given the difficulty that Brutus Trading itself purports to have had in "decloak[ing]" these alleged illegal transactions, there would be no reason to assume that Government counsel were aware of such misconduct by the bank, as opposed to not having investigated to a degree necessary to uncover such machinations.

Brutus Trading's allegations do not come to close to supporting the serious allegation that the Government or AUSA Barnea committed fraud on the Court by denying that Standard Chartered Bank engaged in illegal transactions. There is no basis to infer a conflict of interest between the AUSA Barnea and the Government—and Brutus Trading has done nothing to substantiate that claim.[2]

A motion to disqualify counsel is a severe sanction and is "subjected to a high standard of proof." *Copantitla*, 788 F. Supp. 2d at 281 (S.D.N.Y. 2011). Brutus Trading's submissions fall very far short of meeting that standard.

### CONCLUSION

The Court denies Brutus Trading's motion to disqualify. The Clerk of the Court is respectfully directed to terminate the motion pending at Docket 127.

---

[2] Brutus Trading also alleges that AUSA Barnea deliberately withheld from the Court the fact that (1) Brutus Trading met with DFS before filing its initial Complaint on December 17, 2012; and (2) DFS and OFAC had preliminary investigated Brutus Trading's allegations regarding Standard Chartered Bank's illegal activity before the Government began its investigation. These allegations do not avail Brutus Trading on this motion, for multiple reasons. For one, contrary to the claim that it hid this information, the Government points to several submissions in which it acknowledged both events. *See* Gov't Opp at 8–9. For another, these allegations do not appear relevant to either the motion to disqualify or the Rule 60(d)(3) motion.

The Court hereby directs the Government to respond to Brutus Trading's motions to vacate and to appoint an independent expert by August 23, 2024. Brutus Trading's reply is due August 30, 2024. This amended briefing schedule will permit the Court to resolve both motions simultaneously.[3]

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 12, 2024
     New York, New York

---

[3] This amends the briefing schedule at Docket 120 and implements the parties' suggestion, which is well-taken, that these motions be resolved simultaneously. *See* Dkt. 121.

**[SPA-13]**

Case 1:18-cv-11117-PAE     Document 157     Filed 11/13/24     Page 1 of 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA, *ex rel.* BRUTUS
TRADING, LLC,

                                                    Plaintiff,

                        -v-

STANDARD CHARTERED BANK, STANDARD
CHARTERED PLC, and STANDARD CHARTERED
TRADE SERVICES CORPORATION,

                                                    Defendants.

---

18 Civ. 11117 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

In this *qui tam* action brought on behalf of the United States, relator Brutus Trading, LLC

("Brutus"), has alleged that defendants Standard Chartered Bank, Standard Chartered PLC, and

Standard Chartered Trade Services Corporation (together, "defendants" or "Standard

Chartered"), after 2007, engaged in banking practices that violated U.S. sanctions against Iran.

In a July 2020 decision, the Court dismissed Brutus's Complaint, finding that the Government

had articulated multiple valid purposes served by dismissal, and that Brutus had not carried its

burden to show that a dismissal would be "fraudulent, arbitrary and capricious, or illegal."

Dkt. 62 ("July Op.") at 8–9. While Brutus's appeal was pending, it moved for an indicative

ruling under Federal Rule of Civil Procedure 62.1 as to whether the Court, based on information

allegedly leaked in post-judgment *Buzzfeed News* articles, would vacate the dismissal under

Rule 60. Dkt. 67. Brutus argued that these news reports justified vacating the dismissal because

they purportedly constituted newly discovered evidence exposing as untrue the Government's

representations in filings in support of dismissal. In an October 2021 decision, the Court denied

the motion, finding that the materials Brutus cited did not contradict the Government's

representations. Dkt. 97 ("October Op."). The Second Circuit affirmed both orders. Dkt. 100.

Brutus now moves to (1) set aside the Court's prior decisions pursuant to Rule 60(d)(3),

based on the Government's allegedly having committed fraud on the Court by falsely denying

that Standard Chartered did not conduct illegal transactions after 2007; and (2) appoint an

independent expert, pursuant to Federal Rule of Evidence 706(a), to perform a forensic analysis

on certain electronic transaction data files that Brutus previously provided the Government that it

contends demonstrate Standard Chartered's illegal transactions with Iranian entities and foreign

terrorist organizations. For the reasons that follow, the Court denies Brutus's motions.

## I.    Factual Background

### A.    Motion to Dismiss

The Court assumes familiarity with the case's facts and procedural history, as reviewed in

the decisions cited above.

In brief, this matter stems from defendants' admitted practice, between 2001 and 2007, of

deceptively facilitating U.S. dollar transactions by Iranian clients, in violation of U.S. sanctions

and federal and New York banking regulations. *See* Dkt. 18 ("Second Amended Complaint," or

"SAC") ¶¶ 27–32.[1] After a multi-year, multi-agency investigation, defendants entered into a

2012 Deferred Prosecution Agreement (the "2012 DPA") with the Department of Justice

("DOJ")—and related settlements or consent agreements with the Office of Foreign Asset

Control ("OFAC"), the Federal Reserve, the New York County District Attorney's Office, and

the New York Department of Financial Services ("DFS")—to resolve the matter. Under these,

---

[1] Except where specified, citations to the docket refer to the docket of 18 Civ. 11117 (PAE).

2

defendants paid hundreds of millions of dollars in fines and penalties. *See id.* The 2012 DPA was publicly announced on December 10, 2012. *Id.* ¶¶ 29, 31–32.

On December 17, 2012, Brutus, an entity formed by Julian Knight and Robert Marcellus for the purpose of pursuing this action, filed a *qui tam* action assigned to the Hon. Katherine B. Forrest. *Id.* ¶ 33; *see United States ex rel. Brutus Trading, LLC v. Standard Chartered Bank et al.*, No. 12 Civ. 9160 (KBF) ("*Brutus Trading I*"). Brutus alleged that, in negotiating the 2012 DPA, the defendants had misled the Government. *See Brutus Trading I*, Dkt. 36 ¶¶ 25–34. It alleged that defendants had continued to violate the sanctions after 2007, notwithstanding their representations that they had ceased to do so. *Id.*

In approximately August 2013, the Government informed Brutus's counsel that it intended to decline to intervene in the case. Dkt. 31 ("Nov. 2019 Gov't Mem.") at 8; Dkt. 32 ("Nov. 2019 Komar Decl.") ¶¶ 24–25. The Government kept the Complaint under seal, however, while it pursued a separate investigation of potential Iran sanctions violations by defendants (the "2013 Investigation"). Nov. 2019 Gov't Mem. at 8; Nov. 2019 Komar Decl. ¶ 31. On May 10, 2017, Judge Forrest unsealed the case, *Brutus Trading I*, Dkt. 19; on July 14, 2017, the Government notified Judge Forrest that it would not be intervening, *id.*, Dkt. 24. On September 19, 2017, Brutus dismissed its Complaint without prejudice. *Id.*, Dkt. 35.

On November 29, 2018, Brutus re-filed its Complaint, *see* SAC ¶ 37, which was assigned to this Court after Judge Forrest's resignation. Dkt. 1. In March 2019, the Government again declined to intervene, Nov. 2019 Gov't Mem. at 12; the case was later unsealed, Dkt. 3. On April 9, 2019, the DOJ announced a new DPA (the "2019 DPA") with defendants—and OFAC, the Federal Reserve, and DFS announced new settlement or consent agreements with

defendants—stemming from the results of the 2013 Investigation. *See* SAC ¶¶ 60–61; *see also* Dkt. 35 ¶¶ 11–16; Dkt. 58 ¶¶ 13–14.

On July 19, 2019, Brutus filed its First Amended Complaint. Dkt. 15 ("FAC"). It added, *inter alia*, the allegation that the 2019 DPA, like the 2012 DPA, "did not address the broader course of conduct by [defendants] in violation of the Iran sanctions" that Brutus's Complaint alleged. *Id.* ¶ 62. The FAC also advanced a new theory of recovery based on alleged reverse false claims, *see* 31 U.S.C. § 3729(a)(1)(G), by defendants, FAC ¶¶ 63–65.

On September 23, 2019, Brutus filed the SAC. It added allegations that it had been the initial source of the information leading to the 2019 DPA and related agreements, *see* SAC ¶¶ 64–65, and was thus entitled to a share of the Government's recovery from those agreements, *id.* ¶ 69.

On November 21, 2019, the Government filed a motion to dismiss the SAC, Dkt. 30, a supporting memorandum of law, Dkt. 31, and declarations, Dkts. 32–35. On January 10, 2020, Brutus filed a memorandum of law in opposition, Dkts. 48–49, with attached exhibits and declarations. On February 28, 2020, the Government filed a reply, Dkt. 54, and associated exhibits and affirmations, Dkts. 55–58. On March 13, 2020, Brutus filed a sur-reply, Dkt. 61, with attached exhibits.

On July 2, 2020, the Court granted the Government's motion to dismiss Brutus's *qui tam* Complaint. The Court found that the Government had proffered at least two valid reasons for dismissal of the suit, and that Brutus had not carried its burden to show that dismissal would be fraudulent, arbitrary and capricious, or illegal. *See* July Op. at 8–9. On August 3, 2020, Brutus filed a notice of appeal. Dkt. 66.

**B.    Indicative Motion to Vacate**

On October 27, 2020, Brutus filed a motion to reopen the case, Dkt. 67, and a brief in support of its motion for an indicative ruling that, had the Court retained jurisdiction, it would have vacated the dismissal, Dkt. 68. The basis for the motion was a series of *Buzzfeed News* reports, which Brutus claimed constituted newly discovered evidence that exposed as untrue the Government's representations in support of dismissal. *See* Dkt. 68 at 1–2, 4–9. On October 13, 2021, the Court denied the motion, finding that the new materials did not contradict the Government's representations.

On November 3, 2023, the Second Circuit affirmed the dismissal and the order denying the motion to reopen the case. Dkt. 100.

**C.    Instant Motions**

On May 31, 2024, Brutus filed the instant motion to vacate the judgment, Dkt. 101, a supporting memorandum of law, Dkt. 102 ("Brutus Br."), and associated exhibits and declarations, Dkts. 103–05. On July 9, 2024, Brutus filed the instant motion to appoint an independent expert, Dkt. 122, a supporting memorandum of law, Dkt. 123, and declarations, Dkts. 124–26. On September 6, 2024, the Government filed its opposition to both motions. Dkt. 137. On September 27, 2024, Brutus filed a reply. Dkt. 142.

As in its first attempt to set aside the judgment, Brutus in its second motion to vacate argues that the Government committed a fraud upon the Court insofar as it failed to uncover (or if uncovered, disclose) that Standard Chartered had engaged in criminal conduct later than previously revealed. Brutus Br. at 14–16. Brutus argues that, with the assistance of forensic data analysis performed by David J. Scantling, *see* Dkt. 104, it has uncovered or "decloaked" hidden data, which it terms newly discovered evidence that it claims expose as untrue the Government's

representations in support of dismissal. Brutus Br. at 1–2, 9–12. In connection with this motion, Brutus has also moved to appoint an independent expert to perform a more thorough forensic analysis than that performed by Scantling of the data Brutus provided to the Government in 2012 and 2013. Dkt. 122.

## II.    Motion to Vacate Pursuant to Rule 60(d)(3)

Rule 60(d) allows the court to "entertain an independent action to relieve a party from a judgment," Fed. R. Civ P. 60(d)(l), or, in the provision upon which Brutus relies here, to "set aside a judgment for fraud on the court," Fed. R. Civ. P. 60(d)(3). "A party seeking relief under Rule 60(d)(3) bears a formidable burden." *United States v. Ohle*, No. 8 Cr. 1109, 2015 WL 9647534, at \*1 (S.D.N.Y. Dec. 30, 2015). "Rule 60(d) actions are warranted only when necessary 'to prevent a grave miscarriage of justice.'" *LinkCo, Inc. v. Naoyuki Akikusa*, 367 F. App'x 180, 182 (2d Cir. 2010) (quoting *United States v. Beggerly*, 524 U.S. 38, 47 (1998)). That standard "is narrower in scope than that which is sufficient for relief" under Rule 60(b)(3), which also provides for relief from judgment in the context of fraud. *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1325 (2d Cir. 1995) (citing *Gleason v. Jandrucko*, 860 F.2d 556, 558 (2d Cir. 1988)).[2] To meet the Rule's "stringent and narrow" requirements for relief, the movant must show, by clear and convincing evidence, that the fraud "seriously affects the integrity of the normal process of adjudication," and that "the fraud, misrepresentation or conduct . . . actually deceived the court." *Anderson*, 2012 WL 4513410, at \*4 (cleaned up). In other words, fraud under Rule 60(d) entails conduct "which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court." *Hadges*, 48 F.3d at 1325.

---

[2] Unlike Rule 60(b)(3), however, Rule 60(d) does not have a prescribed limitations period. *Anderson v. New York*, 7 Civ. 9599, 2012 WL 4513410, at \*5 (S.D.N.Y. Oct. 2, 2012).

The Court has previously found Brutus's allegations of fraud threadbare. The Court so finds again. Brutus claims that the data it has recently "decloaked"[3]—derived from spreadsheets it provided to the Government in 2012 and 2013, more than a decade ago—reveal governmental fraud on the Court. Brutus Br. at 1–2. Brutus claims that this ostensibly newly discovered evidence exposes as untrue the Government's representation in support of dismissal that Standard Chartered had not engaged in sanctions-violating conduct after 2007. *Id.*

For several independent reasons, Brutus's showing does not come close to meeting its "formidable burden" to secure Rule 60(d)(3) relief.

First, as earlier, *see* July Op. at 6–9; October Op. at 14–15, Brutus has not given the Court a basis on which to find that the Government made a false representation to the Court. Brutus claims that the Government misrepresented that it had conducted a comprehensive investigation and/or that Brutus's factual allegations were unsupported. Brutus Br. at 14. However, the Government has repeatedly detailed its thorough investigation of Standard Chartered and the reasons it found that Brutus's evidence, including the spreadsheets that Brutus claims to have "decloaked," do not substantiate its allegations. *See* July Op. at 6 (describing investigative record). And Brutus concedes that the Government has already "re-reviewed" the provided data, "including all 'hidden' information . . . and did not see any additional material information that would have been relevant to [the Government's] investigation." Brutus Br. at 15 (quoting Dkt. 55 ¶ 5 n.3).

---

[3] Brutus alleges that the "decloaked" data includes "millions of [Standard Chartered] transactions that were hidden" within the electronic spreadsheets it collected from defendants and provided to the Government in 2012 and 2013. Brutus Br. at 1, 9. The data comprises approximately 200 spreadsheets purportedly reflecting the raw information of thousands of third-party customers.

The Court has not been given any basis to discredit these representations. As Judge Furman put the point in similarly dismissing a relator's claim:

> The Government's memoranda reveal, and the Court has no basis to doubt, that the Government undertook a lengthy, costly, and substantial investigation into [relator]'s claims that spanned several years and multiple offices and agencies. . . . [Relator]'s subjective disagreement with the Government's investigative strategy and ultimate decision does not provide the Court with a basis to second-guess the Government's decision to dismiss the case.

*United States ex rel. Borzilleri v. AbbVie, Inc.*, No. 15 Civ. 7881, 2019 WL 3203000, at *2 (S.D.N.Y. July 16, 2019) (internal citations omitted). Still less does Brutus's disagreement with the Government's factual conclusions supply a basis to determine that the Government acted to deceive or with conscious awareness that its findings were incorrect.

Second, Brutus is wrong to claim it has been denied an opportunity to pursue its allegation of fraud upon the Court by the Government. *See* Brutus Br. at 1 (claiming to have been denied a "meaningful opportunity to challenge the Government's false statements"). On the contrary, Brutus has been given ample opportunity to pursue that allegation. Its arguments to that effect, including in its earlier bid to set aside the judgment based on the *Buzzfeed News* articles, have simply failed, *see* Dkt. 49 at 5; Dkt. 76 at 2–6, as Brutus has not shown conduct approaching fraud at all, let alone "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason*, 860 F.2d at 559 (citing *Kupferman v. Consol. Rsch. & Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972) and 7 J. Moore, *Federal Practice* ¶ 60.33, at 360 (2d ed. 1987)). And "courts are not prevented from impartially and fairly adjudicating a case where the plaintiff had an adequate opportunity to redress the alleged fraud." *Mazzei v. The Money Store*, 62 F.4th 88, 93 (2d Cir. 2023) (citation omitted).

To the extent Brutus's theory turns on its recent alleged deconstruction of the data files that it produced to the Government, its claim cannot be taken be seriously. Brutus has had

8

possession of these materials for years. Brutus, not the Government or the Court, is responsible for its decision to wait until recently to pursue the "decloaking" of the data within these files on which it now relies. *See Mazzei*, 62 F.4th at 94 (affirming dismissal of fraud on court where relator had reasonable opportunity to uncover the alleged fraud during the underlying action); *see also Gleason*, 860 F.2d at 560 (aggrieved party "must be able to show that there was no 'opportunity to have the ground now relied upon to set aside the judgment fully litigated in the original action.'") (quoting *Serzysko v. Chase Manhattan Bank*, 461 F.2d 699, 702 n.2 (2d Cir. 1972)); *Marco Destin, Inc. v. Levy*, 690 F. Supp. 3d 182, 190–91 (S.D.N.Y. 2023), *aff'd*, 111 F.4th 214 (2d Cir. 2024) (denying relief where plaintiff "had every opportunity in the Underlying Action to use the tools available in the adversarial process" to uncover the truth, notwithstanding that its adversary lied under oath and "purposefully withheld" key evidence).

A party seeking Rule 60(d)(3) relief "must prove, by clear and convincing evidence, that the defendant interfered with the judicial system's ability to adjudicate impartially and that the acts of the defendant must have been of such a nature as to have prevented the plaintiff from fully and fairly presenting a case or defense." *Mazzei*, 62 F.4th at 93–94. Brutus has not come remotely close to showing such here. The Court thus denies its latest bid for such relief.

### III. Expert Appointment Pursuant to Rule 706(a)

Under Federal Rule of Evidence 706(a), a court may, on its own motion or on a motion by any party, "appoint any expert that the parties agree on and any of its own choosing." Fed. R. Evid. 706(a). "The determination to appoint an expert rests solely in the Court's discretion and is to be informed by such factors as the complexity of the matters to be determined and the Court's need for a neutral, expert view." *Rowell v. City of New York*, No. 16 Civ. 6598, 2017 WL 11569520, at *1 (S.D.N.Y. Aug. 29, 2017) (quoting *Pabon v. Goord*, No. 99 Civ. 5869,

**[SPA-22]**

2001 WL 856601, at *1 (S.D.N.Y. July 30, 2001)). Rule 706 "is intended to aid the trier-of-fact in its understanding and assessment of technical or scientific issues, not to further the 'partisan interests of any party.'" *Gioconda Law Grp. PLLC v. Kenzie*, No. 12 Civ. 4919, 2013 WL 2389791, at *2 (S.D.N.Y. May 31, 2013) (quoting *Benitez v. Mailloux*, 5 Civ. 1160, 2007 WL 836873, at *1 (N.D.N.Y. Mar. 15, 2007)).

Because Brutus has not demonstrated that the Court's decision to dismiss its claims was the product of a fraud on the Court or anything close, the Court denies Brutus's motion to vacate. There is no basis to pursue, let alone subsidize, additional discovery. Under these circumstances, the appointment of an independent expert is unwarranted. Court appointments of experts are relatively rare. *See In re Joint E. & S. Districts Asbestos Litig.*, 830 F. Supp. 686, 693 (E.D.N.Y. 1993); Fed. R. Evid. 706, Advisory Comm. Note ("experience indicates that actual appointment is a relatively infrequent occurrence"). And their appointment is to be informed by factors such as the complexity of the case and the Court's need for a neutral, expert view. *Rowell*, 2017 WL 11569520, at *1. Experts appointed pursuant to Rule 706(a) are meant to aid the Court in its understanding of technical issues, not to further a party's interests. *Gioconda Law Grp. PLLC*, 2013 WL 2389791, at *2. Here, however, there are no open issues to be resolved, much less complex ones. And the Court's review of Brutus's allegations is complete.

Indeed, even if open factual issues remained—and they do not—Brutus has already utilized the services of a "highly accomplished intelligence analyst and forensic investigator who specializes in global terror financing" to discover the "millions of [Standard Chartered] transactions that were hidden within the Brutus Data." Brutus Br. at 9. There is no reason to believe that an independent expert would uncover information inaccessible to Brutus. The Court therefore denies Brutus's motion to appoint an independent expert.

## CONCLUSION

For the foregoing reasons, the Court denies Brutus's motion to vacate and motion to

appoint an independent expert.

The Court also denies the motion by non-party Times Media Limited ("Times Media") to

unseal Brutus's Exhibit K.[4]

The Clerk of Court is respectfully directed to terminate the motions pending at Dockets

101, 122, and 144.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: November 13, 2024
        New York, New York

---

[4] In support of Brutus's first motion to vacate, its counsel Patrick McSweeney, Esq., submitted a declaration and accompanying exhibits, including Exhibit K, which he described as "true and correct electronic copies of the cloaked and decloaked data files that Brutus gave to the Government in 2012 and 2013." Dkt. 103. Brutus, in later letter motions, sought leave to file the exhibit under seal "[t]o protect the economic privacy of innocent third parties," because the data "contain[ed] sensitive data that is not relevant to these proceedings." Dkt. 106, *see* Dkt. 108. In light of the third-party privacy interests at stake, the Court granted Brutus's request to file Exhibit K under seal. Dkt. 109. On October 7, 2024, Times Media filed a letter-motion seeking the unsealing of Exhibit K. Dkt. 144. Non-parties Jewish Insider and WWBT 12 On Your Side joined Times Media's motion. Dkts. 155–56. Standard Chartered opposed the motion, noting that the data was collected without its consent, and that Exhibit K contained "approximately 200 spreadsheets" with "raw data including, among other things, customer names, contact information, transaction dates, trade volume and revenue information." Dkt. 151 at 1. Standard Chartered also raised concerns over the "purported bank records of dubious accuracy and origin," given Brutus's admissions to manipulating the data in connection with its "decloaking" process. *Id.* at 3. The Government did not take a position. Dkt. 149. As before, the Court finds that Exhibit K is properly maintained under seal, to protect the privacy interests of unrelated third parties. The Court thus denies Times Media's motion to unseal Exhibit K.



MAJORITY STAFF REPORT

COMMITTEE ON THE JUDICIARY

CHAIRMAN CHARLES E. GRASSLEY

MARCH 4, 2025


STATE DEPARTMENT OBSTRUCTION OF LAW ENFORCEMENT ACTION AGAINST
IRAN'S WEAPONS OF MASS DESTRUCTION AND BALLISTIC MISSILE PROGRAMS
UNDER THEN-SECRETARY OF STATE JOHN KERRY

### Brief History of U.S. Sanctions Against Iran

For over two decades, Republican and Democratic administrations imposed sanctions on Iran "to deter, constrain, and encourage change in the adversarial behavior of the Iranian regime, including its support for international terrorism, nuclear and missile development programs and proliferation activities, destabilizing regional interventions, and human rights abuses."[1] Further, "Congress has played a leading role in shaping U.S. policy, enacting legislation to authorize and oversee successive Administrations' implementation of Iran-related sanctions."[2] As international concerns heightened about Iran's nuclear program, "Congress, beginning in 2010, increased the scope of U.S. sanctions."[3] Through these authorities, "Congress mandated that to waive or lift sanctions, the President must certify that Iran is meeting certain conditions, including that the Iranian government has ceased its support of international terrorism and its proliferation activities."[4]

### Obama-Biden Administration Softens U.S. Sanctions Against Iran

In November 2013, the Obama-Biden administration began its Joint Plan of Action, which served as the negotiating process for the Joint Comprehensive Plan of Action (JCPOA), commonly known as the Iran Nuclear Deal.[5] Then-President Obama declared on November 23, 2013, "the broader architecture of sanctions will remain in place and we will continue to enforce them vigorously."[6] Congress also took a strong stance against Iran and expressed its intent to ensure the Obama-Biden administration held Iran accountable. On May 22, 2015, the House and Senate communicated Congress's intent to hold Iran accountable when it passed the Iran Nuclear Agreement Review Act of 2015 with a provision that stated:

> [t]he President may not waive, suspend, reduce, provide relief from, or otherwise limit the application of statutory sanctions with respect to Iran under any provision of law or refrain from applying any such sanctions pursuant to an agreement described in subsection (a).[7]

---

[1] Congressional Research Service, *U.S. Sanctions on Iran*, (Jul. 20, 2023), https://crsreports.congress.gov/product/pdf/IF/IF12452.

[2] *Id*.

[3] *Id*.

[4] *Id*.

[5] Media Note, *Implementation of the Joint Plan of Action from November 24, 2013 in Geneva between the P5+1 and The Islamic Republic of Iran and Provision of Limited, Temporary, and Targeted Sanctions Relief*, Archived Content: U.S. DEPARTMENT OF STATE, (Jan. 20, 2014), https://2009-2017.state.gov/r/pa/prs/ps/2014/01/220054.htm.

[6] Press Release, *Statement By The President On First Step Agreement On Iran's Nuclear Program*, THE WHITE HOUSE: PRESIDENT BARACK OBAMA, (Nov. 23, 2013), https://obamawhitehouse.archives.gov/the-press-office/2013/11/23/statement-president-first-step-agreement-irans-nuclear-program.

[7] This limitation on the President applied to the time period of the initial congressional review of a nuclear agreement with Iran, 12 calendar days following the date of a joint resolution of disapproval passed in both houses, and 10 days following the President's veto of a joint resolution of disapproval passed by both houses. Iran Nuclear Agreement Review Act of 2015, Pub. Law 114-17. The time for Congressional review would be 60 days if the President transmitted the deal to Congress between July 10, 2015, and September 7, 2015. The congressional review began during this time period on July 14, 2015, when President Obama announced the Iran Nuclear Deal and stated, "Congress will now have an opportunity to review the details, and my administration stands ready to provide

On July 14, 2015, the Obama-Biden administration finalized negotiations with China, France, Germany, Russia, the UK, the EU, and Iran (P5+1) on the Iran Nuclear Deal.[8]  In describing the Iran Nuclear Deal's effect on U.S. sanctions against Iran, President Obama said:

> We still have sanctions on Iran for its violations of human rights, for its support of terrorism, and for its ballistic missile program.  ***And we will continue to enforce these sanctions, vigorously*** [emphasis added].  Iran's recent missile test, for example, was a violation of its international obligations.  And as a result, the United States is imposing sanctions on individuals and companies working to advance Iran's ballistic missile program.  And we are going to remain vigilant about it.[9]

On July 23, 2015, then-Secretary of State John Kerry testified before the Senate Foreign Relations Committee on the terms and implementation of the Iran Nuclear Deal.[10]  According to the hearing testimony, in response to questions about the continuation of U.S. sanctions and export restrictions on Iran under the terms of the Iran Nuclear Deal, then-Secretary Kerry testified that the Iranians are "restrained from any sharing of missile technology, purchase of missile technology, exchange of missile technology, work on missiles."[11]  Then-Secretary Kerry stated the Iran Nuclear Deal does not prevent the U.S. from using "our authorities to impose sanctions on Iran for terrorism, human rights, missiles or any other non-nuclear reason" and "does not provide Iran any relief from U.S. sanctions under any of those authorities or other authorities, mind you."[12]  In response to questions about U.S. military commanders criticizing the Iran Nuclear Deal for potentially lifting U.S. embargos and restrictions on Iran obtaining missile technology for its ballistics program, then-Secretary Kerry testified the U.S. has:

> Additional capacities to be able to deal with missiles.  We have the lethal military equipment sanctions provision in the Foreign Assistance Act.  We have the Iran's – the 1996 Iran Sanction Act.  We have the Iran/Iraq Arms Nonproliferation Act.  We have – those are unilateral tools, by the way.

> We have a bunch of multilateral tools, the Proliferation Security Initiative with 100 countries which works to help limit Iranian

---

extensive briefings on how this will move forward.  As the American people and Congress review the deal, it will be important to consider the alternative."  Press Release, *Statement By The President On Iran*, THE WHITE HOUSE: PRESIDENT BARACK OBAMA, (July 14, 2015), https://obamawhitehouse.archives.gov/the-press-office/2015/07/14/statement-president-iran.

[8] *Joint Comprehensive Plan of Action*, State Archives, (last accessed Mar. 3, 2025), https://2009-2017.state.gov/e/eb/tfs/spi/iran/jcpoa/.

[9] President Barrack Obama, *Statement by the President on Iran*, THE WHITE HOUSE, (Jan. 17, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/01/17/statement-president-iran.

[10] Senate Foreign Relations Committee, *Iran Nuclear Agreement Review*, (Jul. 23, 2015), https://www.foreign.senate.gov/hearings/iran-nuclear-agreement-review.

[11] *Id*.

[12] *Id*.

missile-related imports and exports. We have the missile control technology regime, which does a lot to prevent the growth of any missile capacity. So, you know, there are many things we will continue to do, but it didn't go away. We actually kept it. And we kept it notwithstanding the fact that three out of seven of the negotiating parties wanted to get rid of it altogether. We kept it.[13]

On January 16, 2016, the JCPOA was implemented.[14] That same day the Obama-Biden administration announced a prisoner swap with Iran, where five Americans imprisoned in Iran were freed in exchange for the release of seven Iranians detained or indicted in the U.S.[15] However, subsequent reports would reveal that the full scope of the prisoner swap also coincided with a $1.7 billion cash payment to the Iranian government and the Justice Department dropping charges and international arrest warrants against 14 fugitives supporting Iran's Weapons of Mass Destruction (WMD) and ballistic missile programs.[16] Reports quote the Obama-Biden administration describing the dropping of the charges as the U.S. "remov[ing] any Interpol red notices and dismiss[ing] any charges against 14 Iranians for whom it was assessed that extradition requests were unlikely to be successful."[17] However, legally protected whistleblower disclosures paint a more alarming picture. Those disclosures noted that "Kerry and the State Department sold out the safety of Americans and our allies when they provided $1.7 billion in cash to Iran which, unsurprisingly, Iran used to continue development of their weapons programs and to better equip and fund their proxies."[18] The disclosures noted that, "the death and destruction seen on October 7, 2023, is only one of the tragic results from providing this cash to Iran and from the State Department, DOJ leadership, and FBI Director Comey systematically obstructing Iranian investigations and prosecutions for years."[19]

The whistleblower disclosures further noted that at the same time then-President Obama and then-Secretary Kerry made assurance to maintain an aggressive stance against Iran, "Iran illegally obtained U.S. technology and components used to make improvised explosive devices in Iraq and elsewhere to kill U.S. military personnel. Similarly, Iran illegally obtained U.S. components for missiles, unmanned aerial vehicles, and other types of military equipment."[20]

---

[13] Senate Foreign Relations Committee, *Iran Nuclear Agreement Review*, (Jul. 23, 2015), https://www.foreign.senate.gov/hearings/iran-nuclear-agreement-review.
[14] State Department Archives, *supra* note 8.
[15] The White House, *Press Call by Senior Administration Officials on Iran*, (Jan. 17, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/01/17/press-call-senior-administration-officials-iran; Nahal Toosi, *Iran Releases 5 Detained Americans, Including Washington Post Reporter*, POLITICO, (January 16, 2016), https://www.politico.com/story/2016/01/iran-prisoners-217875.
[16] Louis Nelson, *U.S. wire payments to Iran undercut Obama*, POLITICO, (Sep. 18, 2016), https://www.politico.com/story/2016/09/us-iran-payments-wire-transfer-228324#ixzz4KhjmXpzD; Josh Meyer, *Obama's hidden Iran deal giveaway*, POLITICO, (Apr. 24, 2017), https://www.politico.com/story/2017/04/24/obama-iran-nuclear-deal-prisoner-release-236966.
[17] Josh Meyer, *Obama's hidden Iran deal giveaway*, POLITICO, (Apr. 24, 2017), https://www.politico.com/story/2017/04/24/obama-iran-nuclear-deal-prisoner-release-236966.
[18] On file with Comm. staff.
[19] On file with Comm. staff.
[20] On file with Comm. staff.

The whistleblower disclosures claimed this should have been stopped as "Iran's efforts were known to the Obama-Biden administration when they decided to soften sanctions by seriously undermining and blocking enforcement of laws prohibiting the sale or transfer of U.S. technology to Iran which used the components to make WMDs and other military-use weapons."[21]  The disclosures noted that "FBI's objective, professional assessment was that Iran would continue to purchase U.S. components for lethal weapons and, as a result of the JCPOA deal, would have even more funds and avenues for illegal, U.S. technology procurement.  The death and destruction caused by Iran and their proxies the last few years was foreseen and preventable."[22]

In addition to these accounts, the unclassified legally protected whistleblower disclosures in this memorandum show that while the Obama-Biden administration publicly committed to "preventing Iran from obtaining a nuclear weapon" while the U.S. maintained its "own sanctions related to Iran's support for terrorism, its ballistic missile program, and its human rights violations,"[23] then-Secretary of State John Kerry actively interfered with and obstructed the FBI and other federal law enforcement agencies from pursuing and executing arrest warrants on individuals illegally supporting Iranian efforts, including financial efforts, to develop its WMD and ballistic missile programs.  Further, the unclassified records and public reports raise serious questions concerning the Obama-Biden administration's justification that extradition was unlikely for granting amnesty to the 14 fugitives indicted for violating U.S. sanctions and export restrictions.

### State Department Obstructs Justice Department Law Enforcement Efforts Against Iran

According to unclassified FBI email records, before and after the Iran Nuclear Deal was finalized, the State Department prevented the FBI and other U.S. law enforcement agencies from enforcing U.S. sanctions and export control violations against Iranians and actively obstructed their pursuit to arrest these individuals.[24]  Whistleblower disclosures noted that, "Obama-Biden administration officials in the State Department and DOJ refused to allow already-indicted criminals investigated for years from being arrested on lawfully issued arrest warrants."[25]  The disclosures further stated that "these were de facto pardons, not standard, straightforward uses of prosecutorial discretion."[26]  The records indicate this obstruction was pervasive as FBI email records show that State and Justice Department officials blocked the FBI's efforts since April 2015 to arrest Iranians indicted for sanctions and export violations, and Justice Department leadership offered little or inconsistent guidance on how the FBI was to overcome this obstacle.[27]

---

[21] On file with Comm. staff.
[22] On file with Comm. staff.
[23] Speech, *President Obama on Iran Nuclear Deal*, U.S. Department of State, (Jul. 15, 2015), https://id.usembassy.gov/statement-by-president-obama-on-iran-nuclear-deal/.
[24] Exhibit A.
[25] On file with Comm. staff.
[26] On file with Comm. staff.
[27] Exhibit A.

-----Original Message-----
From: ███████ (CD) (FBI)
Sent: Wednesday, July 29, 2015 1:13 PM
To: Buma, Johnathan C. (CD) (FBI); Burnham, Cindy R. (MP) (FBI)
Subject: RE: Current Iran case roadblock

Cindy-
State/DOJ have been blocking all of our overt LE actions since April. Unfortunately, there have been mixed and inconsistent messages and we are working to get some stability to the guidance. DOJ is working on some guidance for its offices which may be released next week. In the interim, can you advise the names of the CES attorney's? From what I have seen, it is accurate that any decisions requiring CES permission have been run through State and DOJ front office for approval.

We like to keep track of these decisions so please save communications and forward to us.

Best,
█

      According to unclassified FBI email records, the FBI initially believed that State's failure to issue visas to lure Iranians to the U.S. for arrest and prosecution for supporting Iran's WMD and ballistic missile programs in violation of U.S. export and sanctions laws was in part due to the agenda of a particular government bureaucrat, then-Under Secretary of State for Political Affairs, Wendy Sherman. The records show the FBI believed Sherman was responsible for telling the FBI to "stand down from pushing State on visa issuance due to 'other sensitivities.'"[28] At the time, Sherman led the U.S. negotiations team that reached the agreement on the Iranian Nuclear Deal.[29]

---

[28] Exhibit B.
[29] Press Release, *Biography: Wendy R. Sherman*, STATE DEPARTMENT, (Jul. 28, 2023), https://www.state.gov/biographies/wendy-r-sherman; Press Release, *Robert Allan Jones Named Special Agent in Charge of the Pittsburgh Field Office*, FBI, (Jun. 19, 2018), https://www.fbi.gov/news/press-releases/robert-allan-jones-named-special-agent-in-charge-of-the-pittsburgh-field-office.

Page 6 of 24

------- Original message -------
From: "Moy, Stacey R. (CD) (FBI)" ██████████ >
Date:05/12/2015 5:31 PM (GMT-05:00)
To: "Bladel, Louis E. (CD) (FBI)" ██████████ >
Subject: ██████

Lou,
Aaron called me in and said he received a cryptic call from Bob Jones that FBI was to stand down from pushing State on
visa issuance due to "other sensitivities." He had no other issue so I circled the wagon with ██ so he can track from his
interagency contacts to verify before we reengage for greater details on what this means (presume US Wendy Sherman
issues) and whether we bring this at a higher-level? Will keep you appraised, thanks

V/R Stacey

Stacey R. Moy
Assistant Section Chief
FBIHQ/FBI Counterproliferation Center/Room ██
████████

FBI and DOJ email records indicate the FBI was frustrated that Sherman blocked its
ability to arrest a high value Iranian target. The FBI eventually elevated the matter to the
Assistant Attorney General (AAG) level, specifically saying the request to lure the target to the
U.S. "should go to the [FBI Deputy Director] for decision-makers and not be left to
Sherman...."[30]

| From: | Moy, Stacey R. (CD) (FBI) |
|---|---|
| Sent: | Wednesday, May 13, 2015 1:36 PM |
| To: | Bladel, Louis E. (CD) (FBI) |
| Cc: | ████████████ |
| Subject: | RE: ██████ |

Briefed this at the 1 PM along with the NF case – thanks to ██, provided the back-material along with updated BBC for
Jones to provide to the DD for context. Aaron read the material and agreed it should go to the DD for decision-makers
and not be left to Sherman based on the info, thanks

V/R Stacey

---
[30] Exhibit B.

Page 7 of 24



Additional records show the FBI and the Justice Department's National Security Division's (NSD) efforts to escalate the situation to the Assistant Attorney General (AAG) and Deputy Assistant Attorney General (DAAG) levels in order to stop the State Department from interfering in the FBI investigation failed.[31] The records show officials from the FBI and NSD believed these issues needed to be elevated at the highest level to then-Attorney General Lynch and then-Deputy Attorney General Yates, which they ultimately did.[32] However, as the records indicate, State's efforts to obstruct the FBI from arresting the high-value Iranian target succeeded.[33]



In addition to obstructing the FBI from making lawful arrests of individuals indicted for U.S. sanctions and export violations, the records show that State Department officials also blocked the Justice Department's NSD Counterintelligence and Export Control Section (CES) from moving forward with Grand Jury indictments of Iranians violating U.S. sanctions and export laws without "exigent circumstances," which the records indicate were "a direct contradiction to…the notes sent down from HQ."[34] These notes provided that "such actions are not precluded or restricted" by ongoing State Department negotiations with Iran.[35]

---

[31] Exhibit B.
[32] *Id*.
[33] *Id*.
[34] Exhibit A.
[35] *Id*.; *See also*, Department of Justice, 9-90.010 - Export Control and Sanctions Enforcement Policy for Business Organizations, DOJ Justice Manual, (Dec. 2020), https://www.justice.gov/jm/jm-9-90000-national-security ("The Counterintelligence and Export Control Section (CES) of the National Security Division under the supervision of the

-----Original Message-----
From: Perry Davis
Sent: Tuesday, July 28, 2015 10:54 AM
To: Dan Clutch; Dave Nardella
Cc: Jon Svendsen; Burnham, Cindy R. (MP) (FBI)
Subject: Current Iran case roadblock

Dan,

Based on yesterday's discussion of how our historic/ongoing Iran cases should not be impacted by the recent Iran deal, I have an issue that I think you and or HQ may want to address. I'm copying Jon because the case at issue is his Green Wave case. (Case No. ███████  The case is a joint investigation with FBI and HSI and has been under investigation since 2011. There have been significant investigative actions and a significant amount of investigative effort expended by all the joint agencies over the last few years. Jon's FBI co-case agent, Cindy Burnham, (copied here) in ███████ just informed me that over the past few weeks, and as recently as yesterday, CES advised that the State Department would not allow CES to move forward with grand jury without "exigent circumstances." This seems to be a direct contradiction to the second bullet point in the notes sent down form HQ that indicate "State requests coordination on significant Iranian enforcement actions but such actions are not precluded or restricted."

I am only the assisting agent on this case and my knowledge of the details is slim. If you would like some more detail, I could probably arrange a phone call for you with Cindy Burnham.

Thanks,

Perry

     While the Obama-Biden administration's State Department publicly proclaimed the U.S. would continue its aggressive position against Iran, to include sanctions, "because of their activities around the world that are connected to terrorism or human rights or other missile-related activity;" [36] unclassified emails show State actively worked behind the scenes to prevent U.S. law enforcement from doing exactly that. The records show the Obama-Biden State Department put political considerations of the Iran Nuclear Deal above U.S. national security.

<u>**Then-Secretary of State Kerry Was Directly Involved in
Obstructing Law Enforcement Efforts Against Iran**</u>

     Based on whistleblower disclosures to my office, "for the benefit of Iran, Kerry and the State Department conducted an unprecedented campaign to prevent and obstruct enforcement of laws prohibiting the sale or transfer of U.S. technology to Iran. Their actions were direct violations of the Iran Nuclear Agreement Review Act of 2015 and were concealed in order to circumvent congressional oversight of the Executive Branch's violation of law." [37] The disclosures explained that "Secretary Kerry and his State Department protected the personal and

---

AAG or a higher authority, conducts, handles, and supervises prosecutions" related to export controls and sanctions violations.).

[36] Wendy R. Sherman, Under Secretary for Political Affairs, *Briefing to the Press on the Iran Nuclear Deal*, U.S. DEPARTMENT OF STATE, (Jul. 16, 2015), https://2009-2017.state.gov/p/us/rm/2015/245007.htm.

[37] On file with Comm. staff.

financial interests of a particular, high-ranking Iranian government official and the Iranian regime."[38]

Unclassified FBI email records support these disclosures and show efforts by State to circumvent the enforcement of U.S. sanctions and export restrictions against Iran, due to the political considerations of the Iran Nuclear Deal, came directly from then-Secretary Kerry. For example, according to unclassified FBI emails, on July 2, 2015, DOJ Attorney Dave Recker told FBI personnel that Justice Department CES was required to raise requests to arrest indicted Iranians to the Justice and State Departments concurrently.[39] These records show that FBI officials found this concurrent approval process out of the ordinary and FBI officials did not understand why these arrests needed to be raised by DOJ leadership with State in the first place.[40] According to these emails, FBI personnel discussed Recker's comments "that all of the Iran proliferation cases are being discussed and decided by a small group of Justice Department officials and State Department officials due to the implications that it could have on the pending Nuclear negotiations with Iran."[41] The records say that Recker relayed to the FBI personnel that the Justice Department officials that "participated in these discussions, [included] Luke Demboski (DAAG), Bruce Swartz (NSD OIA) and Mary Rodriguez (NSD OIA)" and their counterparts from State.[42] Moreover, the records show Recker "was aware of one instance where the Secretary of State personally told DOJ officials that they were to stand down on an arrest."[43]

The email record further indicates Recker also made this accusation against then-Secretary Kerry during an earlier internal Justice Department conference call concerning State's approval process for Iranian sanction violation cases being "based on the possible implications that an arrest could possibly have [on] the current negotiations with Iran."[44] The email records show the FBI became increasingly frustrated, internally emailing "[w]e are all beside ourselves on asking the field to stand down on a layup arrest, however as it stands right now we all have to sit back and wait until all the US and Iran negotiations resolve themselves."[45] Then-Secretary Kerry's alleged direct political interference in law enforcement activity relating to U.S. sanctions and export restrictions against Iran came just weeks before his aforementioned testimony in front of the Senate Foreign Relations Committee that the negotiated agreement "does not provide Iran any relief from U.S. sanctions."[46]

---

[38] On file with Comm. staff.
[39] Exhibit C.
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Id.*
[45] Exhibit D.
[46] Senate Foreign Relations Committee Hearing, *supra* note 10.

**From:** Sisk, Trevor A. (CD) (FBI)
**Sent:** Thursday, July 02, 2015 11:32 AM
**To:** Storino, Alexander L. (LA) (FBI); Reyes, Reginald B. (LA) (FBI)
**Cc:** ▮▮▮▮▮▮▮▮
**Subject:** RE: Italy Follow Up

Alex / Reggie –

FYI - I just contacted CES Attorney Dave Recker to inquire why they (CES) would need to have the DAAG raise our plan to arrest T or F with State. He advised that all of the Iran proliferation cases are being discussed and decided by a small group of DOJ officials and State Department officials due to the implications that it could have on the pending Nuclear negotiations with Iran. Attorney Recker stated that some of the requests to move forward with arrests / operations are being approved and some are not. He stated he knows of certain DOJ personnel that have participated in these discussions, to include Luke Dembroski (DAAG), Bruce Swartz (NSD OIA) and Mary Rodriguez (NSD OIA). Attorney Recker advised that personnel of comparable standing from State Department also participate in these meetings. Attorney Recker advised that he was aware of one instance where the Secretary of State personally told DOJ officials that they were to stand down on an arrest (NFI). As you are aware, Attorney Recker made similar statements yesterday during our conference call about the current approval process for these matters based on the possible implications that an arrest could possibly have of the current negotiations with Iran... but I wanted to share with you the fact that we had a similar conversation today.

Trevor

------- Original message -------
**From:** "Bladel, Louis E. (CD) (FBI)" ▮▮▮▮▮▮▮▮ >
**Date:** 07/03/2015 7:45 PM (GMT-05:00)
**To:** "Reyes, Reginald B. (LA) (FBI)" ▮▮▮▮▮▮▮▮ >
**Subject:** RE: HQ Support

Thanks and likewise. We are all beside ourselves on asking the field to stand down on a layup arrest, however as it stands right now we will all have to sit back and wait until all the US and Iran negotiations resolve themselves. We will continue to argue for aggressive action, however we will probably lose. ▮▮ and his Unit always push the envelope and hate our current stance, I totally agree, even though our hands are tied. Thanks for your patience and enjoy your weekend.

¨

     Nearly three months after the Iran Nuclear Agreement was finalized, on October 7, 2015, David H. Laufman, Chief of CES, sent an unclassified memo to the National Security/Anti-Terrorism Advisory Council Coordinators transmitting guidance regarding the Iran Nuclear Deal and criminal investigations and prosecutions of sanction violators.[47] Unclassified FBI emails show that while the JCPOA culminated in July 2015, "sanctions against Iran are still in effect and to be enforced by the US Government."[48]

---

[47] Exhibit E.
[48] Exhibit F.

**From:** CLINE, LISA (CD)(FBI)
**Sent:** Thursday, October 08, 2015 1:07 PM
**To:** BELOTE, CAROLYN D. (WMD) (FBI); YUSTEIN, JACQUELINE A. (OGC) (FBI); WALSH, DANIEL P (CD) (FBI); PEREZ-MIRANDA, LUIS A. (CD) (FBI)
**Cc:** SINTON, ROBERT STUART (OGC) (FBI); BLUMENFELD, LAURA ROSS (OGC) (FBI)
**Subject:** RE: DoJ/NSD guidance --- UNCLASSIFIED

Classification: UNCLASSIFIED
==========================================================
How about this:

Good afternoon.

As a follow-up to the Fact Sheet about the Joint Comprehensive Plan of Action (JCPOA) agreement I provided to all field offices back in August, attached is the newly issued Guidance from US Department of Justice (DOJ) regarding the nuclear deal with Iran as it relates to criminal investigations and prosecutions. While the United States, Iran, the European Union and five other nations framed the JCPOA agreement in July 2015, sanctions against Iran are still in effect and to be enforced by the US Government. This document will help field offices understand the guidance provided to AUSAs by DOJ for you to keep in mind as the FBI continues to investigate violations of these sanctions.

If you have any questions, please consult with your AUSAs and CDCs.


As implementation day for the Iran Nuclear Deal approached, FBI and DOJ email records demonstrate that the Justice Department was concerned about the lack of coordination with State regarding the enforcement of sanctions and the arrest of individuals supporting Iran's WMD program.[49] Unclassified FBI and DOJ email records from December 17, 2015, show that FBI and Justice Department CES officials requested to meet with State's then-Assistant Secretary for International Security and Nonproliferation (ISN), Thomas Countryman, to coordinate efforts between the FBI and State concerning the enforcement of sanctions related to Iran's WMD program, given implementation day for the Iran Nuclear deal on January 16, 2016, was approaching.[50] However, email records show that State official Tom Shannon's office instructed Countryman not to meet with the FBI on this issue.[51]

---

[49] Exhibit G.
[50] *Id*. State Department, *Biography: Thomas M. Countryman*, Senior Officials Bios archived https://2009-2017.state.gov/r/pa/ei/biog/174947.htm (The ISN Bureau leads the U.S. effort to prevent the spread of nuclear, chemical, and biological weapons, their related materials, and their delivery systems.).
[51] Exhibit G.

-------- Original message --------
From: "Bratt, Jay (NSD)" <████████ <████████ > >
Date: 12/17/2015 1:31 PM (GMT-05:00)
To: "Moy, Stacey R. (CD) (FBI)" ████████ <████████ > >
Subject: RE: Meeting with Mr Countryman

I just tried calling. Are you around?

From: Moy, Stacey R. (CD) (FBI) ████████ ]
Sent: Thursday, December 17, 2015 1:29 PM
To: Laufman, David (NSD); Bratt, Jay (NSD); ████████
Cc: Wilson, E J. (CD) (FBI)
Subject: Fwd: Meeting with Mr Countryman

Just got off the phone with our WMDD executives - looks like it is state political affairs (p) who are vetoing.
Have you heard anything from NSD on this? Thanks

--

-------- Original message --------
From: "SampollRamirez, Gabriel"
<████████ @ █fbi.gov <████████ >
Date: 12/17/2015 12:57 PM (GMT-05:00)
To: "Spencer, Charles P. (WMD) (FBI)" <████████ <████████ > >
Cc: "Moy, Stacey R. (CD) (FBI)" <████████ <████████ > >
Subject: FW: Meeting with Mr Countryman
How do you want to proceed?

See below

From: Clark, Samantha T ████████ @state.gov]
Sent: Thursday, December 17, 2015 12:55 PM
To: SampollRamirez, Gabriel
Cc: Harcum, Tanya Y. (WMD) (FBI); Frantz, Amanda G; Suarez, Gonzalo O
Subject: RE: Meeting with Mr Countryman

Hi Gabe,

I'm sorry for the confusion—I've just learned that we've been instructed by Counselor Tom Shannon's office not
to engage on this issue. A/S Countryman won't be able to take this meeting.

Thank you for your understanding,
Samantha

Samantha (Raddatz) Clark
O: ████████
BB: ████████

From: Clark, Samantha T
Sent: Thursday, December 17, 2015 12:32 PM
To: 'SampollRamirez, Gabriel'
Cc: Harcum, Tanya Y. (WMD) (FBI); Frantz, Amanda G; Suarez, Gonzalo O
Subject: RE: Meeting with Mr Countryman

Hi Gabe,

I was just able to speak with A/S Countryman about tomorrow's schedule. Unfortunately, he is not able to meet
tomorrow (he's just returned from international travel and his schedule is packed). He is available on Monday,
December 21 at 11:30am or 3pm. Do either of those work?

Thank you,
Samantha


This email is UNCLASSIFIED.

The records also show this matter was shared with FBI leadership.  Then-Assistant
Section Chief of the FBI Counterproliferation Center in the Counterintelligence Division (CD) at
FBI HQ, Stacey Moy, emailed an update on the situation with State to Counterintelligence
Deputy Assistant Director Richard Kollmar to be shared with the Executive Assistant Director
(EAD).  That update explained State's failure to participate in these interagency efforts directly
impacted Justice Department and FBI guidance about continuing the enforcement of U.S.
sanctions and export restrictions on Iran.[52]  From then-Assistant Section Chief Moy:


As a follow-up from the 1 PM, we have the following for EAD consideration/review, please advise if you
need additional information:


(U//FOUO)  On 12/17/2015, as part of an interagency outreach for the status and coordination of Iran
Counterproliferation operations, FBI received the following notice from US Department of State (DoS),
Bureau of International Security and Nonproliferation (ISN), indicating they were instructed not to
participate in discussions with the FBI on this matter by Counselor Shannon's office, DoS Under
Secretary for Political Affairs, "P" (previously occupied by Ms. Wendy Sherman), detailed e-mail
correspondence attached.  By way of background, FBI and DoJ/Counterintelligence and Export Control
Section (CES) sought a meeting with DoJ/ISN Assistant Secretary  Countryman as detailed below.
WMDD DAD Spencer will attempt another meeting following the Holiday but would elevate to the EAD
as appropriate on the WMDD-side.  DoJ/CES advised they will meet with Ms. Mary McCord to brief AAG
John Carlin, DoJ/National Security Division on the matter as DoS' failure to participate in an interagency
collaboration directly impacts previous DoJ and FBI guidance towards Iran.


Moy included in this same email to Kollmar a forwarded email exchange between
himself and Jay Bratt at NSD indicating the FBI believed State's refusal to engage on issues
related to Iranian WMD investigations was so egregious and a threat to U.S. national security

---
[52] Exhibit H.

that Moy told Justice Department officials, "I'd recommend our FBI-side document should there ever be a special investigation/hearing etc. on why FBI could not action law, and potentially prevent national security incident…."[53]

-----Original Message-----
From: Bratt, Jay (NSD) ████████████████
Sent: Thursday, December 17, 2015 3:49 PM
To: Moy, Stacey R. (CD) (FBI)
Subject: Re: Meeting with Mr Countryman

Thanks. David and I are also discussing whether we should elevate within DOJ.

> On Dec 17, 2015, at 3:33 PM, Moy, Stacey R. (CD) (FBI) < ███████████ > wrote:
>
> Roger that - in interim, good news/bad news from our WMDD FO
> assessment as DoS did specify it was their P-side who instructed it.
> Our DAD will call over after Christmas to re-engage.  Please advise if
> you know if there are other things at work as they (State) are
> unwilling to entertain a forum to even discuss options, timing, etc.
> I'd recommend our FBI-side document should there ever be a special
> investigation/hearing etc. on why FBI could not action law, and
> potentially prevent national security incident, please advise of
> broader DoJ guidance and this countermands what we've both put forward
> and potentially has impact on others in the future, thanks
>
> R/ Stacey

Additionally, it's been alleged to my staff that FBI personnel spoke and corresponded with FBI attorneys asking whether State's obstruction was unlawful and the attorneys responded that it was.[54]  Specifically, whistleblower disclosures to my office noted "when individual FBI attorneys agreed that the obstruction from the State Department, DOJ leadership, and FBI Director Comey violated the law, they were prohibited from putting it in writing."[55]

### State Continues Obstructing Law Enforcement Action Against Iranians After Implementation Day

Following the January 2016 implementation of the Iranian Nuclear Deal, records show Obama-Biden State officials continued to slow roll and prevent the FBI from pursuing cases involving individuals violating U.S. sanctions and export restrictions on Iran, even as these cases were supposedly not affected by the Iranian Nuclear Deal.  According to whistleblower disclosures, the FBI felt misled by State and DOJ stating:

> State Department and DOJ officials deliberately and falsely led us
> to believe their interference was to protect the negotiations leading
> up to the JCPOA and there would be no interference after
> implementation day of the deal.  That was false.  State and DOJ

---

[53] Exhibit H.
[54] On file with Comm. staff.
[55] On file with Comm. staff.

interference continued as we watched Iran violate the deal itself and
continue to illegally procure U.S. components for their military.[56]

Even State's own staff was confused by the continued obstruction.  For example, according to a
State email sent on March 1, 2016, State official Samantha Boyer conceded to the FBI that the
Bureau had a "very solid case" and "it's a little like WTF that it's being held up (if you'll excuse
the phrasing).  However it is what it is."[57]

**From:** Boyer, Samantha A [███████████ @state███.gov]
**Sent:** Tuesday, March 01, 2016 9:30 AM
**To:** MOY, STACEY R. (CD) (FBI)
**Subject:** follow-up from yesterday

Hi Stacey,

I just wanted to follow up with you from my call yesterday.  I know that the current state of play has been very
frustrating for you and your enforcement colleagues.  I am sure it's also annoying that the State guidance was
that this was being handled with P, and now it's back to the working level.  I just want you to know that JCPOA
and post-Implementation Day issues have been a moving target, and we are/I am not trying to jerk you guys
around.  We're just trying to do the right thing, follow the policy, and all that.  As part of this discussion, we will
also find you a primary POC, so you don't have to talk to multiple parts of the Department.

On ████, I understand that this is a very solid case, he broke the law, there's an indictment, and it's a little like
WTF that it's being held up (if you'll excuse the phrasing).  However it is what it is.

I talked to Leslie, and though she does not make the determination (we will escalate to P because we are not in
agreement –the desk doesn't want to have an arrest, and ISN supports it) she has a strong voice.  Like I said
yesterday, she seems to be willing to consider additional information that ████ was engaged in proliferant
activity post-Implementation day OR missile procurement, since missile-related anything is still prohibited.

Let me know if you want to discuss.

Best,
Sam


Samantha Boyer
ISN/MBC
████@state███.gov


Sensitive
This email is UNCLASSIFIED.


========================================================
Classification: UNCLASSIFIED//FOUO

---

[56] On file with Comm. staff.
[57] Exhibit I.

As State continued to obstruct FBI law enforcement efforts after implementation day, email records from April 2016 show then-AG Loretta Lynch raised this issue directly with then-Secretary Kerry.[58]  FBI emails describe the situation as the "meeting between Secretary Kerry and the AG didn't go well for us" and "now is not a 'good time' to be requesting approvals for extraditions or lures on Iran CP [counter proliferation] cases."[59]  Another email from May 3, 2016, describes the tension between the AG and then-Secretary Kerry as "when the PC [Principals Committee] ended, Kerry packed up his stuff and rushed out without engaging with the AG at all.  The issues remain unresolved."[60]

| From: | Jay.Bratt@███████doj█████ |
| Sent: | Tuesday, May 03, 2016 5:13 PM |
| To: | ██████████ (CD) (FBI) |
| Subject: | RE: Last Thursday's meeting --- UNCLASSIFIED (FOUO) |

CLASSIFICATION:FOUO

I just got back from our AAG biweekly updates and asked whether he or Mary McCord had received a read-out. According to Mary, when the PC ended, Kerry packed up his stuff and rushed out without engaging with the AG at all. The issues remain unresolved. I am going to circle back with Mary, Denise Cheung, and Bruce Swartz to see how we can get this back on the AG's agenda.

Even though then-Secretary Kerry continued avoiding discussion of Iranian cases with AG Lynch, an unclassified email sent on September 12, 2016, from Justice Department NSD to FBI CD shows that officials in the Justice Department continued to push the AG to raise these issues with then-Secretary Kerry.[61]  Despite constant pushback and obstruction from State and a lack of support from Justice Department leadership, FBI agents and DOJ personnel continued pursuing cases against Iranians.[62]

---

[58] Exhibit J.
[59] *Id*. (used in prior letter).
[60] Exhibit K (used in prior letter).
[61] Exhibit L.
[62] *Id*.

| From: | Jay.Bratt@ ███ doj ███ |
| Sent: | Monday, September 12, 2016 6:01 PM |
| To: | ███ (CD) (FBI) |
| Subject: | Cases (FOUO) |

CLASSIFICATION:FOUO

███:

We're still working on getting the AG to press Sec. Kerry again about the stalled cases. With respect to ███, I just want to confirm that the Ambassador in ███ approved the lure subject to Main State approval. I believe that's the case, but I want to make sure our briefing memo is correct.

Thanks.

Jay

However, State's actions did have a chilling effect on FBI and DOJ law enforcement initiatives. For example, according to whistleblower disclosures, "The State Department and Obama-Biden administration officials persistently and systematically derailed criminal and national security investigations, creating a shadow amnesty program that protected scores of additional Iranian criminals. FBI offices abandoned dozens of Iran-related investigations and U.S. Attorneys shut down prosecutions after recognizing the State Department and DOJ obstruction would thwart effective enforcement efforts."[63]

### 14 Fugitives Granted Amnesty by Obama-Biden Administration

As previously mentioned, on January 16, 2016, implementation day of the Iran Nuclear Deal, the Obama-Biden administration dropped charges and international arrest warrants against 14 Iranian fugitives for providing support for Iran's WMD and ballistic missile programs because "it was assessed that extradition requests were unlikely to be successful."[64] However, it was reported that the Obama-Biden administration attempted to hide this information from the American people by not initially acknowledging publicly that these charges and arrest warrants were dropped.[65] Reportedly, the identities of the 14 Iranian fugitives were learned once Iran's

---

[63] On file with Comm. staff.

[64] Louis Nelson, *U.S. wire payments to Iran undercut Obama*, POLITICO, (Sep. 18, 2016), https://www.politico.com/story/2016/09/us-iran-payments-wire-transfer-228324#ixzz4KhjmXpzD; Josh Meyer, *Obama's hidden Iran deal giveaway*, POLITICO, (Apr. 24, 2017), https://www.politico.com/story/2017/04/24/obama-iran-nuclear-deal-prisoner-release-236966; Josh Meyer, *The Iran deal: The full picture*, POLITICO, (Apr. 24, 2017), https://www.politico.com/story/2017/04/24/obama-iran-nuclear-deal-prisoner-list-details-237381.

[65] Josh Meyer, *The Iran deal: The full picture*, POLITICO, (Apr. 24, 2017), https://www.politico.com/story/2017/04/24/obama-iran-nuclear-deal-prisoner-list-details-237381; *see* Josh Meyer,

state news service, FARS, disclosed the information.[66]  These reports also stated Justice Department lawyers, prosecutors, and FBI agents who worked these cases for several years and had intimate knowledge about these suspects were not consulted or asked for input before the Justice Department dismissed the charges for the 14 Iranians.[67]  According to disclosures to my office, "what the media portrayed as amnesty for 14 Iranians was only the visible tip of a massive effort to obstruct U.S. laws prohibiting the sale (and ultimate use) of U.S. technology and components to Iran."[68]  These claims appear supported by unclassified Justice Department and FBI email records concerning the prisoner swap.

In an unclassified email from December 15, 2015, then-Acting Section Chief for the FBI CD Stacey Moy wrote to David Laufman and Jay Bratt at NSD about contacting DAAG Bruce Swartz about the status of FBI operations and potential conflicts with the ongoing prisoner exchange negotiations between Iran and State.[69]  As referenced above, Swartz was part of a small group of Justice and State Department officials who met and discussed cases relating to individuals providing support for Iran's WMD and ballistic missile programs.[70]  The email shows the FBI wanted to provide information about their operations and how the U.S.'s negotiation position with Iran could be strengthened if senior policy makers authorized indictments.[71]  However, as previously mentioned, the records show State continued to obstruct FBI and Justice Department attorneys from pursuing these cases and did not want to meet with FBI personnel to discuss these relevant matters.[72]

---

*Obama's hidden Iran deal giveaway*, POLITICO, (Apr. 24, 2017), https://www.politico.com/story/2017/04/24/obama-iran-nuclear-deal-prisoner-release-236966 (Reporting, "in a series of unpublicized court filings, the Justice Department dropped charges and international arrest warrants against 14 other men, all of them fugitives.  The administration didn't disclose their names or what they were accused of doing, noting only in an unattributed, 152-word statement about the swap that the U.S. 'also removed any Interpol red notices and dismissed any charges against 14 Iranians for whom it was assessed that extradition requests were unlikely to be successful.'").
[66] *Id*.
[67] Josh Meyer, *Obama's hidden Iran deal giveaway*, POLITICO, (Apr. 24, 2017), https://www.politico.com/story/2017/04/24/obama-iran-nuclear-deal-prisoner-release-236966.
[68] On file with Comm. staff.
[69] Exhibit H.
[70] Exhibit C.
[71] Exhibit H.
[72] Exhibit C.

**[SPA-43]**

From: MOY, STACEY R. (CD) (FBI)

Sent: Tuesday, December 15, 2015 10:44 AM

To: 'David.Laufman@▮▮▮doj▮▮▮▮▮; 'Jay.Bratt@▮▮▮doj▮▮▮

Subject: FW: Contact Information --- UNCLASSIFIED

Classification: UNCLASSIFIED

==========================================================

David/Jay,

Hope things are well – I've been advised by my folks via DoJ/OI to reach out to Mr. Swartz (Mr. Dembosky's equivalent) for the status of our undercover/lure-ops as he would have visibility for conflicts with ongoing hostage/prisoner exchange with Iran via DoS. Our efforts would be to provide the joint FBI-interagency ops with potential actions (via indictments) as mechanisms to help inform senior policymakers on areas of leverage/strengthening positions in their negotiations should they choose to authorize. Having a broader sense of community efforts will also help us at the field-level (FBI and interagency) to continue to work our sources and other collection efforts to synch and/or daisy-chain out to keep these options alive. Please let me know if you would prefer to socialize via CES or NSD FO? Thanks

V/R Stacey

Further, an unclassified FBI email sent on January 19, 2016, just three days after the prisoner swap, shows the FBI field agent assigned to a case against an indicted Iranian was not told that his case was one of the 14 where the Justice Department dropped the charges, and "the AUSA [Assistant U.S. Attorney] in the case said she was under strict orders from DOJ not to tell the case agents."[73] However, officials within FBI CD made it a priority to notify each agent assigned to the 14 cases where the Justice Department dropped the charges against or released Iranians as part of the prisoner exchange deal and to get information about how these decisions were made.[74]

---

[73] Exhibit M.
[74] *Id.*

| | |
|---|---|
| **From:** | ████████████ (CD)(FBI) |
| **Sent:** | Tuesday, January 19, 2016 12:11 PM |
| **To:** | BUMA, JOHNATHAN C (CD) (FBI); CARPENTER, CHANTE L. (CD) (FBI); GLEASON, MARY F. (CD) (FBI); MARTIN, SCOTT F (CD) (FBI); SISK, TREVOR A (CD) (FBI) |
| **Subject:** | Iran prisoner deal --- UNCLASSIFIED//FOUO |
| **Importance:** | High |
| **SentinelCaseId:** | TRANSITORY RECORD |

Classification: UNCLASSIFIED//FOUO
=================================================
TRANSITORY RECORD



Attached is the list of those released or charges dropped as a result of this weekend's actions.

I want to ensure that the case agent of each of these cases has been notified. I think that has happened in many cases but please scrub through both lists and reach out to understand how this unfolded locally and offer support and clarification of the Iran program moving forward.

I just got off the phone with SA Bradley Hull from Cincy, formerly case agent of Boston's MKS case where ████ is on the list to have charges dropped. He was not told of the action and the AUSA in the case said she was under strict orders from DOJ not to tell the case agents.



=================================================
Classification: UNCLASSIFIED//FOUO

This new information raises questions about how the Obama-Biden administration believed extradition was "likely to be unsuccessful" if case agents weren't consulted. It also raises questions whether the true reason extradition was unlikely was due to State, with then-Secretary Kerry at the helm, obstructing law enforcement activity.

In short, according to whistleblower disclosures, during the Obama-Biden years:

Between 2013 and 2017, FBI Headquarters executives allowed the FBI to become a political tool. The State Department and the DOJ leadership actively obstructed FBI investigations and operations targeting Iranian procurement of material supporting their WMD, ballistic missile, and conventional weapons programs. There was shock and disbelief among FBI agents and analysts when we were told not to arrest individuals and then watched those individuals continue to support the Iranian weapons programs. The failure to arrest individuals not only enabled them to continue their illegal activities against the US, but we also missed the opportunity to obtain valuable intelligence the arrest would have provided – intelligence that could have better informed the ongoing JCPOA negotiations.[75]

When whistleblowers came forward in 2015, they were ignored and silenced. Rather than uphold the law and speak out against the improper influence, high-ranking FBI and DOJ officials chose to cover it up. During this time, FBI officials systematically reassigned and depleted the FBI agents and analysts working the Iran threat (highest level national threat priority) and reassigned some to work the Crossfire investigations. When FBI whistleblowers made formal complaints to Director Comey, the FBI's Inspection Division, and DOJ OIG based on clear and compelling evidence, they were universally dismissed without any investigation.[76]

### Trump Administration Reverses Course from Obama-Biden Administration and Then-Secretary Kerry Obstruction

Unclassified email records show that Justice Department and FBI leadership allowed then-Secretary Kerry to interfere with and obstruct the Justice Department and FBI from pursuing arrests and indictments of individuals supporting Iran's WMD and ballistic missile programs. However, the records show that the Trump administration altered course. According to whistleblowers, "The election of President Trump in 2016 did result in an immediate move back toward normal enforcement of the law against the Iran regime and its supporters."[77] Indeed, the change in approach is supported by a November 29, 2016, email from Shell to an FBI official within then-FBI Director James Comey's office.[78]

---

[75] On file with Comm. staff.
[76] On file with Comm. staff.
[77] On file with Comm. staff.
[78] Exhibit N.

-------- Original message --------
From: "Paarmann, C. B. (IOD) (FBI)"
Date: 11/29/2016 5:53 PM (GMT-05:00)
To: "Koerner, Heather P. (DO) (FBI)"
Cc: "Strzok, Peter P. (CD) (FBI)" , "Corsi, Dina M. (CD) (FBI)"
Subject: RE: Iran

Thank you Heather - Have cc'd DAD Strzok and Corsi for their visibility.

C. Bryan Paarmann

Deputy Assistant Director

International Operations, FBI

(o) ▮▮▮▮▮▮▮

(c) ▮▮▮▮▮▮▮

unclass - ▮▮▮▮▮▮▮

**From:** Koerner, Heather P. (DO) (FBI)
**Sent:** Tuesday, November 29, 2016 9:51 AM
**To:** Paarmann, C. B. (IOD) (FBI) ; Schultz, Thomas J. (IOD) (FBI)
**Cc:** Brekke, Bradley (DO) (FBI) ; Korneski, Douglas M. (AT) (FBI)
**Subject:** FW: Iran

Hello DAD Paarmann and SC Schultz,

Passing on information and perspective from Walied Shater from Shell...

FYSA

Heather Petry Koerner

(o) ▮▮▮▮▮▮ | (c) ▮▮▮▮▮▮ | Time Zone: CST

**From:** Walied.Shater@▮▮▮▮▮▮▮▮▮▮▮▮ ]
**Sent:** Tuesday, November 29, 2016 2:59 AM
**To:** Koerner, Heather P. (DO) (FBI)
**Subject:** Iran

Hi Heather-

Just to pass on to your analysts. It seems Trump election win having impact on doing business in Iran. We are going to sign a small deal in Iran this week ($5 million licensing agreement). We were in talks with a Japanese bank to handle the funds, but they have recently backed off, unofficially citing coming Trump presidency. European banks feeling the same way. Small amount of money, but having a dampening effect on doing business in Iran.

Regards,

Walied



Shell

This change in course is further evidenced by the individuals the Trump administration brought to justice for providing support for Iran's WMD and ballistic program in violation of U.S. sanctions and export restrictions against Iran—individuals whom the Obama-Biden administration and then-Secretary Kerry's State Department allowed to continue to operate at the risk of U.S. national security. Specifically, the unclassified records coupled with public reports reveal the Trump administration brought the following individuals to justice whom the Obama-Biden administration and then-Secretary Kerry let walk.

**Green Wave Telecommunications-Alireza Jalali and Negar Ghodskani**: Unclassified FBI email records show that in July 2015, the Justice Department sought to bring grand jury proceedings against Jalali and Ghodskani for violating U.S. sanctions and export restrictions against Iran as part of its investigation into Green Wave Telecommunications, which the FBI and Homeland Security Investigations had been investigating since 2011.[79] According to the records, in the case against Green Wave, the Justice Department couldn't "schedule Grand Jury [proceedings] until State Department approves."[80] Public Justice Department reports provide that "[s]ince its incorporation in 2009, Green Wave operated as a front company for Fanavar Moj Khavar (Fana Moj), an Iran-based company that specializes in both broadcast communications and microwave communications."[81] Reportedly Green Wave unlawfully acquired sensitive export-controlled technology from the U.S., shipped it to Malaysia, and then shipped the technology to Iran to avoid U.S. export controls.[82] In 2017, the Trump administration designated Fana Moj as a Specially Designated National for its support of the Iranian Revolutionary Guard.[83] On November 29, 2017, Jalali pleaded guilty for his participation in the fraud conspiracy and was sentenced to 15 months in prison.[84] On August 9, 2019, Ghodskani pleaded guilty for her participation in the conspiracy and was sentenced to 27 months in prison.[85]

<u>**Conclusion**</u>

On May 21, 2024, I wrote to the State Department, FBI, and Justice Department requesting the production of records for certain officials referenced in these records.[86] I sent

---

[79] Exhibit J; Department of Justice, *Summary of Major U.S. Export Enforcement, Economic Espionage, And Sanctions-Related Criminal Cases (January 2016 to the present: updated November 2019)*, National Security Division, (Nov. 2019), https://www.justice.gov/nsd/page/file/1044446/dl?inline.

[80] Exhibit A.

[81] Department of Justice, *Summary of Major U.S. Export Enforcement, Economic Espionage, And Sanctions-Related Criminal Cases (January 2016 to the present: updated November 2019)*, National Security Division at 24, (Nov. 2019), https://www.justice.gov/nsd/page/file/1044446/dl?inline.

[82] *Id*.

[83] *Id*.

[84] *Id*.

[85] *Id*.

[86] Letter from Senator Charles Grassley, Ranking Member, Senate Budget Committee, and Senator Ron Johnson, Ranking Member, Permanent Subcommittee on Investigations, to Antony Blinken, Secretary, Department of State, (May 21, 2024); Letter from Senator Charles Grassley, Ranking Member, Senate Budget Committee, and Senator Ron Johnson, Ranking Member, Permanent Subcommittee on Investigations, to Merrick Garland, Attorney General, Department of Justice, (May 21, 2024); Letter from Senator Charles Grassley, Ranking Member, Senate Budget Committee, and Senator Ron Johnson, Ranking Member, Permanent Subcommittee on Investigations, to Christopher Wray, Director, Federal Bureau of Investigation, (May 21, 2024), https://www.grassley.senate.gov/news/news-releases/grassley-johnson-uncover-obama-biden-state-departments-politically-motivated-obstruction-of-fbi-law-enforcement-efforts.

these letters to gain greater insight into the danger posed by then-Secretary Kerry's politically motivated decisions to interfere with law enforcement efforts against individuals who supported Iran's WMD and ballistic missile programs in contradiction of U.S. sanctions and export restrictions and to seek accountability for this obstruction.[87]  However, the Biden-Harris State Department, FBI, and Justice Department failed to respond.

The unclassified records reveal the Obama-Biden administration's brazen political calculus forced the FBI to stand down on efforts to arrest and indict individuals who provided support for Iran's nuclear and ballistic missile programs.  More precisely, then-Secretary of State Kerry's obstructive conduct against law enforcement efforts did not reinforce or strengthen our national security.  Kerry's obstructive conduct contradicted his testimony before Congress that the Iran Nuclear Deal "does not provide Iran any relief from U.S. sanctions under any of those authorities or other authorities, mind you."[88]  Further, the email records expose that the FBI and Justice Department, under the leadership of then-Director Comey and then-Attorney General Loretta Lynch, failed to stop Kerry's political interference and obstruction.  Whistleblower disclosures summed up the consequences of State's obstruction saying that, "Tragically, the constant unlawful interference hindered and obstructed hundreds of investigations into thousands of illegal acts, all of which benefited the Iranian regime, its military, and proxies.  In short, this unceasing political interference guaranteed Iran's illegal activities would continue."[89]

---

[87] Negar Mojtahedi, *Whistleblowers Allege John Kerry Blocked FBI From Arresting Iranian Agents*, IRAN INTERNATIONAL, (May 23, 2024), https://www.iranintl.com/en/202405231235.
[88] Senate Foreign Relations Committee, *Iran Nuclear Agreement Review*, (Jul. 23, 2015), https://www.foreign.senate.gov/hearings/iran-nuclear-agreement-review.
[89] On file with Comm. staff.

**[SPA-49]**

# Exhibit A

| | |
|---|---|
| **From:** | Burnham, Cindy R. (MP) (FBI) |
| **Sent:** | Wednesday, July 29, 2015 2:41 PM |
| **To:** | ████████; Buma, Johnathan C. (CD) (FBI) |
| **Subject:** | RE: Current Iran case roadblock |

Thanks ██ - as always, I appreciate your support.

I have had two separate cases blocked, details are below, at the U//FOUO level:

██████: A ██-based Iranian front company. Case is ready for Grand Jury, and the subject is currently located in the ██████████. Subject is trying to obtain permanent residency in the ██, so we would like to have him arrested before he gets that residency (it's much easier to extradite a non-resident). Statute runs Feb 2016. AUSA Ari Redbord (District of Columbia), CES Attorney is Julie Edelstein. Yesterday, Julie reiterated that State Department approval was needed for Grand Jury.

Green Wave: A Malaysia-based Iranian front company. Case is ready for Grand Jury, with subjects in Malaysia and Australia. Case has been coordinated with the Attorney General Chambers in Malaysia and Australia, and the statute runs in Feb 2016. AUSA Charlie Kovats (District of Minnesota) and CES Attorney David Recker. Recker reiterated to me yesterday that we can't schedule Grand Jury until State Department approves.

For whatever it's worth: in both cases, the CES attorneys have been fantastic to work with, and have pushed the cases whenever possible. This seems to be coming from far above the CES trial attorney level.

Thanks again, and please let me know if you have any questions.

Cindy

-----Original Message-----
From: ████████ (CD) (FBI)
Sent: Wednesday, July 29, 2015 1:13 PM
To: Buma, Johnathan C. (CD) (FBI); Burnham, Cindy R. (MP) (FBI)
Subject: RE: Current Iran case roadblock

Cindy-
State/DOJ have been blocking all of our overt LE actions since April. Unfortunately, there have been mixed and inconsistent messages and we are working to get some stability to the guidance. DOJ is working on some guidance for its offices which may be released next week. In the interim, can you advise the names of the CES attorney's? From what I have seen, it is accurate that any decisions requiring CES permission have been run through State and DOJ front office for approval.

We like to keep track of these decisions so please save communications and forward to us.

Best,
██

-----Original Message-----
From: Buma, Johnathan C. (CD) (FBI)
Sent: Wednesday, July 29, 2015 1:20 PM
To: ███████████ (CD) (FBI)
Subject: FW: Current Iran case roadblock

Another example from ███████████ documenting Dept. of State's claim that it must approve
enforcement actions, such as scheduling Grand Jury:

-----Original Message-----
From: Burnham, Cindy R. (MP) (FBI)
Sent: Tuesday, July 28, 2015 5:15 PM
To: Buma, Johnathan C. (CD) (FBI); Isaacson, Grant (MP) (FBI)
Subject: FW: Current Iran case roadblock

Just FYI - I had a conference call today with the SAC of Commerce's ███████ field office. Commerce provided
written guidance to their case agents which states, "State requests coordination on significant Iranian
enforcement actions but such actions are not precluded or restricted."

I have been told by two different CES attorneys covering cases in two separate judicial districts that State
Department must approve significant enforcement actions, such as scheduling Grand Jury. The ███████
Commerce SAC is going to reach out to his director and try to get clarification.

Both of these cases are joint OEE/FBI investigations, so we may become a part of the discussion. Please let me
know if you hear anything or have any questions.

Thanks - Cindy

-----Original Message-----
From: Dan Clutch ███████████ @██ .doc.gov}
Sent: Tuesday, July 28, 2015 12:58 PM
To: Perry Davis; Dave Nardella
Cc: Jon Svendsen; Burnham, Cindy R. (MP) (FBI)
Subject: RE: Current Iran case roadblock

Perry, thank you for the information. I think a call to flesh things out would be helpful -- can we talk at 3pm
today?

Thank you,
Dan.

-----Original Message-----
From: Perry Davis
Sent: Tuesday, July 28, 2015 10:54 AM
To: Dan Clutch; Dave Nardella

**[SPA-52]**

Cc: Jon Svendsen; Burnham, Cindy R. (MP) (FBI)
Subject: Current Iran case roadblock

Dan,

Based on yesterday's discussion of how our historic/ongoing Iran cases should not be impacted by the recent Iran deal, I have an issue that I think you and or HQ may want to address. I'm copying Jon because the case at issue is his Green Wave case. (Case No. ███████████ The case is a joint investigation with FBI and HSI and has been under investigation since 2011. There have been significant investigative actions and a significant amount of investigative effort expended by all the joint agencies over the last few years. Jon's FBI co-case agent, Cindy Burnham, (copied here) in ███████ just informed me that over the past few weeks, and as recently as yesterday, CES advised that the State Department would not allow CES to move forward with grand jury without "exigent circumstances." This seems to be a direct contradiction to the second bullet point in the notes sent down form HQ that indicate "State requests coordination on significant Iranian enforcement actions but such actions are not precluded or restricted."

I am only the assisting agent on this case and my knowledge of the details is slim. If you would like some more detail, I could probably arrange a phone call for you with Cindy Burnham.

Thanks,

Perry

# Exhibit B

| | |
|---|---|
| **From:** | Moy, Stacey R. (CD) (FBI) |
| **Sent:** | Monday, May 18, 2015 8:04 PM |
| **To:** | ██████████████ Carpenter, Chante L. (CD) (FBI); Sander, Jonathan K. (WMD) (FBI) |
| **Subject:** | Fwd: ████ |

FYI - hope to get some more clarity in the AM, thanks

------- Original message -------
From: "Moy, Stacey R. (CD) (FBI)" ████████████
Date:05/18/2015 8:01 PM (GMT-05:00)
To: "Dembosky, Luke (NSD) (JMD)" █████████████, "Laufman, David (NSD) (JMD)"
██████████████, "Jones, Robert A. (CD) (FBI)" ██████████████, "Edelstein, Julie (NSD) (JMD)"
Subject: RE: ████

Much appreciated Sir - on standby to provide whatever higher needs, thanks

------- Original message -------
From: "Dembosky, Luke (NSD)" ██████████████
Date:05/18/2015 7:34 PM (GMT-05:00)
To: "Laufman, David (NSD) (JMD)"██████████████, "Jones, Robert A. (CD) (FBI)"
██████████████, "Moy, Stacey R. (CD) (FBI)"██████████████, "Edelstein, Julie (NSD) (JMD)"
Subject: ████

We're going to need to elevate further. Exhausted DAAG and AAG levels today, to no avail. Friday night we briefed AG and DAG together, so they already understand the context. Stay tuned.

Sir,

Joint FBI and OGA intel info on your JWICS now – working to get the remaining items for speaking points/context shortly. Do you also have a red-side (SECRET/SIPRNET) we can send those on? Thanks

V/R Stacey

Stacey R. Moy
Assistant Section Chief
FBIHQ/FBI Counterproliferation Center/Room ▉

---

**From:** Dembosky, Luke (NSD) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
**Sent:** Monday, May 18, 2015 11:30 AM
**To:** Bladel, Louis E. (CD) (FBI); Laufman, David (NSD) (JMD); Moy, Stacey R. (CD) (FBI); ▉▉▉▉▉▉▉▉▉▉;
Kollmar, Richard W. (CD) (FBI)
**Cc:** Arrowood, Casey (NSD) (JMD); Hickey, Adam (NSD) (JMD)
**Subject:** RE: ▉▉▉▉▉▉▉
**Importance:** High

Lou,

The AAG has a high-level call on this at 5:30. If we have or can get it, it would help very much to get any FBI and OGA info, poster or list illustrating how important this person is. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Thanks.

Luke

---

**From:** Bladel, Louis E. (CD) (FBI) ▉▉▉▉▉▉▉▉▉▉
**Sent:** Sunday, May 17, 2015 7:45 PM
**To:** Dembosky, Luke (NSD); Laufman, David (NSD); Moy, Stacey R. (CD) (FBI); ▉▉▉▉▉▉▉▉▉; Kollmar,
Richard W. (CD) (FBI)
**Cc:** Arrowood, Casey (NSD)
**Subject:** RE: ▉▉▉▉▉▉▉

The early June date is still accurate. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Thanks, Lou

--

-------- Original message --------
From: "Dembosky, Luke (NSD)" ▉▉▉▉▉▉▉▉▉▉>
Date:05/17/2015 4:39 PM (GMT-05:00)
To: "Laufman, David (NSD) (JMD)" ▉▉▉▉▉▉▉▉>
Cc: "Bladel, Louis E. (CD) (FBI)" ▉▉▉▉▉▉▉▉>, "Arrowood, Casey (NSD) (JMD)"
▉▉▉▉▉▉▉>
Subject: Re: ▉▉▉▉▉▉

Last info I have is interest continues for early June. Please let me know if anything has changed in that regard. We are about to escalate the issue with counterparts.

▉

**[SPA-56]**

**From:** Moy, Stacey R. (CD) (FBI)
**Sent:** Wednesday, May 13, 2015 1:36 PM
**To:** Bladel, Louis E. (CD) (FBI)
**Cc:**
**Subject:** RE: █████████

Briefed this at the 1 PM along with the NF case – thanks to ██. provided the back-material along with updated BBC for Jones to provide to the DD for context. Aaron read the material and agreed it should go to the DD for decision-makers and not be left to Sherman based on the info, thanks

V/R Stacey

**From:** Bladel, Louis E. (CD) (FBI)
**Sent:** Wednesday, May 13, 2015 9:40 AM
**To:** Moy, Stacey R. (CD) (FBI)
**Subject:** RE: █████████

Good news. Glad logic won out.

--

-------- Original message --------
From: "Moy, Stacey R. (CD) (FBI)" █████████ >
Date:05/13/2015 8:27 AM (GMT-05:00)
To: "Bladel, Louis E. (CD) (FBI)" █████████ >
Subject: RE: █████████

Back in – Aaron reached out following discussion w/ Bob Jones and needed additional details on timeframe which we provided. Jones did talk w/ Sherman and we provided additional context on the appropriate-level call (DD), which they are trying to schedule by the end of the week. We are updating the BBC (w/ intel brief to accompany) for speaking points, will keep you apprised.

EA authority is still on deck for 10 AM and█████████████████████████████
█████████████████████ as scheduled, thanks

V/R Stacey

**From:** Bladel, Louis E. (CD) (FBI)
**Sent:** Tuesday, May 12, 2015 5:41 PM
**To:** Moy, Stacey R. (CD) (FBI)
**Subject:** RE: █████████

Let's stand down unless you hear otherwise from our chain. Pls make sure ██ understands. Crazy.

--

-------- Original message --------
From: "Moy, Stacey R. (CD) (FBI)" █████████████ >
Date:05/12/2015 5:31 PM (GMT-05:00)
To: "Bladel, Louis E. (CD) (FBI)" █████████████ >
Subject: ████████████

Lou,

Aaron called me in and said he received a cryptic call from Bob Jones that FBI was to stand down from pushing State on visa issuance due to "other sensitivities." He had no other issue so I circled the wagon with ██ so he can track from his interagency contacts to verify before we reengage for greater details on what this means (presume US Wendy Sherman issues) and whether we bring this at a higher-level? Will keep you apprised, thanks

V/R Stacey

Stacey R. Moy
Assistant Section Chief
FBIHQ/FBI Counterproliferation Center/Room ██
█████████

# Exhibit C

| | |
|---|---|
| **From:** | Reyes, Reginald B. (LA) (FBI) |
| **Sent:** | Thursday, July 2, 2015 7:27 PM |
| **To:** | Sisk, Trevor A. (CD) (FBI); Storino, Alexander L. (LA) (FBI) |
| **Cc:** | ███████ ██ ██ |
| **Subject:** | RE: Italy Follow Up |

Trevor ██

As Alex mentioned in his e-mail, we appreciate the constant support from your team in spite of the political and bureaucratic obstacles. Have a safe Independence day. Best regards, Reggie.

**From:** Sisk, Trevor A. (CD) (FBI)
**Sent:** Thursday, July 02, 2015 11:32 AM
**To:** Storino, Alexander L. (LA) (FBI); Reyes, Reginald B. (LA) (FBI)
**Cc:** █
**Subject:** RE: Italy Follow Up

Alex / Reggie --

FYI - I just contacted CES Attorney Dave Recker to inquire why they (CES) would need to have the DAAG raise our plan to arrest T or F with State. He advised that all of the Iran proliferation cases are being discussed and decided by a small group of DOJ officials and State Department officials due to the implications that it could have on the pending Nuclear negotiations with Iran. Attorney Recker stated that some of the requests to move forward with arrests / operations are being approved and some are not. He stated he knows of certain DOJ personnel that have participated in these discussions, to include Luke Dembroski (DAAG), Bruce Swartz (NSD OIA) and Mary Rodriguez (NSD OIA). Attorney Recker advised that personnel of comparable standing from State Department also participate in these meetings. Attorney Recker advised that he was aware of one instance where the Secretary of State personally told DOJ officials that they were to stand down on an arrest (NFI). As you are aware, Attorney Recker made similar statements yesterday during our conference call about the current approval process for these matters based on the possible implications that an arrest could possibly have of the current negotiations with Iran... but I wanted to share with you the fact that we had a similar conversation today.

Trevor

**From:** Recker, David (NSD) ██████████████████████ ▮
**Sent:** Thursday, July 02, 2015 1:12 PM
**To:** Takla, Mark (USACAC)
**Cc:** Storino, Alexander L. (LA) (FBI); Daniel McGowan; Willie Lo; Sisk, Trevor A. (CD) (FBI); Kwon, Virginia (LA) (FBI); Reyes, Reginald B. (LA) (FBI); Bertrand, Michael C. (NY) (FBI); Bents, James J. (RO) (FBI)
**Subject:** RE: Italy Follow Up

OK. I will let the DAAG know that the current request to be raised with State is that plan.

**From:** Takla, Mark (USACAC) ███████████ ▮
**Sent:** Thursday, July 02, 2015 1:11 PM
**To:** Recker, David (NSD)

**[SPA-60]**

**Cc:** Storino, Alexander L. (LA) (FBI); Daniel McGowan; Willie Lo; Sisk, Trevor A. (CD) (FBI); Kwon, Virginia (LA) (FBI); Reyes, Reginald B. (LA) (FBI); Bertrand, Michael C. (NY) (FBI); Bents, James J. (RO) (FBI)
**Subject:** Re: Italy Follow Up

Yes, that is the plan once we are authorized to arrest.

On Jul 2, 2015, at 9:59 AM, "Recker, David (NSD)" ▮▮▮▮▮▮▮▮▮▮ ▮ wrote:

> Alex,
>
> Thanks for the update.
>
> As for the other two defendants who frequently travel to the U.S., is the plan to go forward with an arrest the next time they arrive and seek to close the courtroom? I'll need to go back and tee that plan up with NSD folks.
>
> Thanks,
>
> Dave
>
> ---
>
> **From:** Storino, Alexander L. (LA) (FBI) [▮▮▮▮▮▮▮▮▮▮▮▮▮]
> **Sent:** Thursday, July 02, 2015 12:53 PM
> **To:** Takla, Mark (USACAC); Daniel McGowan; Willie Lo; Recker, David (NSD); Sisk, Trevor A. (CD) (FBI); Posa, Cristina
> **Cc:** Kwon, Virginia (LA) (FBI); Reyes, Reginald B. (LA) (FBI); Bertrand, Michael C. (NY) (FBI); Bents, James J. (RO) (FBI)
> **Subject:** Italy Follow Up
>
> All,
>
> This morning I received information from our ▮▮▮ in ▮▮▮ indicating ▮▮▮▮▮▮▮ had applied for a ▮▮▮▮▮ visa at the ▮▮▮ Embassy in Tehran for the time period we referenced, however his visa request was refused. Looks like this opportunity didn't pan out. Thanks for all your help and let me know if you have any questions. Have a good 4th.
>
> Regards,
>
> Alex
>
> **SA Alex Storino**
> **FBI –** ▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮

# Exhibit D

**[SPA-62]**

| | |
|---|---|
| **From:** | Sisk, Trevor A. (CD) (FBI) |
| **Sent:** | Friday, July 3, 2015 8:39 PM |
| **To:** | ███████████ (CD) (FBI) |
| **Subject:** | RE: HQ Support |

Kind words by Reggie but it still doesn't get us any closer to moving forward....

--

-------- Original message --------
From: "███████████ (CD) (FBI)" ███████████
Date:07/03/2015 8:22 PM (GMT-05:00)
To: "Sisk, Trevor A. (CD) (FBI)" ███████████
Subject: Fwd: HQ Support

--

-------- Original message --------
From: "Bladel, Louis E. (CD) (FBI)" ███████████ >
Date:07/03/2015 7:45 PM (GMT-05:00)
To: "Reyes, Reginald B. (LA) (FBI)" ███████████ >
Subject: RE: HQ Support

Thanks and likewise. We are all beside ourselves on asking the field to stand down on a layup arrest, however as it stands right now we all have to sit back and wait until all the US and Iran negotiations resolve themselves. We will continue to argue for aggressive action, however we will probably lose. ███ and his Unit always push the envelope and hate our current stance, I totally agree, even though our hands are tied. Thanks for your patience and enjoy your weekend.

--

-------- Original message --------
From: "Reyes, Reginald B. (LA) (FBI)" ███████████ >
Date:07/03/2015 6:14 PM (GMT-05:00)
To: "Bladel, Louis E. (CD) (FBI)" ███████████ >
Subject: HQ Support

Lou,
I wanted to personally reach out to let you know that I am very appreciative of your team. Specifically ███ and Trevor for assisting us navigate through the on-going politics and beauracracy. Everytime I've engaged with them, I am left with confidence that they will take action and support my team. I hope you and your family have a safe and festive Independence holiday. Thanks again, Reggie. (No, I don't want to come back to HQ.)

# Exhibit E

**[SPA-64]**

FOR OFFICIAL USE ONLY



**U.S. Department of Justice**

National Security Division

---

*Counterintelligence and Export Control Section*                    *Washington, D.C. 20530*

---

**MEMORANDUM**

**TO:**      National Security/Anti-Terrorism Advisory Council Coordinators

**FROM:**    David H. Laufman
             Chief, Counterintelligence and Export Control Section

**SUBJECT:** Guidance Regarding the Nuclear Deal with Iran and Criminal Investigations and
             Prosecutions

**DATE:**    October 7, 2015

On July 14, 2015, the United States, Iran, the European Union ("E.U."), and five other nations reached a Joint Comprehensive Plan of Action ("JCPOA") that limits Iran's nuclear program in return for sanctions relief. The purpose of this guidance is to provide clarity on sanctions relief under the JCPOA and to describe how it may affect criminal investigations and prosecutions.

First, no changes will be made to any sanctions unless and until Iran has taken certain nuclear-related actions and these actions have been verified by the International Atomic Energy Agency ("IAEA"). Following completion of these steps, which the U.S. Government does not expect to occur imminently, sanctions relief will go into effect on "Implementation Day." Second, while the JCPOA will provide relief from a wide range of "secondary" economic and financial sanctions affecting foreign entities doing business with Iran, most of the laws and regulations used in U.S. Department of Justice ("DOJ") criminal cases will not be affected. Third, although the laws that DOJ criminally enforces will not significantly change, the JCPOA may have practical implications for our criminal prosecutions.

**I.      Sanctions relief will not occur until Implementation Day.**

- All current sanctions will remain in place until Implementation Day. The timing of Implementation Day depends on when Iran completes the nuclear commitments to which it agreed under the JCPOA.

FOR OFFICIAL USE ONLY

- The only exception is the limited sanctions relief under the Joint Plan of Action ("JPOA"),[1] which has been in place during negotiations of the JCPOA and will continue to apply until Implementation Day.[2]

**II.** **After Implementation Day, sanctions relief will not affect most laws and regulations used in criminal cases.**

    A. The Iranian Transactions and Sanctions Regulations will be minimally affected.

- The JCPOA does not terminate, suspend, or otherwise substantially relieve the prohibitions in the ITSR — commonly referred to as "primary sanctions."[3] The ITSR will continue to prohibit most transactions involving the export or re-export of U.S. goods or services to Iran, as well as transactions involving U.S. persons and Iran, the Government of Iran, or Iranian financial institutions.

- In essence, except as specified below:

    o **U.S. or foreign persons involved in the export or re-export of U.S. goods or services to Iran remain subject to prosecution.**

    o **U.S. persons involved in Iranian transactions remain subject to prosecution.**

- The only sanctions relief related to the ITSR that is provided for under the JCPOA is:

    o the export, re-export, sale, lease, or transfer to Iran of commercial passenger aircraft, parts, and services for civil end-uses, which will be authorized on a case-by-case basis through specific licenses issued by OFAC;

    o the import of Iranian-origin carpets and foodstuffs, which will be authorized via a general license issued by OFAC; and

    o foreign entities that are owned or controlled by a U.S. person will be permitted, via an OFAC general license, to engage in certain transactions involving Iran that do not involve U.S. goods, U.S. services, or U.S. persons.

---

[1] The JPOA refers to the interim deal concluded in November 2013, pursuant to which the United States has provided Iran temporary and reversible sanctions relief. The JCPOA refers to the nuclear deal with Iran reached on July 14, 2015. Similar to the JCPOA, the JPOA primarily provides sanctions relief to non-U.S. entities engaging in transactions involving Iran in certain sectors, but not involving the United States or otherwise implicating the Iranian Transactions and Sanctions Regulations ("ITSR").

[2] The U.S., E.U., and U.N. sanctions that will be lifted or suspended on Implementation Day can "snap back" if Iran fails to satisfy its commitments under the JCPOA.

[3] The ITSR are located at 31 CFR Part 560 and are administered by the Office of Foreign Assets Control ("OFAC") at the U.S. Department of the Treasury.

**[SPA-66]**

FOR OFFICIAL USE ONLY

B. <u>The International Traffic in Arms Regulations ("ITAR") and Export Administration Regulations ("EAR") will not be affected.</u>

- U.S. restrictions on Iran related to defense articles on the U.S. Munitions List ("USML") (including conventional arms and ballistic missiles), defense services, and items subject to the EAR will remain in place.

- Iran must abide by the JCPOA for several years before U.N. restrictions related to conventional arms (five years) and ballistic missiles (eight years) are lifted. The lifting of these U.N. restrictions will not change U.S. restrictions on exporting conventional arms and ballistic missiles to Iran.

C. <u>Some entities/individuals will be removed from Sanctions Lists administered by OFAC.</u>

- The JCPOA identifies entities and individuals that will be removed from OFAC's List of Specially Designated Nationals and Blocked Persons ("SDN List"), the Foreign Sanctions Evaders List, and the Non-SDN Iran Sanctions Act List.[4]

   o These entities and individuals have a nexus to Iran and were included on the lists for reasons other than terrorist activity, ballistic missile proliferation, narcotics trafficking, destabilizing regional activity, or human rights violations.

- Government of Iran entities and individuals and Iranian financial institutions will remain blocked under the ITSR. Transactions by U.S. persons with these blocked entities and individuals will remain prohibited. Accordingly, some entities and individuals that will be removed from the SDN List and other lists, but are identified as the Government of Iran or an Iranian financial institution, will remain blocked.

D. <u>The lifting of "secondary" economic and financial sanctions targeting non-U.S. persons will not alter the laws that DOJ criminally enforces.</u>

- The U.S. will suspend economic and financial sanctions directed toward activities with Iran by non-U.S. persons that do not involve U.S. goods, U.S. services, or U.S. persons – known as "secondary sanctions." These include sanctions on certain financial activities, Iran's energy and petrochemical sectors, and Iran's automotive sector.

- The suspension of secondary sanctions will not impact the ITSR. Secondary sanctions are implemented pursuant to statutes, executive orders, and regulations that are separate from the ITSR.

- The U.S. has never brought criminal charges for violations of secondary sanctions.

---

[4] Many individuals and entities will be removed from these lists on Implementation Day, and some others will be removed on Transition Day (the earlier of 8 years after Adoption Day or when the IAEA concludes that all nuclear material in Iran remains in peaceful activities).

3

**[SPA-67]**

FOR OFFICIAL USE ONLY

**III.  The JCPOA and the implementation of sanctions relief may have practical implications for criminal investigations and prosecutions.**

- Although sanctions relief under the JCPOA will not significantly change the laws that DOJ criminally enforces, some of our criminal cases may be affected in the following ways:

  o  The removal of some U.N. and E.U. sanctions may hinder our ability to obtain the arrest or extradition of persons abroad for violating the ITSR because some countries may maintain that the request is political or there is no dual criminality. To protect against this risk -- and consistent with the National Security Division's new Strategic Plan for Export Control and Sanctions Enforcement -- U.S. **Attorneys' Offices should, when possible, also charge defendants with violations of the ITAR or EAR, with engaging in transactions with individuals or entities on the SDN List, or with violations of non-export related statutes such as wire fraud.**

  o  The JCPOA may affect sentences that defendants will receive for ITSR violations due to the misperception that the underlying conduct is no longer criminal in light of sanctions relief or does not significantly impact national security. It will be necessary to brief judges on the limited changes that the JCPOA will make to U.S. sanctions against Iran and the importance of the remaining sanctions to national security. It will also be critical to highlight at sentencing all aspects of a case that implicate national security, including whether the goods are listed on the Commerce Control List or USML and the threat to national security posed by the procurement agent and the end user.

  o  Defendants who unlawfully export goods or services to Iran may claim that they believed their conduct was lawful under the JCPOA. The U.S. government is already engaged in public outreach and education to mitigate this defense.

- Close coordination with the Counterintelligence and Export Control Section ("CES") will be essential on all export control and sanctions cases involving Iran to identify how the JCPOA may affect your cases and to discuss options for maximizing your success in future prosecutions.

  o  CES's primary point of contact for such coordination is Jay Bratt, Deputy Chief, Export Control and Sanctions, who may be reached at ▮▮▮▮▮▮ or at ▮▮▮▮▮▮▮▮

**[SPA-68]**

# Exhibit F

**[SPA-69]**

| | |
|---|---|
| **From:** | CLINE, LISA (CD)(FBI) |
| **Sent:** | Friday, October 09, 2015 1:47 PM |
| **To:** | PEREZ-MIRANDA, LUIS A. (CD) (FBI); MOY, STACEY R. (CD) (FBI) |
| **Cc:** | WALSH, DANIEL P (CD) (FBI); |
| **Subject:** | RE: DoJ/NSD guidance --- UNCLASSIFIED |
| | |
| **SentinelCaseId:** | NON-RECORD |

Classification: UNCLASSIFIED
========================================================

Thank you.

---

**From:** PEREZ-MIRANDA, LUIS A. (CD) (FBI)
**Sent:** Friday, October 09, 2015 1:32 PM
**To:** CLINE, LISA (CD)(FBI); MOY, STACEY R. (CD) (FBI)
**Cc:** WALSH, DANIEL P (CD) (FBI);
**Subject:** RE: DoJ/NSD guidance --- UNCLASSIFIED

Classification: UNCLASSIFIED
========================================================

Greetings to all. The below matter was covered yesterday when SC Archey forwarded the preamble paragraph mentioned below to CD EM.

Thank you,

**LUIS A. PEREZ-MIRANDA**
Assistant Section Chief
Global Section (CD-2)
Counterintelligence Division (CD)
FBIHQ - Washington, DC

---

**From:** CLINE, LISA (CD)(FBI)
**Sent:** Friday, October 09, 2015 9:19 AM
**To:** MOY, STACEY R. (CD) (FBI)
**Cc:** WALSH, DANIEL P (CD) (FBI); PEREZ-MIRANDA, LUIS A. (CD) (FBI);
**Subject:** RE: DoJ/NSD guidance --- UNCLASSIFIED

Classification: UNCLASSIFIED
========================================================

Luis was giving the final language to Dave, who was supposed to review it and give it to the DAD. I never heard back, so I think it was probably ok or at least gave them something to show the AD.

**[SPA-70]**

**From:** MOY, STACEY R. (CD) (FBI)
**Sent:** Friday, October 09, 2015 9:18 AM
**To:** CLINE, LISA (CD)(FBI)
**Cc:** WALSH, DANIEL P (CD) (FBI); PEREZ-MIRANDA, LUIS A. (CD) (FBI); ███████████
**Subject:** RE: DoJ/NSD guidance --- UNCLASSIFIED

Classification: UNCLASSIFIED
======================================================

Lisa,
Is there any additional follow-up needed on this?  Thanks

R/ Stacey

**From:** WALSH, DANIEL P (CD) (FBI)
**Sent:** Thursday, October 08, 2015 1:37 PM
**To:** ████████(CD)(FBI)
**Cc:** MOY, STACEY R. (CD) (FBI)
**Subject:** FW: DoJ/NSD guidance --- UNCLASSIFIED

Classification: UNCLASSIFIED
======================================================

FYSA. This is the verbiage we agreed upon

**From:** PEREZ-MIRANDA, LUIS A. (CD) (FBI)
**Sent:** Thursday, October 08, 2015 1:24 PM
**To:** CLINE, LISA (CD)(FBI); YUSTEIN, JACQUELINE A. (OGC) (FBI); BELOTE, CAROLYN D. (WMD) (FBI); WALSH, DANIEL P (CD) (FBI)
**Cc:** BLUMENFELD, LAURA ROSS (OGC) (FBI)
**Subject:** RE: DoJ/NSD guidance --- UNCLASSIFIED

Classification: UNCLASSIFIED
======================================================

I agree.  Let's get Daniel's concurrence and I will forwarded to Dave for DAD/AD notification.

Luis


**LUIS A. PEREZ-MIRANDA**
Assistant Section Chief
Global Section (CD-2)
Counterintelligence Division (CD)
FBIHQ - Washington, DC
███████████

# [SPA-71]

**From:** CLINE, LISA (CD)(FBI)
**Sent:** Thursday, October 08, 2015 1:15 PM
**To:** YUSTEIN, JACQUELINE A. (OGC) (FBI); BELOTE, CAROLYN D. (WMD) (FBI); WALSH, DANIEL P (CD) (FBI); PEREZ-MIRANDA, LUIS A. (CD) (FBI)
**Cc:** SINTON, ROBERT STUART (OGC) (FBI); BLUMENFELD, LAURA ROSS (OGC) (FBI)
**Subject:** RE: DoJ/NSD guidance --- UNCLASSIFIED

Classification: UNCLASSIFIED
===========================================================

Luis, what do you think?

---

**From:** YUSTEIN, JACQUELINE A. (OGC) (FBI)
**Sent:** Thursday, October 08, 2015 1:08 PM
**To:** CLINE, LISA (CD)(FBI); BELOTE, CAROLYN D. (WMD) (FBI); WALSH, DANIEL P (CD) (FBI); PEREZ-MIRANDA, LUIS A. (CD) (FBI)
**Cc:** SINTON, ROBERT STUART (OGC) (FBI); BLUMENFELD, LAURA ROSS (OGC) (FBI)
**Subject:** RE: DoJ/NSD guidance --- UNCLASSIFIED

Classification: UNCLASSIFIED
===========================================================

PERFECT

---

**From:** CLINE, LISA (CD)(FBI)
**Sent:** Thursday, October 08, 2015 1:07 PM
**To:** BELOTE, CAROLYN D. (WMD) (FBI); YUSTEIN, JACQUELINE A. (OGC) (FBI); WALSH, DANIEL P (CD) (FBI); PEREZ-MIRANDA, LUIS A. (CD) (FBI)
**Cc:** SINTON, ROBERT STUART (OGC) (FBI); BLUMENFELD, LAURA ROSS (OGC) (FBI)
**Subject:** RE: DoJ/NSD guidance --- UNCLASSIFIED

Classification: UNCLASSIFIED
===========================================================

How about this:

Good afternoon.

As a follow-up to the Fact Sheet about the Joint Comprehensive Plan of Action (JCPOA) agreement I provided to all field offices back in August, attached is the newly issued Guidance from US Department of Justice (DOJ) regarding the nuclear deal with Iran as it relates to criminal investigations and prosecutions. While the United States, Iran, the European Union and five other nations framed the JCPOA agreement in July 2015, sanctions against Iran are still in effect and to be enforced by the US Government. This document will help field offices understand the guidance provided to AUSAs by DOJ for you to keep in mind as the FBI continues to investigate violations of these sanctions.

If you have any questions, please consult with your AUSAs and CDCs.

**[SPA-72]**

---

**From:** BELOTE, CAROLYN D. (WMD) (FBI)
**Sent:** Thursday, October 08, 2015 12:52 PM
**To:** CLINE, LISA (CD)(FBI); YUSTEIN, JACQUELINE A. (OGC) (FBI); WALSH, DANIEL P (CD) (FBI); PEREZ-MIRANDA, LUIS A. (CD) (FBI)
**Cc:** SINTON, ROBERT STUART (OGC) (FBI); BLUMENFELD, LAURA ROSS (OGC) (FBI)
**Subject:** RE: DoJ/NSD guidance --- UNCLASSIFIED

Classification: UNCLASSIFIED
=======================================================

Why not just say this is an update to guidance Randy sent out in August indicating there was an agreement and use the language Lisa provided below saying this is what DOJ sent to us and that there are still Iranian sanctions in place and this guidance will help field offices understand the guidance that has been provided to AUSAs and to keep it in mind as we move investigations forward.

---

**From:** CLINE, LISA (CD)(FBI)
**Sent:** Thursday, October 08, 2015 12:44 PM
**To:** YUSTEIN, JACQUELINE A. (OGC) (FBI); WALSH, DANIEL P (CD) (FBI); PEREZ-MIRANDA, LUIS A. (CD) (FBI)
**Cc:** SINTON, ROBERT STUART (OGC) (FBI); BLUMENFELD, LAURA ROSS (OGC) (FBI); BELOTE, CAROLYN D. (WMD) (FBI)
**Subject:** RE: DoJ/NSD guidance --- UNCLASSIFIED

Classification: UNCLASSIFIED
=======================================================

I don't know what Randy has been told. All I know is that he told the DADs that he wanted to send this DOJ guidance to the field with an email. I was asked to compose an email with CPC (that NSLB approved of) and to get it to Randy by COB today.

---

**From:** YUSTEIN, JACQUELINE A. (OGC) (FBI)
**Sent:** Thursday, October 08, 2015 12:40 PM
**To:** CLINE, LISA (CD)(FBI); WALSH, DANIEL P (CD) (FBI); PEREZ-MIRANDA, LUIS A. (CD) (FBI)
**Cc:** SINTON, ROBERT STUART (OGC) (FBI); BLUMENFELD, LAURA ROSS (OGC) (FBI); BELOTE, CAROLYN D. (WMD) (FBI)
**Subject:** RE: DoJ/NSD guidance --- UNCLASSIFIED

Classification: UNCLASSIFIED
=======================================================

Lisa, it would make sense that Carrie's group would put out guidance in similar (updated) fashion to the Fact Sheet she submitted on or about July 27, 2015. The FACT SHEET also was intended for BU-wide dissemination. Has that idea been brought to Randy's attention?

I need to check with Bob, but I'm not certain that NSLB has been given enough time and opportunity to digest CES' guidance (however, straight forward it might appear –which it does), fact check it, and determine the JCPOA's impact ourselves.

<< File: Fact Sheet JCPOA_20150727.docx >>

**From:** CLINE, LISA (CD)(FBI)
**Sent:** Thursday, October 08, 2015 11:24 AM
**To:** WALSH, DANIEL P (CD) (FBI); PEREZ-MIRANDA, LUIS A. (CD) (FBI); YUSTEIN, JACQUELINE A. (OGC) (FBI)
**Subject:** FW: DoJ/NSD guidance --- UNCLASSIFIED

Classification: UNCLASSIFIED
========================================================
The AD would like to send an email to all the SACs as he has been doing with his photo at the top to bring this document to their attention. This is my proposed language for the email, but I need CPC and NSLB approval. The AD needs this done by COB today.

Thank you.


Good afternoon.

Attached is the newly issued Guidance from US Department of Justice regarding the nuclear deal with Iran as it relates to criminal investigations and prosecutions. While the United States, Iran, the European Union and five other nations reached a Joint Comprehensive Plan of Action (JCPOA) in July 2015, sanctions are still in effect and to be enforced by the US Government.

Some key takeaways to DOJ's guidance are:

1.  Sanctions relief will not begin until Iran fulfills outlined, nuclear-related actions set forth in the agreement and verified by the International Atomic Energy Agency. This will take an indefinite amount of time and sanctions relief would go into effect on Implementation Day.

2.  The agreement does not "terminate, suspend or relieve" prohibitions in the Iranian Transactions Sanctions Regulations. Therefore, the export or re-export of US goods/services to Iran will remain prohibited (unless specifically excepted). It is important to note however the (future) export of commercial aircraft parts for civil end use to Iran will be reviewed/licensed by OFAC on case by case basis.

3.  US and Foreign persons involved in such transactions are still subject to prosecution.

4.  US Munitions List defense articles subject to Export Administration Regulations are not affected.

If you have any questions, please contact your AUSAs and CDCs.


<< File: Iran_guidance_--_PDF_2015_10_07.pdf >>

========================================================
Classification: UNCLASSIFIED

========================================================
Classification: UNCLASSIFIED

**[SPA-74]**

===================================================
Classification: UNCLASSIFIED

===================================================
Classification: UNCLASSIFIED

===================================================
Classification: UNCLASSIFIED

===================================================
Classification: UNCLASSIFIED

===================================================
Classification: UNCLASSIFIED

===================================================
Classification: UNCLASSIFIED

===================================================
Classification: UNCLASSIFIED

===================================================
Classification: UNCLASSIFIED

===================================================
Classification: UNCLASSIFIED

===================================================
Classification: UNCLASSIFIED

===================================================
Classification: UNCLASSIFIED

# Exhibit G

**From:** Moy, Stacey R. (CD) (FBI)
**Sent:** Thursday, December 17, 2015 3:35 PM
**To:**               ; Hardiman, Kellie M. (CD) (FBI)
**Cc:** Wilson, E J. (CD) (FBI); Moyer, Sally A. (OGC) (FBI)
**Subject:** FW: Meeting with Mr Countryman

FYI

-----Original Message-----
From: Moy. Stacey R. (CD) (FBI)
Sent: Thursday, December 17, 2015 3:34 PM
To: Bratt, Jay (NSD) (JMD)
Subject: RE: Meeting with Mr Countryman

Roger that - in interim, good news/bad news from our WMDD FO assessment as DoS did specify it was their P-side who instructed it. Our DAD will call over after Christmas to re-engage. Please advise if you know if there are other things at work as they (State) are unwilling to entertain a forum to even discuss options, timing, etc. I'd recommend our FBI-side document should there ever be a special investigation/hearing etc. on why FBI could not action law, and potentially prevent national security incident, please advise of broader DoJ guidance and this countermands what we've both put forward and potentially has impact on others in the future, thanks

R/ Stacey

-----Original Message-----
From: Bratt, Jay (NSD)
Sent: Thursday, December 17, 2015 2:35 PM
To: Moy, Stacey R. (CD) (FBI)
Subject: Re: Meeting with Mr Countryman

I'm away now. I should be back around 5. Will try when I return.

On Dec 17, 2015, at 2:34 PM, Moy, Stacey R. (CD) (FBI)
<      <      >> wrote:

Yep, sorry - Heading back from e2c2 (totto retirement), will call you upon return

--

-------- Original message --------
From: "Bratt, Jay (NSD)" <     <     >>
Date: 12/17/2015 1:31 PM (GMT-05:00)

To: "Moy, Stacey R. (CD) (FBI)" ██████████ < ██████████ >>
Subject: RE: Meeting with Mr Countryman

I just tried calling. Are you around?

From: Moy, Stacey R. (CD) (FBI) ██████████ ]
Sent: Thursday, December 17, 2015 1:29 PM
To: Laufman, David (NSD); Bratt, Jay (NSD); ██████████
Cc: Wilson, E J. (CD) (FBI)
Subject: Fwd: Meeting with Mr Countryman

Just got off the phone with our WMDD executives - looks like it is state political affairs (p) who are vetoing.
Have you heard anything from NSD on this? Thanks


--


-------- Original message --------
From: "SampollRamirez, Gabriel"
< ██████████ @ ██ fbi.gov < ██████████ >
Date: 12/17/2015 12:57 PM (GMT-05:00)
To: "Spencer, Charles P. (WMD) (FBI)" < ██████████ < ██████████ >>
Cc: "Moy, Stacey R. (CD) (FBI)" < ██████████ < ██████████ >>
Subject: FW: Meeting with Mr Countryman
How do you want to proceed?

See below

From: Clark, Samantha T ██████████ @state.gov]
Sent: Thursday, December 17, 2015 12:55 PM
To: SampollRamirez, Gabriel
Cc: Harcum, Tanya Y. (WMD) (FBI); Frantz, Amanda G; Suarez, Gonzalo O
Subject: RE: Meeting with Mr Countryman

Hi Gabe,

I'm sorry for the confusion—I've just learned that we've been instructed by Counselor Tom Shannon's office not
to engage on this issue. A/S Countryman won't be able to take this meeting.

Thank you for your understanding,
Samantha

Samantha (Raddatz) Clark
O: ██████████
BB: ██████████

Bureau of International Security and Nonproliferation

This email is UNCLASSIFIED.

From: Clark, Samantha T
Sent: Thursday, December 17, 2015 12:32 PM
To: 'SampollRamirez, Gabriel'
Cc: Harcum, Tanya Y. (WMD) (FBI); Frantz, Amanda G; Suarez, Gonzalo O
Subject: RE: Meeting with Mr Countryman

Hi Gabe,

I was just able to speak with A/S Countryman about tomorrow's schedule. Unfortunately, he is not able to meet tomorrow (he's just returned from international travel and his schedule is packed). He is available on Monday, December 21 at 11:30am or 3pm. Do either of those work?

Thank you,
Samantha

This email is UNCLASSIFIED.

From: SampollRamirez, Gabriel ███████████████@███bi.gov]
Sent: Thursday, December 17, 2015 9:53 AM
To: Clark, Samantha T
Cc: Harcum, Tanya Y. (WMD) (FBI)
Subject: Meeting with Mr Countryman

Samantha

Friday: Dec 18
Time: TBD
Office: FBI WMD Directorate (WMDD) & Counterprolifration Center (CPC)
Topic: Counterproliferation Cases
Attendees:
FBI WMDD Deputy Assistant Director, Charles Spencer FBI WMDD Chief Scientist, Dr. Gabe Sampoll FBI CPC
Assistant Section Chief, Stacey Moy FBI CPC UC ██████ Iran
DOJ: Jay Bratt

Thank you so much for your assistance.

Ms Tanya Harcum can help with more information.

**Gabe**

# Exhibit H

**From:** Kollmar, Richard W. (CD) (FBI)
**Sent:** Thursday, December 17, 2015 8:06 PM
**To:** Moy, Stacey R. (CD) (FBI)
**Subject:** RE: Meeting with Mr Countryman

Thanks Stacey

--

-------- Original message --------
From: "Moy, Stacey R. (CD) (FBI)" ███████████ >
Date: 12/17/2015 4:00 PM (GMT-05:00)
To: "Kollmar, Richard W. (CD) (FBI)" ██████████ >
Cc: "Woodbery, Paul S. (CD) (FBI)" ████████ >
Subject: FW: Meeting with Mr Countryman

Sir, FYI - same results from attempts towards re-engagement at DoS, will keep you appraised, thanks

V/R Stacey

-----Original Message-----
From: Bratt, Jay (NSD) ████████████
Sent: Thursday, December 17, 2015 3:49 PM
To: Moy, Stacey R. (CD) (FBI)
Subject: Re: Meeting with Mr Countryman

Thanks. David and I are also discussing whether we should elevate within DOJ.

> On Dec 17, 2015, at 3:33 PM, Moy, Stacey R. (CD) (FBI) < ████████ > wrote:
>
> Roger that - in interim, good news/bad news from our WMDD FO
> assessment as DoS did specify it was their P-side who instructed it.
> Our DAD will call over after Christmas to re-engage. Please advise if
> you know if there are other things at work as they (State) are
> unwilling to entertain a forum to even discuss options, timing, etc.
> I'd recommend our FBI-side document should there ever be a special
> investigation/hearing etc. on why FBI could not action law, and
> potentially prevent national security incident, please advise of
> broader DoJ guidance and this countermands what we've both put forward
> and potentially has impact on others in the future, thanks
>
> R/ Stacey
>
> -----Original Message-----
> From: Bratt, Jay (NSD) ████████████
> Sent: Thursday, December 17, 2015 2:35 PM
> To: Moy, Stacey R. (CD) (FBI)
> Subject: Re: Meeting with Mr Countryman

\>
\> I'm away now. I should be back around 5. Will try when I return.
\>
\> On Dec 17, 2015, at 2:34 PM, Moy, Stacey R. (CD) (FBI)
█████████████████████████████████>> wrote:
\>
\> Yep, sorry - Heading back from e2c2 (totto retirement), will call you
\> upon return
\>
\>
\>
\> --
\>
\>
\> -------- Original message --------
\> From: "Bratt, Jay (NSD)"
\> ███████████████████████████>>
\> Date: 12/17/2015 1:31 PM (GMT-05:00)
\> To: "Moy, Stacey R. (CD) (FBI)"
\> <█████████████████████████>>
\> Subject: RE: Meeting with Mr Countryman
\>
\> I just tried calling. Are you around?
\>
\> From: Moy, Stacey R. (CD) (FBI)████████████████
\> Sent: Thursday, December 17, 2015 1:29 PM
\> To: Laufman, David (NSD); Bratt, Jay (NSD);██████████
\>████
\> Cc: Wilson, E J. (CD) (FBI)
\> Subject: Fwd: Meeting with Mr Countryman
\>
\> Just got off the phone with our WMDD executives - looks like it is
\> state political affairs (p) who are vetoing. Have you heard anything
\> from NSD on this? Thanks
\>
\>
\>
\> --
\>
\>
\> -------- Original message --------
\> From: "SampollRamirez, Gabriel"
\>██████████████████████████████████
\>███>>
\> Date: 12/17/2015 12:57 PM (GMT-05:00)
\> To: "Spencer, Charles P. (WMD) (FBI)"
\> <█████████████████████>>
\> Cc: "Moy, Stacey R. (CD) (FBI)"
\> <██████████████████>>
\> Subject: FW: Meeting with Mr Countryman How do you want to proceed?
\>
\> See below
\>
\> From: Clark, Samantha T██████████@state.gov]
\> Sent: Thursday, December 17, 2015 12:55 PM
\> To: SampollRamirez, Gabriel

**[SPA-83]**

> Cc: Harcum, Tanya Y. (WMD) (FBI); Frantz, Amanda G; Suarez, Gonzalo O
> Subject: RE: Meeting with Mr Countryman
>
> Hi Gabe,
>
> I'm sorry for the confusion-I've just learned that we've been instructed by Counselor Tom Shannon's office not to engage on this issue. A/S Countryman won't be able to take this meeting.
>
> Thank you for your understanding,
> Samantha
>
> Samantha (Raddatz) Clark
> O: ▮▮▮▮▮▮
> BB: ▮▮▮▮▮▮
> Bureau of International Security and Nonproliferation
>
>
>
>
> This email is UNCLASSIFIED.
>
>
> From: Clark, Samantha T
> Sent: Thursday, December 17, 2015 12:32 PM
> To: 'SampollRamirez, Gabriel'
> Cc: Harcum, Tanya Y. (WMD) (FBI); Frantz, Amanda G; Suarez, Gonzalo O
> Subject: RE: Meeting with Mr Countryman
>
> Hi Gabe,
>
> I was just able to speak with A/S Countryman about tomorrow's schedule. Unfortunately, he is not able to meet tomorrow (he's just returned from international travel and his schedule is packed). He is available on Monday, December 21 at 11:30am or 3pm. Do either of those work?
>
> Thank you,
> Samantha
>
>
> This email is UNCLASSIFIED.
>
> From: SampollRamirez, Gabriel
> ▮▮▮▮▮▮@▮▮bi.gov]
> Sent: Thursday, December 17, 2015 9:53 AM
> To: Clark, Samantha T
> Cc: Harcum, Tanya Y. (WMD) (FBI)
> Subject: Meeting with Mr Countryman
>
> Samantha
>
> Friday: Dec 18
> Time: TBD
> Office: FBI WMD Directorate (WMDD) & Counterproliferation Center (CPC)
> Topic: Counterproliferation Cases
> Attendees:
> FBI WMDD Deputy Assistant Director, Charles Spencer FBI WMDD Chief

**[SPA-84]**

> Scientist, Dr. Gabe Sampoll FBI CPC Assistant Section Chief, Stacey
> Moy FBI CPC UC ▮▮▮▮▮▮, Iran
> DOJ: Jay Bratt
>
> Thank you so much for your assistance.
>
> Ms Tanya Harcum can help with more information.
>
> Gabe
>
>

As a follow-up from the 1 PM, we have the following for EAD consideration/review, please advise if you need additional information:

(U//FOUO) On 12/17/2015, as part of an interagency outreach for the status and coordination of Iran Counterproliferation operations, FBI received the following notice from US Department of State (DoS), Bureau of International Security and Nonproliferation (ISN), indicating they were instructed not to participate in discussions with the FBI on this matter by Counselor Shannon's office, DoS Under Secretary for Political Affairs, "P" (previously occupied by Ms. Wendy Sherman), detailed e-mail correspondence attached. By way of background, FBI and DoJ/Counterintelligence and Export Control Section (CES) sought a meeting with DoJ/ISN Assistant Secretary Countryman as detailed below. WMDD DAD Spencer will attempt another meeting following the Holiday but would elevate to the EAD as appropriate on the WMDD-side. DoJ/CES advised they will meet with Ms. Mary McCord to brief AAG John Carlin, DoJ/National Security Division on the matter as DoS' failure to participate in an interagency collaboration directly impacts previous DoJ and FBI guidance towards Iran.

> From: Clark, Samantha T         @state.gov]

> Sent: Thursday, December 17, 2015 12:55 PM

> To: SampollRamirez, Gabriel

> Cc: Harcum, Tanya Y. (WMD) (FBI); Frantz, Amanda G; Suarez, Gonzalo O

> Subject: RE: Meeting with Mr Countryman

>

> Hi Gabe,

>

> I'm sorry for the confusion-I've just learned that we've been instructed by Counselor Tom Shannon's office not to engage on this issue. A/S Countryman won't be able to take this meeting.

>

> Thank you for your understanding,

> Samantha

>

> Samantha (Raddatz) Clark

> O:

> BB:

> Bureau of International Security and Nonproliferation

V/ R Stacey

Stacey R. Moy

Acting Section Chief

FBIHQ/FBI Counterproliferation Center/Rm █████

█████████

────────────────────────────────────

From: MOY, STACEY R. (CD) (FBI)

Sent: Tuesday, December 15, 2015 10:44 AM

To: 'David.Laufman@████doj███.gov'; 'Jay.Bratt@████doj███.gov'

Subject: FW: Contact Information --- UNCLASSIFIED

Classification: UNCLASSIFIED

=====================================================

David/Jay,

Hope things are well – I've been advised by my folks via DoJ/OI to reach out to Mr. Swartz (Mr. Dembosky's equivalent) for the status of our undercover/lure-ops as he would have visibility for conflicts with ongoing hostage/prisoner exchange with Iran via DoS. Our efforts would be to provide the joint FBI-interagency ops with potential actions (via indictments) as mechanisms to help inform senior policymakers on areas of leverage/strengthening positions in their negotiations should they choose to authorize. Having a broader sense of community efforts will also help us at the field-level (FBI and interagency) to continue to work our sources and other collection efforts to synch and/or daisy-chain out to keep these options alive. Please let me know if you would prefer to socialize via CES or NSD FO? Thanks

V/R Stacey

█████████████

Bruce Swartz

Deputy Assistant Attorney General

█████████

# Exhibit I

**[SPA-89]**

| | |
|---|---|
| **From:** | MOY, STACEY R. (CD) (FBI) |
| **Sent:** | Wednesday, March 02, 2016 4:54 PM |
| **To:** | JOHNSON, GORDON B (CD) (FBI) |
| **Cc:** | RANKIN, CHARLES H (CD) (FBI); WILSON, E J (CD) (FBI); ▉▉▉▉▉▉▉▉▉ ; HARDIMAN, KELLIE M (CD) (FBI); David.Laufman@▉▉▉doj▉▉▉ Jay.Bratt@▉▉doj▉ CARPENTER, CHANTE L. (CD) (FBI) |
| **Subject:** | FW: follow-up from yesterday --- UNCLASSIFIED//FOUO |
| | |
| **SentinelCaseId:** | NON-RECORD |

Classification: UNCLASSIFIED//FOUO
========================================================

Sir, trying to keep the peace for our other relationships through this Bureau but looks like State is attempting to continue openings to slow-roll and fundamentally disconnected on the legal aspects.

V/R Stacey

**From:** MOY, STACEY R. (CD) (FBI)
**Sent:** Wednesday, March 02, 2016 4:50 PM
**To:** 'Boyer, Samantha A'
**Subject:** RE: follow-up from yesterday --- UNCLASSIFIED//FOUO

Classification: UNCLASSIFIED//FOUO
========================================================

Thanks Sam – will advise when we learn more details.

As for re-adjudicating cases, outside of Iran-matters (as we discussed, deferred to senior-agency leadership), specific details for background/clarification should be permitted for coordination purposes but if there is question about a judicial outcome (signed/approved court orders), those fall outside of the executive branch and are part of official record for violations of US law(s), regardless of country-matter.

Look forward to meeting you the next time I'm over at HST, thanks

R/ Stacey

**From:** Boyer, Samantha A [▉▉▉▉▉▉@state▉▉▉.gov]
**Sent:** Wednesday, March 02, 2016 2:30 PM
**To:** MOY, STACEY R. (CD) (FBI)
**Subject:** RE: follow-up from yesterday --- UNCLASSIFIED//FOUO

Hi Stacey,

**[SPA-90]**

Thanks for the update. Is there a meeting planned to discuss these at the senior level? If you hear of one, can you let me know so we can get the best info to our seniors? (Ideally, we'd also work out the issues between the agencies beforehand too.) I will continue to keep you posted on what we're doing, if you like. I think the majority of these are good cases, and in general, ISN likes people who violate the law to go to jail. In that vein, we're currently working the angles on our end on the side of logic (that the JCPOA does not preclude arresting people who violate the law).

On a related note, there had been some discussion of reaching out to the Bureau/DOJ on questions as we re-adjudicate the cases. Should we no longer consider that an option?

Finally, upon further investigation, the Cuba CI thing seems to be based on the paranoia of one person, so I won't bother you/waste your time with it. 😊 But I appreciate the offer to help.

Next time you're at the Department, let me know. It would be nice to meet you in person.

Best,
Sam

Sensitive
This email is UNCLASSIFIED.

**From:** MOY, STACEY R. (CD) (FBI) [ ]
**Sent:** Wednesday, March 02, 2016 2:12 PM
**To:** Boyer, Samantha A
**Subject:** RE: follow-up from yesterday --- UNCLASSIFIED//FOUO

Classification: UNCLASSIFIED//FOUO
=====================================================

Sam,
I just received information from both FBI and DoJ executive management indicating this matter will be handled directly with your agency's senior leadership. As such, FBI will not be participating in a SVTC for the upcoming (working-level) group. I will continue to keep you apprised should I have more specific information but sincerely appreciate ISN's engagement and support towards a whole-of-government approach on these complex matters.

Please let me know if you need a Cuba CI contact and will pass along, thanks

R/ Stacey

**From:** MOY, STACEY R. (CD) (FBI)
**Sent:** Tuesday, March 01, 2016 5:19 PM
**To:** 'Boyer, Samantha A'
**Subject:** RE: follow-up from yesterday --- UNCLASSIFIED//FOUO

Classification: UNCLASSIFIED//FOUO
=====================================================

Sure thing Sam – We are sourcing who will be the optimum working-level representative for the group. Aside from the subject-matter, do you have any more details on time/location, other agency attendees, etc., so we may ensure we have the right folks?

For Cuba CI with no counterproliferation equities, we do not work this but certainly can provide the Section that does to connect your side, thanks

R/ Stacey

**From:** Boyer, Samantha A [████████ @state███.gov]
**Sent:** Tuesday, March 01, 2016 12:46 PM
**To:** MOY, STACEY R. (CD) (FBI)
**Subject:** RE: follow-up from yesterday --- UNCLASSIFIED//FOUO

Thanks, Stacey. I don't know if Leslie will be part of the senior engagement. I imagine that if it comes to that, P Staff will want to handle it. I have one follow-up and one unrelated question for you.

First, as we move forward, do you want to be the FBI POC for a SVTC with the group on this (it will be working level)? Or should it be someone else? It should be someone who can speak to the cases and answer questions about them. My understanding is that we'll try to work through them one at a time.

Second, does your shop do Cuba CI? One of my folks wants to refer a case to the interagency on that.

Thanks
Sam

Sensitive
This email is UNCLASSIFIED.

**From:** MOY, STACEY R. (CD) (FBI) [████████████]
**Sent:** Tuesday, March 01, 2016 9:57 AM
**To:** Boyer, Samantha A
**Subject:** RE: follow-up from yesterday --- UNCLASSIFIED//FOUO

Classification: UNCLASSIFIED//FOUO
=========================================================

Thank you Sam – we appreciate your engagement and outreach for a way forward. While unlikely to yield additional intel on current activities, we have socialized to the relevant USIC co-partners on ████ and will advise. If Leslie is a strong voice as you opine, we would recommend she be an active participant in any senior-level discussions between State, FBI, and DoJ, which are being sought.

R/ Stacey

Stacey R. Moy

**[SPA-92]**

Acting Section Chief (SES)
FBIHQ/FBI Counterproliferation Center/Rm █████

████████

**From:** Boyer, Samantha A [████████ @state█████.gov]
**Sent:** Tuesday, March 01, 2016 9:30 AM
**To:** MOY, STACEY R. (CD) (FBI)
**Subject:** follow-up from yesterday

Hi Stacey,

I just wanted to follow up with you from my call yesterday. I know that the current state of play has been very frustrating for you and your enforcement colleagues. I am sure it's also annoying that the State guidance was that this was being handled with P, and now it's back to the working level. I just want you to know that JCPOA and post-Implementation Day issues have been a moving target, and we are/I am not trying to jerk you guys around. We're just trying to do the right thing, follow the policy, and all that. As part of this discussion, we will also find you a primary POC, so you don't have to talk to multiple parts of the Department.

On █████, I understand that this is a very solid case, he broke the law, there's an indictment, and it's a little like WTF that it's being held up (if you'll excuse the phrasing). However it is what it is.

I talked to Leslie, and though she does not make the determination (we will escalate to P because we are not in agreement –the desk doesn't want to have an arrest, and ISN supports it) she has a strong voice. Like I said yesterday, she seems to be willing to consider additional information that █████ was engaged in proliferant activity post-Implementation day OR missile procurement, since missile-related anything is still prohibited.

Let me know if you want to discuss.

Best,
Sam


Samantha Boyer
ISN/MBC
█████@state█████.gov


Sensitive
This email is UNCLASSIFIED.


==========================================================
Classification: UNCLASSIFIED//FOUO


••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

# Exhibit J

**[SPA-94]**

| | |
|---|---|
| **From:** | BURNHAM, CINDY R. (MP) (FBI) |
| **Sent:** | Friday, April 29, 2016 11:33 AM |
| **To:** | (CD) (FBI) |
| **Subject:** | Just between us... --- UNCLASSIFIED |

**SentinelCaseId:**      NON-RECORD

Classification: UNCLASSIFIED
======================================================

A few more details that I didn't want to share with Matt, our new ALAT, because I don't want this getting around the Embassy or back to the ▮▮▮...

The Thursday meeting between Secretary Kerry and the AG didn't go well for us...the read-out is that now is not a "good time" to be requesting approvals for extraditions or lures on Iran CP cases. In other words, State has no current plans to send our request to the ▮▮▮▮ But we don't want the ▮▮s to know that....since they worked hard to put together a thorough assessment of dual criminality, which stated that extradition is likely on 4 of the 7 counts in the indictment. In other words, they are willing to extradite if we just ask. The USG looks terrible if we don't even ask, at this point.

In addition, as you probably know, Interpol's General Counsel Kevin Smith has relayed the following: "We've put all Iranian sanction/embargo cases on hold since the treaty was signed and the sanctions were lifted, and we were asked to cancel approximately 12 red notices in January. We have a quite few piled up and would need to consult with DOJ and State before doing any of them. I don't think this issue will be addressed for some time."

The small glimmer of hope is that State said we could raise the issue/request again in the future. We plan to do so in June...the indictment is dated December 8, 2015. According to case law, there is a presumption that the Government should make substantial efforts within one year to apprehend the subject. After a year, the Government must explain why it did not take steps to apprehend the subject. (This is due, in part, to the defendant's right to a speedy trial.) That might be pressure point to get State to move. Things really can't get worse for us, but *maybe* they get better??

In the meantime, we are pushing forward to lure defendant ▮▮ to ▮▮ (it's the same indictment, so the same dual criminality assessment would apply). ▮▮▮▮▮ gave us an email address to use, and our ▮ is initiating contact with ▮ today. Please keep your fingers crossed for us!

Cindy

======================================================
Classification: UNCLASSIFIED

# Exhibit K

| | |
|---|---|
| **From:** | Jay.Bratt@ ███ doj ███ .gov |
| **Sent:** | Tuesday, May 03, 2016 5:13 PM |
| **To:** | ██████████ (CD) (FBI) |
| **Subject:** | RE: Last Thursday's meeting --- UNCLASSIFIED (FOUO) |

CLASSIFICATION:FOUO

I just got back from our AAG biweekly updates and asked whether he or Mary McCord had received a read-out. According to Mary, when the PC ended, Kerry packed up his stuff and rushed out without engaging with the AG at all. The issues remain unresolved. I am going to circle back with Mary, Denise Cheung, and Bruce Swartz to see how we can get this back on the AG's agenda.

-----Original Message-----
From: ██████████ (CD) (FBI) ██████████
Sent: Tuesday, May 03, 2016 2:14 PM
To: Bratt Jay NSD USA GOV
Subject: Last Thursday's meeting --- UNCLASSIFIED

Classification: UNCLASSIFIED
======================================================
TRANSITORY RECORD

Jay-
Did we ever hear how the meeting last Thursday went?
======================================================
Classification: UNCLASSIFIED

CLASSIFICATION:FOUO

**[SPA-97]**

# Exhibit L

**[SPA-98]**

█████████████████

| | |
|---|---|
| **From:** | Jay.Bratt@███doj██.gov |
| **Sent:** | Monday, September 12, 2016 6:01 PM |
| **To:** | ████████████(CD) (FBI) |
| **Subject:** | Cases (FOUO) |

CLASSIFICATION:FOUO

██:

We're still working on getting the AG to press Sec. Kerry again about the stalled cases. With respect to ██████, I just want to confirm that the Ambassador in ████████ approved the lure subject to Main State approval. I believe that's the case, but I want to make sure our briefing memo is correct.

Thanks.

Jay

CLASSIFICATION:FOUO

# Exhibit M

**[SPA-100]**

---

| | |
|---|---|
| **From:** | ██████████ (CD)(FBI) |
| **Sent:** | Tuesday, January 19, 2016 12:11 PM |
| **To:** | BUMA, JOHNATHAN C (CD) (FBI); CARPENTER, CHANTE L. (CD) (FBI); GLEASON, MARY F. (CD) (FBI); MARTIN, SCOTT F (CD) (FBI); SISK, TREVOR A (CD) (FBI) |
| **Subject:** | Iran prisoner deal --- UNCLASSIFIED//FOUO |
| **Importance:** | High |
| **SentinelCaseId:** | TRANSITORY RECORD |

Classification: UNCLASSIFIED//FOUO
=======================================================
TRANSITORY RECORD



Attached is the list of those released or charges dropped as a result of this weekend's actions.

I want to ensure that the case agent of each of these cases has been notified. I think that has happened in many cases but please scrub through both lists and reach out to understand how this unfolded locally and offer support and clarification of the Iran program moving forward.

I just got off the phone with SA Bradley Hull from Cincy, formerly case agent of Boston's MKS case where ██ is on the list to have charges dropped. He was not told of the action and the AUSA in the case said she was under strict orders from DOJ not to tell the case agents.



=======================================================
Classification: UNCLASSIFIED//FOUO

# Exhibit N

**[SPA-102]**

| | |
|---|---|
| **From:** | Belote, Carolyn D. (WMD) (FBI) |
| **Sent:** | Tuesday, November 29, 2016 9:03 PM |
| **To:** | ████████ ████; Sisk, Trevor A. (CD) (FBI) |
| **Subject:** | Fwd: Iran |

Fyi

--

-------- Original message --------
From: "Moffa, Jonathan C. (CD) (FBI)"
Date: 11/29/2016 8:41 PM (GMT-05:00)
To: "Hardiman, Kellie M. (CD) (FBI)" , "Belote, Carolyn D. (WMD) (FBI)" , "Brawley, Peter H. (CD) (FBI)" , "Velekei, Virginia E. (CD) (FBI)" , "Luckett, Sylvia L. (CD) (FBI)"
Subject: Fwd: Iran

FYI

--

-------- Original message --------
From: "Corsi, Dina M. (CD) (FBI)"
Date: 11/29/2016 8:38 PM (GMT-05:00)
To: "Paarmann, C. B. (IOD) (FBI)" , "Koerner, Heather P. (DO) (FBI)"
Cc: "Moffa, Jonathan C. (CD) (FBI)"
Subject: RE: Iran

Thanks for the info.

Dina

--

--------- Original message --------
From: "Paarmann, C. B. (IOD) (FBI)"
Date: 11/29/2016 5:53 PM (GMT-05:00)
To: "Koerner, Heather P. (DO) (FBI)"
Cc: "Strzok, Peter P. (CD) (FBI)" , "Corsi, Dina M. (CD) (FBI)"
Subject: RE: Iran

Thank you Heather - Have cc'd DAD Strzok and Corsi for their visibility.

# [SPA-103]

C. Bryan Paarmann

Deputy Assistant Director

International Operations, FBI

(o) 

(c) ████████

unclass - ███████████

**From:** Koerner, Heather P. (DO) (FBI)
**Sent:** Tuesday, November 29, 2016 9:51 AM
**To:** Paarmann, C. B. (IOD) (FBI) ; Schultz, Thomas J. (IOD) (FBI)
**Cc:** Brekke, Bradley (DO) (FBI) ; Korneski, Douglas M. (AT) (FBI)
**Subject:** FW: Iran

Hello DAD Paarmann and SC Schultz,

Passing on information and perspective from Walied Shater from Shell...

FYSA

Heather Petry Koerner

(o) ██████ | (c) ██████ | Time Zone: CST

**From:** Walied.Shater@██████ [ ██████████ ]
**Sent:** Tuesday, November 29, 2016 2:59 AM
**To:** Koerner, Heather P. (DO) (FBI)
**Subject:** Iran

Hi Heather-

Just to pass on to your analysts. It seems Trump election win having impact on doing business in Iran. We are going to sign a small deal in Iran this week ($5 million licensing agreement). We were in talks with a Japanese bank to handle the funds, but they have recently backed off, unofficially citing coming Trump presidency. European banks feeling the same way. Small amount of money, but having a dampening effect on doing business in Iran.

Regards,

Walied



Shell

**Mobile**